**UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| BESTWALL LLC,[1] | : | Case No. 17-<u>31795</u> |
| | : | |
| Debtor. | : | |
| | : | |

**DECLARATION OF TYLER L. WOOLSON
<u>IN SUPPORT OF FIRST DAY PLEADINGS</u>**

Tyler L. Woolson, being first duly sworn, deposes and states as follows:

1.       I am the Vice President and Chief Restructuring Officer of Bestwall LLC, a North Carolina limited liability company (the "<u>Debtor</u>"), which is a debtor and debtor in possession in the above-captioned chapter 11 case.  I have been the Vice President of the Debtor since its formation on July 31, 2017; I was appointed Chief Restructuring Officer on November 1, 2017.

2.       I am employed by Georgia-Pacific LLC, a Delaware limited liability company and non-debtor affiliate of the Debtor ("<u>New GP</u>"), and serve as New GP's Chief Financial Officer and Senior Vice President.  I have held these positions with New GP since its formation on July 31, 2017.  Prior to the formation of New GP, I was the Chief Financial Officer and Senior Vice President of the former Georgia-Pacific LLC ("<u>Old GP</u>"), the predecessor to the Debtor and New GP, and served in those capacities beginning in 2006.  I held other positions with affiliates of Old GP from 1995 to 2002 and then again from 2005 to 2006.  As I will discuss in more detail below, as a result of a corporate restructuring on July 31, 2017, Old GP ceased to

---

[1]       The last four digits of the Debtor's taxpayer identification number are 5815.  The Debtor's address is 100 Peachtree Street, N.W., Atlanta, GA 30303.

NAI-1502964874

exist, and the Debtor and New GP were created and succeeded to all the assets and liabilities of Old GP.

3.        Prior to my employment with Old GP or its affiliates, I was a consultant at Towers Perrin and at Finegan & Gressle, as well as an associate at Stern Stewart & Co., all focused on financial consulting.  From 2002 to 2005, I was Chief Financial Officer of Consolidated Container Company, a manufacturer of rigid plastic packaging.

4.        I earned a Bachelor of Arts degree in history from Dartmouth College in 1985.  I also earned a Master of Business Administration from Dartmouth College in 1989.

5.        On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code, as well as certain motions and other pleadings (collectively, the "First Day Pleadings").

6.        I submit this Declaration to support the First Day Pleadings and to provide certain information about the Debtor, its decision to commence this case and its objectives for this case.  I have reviewed each of the First Day Pleadings, and it is my belief that the relief sought therein is necessary to (a) avoid immediate and irreparable harm to the Debtor and/or (b) maximize and preserve the value of the Debtor's chapter 11 estate.

7.        As the Vice President and Chief Restructuring Officer of the Debtor, I am familiar with the Debtor's day-to-day operations, assets, financial condition, business affairs and books and records.  Except as otherwise indicated, all facts set forth in this declaration are based upon:  (a) my personal knowledge; (b) information supplied to me by other members of management, professionals or employees; (c) my review of relevant documents; and/or (d) my opinion based upon my experience and knowledge of the Debtor's assets, liabilities and financial

NAI-1502964874

condition.  If called upon to testify, I could and would testify competently to the facts set forth herein.

8.      Section I of this Declaration provides an overview of the Debtor's history and corporate structure.  Section II describes the corporate restructuring that occurred on July 31, 2017.  Section III describes the circumstances surrounding the commencement of this chapter 11 case, as well as the Debtor's objectives for this case.  Section IV sets forth relevant facts in support of the First Day Pleadings.

## I.      THE DEBTOR'S HISTORY AND CORPORATE STRUCTURE

9.      Old GP was initially incorporated in 1927 as a Georgia corporation under the name Georgia Hardwood Lumber Company, Inc.  It underwent several name changes in its history.  In 1944, the name of the company was changed to Georgia Hardwood Lumber Company.  The name was changed to Georgia-Pacific Plywood & Lumber Co. in 1948.  In 1951, the name was changed to Georgia-Pacific Plywood Company.  In 1956, the name was changed to Georgia-Pacific Corporation.  In December 2005, Koch Industries, Inc. ("Koch") acquired Old GP, then a publicly traded company, and Old GP became a wholly-owned subsidiary of Georgia-Pacific Holdings, LLC, a Delaware limited liability company ("GP Holdings ").  On December 29, 2006, Old GP, then a Georgia corporation, converted into a Delaware corporation, and on December 31, 2006, Old GP, then a Delaware corporation, converted into Georgia-Pacific LLC.

10.     On July 31, 2017, Old GP underwent a corporate restructuring.  As a result of that restructuring, Old GP ceased to exist and two new entities were created, each as a direct wholly owned subsidiary of GP Holdings:  (a) the Debtor in this case, which received certain of Old GP's assets related to the historical Bestwall Gypsum business and became solely responsible for certain liabilities of Old GP, including any asbestos-related liabilities of Old GP

NAI-1502964874

(other than those liabilities for which the exclusive remedy is provided under a workers' compensation statute or similar laws), and the defense and resolution of claims and lawsuits asserting those liabilities; and (b) New GP, which received all other assets of Old GP and became solely responsible for all other liabilities of Old GP.  Following the restructuring, both the Debtor and New GP were named Georgia-Pacific LLC, with the Debtor being a North Carolina limited liability company and New GP being a Delaware limited liability company. Effective November 1, 2017, to avoid confusion that might arise from the shared name upon commencement of this case, the Debtor changed its name from Georgia-Pacific LLC to Bestwall LLC.

11.    Non-debtor GP Holdings is the direct parent of the Debtor as well as non-debtor New GP.  The Debtor is the direct parent of non-debtor GP Industrial Plasters LLC, a North Carolina limited liability company ("PlasterCo").  In turn, PlasterCo is the direct parent of both non-debtor Blue Rapids Railway Company LLC, a Kansas limited liability company ("BRRC"), and non-debtor Industrial Plasters Canada ULC, a Nova Scotia unlimited company ("PlasterCo Canada").  A chart depicting the Debtor's corporate structure is attached to this Declaration as Annex 1.

12.    The Debtor manages and defends thousands of asbestos-related personal injury claims.  The Debtor's subsidiary PlasterCo, together with its wholly owned subsidiaries BRRC and PlasterCo Canada, develops, manufactures, sells and distributes gypsum plaster products, including gypsum floor underlayment, industrial plaster, metal casting plaster, industrial tooling plaster, dental plaster, medical plaster, arts and crafts plaster, pottery plaster and general purpose plaster.  PlasterCo owns or leases three operating facilities, which are located in Blue Rapids, Kansas; Las Vegas, Nevada; and Camden, New Jersey.  PlasterCo's

-4-

subsidiary BRRC operates a short line railway associated with PlasterCo's Blue Rapids, Kansas

facility.  PlasterCo's subsidiary PlasterCo Canada holds certain assets for the benefit of

the plaster business that are located in Canada.

13.     New GP, through its domestic and foreign subsidiaries, manufactures and

sells tissue, pulp, paper, packaging and building products.

14.     The Debtor has no funded indebtedness.

## II.     THE JULY 31, 2017 CORPORATE RESTRUCTURING

15.     In 1965, Old GP acquired Bestwall Gypsum Co., a Maryland corporation

("Old Bestwall").  Following the Old Bestwall acquisition, Old GP continued to expand its

businesses.  Newly acquired or developed assets or operations were integrated with existing

assets and businesses.  This happened with the Old Bestwall assets and operations, which over

time were integrated with other Old GP businesses.  At the same time, Old GP periodically

reviewed and evaluated the effectiveness of its corporate structure.  As a result, Old GP from

time to time implemented corporate restructurings, in many cases to better align particular

operations or businesses.

16.     On July 31, 2017, Old GP completed an internal corporate restructuring

(the "2017 Corporate Restructuring").  It did so for two primary reasons:  (a) to separate and

align its business of managing and defending asbestos-related claims with the assets and team of

individuals primarily related to or responsible for such claims; and (b) to provide additional

optionality regarding potential alternatives for addressing those claims in the future, including

through the commencement of a chapter 11 reorganization proceeding to utilize section 524(g) of

the Bankruptcy Code without subjecting the entire Old GP enterprise to chapter 11.  As I will

discuss in more detail below, a key objective of this restructuring was to make certain that

the Debtor had the same ability to fund the costs of defending and resolving present and future

asbestos claims as Old GP, including in connection with a chapter 11 filing.  This was achieved by including as a subsidiary of the Debtor a profitable industrial plasters business, a business that originated with Old Bestwall, and establishing a funding agreement between the Debtor and New GP.

17.     The 2017 Corporate Restructuring was effectuated through a series of transactions.  On June 26, 2017, PlasterCo and PlasterCo Canada were formed to hold the plaster business.  On July 30, 2017, Old GP purchased from Georgia-Pacific Mt. Holly LLC, an indirect subsidiary of Old GP ("GP Mt. Holly"), the land (but not the improvements) at a facility located at Mt. Holly, North Carolina (the "Mt. Holly Land") and, in connection therewith, entered into a long-term ground lease of that land to GP Mt. Holly (the "Mt. Holly Lease").  Then, on July 31, 2017, a number of transactions were effected in sequence.

- First, the plaster business was separated from other businesses of Old GP through the contribution to PlasterCo of certain U.S. assets and liabilities associated with the plaster business, including the equity interests in BRRC, and the contribution to PlasterCo Canada of certain Canadian assets and liabilities associated with the plaster business.

- The equity interests in PlasterCo Canada then were sold to PlasterCo for approximately CDN$4,000,000, such that PlasterCo Canada, like BRRC, was a direct wholly owned subsidiary of PlasterCo.

- At that point, the equity interests in PlasterCo were sold to Old GP for approximately $145,000,000, such that PlasterCo was a direct wholly owned subsidiary of Old GP.

NAI-1502964874

- Old GP then converted from a Delaware limited liability company to a Texas limited liability company and entered into a funding agreement with GP Holdings (as amended from time to time, the "Funding Agreement"), with Old GP as payee and GP Holdings as payor.

- After converting into a Texas limited liability company and entering into the  Funding Agreement, Old GP effected a divisional merger under the Texas merger statute.

- Upon the effectiveness of the divisional merger, (a) Old GP ceased to exist, (b) two new Texas limited liability companies – the Debtor and New GP – were created, and (c) all of the assets and liabilities of Old GP were allocated between the Debtor and New GP, with certain of Old GP's assets related to the historical Bestwall Gypsum business and all of Old GP's asbestos-related liabilities (other than those liabilities for which the exclusive remedy is provided under a workers' compensation statute or similar laws) and Old GP's rights as payee under the Funding Agreement being allocated to the Debtor.

- Immediately following the effectiveness of the divisional merger, (a) New GP assumed from GP Holdings the obligations as payor under the Funding Agreement, such that the Funding Agreement became an agreement between the Debtor, as payee, and New GP, as payor and (b) the Debtor and New GP entered into certain other agreements, including the secondment agreement and services agreements discussed further below.

NAI-1502964874

- Thereafter, the Debtor converted from a Texas limited liability company to a North Carolina limited liability company, and New GP converted from a Texas limited liability company to a Delaware limited liability company.

- Finally, the Funding Agreement and various other intercompany agreements of the Debtor, including the secondment and services agreements discussed further below, were amended and restated to reflect the names of the parties to those agreements at the conclusion of the 2017 Corporate Restructuring, with those agreements later being again amended and restated as of November 1, 2017 to reflect (among other updates) the Debtor's name change to Bestwall LLC.

18. Pursuant to the divisional merger, the Debtor became the sole entity responsible for Old GP's asbestos-related claims (other than claims for which the exclusive remedy is provided under a workers' compensation statute or similar laws). In addition, the Debtor received, among others, the following assets:

(a) Three bank accounts and approximately $32 million in cash;

(b) All contracts of Old GP related to its asbestos-related litigation, including settlement agreements, service contracts, engagement and retention contracts and two insurance policies with minimal amounts of potential coverage that were issued by insurers that are in insolvency proceedings;

(c) The Mt. Holly Land and the rights as lessor under the Mt. Holly Lease;

(d) All equity interests in PlasterCo;

(e) Causes of action that relate to the assets and liabilities allocated to the Debtor;

(f) Records exclusively relating to the assets and liabilities allocated to the Debtor; and

(g) Privileges relating to these matters.

-8-

Pursuant to the divisional merger, all other assets and liabilities of Old GP were allocated to New

GP, with ownership of such other assets vesting in New GP and New GP becoming the sole

obligor for such other liabilities.

19.     As I mentioned above, the 2017 Corporate Restructuring was carefully

designed to ensure that the Debtor has the same ability to fund asbestos claims that Old GP had.

To that end, the Debtor received the equity of PlasterCo, which we project will generate

approximately $14 million in EBITDA in 2018 and approximately $18 million in the years

thereafter.  Based on a valuation analysis, we believe that PlasterCo and its subsidiaries have

a value of approximately $145 million, including cash on hand.  In addition, as part of the 2017

Corporate Restructuring, the Debtor received $32 million in cash and entered into the Funding

Agreement with New GP.[2]

20.     Significantly, the Funding Agreement is not a loan agreement.  Instead,

without any corresponding repayment obligation by the Debtor, it requires New GP to provide

funding to pay for all costs and expenses of the Debtor incurred in the normal course of its

business either (a) in the absence of a bankruptcy case or (b) during the pendency of any

chapter 11 case, including the costs of administering the chapter 11 case, in both cases to

the extent that any cash distributions received by the Debtor from its subsidiaries are insufficient

to pay such costs and expenses.  In addition, and again in the absence of any corresponding

repayment obligation by the Debtor, the Funding Agreement requires New GP to fund any

amounts necessary or appropriate to satisfy the Debtor's asbestos-related liabilities in the absence

of a bankruptcy case and also obligates New GP, in the event of a chapter 11 filing, to provide

---

[2]     A copy of the Funding Agreement in effect as of the Petition Date (without its Schedule 2 that includes
confidential bank account information) is attached hereto as Annex 2.  The summary of the terms of the
Funding Agreement in this Declaration is qualified in all respects by the more detailed terms contained in
the Funding Agreement.

NAI-1502964874

the funding for a section 524(g) asbestos trust in the amount required by a confirmed plan of

reorganization for the Debtor, again in both cases to the extent that the Debtor's assets are

insufficient to provide the requisite trust funding.

21.     To ensure that the Debtor has access to services necessary to the effective

operation of its businesses, in connection with the 2017 Corporate Restructuring, the Debtor and

New GP entered into a services agreement pursuant to which New GP provides the Debtor with

certain centralized corporate and administrative services, including legal, accounting, tax, human

resources, information technology, risk management and other support services (including

information retention and records management).  In addition, the Debtor and New GP entered

into a secondment agreement, pursuant to which New GP assigned to the Debtor on a full-time

basis, certain of its employees, including the in house legal team that primarily manages

the defense of the asbestos-related claims.  As a result of the divisional merger, the Debtor also is

party to a secondment agreement with non-debtor affiliate Georgia-Pacific Building Products

LLC, pursuant to which that entity has assigned to the Debtor an employee who provides finance

and related services.

22.     PlasterCo, PlasterCo Canada and the Debtor entered into a cash pooling

agreement that provides for a coordinated cash system among the Debtor and its subsidiaries.

In addition, PlasterCo and New GP entered into a services agreement pursuant to which New GP

provides the same array of needed corporate and administrative services to PlasterCo that it

provides to the Debtor.  Further, although PlasterCo is profitable and generates positive cash

flow, PlasterCo and New GP entered into a revolving credit agreement that permits PlasterCo to

access capital to address any liquidity needs that may arise as a result of working capital

requirements or timing issues.  New GP and Plasters Canada also have entered into a revolving

loan arrangement by which New GP provides Plasters Canada with access to additional capital.

## III.   EVENTS LEADING TO THE COMMENCEMENT OF THIS CASE AND THE DEBTOR'S OBJECTIVES FOR ITS CHAPTER 11 REORGANIZATION

### A.   Asbestos-Related Claims Against the Debtor

23.     As described more fully in the Debtor's Informational Brief filed with

the Court concurrently with this Declaration, this chapter 11 case has been precipitated by

the ongoing onslaught of asbestos-related claims filed or asserted against the Debtor –

a phenomenon that is projected to continue for decades into the future.

24.     The Debtor traces its history to Old Bestwall's gypsum business that was

acquired by Old GP in 1965 and then merged into Old GP.  Old Bestwall was a spin-off of

Certain-Teed Products Company that manufactured wallboard, joint compound products and

industrial plasters.  Old GP continued to sell these products following its acquisition of Old

Bestwall and operated this business as the "Gypsum Division."

25.     The Debtor and its predecessor, Old GP, have faced hundreds of

thousands of asbestos-related lawsuits dating back to at least 1979.  Overall, the Debtor and Old

GP, over the last nearly 40 years, have spent approximately $2.9 billion defending and resolving

more than 430,000 personal injury lawsuits relating to alleged asbestos exposure.  The Debtor

and Old GP have paid over $2 billion of that amount out of pocket (that is, net of insurance)[3] and

Old GP had become one of the most frequently sued defendants in asbestos litigation.  As of

September 30, 2017, there are approximately 64,000 asbestos-related claims pending against

the Debtor in nearly every state and certain territories of the United States, including

---

[3]     Approximately 30% of this amount was covered by insurance before such insurance was almost entirely exhausted in 2013.

NAI-1502964874

approximately 22,000 that are being actively litigated and approximately 13,300 claims pending

on inactive dockets in various jurisdictions.[4]  The Debtor expects that thousands of additional

claims will be filed or asserted against it every year for decades to come.

      **B.**          **The Costs and Burdens of Managing the Asbestos Litigation Are Significant**

      26.      For years, Old GP was a relatively insignificant asbestos defendant and

bore a relatively small financial burden from this litigation.  During the first 20 or more years of

its involvement in asbestos litigation, Old GP was named in a relatively small number of cases

and its defense and indemnity costs were correspondingly small.  After the wave of bankruptcy

filings in 2000 and 2001 by co-defendants, which until then were the primary targets of the

plaintiffs, the number of mesothelioma claims against Old GP began to skyrocket.



---

[4]      "Claims" refers to parties alleging injury and not lawsuits.  Some asbestos claimants have more than one
lawsuit pending against the Debtor or Old GP at any given time.  In addition to the open and inactive
claims, the Debtor has approximately 28,700 claims that have been resolved or dismissed but for which
those resolutions or dismissals have not been finalized.

NAI-1502964874

27.     As the number of mesothelioma cases in which Old GP was identified increased exponentially, so too did the costs of this litigation, including growing costs to resolve these cases.  In the years between 2000 and 2017, Old GP paid on average $125,000 per mesothelioma claim, which was up to five times on average the amount it typically paid in the 1990s.



Average payments for mesothelioma claims by payment year

*  2017 numbers for the partial year through October 31, 2017

28.     In addition, Old GP and the Debtor were required to engage a large number of outside professionals, including defense firms and experts.  In that regard, the Debtor managed roughly 50 outside defense firms around the country, including approximately 35 local

-13-

counsel and 15 special counsel and trial counsel. From 2012 to 2016, an average of approximately 660 attorneys, paralegals and other time keepers at these firms billed Old GP approximately 150,000 hours each year to defend its asbestos lawsuits. That was in addition to the time of nearly 40 experts and various data management and discovery vendors. Despite consistent efforts to negotiate the most favorable rates for its professionals and manage cases efficiently, the costs of defending Old GP's asbestos lawsuits in 2016 exceeded $40 million.

29.    The overall costs to resolve these cases likewise continued unabated. During the 2012 to 2016 time period, Old GP incurred asbestos-related defense and indemnity costs of approximately $160 million a year on average. During the past two full years, total costs were the highest in over a decade—approximately $184 million in 2015 and $174 million in 2016— and, through October 31 of this year, Old GP and the Debtor's total costs were approximately $200 million.

30.    The exodus from the tort system by co-defendants continues to exacerbate the situation. Significantly, most, if not all, of the other significant joint compound manufacturers already have filed for bankruptcy to resolve their asbestos liabilities. These current or former competitors include National Gypsum Company, The Flintkote Company, United States Gypsum Company, Bondex International, Inc. and, most recently, Kaiser Gypsum Company. This left the Debtor as the last major joint compound maker remaining in the tort system.

31.    The asbestos litigation and its attendant financial burdens are projected to continue through at least 2050. At this point, the Debtor can only assume that its future in the tort system, like the past, will be substantially worse than even the most conservative projections.

NAI-1502964874

32.     All these factors, and the prospect of even higher costs in the tort system for decades to come, prompted the Debtor's consideration of a chapter 11 filing.

### C.     The Decision to File for Chapter 11 Reorganization

33.     After careful review of the situation and potential options, the Debtor concluded that the commencement of a chapter 11 case in this Court was prudent and necessary and was the best alternative available under the circumstances.  The considerable burden of the massive asbestos litigation is ongoing and projected to continue for decades.  The costs and administrative burdens of the litigation could even have become substantially greater than they were in the years leading up to the filing.

34.     The Debtor's goal in this case is to negotiate, obtain approval of and ultimately consummate a plan of reorganization that would, among other things, provide for (a) the creation and funding of a trust established under section 524(g) of the Bankruptcy Code to pay valid asbestos-related claims and (b) issuance of an injunction under section 524(g) of the Bankruptcy Code that will permanently protect the Debtor and its affiliates from any further asbestos claims arising from products manufactured and sold by, or operations or conduct of, Old Bestwall or Old GP.  As I understand section 524(g) of the Bankruptcy Code, it contemplates, among other things, that we negotiate an agreement to fund a trust with representatives of current and future claimants, requires approval of any agreement by 75% or more of the current asbestos claimants and provides for review and approval of that agreement by two different federal courts.  The Debtor is prepared to commit the necessary resources to both satisfy the various requirements of section 524(g) and reach an agreement with the claimants' representatives on an acceptable and confirmable plan of reorganization as soon as possible.

-15-

IV.   **FIRST DAY PLEADINGS**

35.    Concurrently with the filing of this chapter 11 case, the Debtor filed First Day Pleadings requesting various forms of relief.

36.    The Debtor will move for entry of an order scheduling an expedited hearing on certain of the First Day Pleadings.[5]  The Debtor anticipates that the Court will conduct a hearing soon after the commencement of its chapter 11 case (the "First Day Hearing") at which the Court will hear and consider certain of the First Day Pleadings.  The Debtor also anticipates that the Court will consider the remainder of the First Day Pleadings at a later time.  The First Day Pleadings that the Debtor anticipates will be heard at the First Day Hearing are described in Section IV.A and IV.B below.  The remaining First Day Pleadings are described in Section IV.C below.

37.    Generally, the purpose of the First Day Pleadings is to (a) obtain authorization for the continued use of the Debtor's bank accounts and operation under other key agreements with its affiliates; (b) extend and apply the automatic stay to certain non-debtors;[6] and (c) establish procedures for the smooth and efficient administration of this chapter 11 case. I have reviewed each of the First Day Pleadings, including the exhibits thereto, and I believe that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve a successful reorganization.

---

[5]    Capitalized terms used below in the descriptions of the First Day Pleadings and not otherwise defined have the meanings given to them in the applicable First Day Pleadings.

[6]    Relief relating to the extension or application of the automatic stay to certain non-debtor affiliates is supported by a separate declaration of J. Joel Mercer, Jr. filed concurrently herewith.

NAI-1502964874

A.      **The Case Administration Motions**

*Appointment of Claims, Noticing and Voting Agent*

38.      The Debtor will seek the entry of an order appointing Donlin, Recano and

Company, Inc. ("DRC") as claims and noticing agent in this chapter 11 case.  I understand that

DRC may, among other things:  (a) prepare and serve all notices required in the Debtor's

chapter 11 case, including notice of the commencement of this cases and the meeting of creditors

pursuant to section 341 of the Bankruptcy Code; (b) maintain the official claims register; and

(c) assist with the mailing and tabulation of ballots in connection with any vote to accept or

reject any plan or plans proposed in this chapter 11 case.  The Debtor obtained and reviewed

engagement proposals from four other claims and noticing agents to ensure selection through

a competitive process.  The Debtor submits, based on all engagement proposals obtained and

reviewed, that DRC's rates are competitive and reasonable given DRC's quality of services and

expertise.

*Request to (I) File List of the Top Law Firms With Asbestos Cases Against the Debtor
in Lieu of the List of the 20 Largest Unsecured Creditors; and (II) Approve Certain
Notice Procedures for Asbestos Claimants*

39.      I understand that, at the inception of these cases, the Bankruptcy

Administrator is expected to appoint an official committee of asbestos claimants consisting of

asbestos plaintiff law firms.  The Debtor does not believe that listing the individual

asbestos-related claimants with the largest unsecured claims against the Debtor would facilitate

the Bankruptcy Administrator's appointment of an asbestos creditors' committee.  Instead,

because I understand that an asbestos claimants' committee typically consists of asbestos plaintiff

law firms acting on behalf of individual asbestos-related claimants, the Debtor will seek

authority to provide the Bankruptcy Administrator with a list of the 25 law firms with the most

significant representations of claimants, based on the volume of filings, scope of payments or

-17-

related factors, across the major types of claims faced by the Debtor (a "Top Asbestos Counsel List"), in lieu of listing the individual asbestos claimants with the largest unsecured claims against the Debtor on a "Top 20" list of unsecured creditors.  The Debtor believes that providing the Bankruptcy Administrator with a Top Asbestos Counsel List would better assist the Bankruptcy Administrator in forming such a committee.

40.     The Debtor also will seek Court approval to (a) serve all notices, mailings, filed documents and other communications relating to the chapter 11 case on individuals (collectively, the "Asbestos Claimants") who are claimants in asbestos-related personal injury lawsuits or other proceedings involving the Debtor, or who have similar claims asserted through counsel, in care of their counsel (collectively, the "Asbestos Firms") at such counsel's address, as further described in the Motion; and (b) list the names, addresses and other contact information, as applicable, of the Asbestos Firms in any creditor or service lists in lieu of listing the contact information of individual Asbestos Creditors.

41.     The proposed notice procedures (collectively, the "Asbestos Notice Procedures") provide for an effective and appropriate noticing process for the Asbestos Claimants.  Further, implementing the Asbestos Notice Procedures would alleviate the administrative burden and expense of gathering current contact information for each of the Asbestos Claimants, which, in many cases, is not readily available or is difficult to verify. The Debtor has access to the names and addresses of the counsel for the Asbestos Claimants (including counsel of record in pending lawsuits), but the names and addresses of a significant number of individual Asbestos Claimants themselves are not readily available.  It would be extremely burdensome, costly and time-consuming for the Debtor to attempt to obtain this information.  In addition, any contact information for the individual Asbestos Claimants

-18-

the Debtor has or is able to obtain may be outdated and unreliable.  Consequently, providing

notice in this chapter 11 case in accordance with the Asbestos Notice Procedures will be more

efficient and reliable than providing notice to the individual Asbestos Claimants directly.

### *Extension of Time to File Schedules*

42.     The Debtor believes it will need additional time beyond the time period

allotted under the Bankruptcy Code to assemble all of the information necessary to complete and

file the required schedules of assets and liabilities, schedule of executory contracts and unexpired

leases and statement of financial affairs (collectively, the "Schedules").  The Debtor will need the

additional time because of (a) the size and complexity of this chapter 11 case and (b) the volume

of material that must be compiled and reviewed by the Debtor's limited staff to complete the

Schedules during the hectic early days of this restructuring.  As of the Petition Date, the Debtor

has approximately 64,000 pending claims against it in nearly every state and certain territories of

the United States.  As a result, the Debtor's chapter 11 case will involve tens of thousands of

creditors and other parties in interest.

43.     The additional time requested is important to help ensure that

the Schedules are as accurate as possible.  Given the volume of information that is provided in

the Schedules, and the fact that the information must be accurate as of the Petition Date,

additional time to complete the Schedules will help ensure that the relevant information is fully

collected and evaluated and can be incorporated into the relevant filings.  Rushing to complete

the Schedules soon after the Petition Date, on the other hand, could compromise their

completeness.  Accordingly, the Debtor will seek to extend the deadline by which it must file its

Schedules to Monday, December 18, 2017, without prejudice to the Debtor's right to seek a

further extension for cause.

NAI-1502964874

**B.** **Request to Continue Using Bank Accounts, Cash Management System and Related Relief**

44.     The Debtor will seek approval of the continued use of its prepetition bank accounts, as well as the authority to open and close bank accounts during the chapter 11 case, as necessary or appropriate.  In the ordinary course of business, the Debtor maintains three bank accounts (the "Bank Accounts") at Bank of America, N.A. in Charlotte, North Carolina.  One of the Debtor's Bank Accounts serves as a concentration account (the "Concentration Account") where all incoming cash is maintained.  All payments and other funds that are received by the Debtor are deposited into that account, including cash from New GP under the Funding Agreement and cash swept from the accounts of the Debtor's subsidiaries in accordance with the Cash Pooling Agreement.  Another account serves as a general disbursement account (the "Disbursement Account") and is used to pay all of the Debtor's costs and expenses, including professional fees, other than payments made by wire tranfer.  The Disbursement Account is maintained as a zero balance account, and is funded by transfers of the Debtor's cash from the Concentration Account on an as-needed basis.  The final Bank Account is a segregated account (the "Segregated Account") funded with $15 million that was part of the initial cash funding of the Debtor upon its formation.  Funds in the Segregated Account are expected to be held to support the overall restructuring through a section 524(g) trust.

45.     The Debtor maintains, in the ordinary course, a process for collecting, holding and disbursing cash using these Bank Accounts through its "Cash Management System." The Debtor's Cash Management System is consistent with the Cash Pooling Agreement and the Funding Agreement and is accurately described in the Motion.  The Cash Management System promotes the central management of cash assets of the Debtor and its affiliates.  Among other things, it ensures adequate liquidity among the Debtor's Bank Accounts and its subsidiaries

NAI-1502964874

and maximizes the efficiency of their financial management and accounting. Continued use of

the Cash Management System, as it is accurately described in the First Day Papers, and

continued performance under the Cash Pooling Agreement is in the best interest of the Debtor's

estate and parties in interest. The Debtor therefore will request authority to maintain its

prepetition Cash Management System.

46.     In addition, the Debtor will request authority for Bank of America, and

any other bank that may hold a bank account of the Debtor during the chapter 11 case

(collectively, the "Bank"), to charge, and the Debtor to pay or honor, both prepetition and

postpetition service and other fees, costs, charges and expenses to which the Bank may be

entitled in accordance with its contractual arrangements with the Debtor. Further, the Debtor

will request that the Court authorize the Bank to charge back returned items to the Bank

Accounts in the normal course of business. The Debtor requires this relief to minimize

disruption to the Bank Accounts and to assist in accomplishing a smooth transition to operating

in chapter 11.

47.     The Bank Accounts are insured by the United States through the Federal

Deposit Insurance Corporation (the "FDIC") and are maintained at a large, well known and well

capitalized institution. Therefore, the Debtor will seek a waiver of section 345(b) of the

Bankruptcy Code in this case to the extent that the funds maintained in the Bank Accounts or any

other domestic accounts during this chapter 11 case exceed the amount insured by the FDIC or

the Federal Savings & Loan Insurance Corporation.

48.     To protect against the possible inadvertent payment of prepetition claims,

the Debtor will advise Bank of America not to honor checks issued prior to the Petition Date,

except as otherwise expressly permitted by an order of the Court and directed by the Debtor.

NAI-1502964874

The Debtor has the capacity to draw the necessary distinctions between prepetition and

postpetition obligations and payments without closing the Bank Accounts and opening new ones.

49.     In the ordinary course of its business, the Debtor uses checks and other

business forms (collectively, the "Business Forms").  The Debtor will request that it not be

required to include the legend "D.I.P.," or any other debtor in possession designation, and

the corresponding bankruptcy case number, on its Business Forms because such alteration is not

necessary in this case.  The Debtor has relatively few business relationships, and the parties it

conducts business with (such as law firms) are expected to be well aware of the Debtor's status as

debtor in possession.

### C.     Anticipated First Day Pleadings To Be Heard at a Later Hearing

***Request to Continue Operating Under Certain Intercompany Agreements***

50.     The Debtor is a party to certain agreements with non-debtor affiliates

(collectively, the "Intercompany Agreements") that are essential to its day-to-day operations.

The transactions contemplated by the Intercompany Agreements are ordinary course

transactions.  Nevertheless, out of an abundance of caution and because the counterparties to

the Intercompany Agreements are non-debtor affiliates of the Debtor, the Debtor will seek

confirmation of its authority to continue to perform under the Intercompany Agreements.

51.     Broadly, the Intercompany Agreements consist of:  (a) secondment

agreements whereby employees of the Debtor's non-debtor affiliates are seconded to work for the

Debtor; and (b) services agreements, whereby (i) New GP provides the Debtor with a wide array

of corporate and administrative services that are critical for the day-to-day operation of its

business or (ii) the Debtor provides certain services, as performed by the seconded employees, to

certain non-debtor affiliates.  I have reviewed the descriptions of the Intercompany Agreements

NAI-1502964874

set forth in the Motion and have determined that they are fair and accurate to the best of my

knowledge, information and belief.

52.     The Intercompany Agreements are critical to provide the Debtor with

the day-to-day services and employees that are essential to the support and management of its

business.  Further, they provide the Debtor with uninterrupted access to the services of

experienced employees with significant historical knowledge and expertise relating to

the Debtor's (a) administrative and business operations and (b) asbestos-related claims.

They also permit the Debtor to provide reciprocal services to its affiliates.  It would be unduly

burdensome and costly for each affiliated entity (particularly the Debtor) to establish its own

duplicative systems, programs and capabilities.  As such, even before the 2017 Corporate

Restructuring, Old GP and its affiliates used similar intercompany arrangements for years.  If

the Debtor were unable to receive employee and other services under certain Intercompany

Agreements, the Debtor likely would need to contract with a different provider to receive such

integral services, and any such contract with a different provider would not be expected to be on

such favorable terms.

53.     The costs associated with the Intercompany Agreements, in each case, are

fair and reasonable.  For instance, the Debtor pays only the cost of the base salary of

the seconded employees, and does not bear the many other costs associated with their

employment, including employee benefits, employee taxes, employee withholding, trust funds,

surcharges, allowances or deductions arising out of or relating to their employment or payment

of their compensation.  Moreover, the fees relating to the services agreements are provided at

the cost to the service provider or with a modest mark-up that has been determined to be a fair

market price by a transfer pricing analysis conducted by an independent third party.  Therefore,

NAI-1502964874

because the Intercompany Agreements are essential to the Debtor's continued operations, and are ordinary course and fair and reasonable, the Debtor will request authority to continue to perform under them.

### Professional Retention Applications

54.     The retention of certain chapter 11 professionals is essential to the Debtor's reorganization efforts.  Accordingly, the Debtor will seek to retain various professionals to represent and assist it in connection with this chapter 11 case.  These professionals include:  (a) Jones Day as bankruptcy counsel; (b) Robinson, Bradshaw & Hinson, P.A. as special counsel for asbestos claim estimation matters and local bankruptcy counsel; (c) Schachter Harris LLP as special litigation counsel for medical science issues; (d) King & Spalding as special counsel for asbestos matters; and (e) Bates White, LLC as asbestos consultants.

### Interim Compensation

55.     The Debtor's chapter 11 case is a large and complex case that requires significant investment of time and resources by the professionals retained by the Debtor. Establishing an orderly, regular process for the allowance and payment of compensation and reimbursement of expenses for retained professionals will prevent such professionals from bearing the unjust burden of funding this chapter 11 case, and will enable the Debtor to closely monitor the costs of administration and establish consistent procedures to pay such costs.

56.     Therefore, the Debtor has proposed that, except as otherwise provided in an order of the Court authorizing the retention of a particular retained professional, all retained professionals be permitted to seek interim payment of compensation and reimbursement of expenses in accordance with the procedures proposed in the Motion.

NAI-1502964874

### *Ordinary Course Professionals*

57.    The Debtor's members and management, in the performance of their duties, call upon certain professional that provide ordinary course services that are not directly related to this chapter 11 case (the "Ordinary Course Professionals") – including, in particular, attorneys – to provide professional services to assist them in carrying out their assigned duties and responsibilities in the ordinary course of the Debtor's business.  These Ordinary Course Professionals provide valuable assistance in addressing issues of importance to the Debtor and its business, particularly in connection with the management of the Debtor's asbestos-related litigation.

58.    The Debtor desires to employ the Ordinary Course Professionals, as and when requested by the Debtor, to render professional and other services to its estate in the same manner and for the same general purposes as such services were provided prior to the Petition Date.  To avoid potential disruptions, it is important that the Debtor continues to have the ability to employ the Ordinary Course Professionals (e.g., for defense counsel, to provide services related to the cases they have been defending), many of whom are familiar with the Debtor's business and affairs, including the thousands of pending litigation matters.

59.    Although most of the Ordinary Course Professionals are counsel in asbestos-related litigation that I understand is expected to remain stayed under section 362 of the Bankruptcy Code, services from these professionals may be needed from time to time. For example, the Debtor may require services in asbestos litigation relating to filing stay notices, addressing potential stay violations, monitoring dockets and providing information about these cases that is not available from any other source.  However, without assurance that the Debtor is authorized to use and pay these parties, I believe that many Ordinary Course Professionals may

-25-

be reluctant to assist the Debtor when needed.  Therefore, the Debtor will request approval of

certain procedures for the engagement and compensation of Ordinary Course Professionals.

## **CONCLUSION**

60.     For all the reasons described herein and in the First Day Pleadings,

I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

*[Remainder of page intentionally left blank.]*

NAI-1502964874

Dated:  November 2, 2017

/s/  *Tyler L. Woolson*
Tyler L Woolson

**<u>Annex 1</u>**

Corporate Structure Chart



**Organizational Structure
of
Bestwall LLC**

NAI-1502964874

## **Annex 2**

Funding Agreement

## SECOND AMENDED AND RESTATED FUNDING AGREEMENT

This SECOND AMENDED AND RESTATED FUNDING AGREEMENT, dated as of November 1, 2017, but effective as of July 31, 2017 (as it may be amended, restated, modified or supplemented from time to time, this "Agreement"), is between GEORGIA-PACIFIC LLC, a Delaware limited liability company ("Payor"), and BESTWALL LLC, a North Carolina limited liability company ("Payee").

RECITALS

A.      On July 31, 2017, (1) Georgia-Pacific Holdings, LLC, a Delaware limited liability company ("GP Holdings"), in its capacity as the sole member of Georgia-Pacific LLC, a Texas limited liability company ("GP (TX)"), approved a Plan of Divisional Merger with respect to GP (TX) (the "Plan of Merger") and (2) contemporaneously therewith, GP Holdings and GP (TX) executed and delivered a Funding Agreement, dated as of July 31, 2017 (the "Original Funding Agreement").

B.      On July 31, 2017, at the effective time of the merger contemplated by the Plan of Merger (the "Merger"), (1) certain assets of GP (TX), as set forth on Schedule 5(b)(i) to the Plan of Merger, were allocated to a new Texas limited liability company having the name "Georgia-Pacific LLC" that was created upon the effectiveness of the Merger ("GP NC (TX)"); (2) certain liabilities of GP (TX), as set forth on Schedule 5(c)(i) to the Plan of Merger (together with the assets described in the preceding clause (1), collectively, the "Allocated Assets and Liabilities"), were allocated to GP NC (TX); (3) the remaining assets and liabilities of GP (TX) were allocated to a new Texas limited liability company having the name "Georgia Pacific DE LLC" that was created upon effectiveness of the Merger ("GP DE (TX)"); and (4) GP (TX) ceased to exist.

C.      In connection with the allocation to GP NC (TX) of the Allocated Assets and Liabilities, GP Holdings agreed, pursuant to the Original Funding Agreement, to provide funding to GP (TX) sufficient to pay the costs of operations of the Payee's business and other liabilities included in the Allocated Assets and Liabilities as and when they become due.

D.      The Allocated Assets and Liabilities included the rights and obligations of GP (TX) under the Original Funding Agreement, and, at the effective time of the Merger, pursuant to the terms and conditions of the Plan of Merger, the rights and obligations of GP (TX) under the Original Funding Agreement were allocated to GP NC (TX) such that, following the effectiveness of the Merger, on July 31, 2017, GP NC (TX) had assets having a value at least equal to its liabilities and had financial capacity sufficient to satisfy its obligations as they become due in the ordinary course of business, including any Asbestos Related Liabilities.

E.      Immediately following the effectiveness of the Merger, on July 31, 2017, GP Holdings assigned to GP DE (TX), and GP DE (TX) assumed from GP Holdings, all rights and obligations of GP Holdings under the Original Funding Agreement (such assignment and assumption, the "Post-Merger Assignment"), whereupon GP Holdings was released from its obligations, and ceased to have any further obligations, under the Original Funding Agreement.

F.      Following the Merger and the Post-Merger Assignment, on July 31, 2017, (1) GP DE (TX) effected a conversion (the "DE Conversion") into Payor, a Delaware limited liability company having the name "Georgia-Pacific LLC," and (2) GP NC (TX) effected a conversion (the "NC Conversion") into Payee, a North Carolina limited liability company then having the name "Georgia-Pacific LLC."

G.     On July 31, 2017, Payor and Payee amended and restated the Original Funding Agreement to reflect that the Merger, the Post-Merger Assignment, the DE Conversion and the NC Conversion had occurred, that Payor was then a Delaware limited liability company having the name "Georgia-Pacific LLC" and that Payee was a North Carolina limited liability company then having the name "Georgia-Pacific LLC" (the "A&R Funding Agreement").

H.     Following the execution and delivery of the A&R Funding Agreement, Payee has effected a change in its name from "Georgia-Pacific LLC" to "Bestwall LLC" (the "Bestwall Name Change").

I.     Payor and Payee now desire to amend and restate the A&R Funding Agreement to reflect that the Bestwall Name Change has occurred and that Payee is a North Carolina limited liability company now having the name "Bestwall LLC."

AGREEMENT

In consideration of the foregoing, the parties hereto agree as follows:

1.     **Definitions**.  As used in this Agreement, the following terms have the meanings herein specified unless the context otherwise requires:

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.  For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

"Allocated Assets and Liabilities" has the meaning specified in the recitals to this Agreement.

"A&R Funding Agreement" has the meaning specified in the recitals to this Agreement.

"Asbestos Related Liabilities" has the meaning specified in Schedule 1 to this Agreement.

"Bankruptcy Case" means any voluntary case under chapter 11 of the Bankruptcy Code commenced by the Payee in the Bankruptcy Court.

"Bankruptcy Code" means Title 11 of the United States Code, as amended from time to time and any successor statute and all rules and regulations promulgated thereunder.

"Bankruptcy Court" means the United States Bankruptcy Court where the Bankruptcy Case is commenced.

"Base Rate" means, for any day, a fluctuating interest rate per annum as shall be in effect from time to time, which rate per annum shall at all times be equal to the greater of: (a) the rate of interest established by Bank of America, N.A from time to time, as its "prime rate," whether or not publicly announced, which interest rate may or may not be the lowest rate charged by it for commercial loans or other extensions of credit; and (b) the Federal Funds Effective Rate in effect from time to time, determined one Business Day in arrears, plus 1/2 of 1% per annum.

"Bestwall Name Change" has the meaning specified in the recitals to this Agreement.

"Board" means: (a) with respect to a corporation, the board of directors of the corporation or any committee thereof; (b) with respect to a partnership, the board of directors of the general partner of the partnership; (c) with respect to a limited liability company, the managing member or members or the board of managers, as applicable, of the limited liability company; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Business Day" means each day other than a Saturday, a Sunday or a day on which banking institutions in Charlotte, North Carolina or at a place of payment are authorized by law, regulation or executive order to remain closed.

"Capital Lease Obligation" means, at the time any determination is to be made, the amount of the liability in respect of a capital lease that would at that time be required to be capitalized on a balance sheet in accordance with GAAP.

"Capital Stock" means: (a) in the case of a corporation, corporate stock; (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock; (c) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding (in each case of (a) through (d) above) any debt securities convertible into such equity securities.

"Contractual Obligation" means, as to any Person, any obligation or similar provision of any security issued by such Person or any agreement, instrument or other undertaking (excluding this Agreement) to which such Person is a party or by which it or any of its property is bound.

"Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"DE Conversion" has the meaning specified in the recitals to this Agreement.

"District Court" means the United States District Court in the district of the Bankruptcy Court.

"Event of Default" has the meaning specified in Section 6.

"Federal Funds Effective Rate" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York.

"Funding Account" means the account of the Payee listed on Schedule 2 to this Agreement, into which the proceeds of all Payments made under this Agreement shall be deposited, or such other account designated in writing by the Payee to the Payor from time to time.

"Funding Date" has the meaning specified in Section 2(b).

"Funding Request" has the meaning specified in Section 2(b).

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified

Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, in effect from time to time, consistently applied.  If at any time any change in GAAP (including any adoption of International Financial Reporting Standards) would materially affect the computation of any amount required to be computed under this Agreement, the Payor may give written notice to the Payee of its intent to preserve the original intent of this Agreement and upon delivery of such notice, such amounts shall be calculated in accordance with GAAP as in effect at the end of the fiscal period ended immediately prior to such change in GAAP.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"GP (DE)" has the meaning specified in the recitals to this Agreement.

"GP DE (TX)" has the meaning specified in the recitals to this Agreement.

"GP Holdings" has the meaning specified in the recitals of this Agreement.

"GP (NC)" has the meaning specified in the recitals to this Agreement.

"GP NC (TX)" has the meaning specified in the recitals to this Agreement.

"GP (TX)" has the meaning specified in the recitals of this Agreement.

"Merger" has the meaning specified in the recitals to this Agreement.

"NC Conversion" has the meaning specified in the recitals to this Agreement.

"Organizational Documents" means, (a) with respect to any corporation, its certificate or articles of incorporation and bylaws, (b) with respect to any limited liability company, its certificate or articles of formation or organization and operating agreement, and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation of such entity.

"Original Funding Agreement" has the meaning specified in the recitals to this Agreement.

"Payee" has the meaning specified in the first paragraph of this Agreement.

"Payee Affiliate" means any wholly owned Affiliate of the Payee (and in no case includes the Payor or any Payor Affiliate).

"Payee Material Adverse Effect" means (a) a material impairment of the rights and remedies of the Payor under this Agreement, or of the ability of the Payee to perform its material obligations under this Agreement, or (b) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payee.

"Payment" has the meaning specified in Section 2(a).

"Payor" has the meaning specified in the first paragraph of this Agreement.

"Payor Affiliate" means any wholly owned Affiliate of the Payor (and in no case includes the Payee or any Payee Affiliate).

"Payor Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the business, assets, liabilities (actual or contingent) or financial condition of the Payor and its Subsidiaries, taken as a whole, (b) a material impairment of the rights and remedies of the Payee under this Agreement, or of the ability of the Payor to perform its material obligations under this Agreement, or (c) a material adverse effect upon the legality, validity or enforceability of this Agreement against the Payor.

"Permitted Funding Use" means each of the following:  (a) the payment of any and all costs and expenses of the Payee incurred in the normal course of its business (including, without limitation, the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee) at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee; (b) the payment of any and all costs and expenses of the Payee incurred during the pendency of any Bankruptcy Case that are necessary or appropriate in connection therewith, including the costs of administering the Bankruptcy Case and any and all other costs and expenses of the Payee incurred in the normal course of its business (including, without limitation, the payment of any indemnification or other obligations of the Payee owing to any managers or officers of the Payee); (c) the funding of any amounts necessary or appropriate to satisfy (i) the Payee's Asbestos Related Liabilities established by a judgment of a court of competent jurisdiction or final settlement thereof at any time when there is no proceeding under the Bankruptcy Code pending with respect to the Payee, (ii) following the commencement of any Bankruptcy Case, the Payee's Asbestos Related Liabilities in connection with the funding of a trust under section 524(g) of the Bankruptcy Code for the benefit of existing and future claimants that is included in a plan of reorganization for the Payee confirmed by a final, nonappealable order of the Bankruptcy Court and the District Court, and (iii) in the case of either (i) or (ii), any ancillary costs and expenses of the Payee associated with such Asbestos Related Liabilities and any litigation thereof, including the costs of any appeals; (d) the funding of any amounts necessary to cause the Funding Account to contain at least $5,000,000 at such time; and (e) the funding of any obligations of the Payee owed to the Payor or any Payor Affiliate, including, without limitation, any indemnification or other obligations of the Payee under any agreement provided for in the Plan of Merger; in the case of clauses (a) through (e) above, solely to the extent that any cash distributions theretofore received by the Payee from its Subsidiaries are insufficient to pay such costs and expenses and fund such amounts and obligations in full and further, in the case of clause (c)(ii) above, solely to the extent the Payee's other assets are insufficient to fund amounts necessary or appropriate to satisfy the Payee's Asbestos Related Liabilities in connection with the funding of such trust.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, or government or any agency or political subdivision thereof.

"Plan of Merger" has the meaning specified in the recitals to this Agreement.

"SEC" means the Securities and Exchange Commission.

"Subsidiary" means any Person a majority of the outstanding Voting Stock of which is owned or controlled by the Payor or by one or more other Subsidiaries and that is consolidated in the Payor's accounts.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of such Person.

2.      **Funding Obligations and Procedures**.

(a)      Funding Obligations.  The Payor hereby agrees, on the terms and conditions set forth in this Agreement, upon the request of the Payee from time to time in accordance with the requirements of Section 2(b), to make payments to the Payee (each, a "Payment"), the proceeds of which shall be used by the Payee for any Permitted Funding Use.  Nothing in this Agreement shall obligate the Payor to make Payments under this Agreement that in the aggregate exceed the aggregate amount necessary for the Payee to fund all Permitted Funding Uses, and nothing in this Agreement shall obligate the Payor to make any individual Payment under this Agreement that exceeds the amount necessary for the Payee to fund the Payee's projected Permitted Funding Uses over the 30 days following the date of such Payment.

(b)      Funding Requests.  To request a Payment, the Payee shall deliver to the Payor a written request (which written request may be a .pdf delivered via email) for such Payment in a form reasonably acceptable to the Payor and signed by the Payee (each, a "Funding Request").  Each Funding Request shall specify (i) the amount of the requested Payment, which shall be no less than $1,000,000, and (ii) the date of the requested Payment, which shall be the date that is three Business Days following the delivery of such Funding Request (each such date, a "Funding Date").  Each Funding Request by the Payee shall constitute a representation and warranty by the Payee that the conditions set forth in Section 2(d) have been satisfied.

(c)      Payments.  Subject only to the satisfaction of the conditions set forth in Section 2(d), on any Funding Date, the Payor shall pay or cause to be paid to the Payee an amount equal to the amount of the requested Payment specified in the applicable Funding Request.  All Payments shall be made by wire or other transfer of immediately available funds, in United States dollars, to the Funding Account.  In the event that the Payor does not make any Payment within the time period required by this Section 2(c), the amount of the requested Payment shall bear interest at a rate per annum equal to the Base Rate *plus* 2% until such Payment is made and the Payor shall include any interest accruing pursuant to this Section 2(c) in the next Payment made to the Payee.

(d)      Conditions to Payments.  The Payor's obligation to make any Payment is subject to the satisfaction of the following conditions as of the date of the Funding Request relating to such Payment: (i) the representations and warranties of the Payee set forth in Section 3(b) shall be true and correct without regard to the impact of any Bankruptcy Case, including any notices or other actions that may be required therein; and (ii) there shall have been no violation by the Payee of the covenant set forth in Section 5.

3.      **Representations and Warranties**.

(a)      Representations and Warranties of the Payor.  The Payor represents and warrants to the Payee that:

(i)      Existence, Qualification and Power.  The Payor (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I)

or (C), to the extent that failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(ii)     <u>Authorization; No Contravention</u>.  The execution, delivery and performance by the Payor of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law, except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payor Material Adverse Effect.

(iii)     <u>Governmental Authorization; Other Consents</u>.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution delivery or performance of this Agreement by, or enforcement against, the Payor.

(iv)     <u>Binding Effect</u>.  This Agreement has been duly executed and delivered by the Payor.  This Agreement constitutes a legal, valid and binding obligation of the Payor, enforceable against the Payor in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

(b)     <u>Representations and Warranties of the Payee</u>.  The Payee represents and warrants to the Payor that:

(i)     <u>Existence, Qualification and Power</u>.  The Payee (A) is duly organized or formed, validly existing and, as applicable, in good standing under the laws of its jurisdiction of incorporation or organization, (B) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (I) own or lease its material assets and carry on its business and (II) execute, deliver and perform its obligations under this Agreement and (C) is duly qualified and is licensed and, as applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (B)(I) or (C), to the extent that failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(ii)     <u>Authorization; No Contravention</u>.  The execution, delivery and performance by the Payee of this Agreement has been duly authorized by all necessary corporate or other organizational action, and does not and will not (A) contravene the terms of its Organizational Documents, (B) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (I) any Contractual Obligation to which it is a party or affecting it or its properties or (II) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject, or (C) violate any applicable law, except in each case referred to in clause (B) or (C), to the extent the failure to do so could not reasonably be expected to have a Payee Material Adverse Effect.

(iii)     <u>Governmental Authorization; Other Consents</u>.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any

other Person is necessary or required in connection with the execution delivery or performance of this Agreement by, or enforcement against, the Payee.

(iv)   Binding Effect. This Agreement has been duly executed and delivered by the Payee. This Agreement constitutes a legal, valid and binding obligation of the Payee, enforceable against the Payee in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally and by equitable principles.

4.   **Covenants of the Payor**.

(a)   Provision of Financial Information.

(i)   The Payor will have its annual financial statements audited by a nationally recognized firm of independent accountants and will furnish to the Payee, no later than 90 days after the end of each fiscal year (in the case of annual financial statements) and 45 days after the end of each fiscal quarter other than the last fiscal quarter (in the case of quarterly financial statements), unaudited quarterly and audited annual consolidated financial statements prepared in accordance with GAAP subject, with respect to quarterly financial statements, to the absence of footnote disclosure and normal year-end audit adjustments.

(ii)   By accepting such financial information, the Payee will be deemed to have represented to and agreed with the Payor that: (A) it will not use the information in violation of applicable securities laws or regulations; and (B) it will not communicate the information to any Person, including, without limitation, in any aggregated or converted form, and will keep the information confidential, other than where disclosure of such information is required by law, regulation or legal process (in which case the Payee shall, to the extent permitted by law, notify the Payor promptly thereof).

(iii)   Notwithstanding the foregoing, the financial statements, information and other documents required to be provided as described in Section 4(a)(i), may be, rather than those of the Payor, those  of any direct or indirect parent of the Payor.  Notwithstanding the foregoing, the Payor may fulfill the requirement to distribute such financial information by filing the information with the SEC within the applicable time periods required by the SEC.  The Payor will be deemed to have satisfied the reporting requirements of Section 4(a)(i) if any direct or indirect parent of the Payor has filed such reports containing such information with the SEC within the applicable time periods required by the SEC and such reports are publicly available.  To the extent a direct or indirect parent of the Payor provides financial statements, information and other documents pursuant to the first sentence of this Section 4(a)(iii) or such parent files such report with the SEC pursuant to the third sentence of this Section 4(a)(iii), and if the financial information so furnished relates to such direct or indirect parent of the Payor, the same shall be accompanied by consolidating information that explains in reasonable detail the difference between the information relating to such parent on the one hand, and the information relating to the Payor and its Subsidiaries on a standalone basis, on the other hand.

(b)   Successor to the Payor upon Consolidation or Merger.

(i)   Subject to the provisions of Sections 4(b)(ii) and 4(b)(iii), nothing contained in this Agreement shall prevent any consolidation or merger of the Payor with or into any Person, or successive consolidations or mergers in which the Payor or its successor or successors shall be a party or parties, or shall prevent any sale, assignment, transfer, lease, conveyance or other

disposition of all or substantially all the property of the Payor (for the avoidance of doubt, calculated by including the equity interests of the Payor), to any Person; *provided*, *however*, and the Payor hereby covenants and agrees, that, if the surviving Person, acquiring Person or lessee is a Person other than the Payor, upon any such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, all of the Payor's funding obligations under this Agreement and the observance of all other covenants and conditions of this Agreement to be performed by the Payor, shall be expressly assumed by an amendment to this Agreement or such other documentation in form reasonably satisfactory to the Payee, executed and delivered to the Payee by the Person formed by such consolidation, or into which the Payor shall have been merged, or by the Person which shall have acquired or leased such property.  This covenant will not apply to:  (A) a merger of the Payor with an Affiliate solely for the purpose of reincorporating the Payor in another jurisdiction within the United States; (B) any conversion of the Payor from an entity formed under the laws of one state to the same type of entity formed under the laws of another state; or (C) any conversion of the Payor from a limited liability company to a corporation, from a corporation to a limited liability company, from a limited liability company to a limited partnership or a similar conversion, whether the converting entity and the converted entity are formed under the laws of the same state or the converting entity is formed under the laws of one state and the converted entity is formed of the laws of a different state.  Notwithstanding the foregoing, this Section 4(b)(i) will not apply to any consolidation or merger, or any sale, assignment, transfer, conveyance, lease or other disposition of assets, between or among Payor and its Subsidiaries.

(ii)     Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets of the Payor (for the avoidance of doubt, calculated by including the equity interests of the Payor) in a transaction that is subject to, and that complies with, the provisions of the preceding clause (i), the successor Person formed by such consolidation into or with which the Payor is merged or to which such sale, assignment, transfer, lease, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Agreement referring to the "Payor" shall refer instead to the successor Person and not to the Payor), and may exercise every right and power of the Payor under this Agreement with the same effect as if such successor Person had been named as the Payor herein.  In the event of a succession in compliance with this Section 4(b)(ii), the predecessor Person shall be relieved from every obligation and covenant under this Agreement upon the consummation of such succession.

(iii)     Any consolidation, merger, sale, conveyance or lease referred to in the preceding clause (i) shall not be permitted under this Agreement unless immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing.

5.     **Covenants of the Payee**.  The Payee shall not use the proceeds of any Payment made under this Agreement for any purpose other than a Permitted Funding Use. The Payee will perform its indemnification obligations owing to the Payor under the agreements provided for in the Plan of Merger in all material respects.

6.     **Events of Default**.  Each of the following events constitutes an "Event of Default":

(a)     the Payor defaults in its funding obligations pursuant to Section 2 and such default continues for a period of five Business Days;

(b)      the Payor defaults in the performance of, or breaches, any covenant or representation or warranty of the Payor in this Agreement (other than a covenant or representation or warranty which is specifically dealt with elsewhere in this Section 6) and such default or breach continues for a period of 90 days, or, in the case of any failure to comply with Section 4(a) of this Agreement, 180 days, in each case after there has been given, by registered or certified mail, to the Payor by the Payee a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(c)      the Payor, pursuant to or within the meaning of the Bankruptcy Code or any similar federal or state law for the relief of debtors, (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it or for all or substantially all of its property, (iv) makes a general assignment for the benefit of its creditors, or (v) generally is not paying its debts as they become due; and

(d)      a court of competent jurisdiction enters an order or decree under the Bankruptcy Code or any similar federal or state law for the relief of debtors that (i) is for relief against the Payor, (ii) appoints a custodian of the Payor for all or substantially all of the property of the Payor, or (iii) orders the liquidation of the Payor, and, in each case of (i) through (iii) above, such order or decree remains unstayed and in effect for 60 consecutive days.

Upon becoming aware of any Default or Event of Default, the Payor shall promptly deliver to the Payee a statement specifying such Default or Event of Default.

7.      **Remedies**.  Upon the occurrence of any Event of Default, and at any time thereafter during the continuance of any such Event of Default, the Payee may pursue any available remedy to collect any unfunded Payments due and owing to the Payee or to enforce the performance of any provision of this Agreement.

8.      **Notices**.  All notices required under this Agreement, including each Funding Request and any approval of or objection to a Funding Request, shall be delivered to the applicable party to this Agreement at the address set forth below.  Unless otherwise specified herein, delivery of any such notice by email, facsimile or other electronic transmission (including .pdf) shall be effective as delivery of a manually executed counterpart thereof.

Payor:

133 Peachtree Street, N.E.
Atlanta, Georgia 30303
Email: gashirk@gapac.com

Payee:

100 Peachtree Street, N.W.
Atlanta, Georgia 30303
Email: sjgordon@gapac.com

9.      **Governing Law**.  This Agreement shall be governed and construed in accordance with the laws of the State of North Carolina.

10.      **No Implied Waiver; Amendments**.  No failure or delay on the part of the Payee to exercise any right, power or privilege under this Agreement, and no course of dealing between the Payor,

on the one hand, and the Payee, on the other hand, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege. No notice to or demand on the Payor in any case shall entitle the Payor to any other or further notice or demand in similar or other circumstances, or constitute a waiver of the right of the holder of this Agreement to any other or further action in any circumstances without notice or demand. The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law. No amendment or waiver of any provision of this Agreement, nor consent to any departure by the Payee therefrom, shall in any event be effective unless the same shall be in writing, specifically refer to this Agreement, and be signed by the Payor and the Payee, and then such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given. A waiver on any such occasion shall not be construed as a bar to, or waiver of, any such right or remedy on any future occasion.

11.     **Counterparts; Entire Agreement; Electronic Execution**. This Agreement may be executed in separate counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersedes, in its entirety, the A&R Funding Agreement (and any schedules thereto). This Agreement shall become effective when it shall have been executed by each party hereto and each party shall have received counterparts hereof which, when taken together, bear the signatures of each of party hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by telecopy, .pdf or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.

12.     **Severability**. If any one or more of the provisions contained in this Agreement are invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of all the remaining provisions will not in any way be affected or impaired. If any one or more provisions contained in this Agreement are deemed invalid, illegal or unenforceable because of their scope or breadth, such provisions shall be reformed and replaced with provisions whose scope and breadth are valid under applicable law.

13.     **Transfer; Assignment**. This Agreement shall be binding upon the Payor and its successors and assigns, and the terms and provisions of this Agreement shall inure to the benefit of the Payee and its successors and assigns. The Payor's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payee; provided, however, that no such consent of the Payee shall be required in connection with any transfer effected in compliance with Section 4(b). The Payee's rights and obligations under this Agreement may not be assigned without the prior written consent of the Payor.

14.     **Rights of Parties**. This Agreement shall not confer any rights or remedies upon any Person other than the parties and their respective successors and permitted assigns.

*[Signature pages follow]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**GEORGIA-PACIFIC LLC**, a Delaware limited liability company, as the Payor

By: _____

Name: Gerald A. Shirk

Title:  Treasurer

**BESTWALL LLC**, a North Carolina limited liability company, as the Payee

By: _____

Name: Duane R. Hughes

Title:  President

## SCHEDULE 1

### Definition of Asbestos Related Liabilities

For purposes of this Agreement, "Asbestos Related Liabilities" means all Liabilities (as defined below) of the Payee related in any way to asbestos or asbestos containing materials.

Capitalized terms that are used in this Schedule 1 have the following meanings:

(a)      "Cause of Action" means any claim, judgment, cause of action, counterclaim, crossclaim, third party claim, defense, indemnity claim, reimbursement claim, contribution claim, subrogation claim, right of set off, right of recovery, recoupment, right under any settlement Contract and similar right, whether choate or inchoate, known or unknown, contingent or noncontingent.

(b)      "Contract" means any contract, agreement, arrangement, lease, indenture, mortgage, deed of trust, evidence of indebtedness, License, Plan, guarantee, understanding, course of dealing or performance, instrument, bid, order, proposal, demand, offer or acceptance, whether written or oral.

(c)      "Governmental Authority" means any national, central, federal, state, provincial, municipal, local or other domestic, foreign or supranational governmental, legislative, administrative, or regulatory authority, agency, court, arbitration tribunal, board, department, commission or other governmental, or regulatory entity, including any competent governmental authority responsible for the determination, assessment or collection of taxes.

(d)      "Law" means any federal, state, local, municipal or foreign statute, law, ordinance, decree, order, injunction, rule, regulation, directive, constitution, code, edict, writ, judgment, opinion, decree, injunction, stipulation, award or other document or pronouncement having the effect of law (including common law), of any Governmental Authority, and includes rules and regulations of any regulatory or self-regulatory authority with which compliance is required by any of the foregoing.

(e)      "Liability" shall mean any claim, demand, offer, acceptance, action, suit, liability or obligation of any kind, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, choate or inchoate, asserted or unasserted, known or unknown, including those arising or that may arise under any past, present, or future Law or Contract or pursuant to any Cause of Action or Proceeding, including all claims for economic or noneconomic damages or injuries of any type or nature whatsoever including claims for physical, mental, and emotional pain and suffering, loss of enjoyment of life, loss of society or consortium, wrongful death as well as claims for damage to property and/or punitive damages.

(f)      "License" means any license, sublicense, agreement, covenant not to sue or permission.

(g)      "Person" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, benefit plan, unincorporated organization, business, syndicate, sole proprietorship, association, organization, labor union, or other entity, association or Governmental Authority.

(h)      "Plan" means, with respect to any Person, (a) any "employee benefit plan" (as defined in Section 3(3) of ERISA), (b) all specified fringe benefit plans as defined in Section 6039(D) of the Internal Revenue Code and (c) any other plan, program, policy, agreement or arrangement, whether or not in writing, relating to compensation, employee benefits, severance, change in control, retention, deferred compensation, equity, employment, consulting, vacation, sick leave, paid time off, salary continuation, disability, hospitalization, medical insurance, life insurance, scholarship programs, incentive compensation or bonus compensation, in each case that is sponsored, maintained or contributed to or required to be sponsored, maintained or contributed to by, or otherwise covering such Person.

(i)      "Proceeding" means any action, appeal, arbitration, assessment, cancellation, charge, citation, claim, complaint, concurrent use, controversy, contested matter, demand, grievance, hearing, inquiry, interference, investigation, litigation (including class actions and multidistrict litigation), mediation, opposition, re-examination, summons, subpoena or suit or other case or proceeding, whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private, commenced, brought, conducted or heard by or before, under the supervision or direction of, or otherwise involving, any Governmental Authority or arbitrator or other agreed-upon tribunal or dispute resolution mechanism.