1

```
 1                     UNITED STATES BANKRUPTCY COURT
                      WESTERN DISTRICT OF NORTH CAROLINA
 2                           CHARLOTTE DIVISION

 3   IN RE:                        :   Case No. 17-31795

 4   BESTWALL LLC                  :   Chapter 11

 5        Debtor,                  :   Charlotte, North Carolina
                                       Tuesday, November 7, 2017
 6                                 :   2:01 p.m.

 7   : : : : : : : : : : : : : : : : : : : : : : : : : : :

 8   BESTWALL LLC,                 :   AP 17-03105

 9        Plaintiff,               :

10             v.                  :

11   THOSE PARTIES LISTED ON       :
     APPENDIX A TO COMPLAINT AND
12   JOHN AND JANE DOES 1-1000,    :

13        Defendants.              :

14   : : : : : : : : : : : : : : : : : : : : : : : : : : :

15                     TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE LAURA TURNER BEYER,
16                   UNITED STATES BANKRUPTCY JUDGE

17   APPEARANCES:

18   For the Plaintiff/Debtor:    Robinson, Bradshaw & Hinson, P.A.
                                   BY:  GARLAND S. CASSADA, ESQ.
19                                 101 N. Tryon Street, Suite 1900
                                   Charlotte, NC  28246
20
     Audio Operator:              COURT PERSONNEL
21
     Transcript prepared by:      JANICE RUSSELL TRANSCRIPTS
22                                 1418 Red Fox Circle
                                   Severance, CO  80550
23                                 (757) 422-9089
                                   trussell31@tdsmail.com
24
     Proceedings recorded by electronic sound recording; transcript
25   produced by transcription service.
```

```
 1   APPEARANCES (continued):

 2   For the Plaintiff/Debtor:      Jones Day
                                    BY:   GREGORY M. GORDON, ESQ.
 3                                        DAN B. PRIETO, ESQ.
                                          AMANDA RUSH, ESQ.
 4                                  2727 North Harwood St., Suite 500
                                    Dallas, TX   75201-1515
 5
                                    Jones Day
 6                                  BY:   JEFFREY B. ELLMAN, ESQ.
                                    1420 Peachtree St., N.E., #800
 7                                  Atlanta, GA   30309

 8   For Georgia-Pacific LLC:       Rayburn Cooper & Durham, P.A.
                                    BY:   JOHN R. MILLER, JR., ESQ.
 9                                  227 West Trade St., Suite 1200
                                    Charlotte, NC   28202
10
                                    Debevoise & Plimpton
11                                  BY:   MARK P. GOODMAN, ESQ.
                                          M. NATASHA LABOVITZ, ESQ.
12                                  919 Third Avenue
                                    New York, NY   10022
13
     For the Bankruptcy            Bankruptcy Administrator's Office
14   Administrator:                 BY:   SHELLEY K. ABEL, ESQ.
                                          ALEXANDRIA KENNY, ESQ.
15                                  402 West Trade Street, Suite 200
                                    Charlotte, NC   28202
16
     For Kazen, McClain, Satterley Montgomery McCracken
17   & Greenwood, PLC and Simmons   BY:   NATALIE D. RAMSEY, ESQ.
     Hanly Conroy LLC:             1105 North Market St., 15th Floor
18                                  Wilmington, DE   19801

19                                  LINDA SIMPSON, ESQ.

20
     ALSO PRESENT:                  J. JOEL MERCER, JR.. ESQ.
21                                  TYLER L. WOOLSON
                                    Bestwall LLC
22
                                    ROLAND TOMFORDE
23                                  Donlin, Recano & Company, Inc.

24

25
```

```
1  | APPEARANCES (via telephone):
   |
2  | For Kazen, McClain, Satterley  Montgomery McCracken
   | & Greenwood, PLC and Simmons  BY:  MARK A. FINK, ESQ.
3  | Hanly Conroy LLC:               1105 North Market St., 15th Floor
   |                                 Wilmington, DE  19801
4  |
   |
5  |
   |
6  |
   |
7  |
   |
8  |
   |
9  |
   |
10 |
   |
11 |
   |
12 |
   |
13 |
   |
14 |
   |
15 |
   |
16 |
   |
17 |
   |
18 |
   |
19 |
   |
20 |
   |
21 |
   |
22 |
   |
23 |
   |
24 |
   |
25 |
```

1                              EXHIBIT INDEX

2                                                        Received

3         A      Woolson declaration              37

4         B      Mercer declaration               68

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                        P R O C E E D I N G S

2          (Call to Order of the Court)

3               THE COURT:  All right.  Good afternoon.

4               We are here in the Bestwall Inc. -- excuse me --

5     Bestwall LLC matter for first day hearings.  And there are a

6     slew of you.

7               So you all can take a seat.

8               And what I typically do is start by having people

9     announce their appearances.  There are a lot of you, but,

10    Ms. Abel, we'll start with you.

11              MS. ABEL:  Shelley Abel and Alex Kenny for the

12    Bankruptcy Administrator's Office.

13              THE COURT:  Okay.  All right.

14              MR. CASSADA:  Good afternoon, Your Honor.  I'm Garland

15    Cassada, Robinson, Bradshaw & Hinson.  We are special, asbestos

16    claims estimation counsel and local chapter 11 counsel for the

17    debtor --

18              THE COURT:  Okay.

19              MR. CASSADA:  -- Bestwall.

20              I'd also like to introduce Greg Gordon of the Jones

21    Day firm.

22              THE COURT:  All right.  Welcome.

23              MR. GORDON:  Good afternoon, Your Honor.

24              MR. CASSADA:  Excuse me.  Jones Day is serving as the

25    lead chapter 11 counsel and I believe late last week you signed

1    orders admitting Mr. Gordon and his colleague *pro hac vice*.

2            THE COURT:  I believe I did.

3            Welcome to Charlotte.  Welcome to the other courtroom

4    in Charlotte, Mr. Gordon.

5            MR. GORDON:  Thank you, Your Honor.  Appreciate that.

6            THE COURT:  You're welcome.

7            Anybody else who would wish to announce an appearance

8    today?

9            MR. MILLER:  Afternoon, Your Honor.  Jack Miller,

10   Rayburn Cooper & Durham.  I'm here on behalf of non-debtor

11   affiliate, Georgia-Pacific LLC, which is a Delaware limited

12   liability company.

13           THE COURT:  Okay.

14           MR. MILLER:  I'd like to also introduce to the Court

15   co-counsel, Mark Goodman and Natasha Labovitz.  They're here

16   from New York, Debevoise & Plimpton.

17           THE COURT:  Okay.  Welcome.

18           MR. GOODMAN:  Thank you, Your Honor.

19           THE COURT:  Uh-huh (indicating an affirmative

20   response).

21           Ms. Simpson, welcome back.

22           MS. SIMPSON:  Thank you.

23           I'm Linda Simpson and I'm appearing as local counsel

24   for two asbestos claimants' law firms, the firm of Simmons

25   Hanly Conroy LLC and the firm of Kazen, McClain, Slatterley

1  [sic] & Greenwood.

2         I'd also like to introduce Natalie Ramsey and Mark

3  Fink is on the telephone.  They are lead counsel for these

4  firms.  Ms. Ramsey and Mr. Fink are partners with the law firm

5  of Montgomery, McCracken, Walker & Rhoads in their Delaware

6  office.  *Pro hac vice* applications were filed today for both of

7  them.

8         THE COURT:  Right.  And I, I don't believe I have

9  signed those orders, but we will get those signed.  We signed a

10  lot of orders in this case.

11        All right.  Are there any other parties who would wish

12  to announce an appearance?

13     (No response)

14        THE COURT:  I know, I understand that there are a lot

15  of folks on the phone and in that regard and with respect to

16  telephonic appearances, probably what, what I will do going

17  forward is basically adopt the same procedures that Judge

18  Whitley has used in the Garlock case and in the Kaiser case.

19  And as I understand it, unless parties have filed notices of

20  appearance with the Court or otherwise been admitted to

21  practice *pro hac*, you will not be allowed to appear

22  telephonically, barring the exception of today.  Procedurally,

23  what you need to do is send an e-mail to my judicial assistant,

24  Sara Durkin, if you wish to appear telephonically -- and that's

25  assuming that you have otherwise noticed an appearance in the

1  case or been admitted to practice *pro hac* -- and she will give

2  you consent and, through me, and she will give you the

3  appropriate dial-in information so that you can appear

4  telephonically.

5        Let me also say just for purposes of the record I am

6  not a fan of folks making argument over the phone.  It just

7  doesn't work very well.

8        So if you wish to participate in this case in a

9  meaningful way, I would suggest that you get yourself here and

10  make yourself available to the Court and argue in person.

11        Having said that, I also know that there will be

12  emergencies that arise.  So we can make exceptions for that,

13  certainly, but that will be an exception and not the rule.

14        And the risk of any difficulty, you know, oftentimes

15  we have parties who appear telephonically and we simply hear

16  every third word.  And so if you appear over the phone, then

17  you bear the risk of any technical difficulties or problems,

18  okay?

19        All right.  I don't believe that there are any other

20  sort of administrative matters that we need to resolve.

21        So with that, we will start with the first day

22  motions.

23        Mr. Gordon.

24        MR. GORDON:  Thank you, Your Honor.  Again, Greg

25  Gordon, Jones Day, on behalf of the debtor here, Bestwall LLC.

1          I'd like to start, if I could, Your Honor, with a

2    couple of sets of introduction.

3          THE COURT:  Uh-huh (indicating an affirmative

4    response).

5          MR. GORDON:  And, following that, with Your Honor's

6    permission, I'd like to make kind of an opening statement to

7    provide Your, the Court with a bit of an overview drawn,

8    largely, from the informational brief we filed in the first day

9    declaration, but just try to pull that together in a summary

10   fashion for the Court.

11         THE COURT:  Okay.  That sounds good.

12         MR. GORDON:  By way of introductions, Your Honor,

13   colleagues of mine who weren't introduced before, Jeff Ellman

14   to my left.

15         THE COURT:  All right.

16         MR. ELLMAN:  Good afternoon.

17         THE COURT:  Welcome.

18         MR. GORDON:  Dan Prieto to his left.

19         MR. PRIETO:  Good afternoon, Your Honor.

20         MR. GORDON:  And then Amanda Rush sitting along the

21   side.

22         THE COURT:  Welcome.

23         MR. GORDON:  And then the other introductions are from

24   the client, from Bestwall, Your Honor, if I could.  Mr. Joel

25   Mercer.  He's --

1           MR. MERCER:  Good afternoon, Your Honor.

2           THE COURT:  Welcome.  Good afternoon.

3           MR. GORDON:  He is the Chief Legal Officer of

4    Bestwall.

5           THE COURT:  Okay.

6           MR. GORDON:  And then Tyler Woolson to his left.

7           MR. WOOLSON:  Good afternoon.

8           THE COURT:  Good afternoon.

9           MR. GORDON:  He is a Vice President and Chief

10   Restructuring Officer of Bestwall.

11          THE COURT:  Okay.  All right.  Thank you.

12          MR. GORDON:  Thank you, Your Honor.

13          And if I might, before I start, I took some of the,

14   the demonstratives out of the informational brief and just put

15   them in a little book for Your Honor.

16          THE COURT:  Okay.

17          MR. GORDON:  I thought that would be helpful.  If I

18   could approach.

19          THE COURT:  Yes, sir.

20          MR. GORDON:  I have a bunch of extra copies for people

21   in the courtroom as well.

22          THE COURT:  Yes, sir.

23          MR. GORDON:  May I approach, Your Honor?

24          THE COURT:  Yes, sir.

25       (Documents handed to the Court and counsel)

1          THE COURT:  Thank you.

2          If we could pass one over here to our law clerk,

3   please.

4          MR. GORDON:  Oh, I'm sorry.

5          THE COURT:  That's okay.

6          MR. GORDON:  One of the more important ones.  There

7   are more up here, too.

8          THE COURT:  So as to not put them on the spot, but two

9   folks who you will -- my, my permanent law clerk is Chris

10  Badger, who also served Judge Hodges in the Garlock case.  So

11  to the extent that you need to send questions and e-mail,

12  Mr. Badger will be the person to whom you should direct those

13  e-mails.

14         So I suspect that you all will get to become very

15  familiar with Mr. Badger.

16         MR. GORDON:  Thank you, Your Honor.

17         THE COURT:  Uh-huh (indicating an affirmative

18  response).

19         MR. GORDON:  So, Your Honor, I'll probably begin by

20  stating the obvious here, which is the fact that we're here in

21  this court because of asbestos claims.  Bestwall and its

22  predecessors have been burdened by asbestos litigation for over

23  40 years and it's projected that these claims will continue to

24  be filed against Bestwall for another 30 more; in fact, through

25  at least 2050.  Since the filing of the first case, which

1    occurred in 1979, Bestwall and its predecessors have been

2    subject to 430,000 asbestos-related personal injury lawsuits.

3    Over that time period, Bestwall and its predecessors have spent

4    approximately $2.9 billion defending and paying claims.  As of

5    the petition date, Your Honor, Bestwall had approximately

6    64,000 pending claims.  Those claims are pending, literally, in

7    virtually every state across the country as well as certain

8    territories of the United States and of those 64,000 claims,

9    about 22,000 are active.

10          Our objective, Your Honor, in this case and the reason

11   we filed in this court is that we're seeking the confirmation

12   of a Section 524(g) plan of reorganization that comprehensively

13   and fairly and equitably resolves all these claims, all the

14   pending claims that I just referred to, as well as all future

15   claims that may be filed against the company.  And I can say

16   with a lot of assurance, Your Honor, that this company is

17   committed to dedicating the resources necessary to getting to

18   that resolution and to do so as soon as we possibly can.

19          I'd like to begin, Your Honor, if I could, with a bit

20   of background about Bestwall, itself.  Bestwall is a North

21   Carolina limited liability company.  It was formed this past

22   July, July 31, 2017, and its formation occurred as part of an

23   internal corporate restructuring of an entity then known as

24   Georgia-Pacific Limited Liability Company and for ease of

25   reference, I'll refer to it as Old GP.  And I, I'm going to

1   come back to that corporate restructuring because I think it's

2   important for the Court and the parties to understand how that

3   worked.

4          But before I do that, what I'd like to do is just talk

5   about the debtor itself, along with its assets and liabilities

6   and its organizational structure.

7          THE COURT:  Uh-huh (indicating an affirmative

8   response).

9          MR. GORDON:  So, Your Honor, if you'll open your, the

10  book I handed up, I'm actually going to use the Demonstrative

11  Exhibit No. 1, which is a fairly simplistic corporate chart,

12  but obviously, Bestwall here is highlighted in yellow.  It has,

13  basically, four principal assets.  It owns land, it owns land

14  in Mt. Holly, North Carolina.  That land is leased to a non-

15  debtor affiliate that operates a plant.  It has cash.  As of

16  the petition date, that amount of cash was about, was

17  approximately $20.7 million.  It owns all of the equity

18  interest in an entity called GP Industrial Plasters LLC.

19  That's the entity underneath and I'm going to talk about that

20  in a bit.  And it also has a funding agreement with, with the

21  New Georgia-Pacific LLC, which I'll refer to as New GP.  That's

22  the entity that sits to the right of, of the Bestwall entity.

23  So there's a funding agreement that runs from George-Pacific

24  LLC, or New GP, to Bestwall.

25          Now coming back, Your Honor, to GP Industrial Plasters

1    LLC, you'll see it has two subsidiaries, Blue Rapids Railway

2    Company, Industrial Plasters Canada ULC.  Those entities

3    together have a plaster business.  They develop, manufacture,

4    sell, and distribute gypsum, gypsum plaster, and this plaster

5    is used for all kinds of different purposes, floor

6    underlayment, industrial plaster, metal casting plaster, even

7    dental plaster, medical plaster, arts and center, arts and

8    crafts plaster, and so on.

9         GP Industrial Plasters owns or leases three

10   facilities.  It owns a facility in Blue Rapids, Kansas and it

11   leases facilities in Las Vegas, Nevada and Camden, New Jersey.

12   You'll be happy to know that Blue Rapids Railway operates a

13   short-line railroad.  So we've got a railroad aspect to this,

14   but it's just at the Blue Rapids facility.

15        And then the plaster, the Canada entity, Industrial

16   Plasters Canada ULC, holds certain assets for that business not

17   currently in use and they principally comprise a, a gypsum mine

18   in Canada.

19        The business of the plaster company, this unit of,

20   this group of three, is profitable.  They're projected to have

21   approximately 14 million in EBITDA in 2018 and approximately 18

22   million in EBITDA for the years thereafter.  And the value of

23   that, just to make a note of that, we believe, is

24   approximately, of this business, is approximately $145 million,

25   including cash on hand, which is about 13 million.

1        Then I wanted to talk a bit about the funding

2   agreement that I referred to before.  So this is an important

3   agreement to understand.  It's probably somewhat unusual,

4   probably an agreement maybe Your Honor hasn't seen before and

5   others here haven't seen before.  I have to say, I haven't seen

6   an agreement quite like this before, either.

7        So again, this is between Bestwall and New GP.  It's

8   not a loan agreement and the reason it's not a loan agreement

9   is there's not an obligation on the part of Bestwall to repay

10  funds that would be provided to Bestwall by New GP.  By its

11  terms, it requires New GP to provide funding to pay all of

12  Bestwall's costs and expenses, to the extent Bestwall isn't

13  able to do so from the distributions it receives from the

14  plaster business.  In addition, it also obligates New GP to

15  fund amounts necessary to pay asbestos claims, including

16  specifically for the funding of a Section 524(g) trust.  But

17  again, only to the extent that Bestwall's assets are

18  insufficient to provide the necessary funding for the trust.

19       So again, it's important to understand not a loan

20  agreement.  It's a funding agreement, but it's a committed

21  obligation by New GP to pay expenses, to the extent the debtor

22  can't pay them, and to pay the asbestos claims, to the extent

23  that the debtor can't pay those with its assets.

24       So those are the, the primary assets of Bestwall, four

25  categories that I've described.

 1           On the liability side, really only one category of

 2    assets -- I'm sorry -- one category of liabilities and those

 3    are the asbestos claims.  And if I'm doing my job right, I'll

 4    be referring to them as the Bestwall Asbestos Claims.  So that,

 5    I can provide some clarity on that.

 6           So just to go back in summary with respect to

 7    Bestwall, it owns a business.  It owns the equity in a business

 8    with a value of approximately 145 million; has approximately 21

 9    million in cash; it has the land in Mt. Holly, North Carolina;

10    and it has the funding agreement with New GP.

11           Now if I could, Your Honor, I'd like to walk through,

12    to some extent, the corporate restructuring back on July 31.

13    And again, this is the transaction that led to the formation of

14    Bestwall LLC.

15           So if we go back to July 31 and, in fact, maybe go a

16    few days before July 31, at that point in time all of the

17    assets and liabilities that today sit in both Bestwall and New

18    GP were at that time in one entity, which, confusingly, was

19    also called GP, but I'm going to refer to it as Old GP.

20           So on July 31, 2017, that former Georgia-Pacific

21    entity, again Old GP, underwent a corporate restructuring.  It

22    did so for two primary reasons.  One reason was it did it to

23    separate and then align its business of managing and defending

24    asbestos claims with the assets and the team of people related

25    to or responsible for those claims.

1        So just to break that down a bit, what was separated out

2   were the asbestos claims and just to pause there for a second.

3   By this time the management of the Best, of the asbestos

4   claims, at least the way I think about it, was a business in

5   and of itself.  We're talking about the management and the

6   defense of literally tens of thousands of claims all across the

7   United States.  In point of fact, it was one of the larger

8   businesses in terms of cash flow of, of all the Georgia-Pacific

9   businesses at the time.

10       So that, those liabilities were separated.  Those

11  claims were separated.  The team that was largely responsible

12  for the management and defense of those claims, really

13  Mr. Mercer and the people who work for him, they were

14  separated.  They've been seconded to, to Bestwall.  So that was

15  the one aspect of it.

16       And then the other aspect of it, I referred to certain

17  assets that were associated with the liabilities.  The

18  liabilities derive -- and I'm going to come back to this --

19  from an acquisition that Old GP did back in 1965.  It acquired

20  a company at that time known as Bestwall Gypsum.  That company

21  had certain businesses and assets.  Among them were plaster

22  assets.  The three sites that I referred Your Honor to that one

23  is leased, or the two that are leased, the one that is owned,

24  those basically are legacy assets from the old Bestwall

25  Company.  So they would put into this Bestwall operation as a

1   subsidiary that is part of this parent and its subsidiaries.

2        I do want Your Honor to know that there are other

3   legacy Bestwall assets that were not moved, principally some

4   assets or some plants that relate to a wallboard business, but

5   it simply wasn't viewed by the company as feasible to separate

6   those assets because they had been so carefully and fully

7   integrated into other wallboard operations at the company.

8        But the effort was to move the claims, separate the

9   claims, put them with the people who managed those claims, and

10  then include in that as well assets that were associated with

11  those liabilities, again assets that were the legacy assets

12  that came along at the time of the Bestwall Gypsum acquisition.

13       So that was Reason No. 1.

14       Reason No. 2 was just to provide additional

15  optionality regarding the filing of the chapter 11 as an

16  alternative to deal with the asbestos liabilities.  And when I

17  say that, what I'm referring to, in particular, is the option

18  to file the chapter 11 in a way that didn't expose the entire

19  Georgia-Pacific enterprise, all its other assets and operations

20  that have nothing to do with the asbestos liabilities, not to

21  expose those to the bankruptcy filing as well.

22       So that was the second, second reason for the

23  corporate restructuring.

24       That said, though, I want to emphasize that although

25  those were, obviously, very important and they were the primary

1   reasons, a key object -- and, of course, the key objective was

2   not to subject these other assets to the bankruptcy.

3          At the same time, the key, another key objection [sic]

4   was to ensure that the financial wherewithal of these other

5   assets and operations -- stated another way, the paying power

6   generated by those other assets and operations -- would

7   nonetheless remain available to Bestwall, if needed, to resolve

8   these asbestos liabilities and that objective was ultimately

9   realized in the form of the funding agreement that I described

10  to Your Honor earlier.

11         Now in terms of the, the restructuring itself, if Your

12  Honor had a chance to review Mr. Woolson's declaration, it went

13  through in some detail the steps.  I'm just going to describe

14  the essence of it because I think if you understand the

15  essence, you know, the steps are just kind, that's the A to B

16  to C that gets you to the ultimate restructuring.

17         So the essence of the restructuring was that Old GP

18  effected what's called a divisional merger under Texas law.

19  And the way I think about it is it's the opposite of what you

20  think a merger normally is.  Instead of companies combining,

21  the company can literally split apart.  But the way it can be

22  done under the Texas statute is that existing entity ceases to

23  exist and in its place, two new entities are created.  One of

24  those entities was Bestwall and Bestwall as part of that

25  restructuring, again, received the, or was allocated the

1   asbestos claims and it was allocated the assets that I

2   described earlier.

3            Then the other entity that was created was what I'm

4   referring now to as New GP --

5            THE COURT:  Uh-huh (indicating an affirmative

6   response).

7            MR. GORDON:  -- which was allocated all the other

8   liabilities and allocated all the other assets and operations.

9            So you have Bestwall on the one hand solely

10  responsible for asbestos claims.  You have New GP on the other

11  solely responsible for all the other liabilities of the former

12  Old GP and then the assets were split, as I described earlier.

13           But again, another key to understanding this -- it's

14  not totally intuitive, at least to me -- is the old entity is

15  gone and in its place now there are two new entities and both

16  were created as of July 31, 2017.  And again, I just want to

17  underscore this.  In terms of New GP, it received the other

18  operations and assets and became solely responsible for the

19  other liabilities and, very importantly, it became the payor

20  under the funding agreement.  So it became the payor; Bestwall,

21  the payee.

22           So, Your Honor, one other comment I'll make about the

23  corporate chart is obviously you have Bestwall to the left, you

24  have Georgia-Pacific LLC or New GP to the right.  You have the

25  funding agreement running from New GP to Bestwall.  There are

1    some other agreements as well.

2           THE COURT:  Uh-huh (indicating an affirmative

3    response).

4           MR. GORDON:  And we've already filed some motions with

5    the Court.  They're not up for today.  But, for example,

6    there's a services agreement that runs from New GP to Bestwall

7    pursuant to which it provides a variety of administrative-type

8    services, legal, tax, accounting, services like that.  There's

9    also the -- excuse me, Your Honor -- secondment agreement that

10   I referred to earlier by which Mr. Mercer and his team had been

11   seconded.  And when I say "seconded," maybe that's a bit of an

12   unusual word.  I can't say it's one I, I usually normally in my

13   vocabulary.  But basically, Your Honor, they've been assigned

14   full time to the Bestwall entity and they're, they're basically

15   dedicating all their time to assisting with the, you know,

16   continuing to do their work with respect to asbestos claims and

17   then this bankruptcy case.

18          THE COURT:  I'm embarrassed to admit it, but my clerk

19   and I thought that was a typo when we first came across that

20   word, but we, we quickly figured out that it was not.

21          MR. GORDON:  Well, it's certainly possible we, we

22   misspelled it and if we did, certainly not my fault.

23          THE COURT:  It, it was not.  It was a term with which

24   we were not familiar, admittedly, so.

25          MR. GORDON:  Well, my colleagues will bear

1    responsibility for that, but --

2              THE COURT:  It's not misspelled.

3              MR. GORDON:  Okay, good.

4              Your Honor, now I'd like to, if I could, refer or talk

5    a bit about the events that have led to us being in this court

6    today.

7              So as I indicated, the filing has, has really been

8    precipitated by these continuing flood of asbestos claims that

9    the company's been receiving over a substantial period of time.

10   They date back, as I indicated, to this acquisition in 1965 of

11   Old, Old Bestwall or Bestwall Gypsum Company.

12             And just to provide Your Honor with a bit of detail

13   about Bestwall Gypsum Company, Old Bestwall manufactured

14   wallboard.  That product didn't contain any asbestos and it

15   also manufactured joint compound products and those products

16   did contain limited amounts of chrysotile asbestos, I think

17   about 3 to 5 percent by weight.  The products came in two

18   forms.  They came in a powder, which you would mix with water,

19   or they became, or they came ready mix.  And I'm not a

20   handyperson at all.  My wife, if she were here to tell you, she

21   would say I can't do anything around the house and I would have

22   a hard time arguing against that.  But, in any event, I

23   understand that joint compound's a paste and could be used to,

24   basically, fill the seams on sections of wallboard, maybe cover

25   nail holes, things like that.  The purpose is to smooth the

1   surface, but it can then be painted or otherwise decorated.

2        So it acquired this company, manufactured these

3   products with small amounts of chrysotile asbestos in 1965.

4   That company was merged into Old GP and Old GP continued to

5   manufacture those products with asbestos for about another 11

6   or 12 years.  All the asbestos was taken out of those products

7   by 1977.

8        Now it is significant -- I'll just go back over

9   this -- at least from our perspective, that the asbestos that

10  was contained in these products was chrysotile asbestos.

11  Because, in our view, there isn't any dispute in the science,

12  scientific or medical community that it's a substantially

13  lower, has a substantially lower potency than other forms of

14  asbestos and, in particular, you may have heard this term,

15  amphiboles, or amphibole asbestos.  And, in fact, Judge Hodges

16  in the Garlock case acknowledged that chrysotile asbestos had a

17  lower potency than other forms of asbestos.

18        It's also important to note, I think, Your Honor, that

19  the joint compound as a whole -- and I'm talking about across

20  all manufacture -- only represented about 1-1/2 percent of all

21  asbestos-containing products manufactured in the US in the 20th

22  century and that would mean that our percentage of asbestos-

23  containing products out in the, in the marketplace would have

24  been well under 1 percent.  It really was -- these joint

25  compound products were really dwarfed by other types of

1    asbestos-containing products; for example, insulation,

2    construction materials, and the like, and those materials

3    largely included amphibole asbestos rather than chrysotile.

4           So from our perspective, Your Honor, this has created

5    a very significant anomaly in a way.  We had limited amounts of

6    asbestos that's far less potent than the other forms of

7    asbestos.  We have a miniscule percentage of all the asbestos-

8    containing products out there in the marketplace, yet in the

9    years leading to the filing Bestwall and Old GP were being sued

10   in about 70 to 80 percent of all mesothelioma cases.  It's

11   really hard for us to reconcile that.

12          Then, Your Honor, the other thing that I think is

13   important to understand about the years leading up to the

14   filing is what happened in terms of the litigation, how the

15   litigation developed over the years.  Because there's a sea

16   change that occurred around 1999.

17          For the first 20 years of the litigation, from about

18   1979 to 1999, Old GP, really, was an insignificant defendant.

19   It paid minimal amounts of defense and indemnity costs and

20   during that time there are other, there are a number of other

21   primary defendants, really these big insulation-type

22   manufacturers, for the most part, or big manufacturers of

23   amphibole products.  They were the primary defendants.  They

24   were paying, by far, the bulk of the money.

25          But, Your Honor, if you turn again to the

1    demonstratives and if you look at the second one, which is very

2    cleverly made to look like a wave, there was literally a wave

3    of filings of the primary defendants that occurred.  This

4    really begins in 2000, actually began in '99, but the biggest

5    years were 2000, 2001, and 2002.  You'll see on this exhibit

6    the primary defendants are represented in red.  You can see

7    Babcock and Wilcox, Pittsburgh Corning, Owens Corning,

8    Armstrong World, Grace, USG, Turner and Newall, and so on.  And

9    it's significant that -- so you can see this really big wave

10   that peaked in 2002 and then it started to recede a bit in the

11   years thereafter.

12          What's very interesting, if you look at that -- well,

13   first of all, let me, let me comment.

14          As a result of that, as those -- those defendants

15   filed bankruptcy.  They exited the tort system.  The plaintiffs

16   increasingly turned to the other defendants, who, up until that

17   time, were minor or insignificant, and began really focusing on

18   them, targeting them.  And, of course, Old GP was one of them.

19   From our perspective, we went through a situation where our

20   products were identified very rarely as causes of asbestos

21   disease, the products that were identified extremely often.

22   And that, that sea change in the product IDs or the

23   identifications or the naming of our company basically tracks

24   this asbestos wave.

25          So if you go back again and look at the demonstrative,

1    you look at Demonstrative Exhibit No. 3.  I mean, this reflects

2    the filings that the company was subject to from the years, for

3    the years 1990 to 2016, but look at the years 1990 through 1999

4    and then 2000 and then look what happens from 2001 forward.

5    This kind of mirrors exactly the bankruptcy wave, the filing

6    wave that I showed Your Honor earlier.

7          And then if you go to Demonstrative Exhibit No. 4, a

8    similar chart, this is the number of meso claims paid by

9    payment year, same, well, same group of years, although this

10   one includes part of 2017.  But again, very similar experience,

11   very low numbers through 1999, picking up in 2000 and then just

12   beginning to skyrocket in 2001, and then staying high

13   throughout.

14          And this phenomenon happened even though the large

15   majority of companies that had filed for bankruptcy had

16   successful bankruptcies in the sense that they reorganized.

17   They established Section 524(g) trusts and they funded those

18   trusts with billions of dollars and those trusts are continuing

19   to operate today and they're paying billions of dollars in, in

20   claims today.

21          Just to provide some additional numbers, in the first

22   20 years of the litigation our, our defense and indemnity costs

23   averaged about six million a year.  They were about a hundred

24   million in total for the first 20 years of the litigation.  In

25   the last 18 years, they've averaged approximately $160 million

1   per year, more than 25 times more than what they were before

2   the wave.

3          And, and I should go one more chart here, Your Honor,

4   Demonstrative Exhibit No. 5.  This shows the, the difference in

5   the average payments made per claim for the years.  Again,

6   first 20 years average $20,000.  Last 17 years or so, over

7   $120,000.  Again, just the sea, sea change.  Additionally -- so

8   that's the history over a long period of time, but things have

9   become even more concerning in the last three years, maybe the

10  last two years and ten months.

11          In 2015, our total defense and indemnity spend hit

12  approximately $184 million; in 2016, that spend hit

13  approximately $174 million; and in 2017, just through the first

14  ten months prior to the filing, that spend hit $200 million.

15  So our experience has been of even greater concern in the last

16  three years.  And, and, you know, bottom line, Your Honor, just

17  looking at that, you know, we feel strongly that the number and

18  the magnitude of the claims are wildly disproportionate to what

19  our true or actual liability could be.

20          Now in that regard -- and I'm not going to spend a lot

21  of time on this, but we did cover it in the informational brief

22  and so I, I do want to say some things about it today -- we

23  think the fact that we're the subject of so many claims and are

24  being forced to pay significantly higher settlements is

25  directly the result of what I would call shortcomings in the

1    tort system and, in fact, some abuses in the tort system.   And

2    there's really two, in particular, that we pointed out in the

3    informational brief.

4           One is just the truly inexplicable number of

5    plaintiffs who are now and have been recently identifying

6    Bestwall products as substantially contributing factors to

7    their disease.   You know, for more than 20 years, you know,

8    plaintiffs were basically identifying the products of these

9    other manufacturers -- again, big insulation manufacturers, the

10   other big companies who made amphibole products -- and not, not

11   identifying products like those that were manufactured by

12   Bestwall or Old GP.   After the bankruptcy wave, that completely

13   changed to the point that now so many additional people have

14   come forward.   In our view, it's far more than ever could

15   really have been exposed in view of the low chrysotile

16   exposures of our product, which was, really, it's limited, it's

17   a limited population and really small amounts of chrysotile.

18   And again, I come back to what I said before.   We're talking

19   about a product that represented less than 1 percent of

20   asbestos-containing products in the marketplace, yet today

21   we're sued in 70 to 80 percent of mesothelioma cases.

22          So that's No. 1.

23          And then the No. 2 item of misconduct that we pointed

24   out was what appears to be repeated failures by plaintiffs to

25   disclose exposures to asbestos-containing products for which

1    trusts are now responsible.  So whereas before they were

2    saying, "I was exposed to W. R. Grace products," or,

3    "Pittsburgh Corning products," or, "USG products," when they're

4    questioned by us or when they were questioned by us they denied

5    that and have said, instead, "No, we were exposed to your

6    products," maybe one or two other either joint compound

7    products or other chrysotile products.

8            And as we took a look at this in preparing for this

9    filing, we did have available to us the record in Garlock that

10   was made publicly available, the trial record, and we learned,

11   first of all, that a number of the cases we settled were the

12   same cases that were specifically identified by Judge Hodges in

13   Garlock as having this very problem that I'm raising here.

14           And, and so we found that we had an overlap.  In terms

15   of the cases we settled, they were the same, they're at least

16   the same plants.  And then we were able to take that record

17   further and actually investigate whether or not it appeared

18   that Bestwall or Old GP was, in fact, subject to the same

19   practice and we found that it was, in many cases.  And we

20   included examples in our informational brief which we just

21   documented as Plaintiffs 1 through 5, but all of them had a

22   very similar fact pattern, at least in my view, in that in

23   testimony in connection with, with Georgia-Pacific's -- I'm

24   sorry -- with Bestwall's claims they indicated that their

25   exposures were to Bestwall products, other joint compounds

1   potentially, or other chrysotile, denied exposure to,

2   basically, the products of any of these companies that had gone

3   through bankruptcy and established trusts, and we were able to

4   determine through investigation, primarily from the Garlock

5   record, that although those statements were made to Bestwall or

6   Old GP prior to the time a settlement was reached -- and, in

7   point of fact, those same individuals were, in fact, either

8   before, during, or later filing trust claims against the trusts

9   or, you know, basically, you know, pursuing claims against

10  other parties, claiming exposure to other parties' products

11  that they had denied in connection with fact-finding efforts

12  conducted by Old GP or Bestwall.

13          So, Your Honor, I'd like to move on from that to just

14  talk a little, provide a little bit more information about the

15  burden of the litigation and how I wind up with what we hope to

16  accomplish in the case, if I'm remembering my outline

17  correctly.

18          So you can imagine that managing and defending this

19  significant number of cases is, is a significant burden.  The

20  company -- well, when I say "the company," I should say

21  Bestwall and formerly Old GP -- have retained approximately 50

22  outside defense firms to help with the defense of the claims.

23  From 2012 to 2016, Old GP paid, on average, about 660 attorneys

24  and paralegals to help with the defense and management of the

25  claims.  In aggregate, they billed, on average, per year about

1   150,000 hours.  In addition to those counsel, Old GP also

2   retained nearly 40 experts, plus it needed data management

3   assistance as well as discovery vendors as well.  In 2016, the

4   defense costs alone exceeded 40 million just to manage these

5   cases.  And, of course, this is managing the cases in a way you

6   have to manage them in the sense there's so many of them, you

7   can't try them all because that literally would mean, that

8   would costs billions of dollars to do that.

9         So they're largely managed to the point where they can

10  be settled.  A number of them are settled through what we call

11  group settlements.  It's an agreement with a law firm where a

12  bunch of claims are grouped together and, and settled all at

13  once or settled as part of a package.  And so, largely, Your

14  Honor, what we're forced to do because we can't possibly try

15  all the proof of claims we are settling in this way to

16  basically avoid the defense costs.  And Your Honor may know

17  from the Garlock case that Judge Hodges recognized that fact in

18  connection with settlements there and ultimately, between that

19  fact and the fact that he saw this misconduct that I talked

20  about earlier, he concluded that the settlement history of a

21  company was not, did not bear any relationship to its actual

22  legal liability.

23        So, Your Honor, the decision to file came after

24  careful consideration by the Board of Managers of Bestwall of

25  its experience and Old GP's experience in the tort system both

1   in the past, in the present, and what was anticipated to happen

2   in the future, which is tens of thousands of additional claims

3   that I indicated earlier at least through 2050.  They were the

4   ones, the Board, that made the decision to file and pursue a

5   Section 524(g) asbestos trust.  You know, I think,

6   fundamentally, it's because the litigation's been a significant

7   burden for years, it's been anticipated to continue for years

8   more, and the concern is as well that the future may very well

9   be considerably worse or significantly worse because the wave

10  that we talked about, I think in Exhibit No. 2, could occur

11  again.  And we're in a similar situation where there are

12  primary defendants paying the bulk of the money in the tort

13  system and if that occurs again, then the, the defense and

14  indemnity costs of Bestwall could have increased or could

15  increase exponentially in the future.

16          And in that regard, Your Honor, I should note that

17  it's our understanding that every other major joint compound

18  manufacturer has filed for bankruptcy or, or, maybe putting it

19  another way, we believe that Bestwall may be the last major

20  joint compound manufacturer that was in the tort system that

21  has now filed for bankruptcy.

22          So, Your Honor, in terms of this proceeding itself, as

23  I indicated earlier, our goal is to negotiate, obtain approval

24  of, and ultimately consummate a chapter 11 plan of

25  reorganization that would create and fund a trust to pay

1   current and future asbestos claims.  That trust, we would

2   contemplate, would treat all claims equitably, or, maybe said

3   better, uniformly.  That trust would process and pay claims

4   pursuant to trust distribution procedures that would have been

5   approved by the Court, or would be approved by the Court.  And

6   importantly, the goal is to pay all the claims in full.  We

7   believe with the funding agreement, we have the capability of

8   doing that.  That plan would also -- we would also contemplate

9   that plan would provide for the issuance of a channeling

10  injunction that would permanently protect Bestwall, its

11  affiliates, and others from Bestwall Asbestos Claims, both

12  current and future.

13        Again, I want Your Honor to know that we're prepared

14  to work with the court-appointed asbestos claimants' committee

15  and future claimants' representative to reach this goal of a,

16  of a Section 524(g) plan of organization.  We're prepared to

17  provide information at the appropriate time to those parties.

18  We're prepared to commence negotiations with those parties as

19  soon as they're ready to go.

20        We're also prepared, Your Honor, that if negotiations

21  for whatever reasons don't prove fruitful, to ask Your Honor to

22  estimate the liability or the asbestos claims for purposes of

23  confirmation to assist us to ultimately get to a resolution.

24  And like in Garlock, we would ask for or seek a, an estimation

25  of our actual liability as opposed to just an estimation of

1   what our settlement experience might have been, had we chosen

2   to remain in the tort system for decades in the future.

3        But, Your Honor, whether we ultimately proceed with or

4   without an estimation, our ultimate objective is a consensual

5   plan.  Our objective is to get to a consensual plan that's

6   supported by both the asbestos claimants' committee and the

7   future claimants' representative.  And, of course, we recognize

8   and acknowledge that Section 524(g) requires a 75 percent plus

9   vote of the current asbestos claimants.  We believe, Your

10  Honor, that a Section 524(g) plan of reorganization is the best

11  outcome for all stakeholders.  We believe it will achieve,

12  enable all parties to achieve a fair, equitable, and

13  comprehensive resolution of all current and future asbestos

14  claims.  If we can reach that result, it will end what we view

15  is inefficient, costly, and uncertain litigation, both for the

16  benefit of us as well as for the benefit of claimants as well.

17  We submit that chapter 11 is the only option available to

18  achieve a permanent comprehensive result of this nature.

19        And, Your Honor, we look forward to working with the

20  claimants and their representatives and also working with Your

21  Honor to achieving that result.

22        Thank you.

23        THE COURT:  Thank you.  And I guess on behalf of the

24  Court let me say that we and the court staff are here to help

25  you and the ACC and the FCR and the BA work together or

1   litigate or do whatever we need to do to meet that goal, so.

2          MR. GORDON:  Appreciate it.

3          THE COURT:  Uh-huh (indicating an affirmative

4   response).  All right.

5          MR. GORDON:  Now, if I could, with Your Honor's

6   permission, I'd like to turn the lack of podium, I guess, over

7   to Mr. Ellman, who would like to address the first day motions

8   and then we would take up the adversary proceeding and the

9   request for the entry of a temporary restraining order last,

10  again with Your Honor's permission.

11         THE COURT:  That sounds like a fine way to proceed.

12         And I'm going to have some -- it's going to take me

13  some time to learn your, your names.

14         So tell me your name, again, Mr. --

15         MR. ELLMAN:  Certainly, Your Honor.  So for the

16  record, Jeffrey Ellman from Jones Day on behalf of the debtor.

17         THE COURT:  Okay.  All right.

18         MR. ELLMAN:  And I will stand over here, if that's all

19  right with Your Honor.

20         THE COURT:  Sure.

21         MR. ELLMAN:  So I can organize.

22         THE COURT:  And if you'll back up just a little bit --

23         MR. ELLMAN:  Yes.

24         THE COURT:  -- Mr. Gordon, so that -- I'm sorry --

25  Mr. Ellman, so that that microphone can pick up your voice.

1      MR. ELLMAN:  I'll turn this a little bit if that's

2  appropriate.

3      THE COURT:  I don't know if you can.

4      MR. ELLMAN:  We'll get the hang of this, eventually.

5      THE COURT:  That's okay.

6      MR. ELLMAN:  So, Your Honor, we do start this process

7  with our initial first day motions.  We have four motions on

8  the calendar in the main case today.  Three of those are

9  administrative motions.  One is a little more operational,

10  which is cash management.  I believe Your Honor was provided

11  with a binder that has all the papers.

12      THE COURT:  I've got it right here.

13      MR. ELLMAN:  And so we're going to kind of follow the

14  order that's in that binder.

15      And before I get into that, I did want to make a note

16  for the record about service.  We did serve all these papers to

17  the best of our ability.  In fact, the service in this case was

18  broader than you might normally have because we did have the,

19  the TRO proceeding that will follow this and because we were

20  giving notice to such a broad group the notice of this hearing

21  went to virtually, you know, all the, the law firms that

22  represent the plaintiffs' bar in this case.

23      So very, a very wide notice, including notice of this

24  hearing.  All the affidavits of service are on the, on the

25  docket.  I think, if I'm correct, I think it's Docket Nos. 52

1   and 53 for the service of the motions and 55 and 56 with

2   respect to the service of the notice of the hearing.  So I

3   wanted to get that on the record as well.

4          THE COURT:  Okay.  And I did note the affidavits of

5   service --

6          MR. ELLMAN:  Yes.

7          THE COURT:  -- on the docket.  Thank you.

8          MR. ELLMAN:  Now Mr. Gordon mentioned this, but we, we

9   have in support of the filing and all of our first day papers a

10  declaration from, from Mr. Woolson, Tyler Woolson, who is here

11  in the courtroom, and is the Vice President and Chief

12  Restructuring Officer of the debtor.  And because it does

13  support the various motions, I would move that into evidence at

14  the outset.  And he is here if, if there are questions of the

15  parties.

16         THE COURT:  Is there any objection to the declaration

17  of Mr. Woolson being admitted?

18     (No response)

19         THE COURT:  Then we will admit that into evidence.

20     (Debtor's Exhibit A admitted in evidence)

21         MR. ELLMAN:  Thank you, Your Honor.

22         So with that, I will move on to the actual motions.

23  The first one is in your binder, I believe at Tab 4, and this

24  is the application to retain Donlin, Recano & Company as

25  claims, noticing, and balloting agent.  And I'm not going to

1   really refer to the papers in great detail, but if you have it

2   there and want to refer to those, certainly fine.

3        Given the size of the case, we believe that it's

4   appropriate -- we have tens of thousands of creditors -- that

5   the administrative burdens that would be placed on the Court

6   and the clerk's office and the, frankly, the debtors in this

7   case, that having a claims and noticing agent is appropriate

8   and, and necessary.  It's typical in a large case, as Your

9   Honor, I'm sure, is aware, to relieve the Court of those

10  administrative duties, in particular the clerk's office, to

11  expedite noticing, to streamline the claims process, and

12  promote efficiency.

13       So we have filed this under the authority in 28 U.S.C.

14  156(c), Section 156(c), and that section of the, of the

15  judicial Code provides, empowers the Court to authorize the use

16  of outside agents and facilities for administrative purposes.

17  We believe that provides the authority for this motion.  Also,

18  Rule 2002 allows the Court to direct other parties to give

19  notice.  We think there's ample authority for the relief.

20       In the papers you have there in front of you, Your

21  Honor, we did include the engagement agreement.  It's dated

22  October 19th and it's attached as Exhibit A.  We, we had a

23  process of getting five proposals for the claims and noticing

24  agent.  This was, in our view, the best proposal on the

25  economics and by a party that we consider to be very qualified.

1            The services that will be provided, I'm not going to

2    go into all of them.  It's described in detail in the

3    engagement agreement and I think, in particular, if you look at

4    Paragraph 11 of the application.  I think it goes on for maybe

5    three pages of bullets of things that they will do, but just to

6    note a few: serving notices in the case, maintaining the

7    service list in the case, which we'll talk about, maintaining

8    the claims register and they will do that with the supervision

9    and control of the clerk's office, and then coordinate with the

10   clerk's office on things like claims transfers and, and the

11   like.  There'll be that coordination back and forth.  They

12   maintain a case website, which has already been initiated,

13   which is, which is live and available today.  And they'll do

14   ballot certification and, when the case is over, they will

15   transfer all the claims to the Federal Archives.  And this is a

16   well-established process that has been used in many cases.

17           So those are kind of the overview of the services.

18   There are others in more detail in the papers, but those are

19   the overview.

20           As far as compensation, Schedule A to the engagement

21   agreement includes their compensation structure.  They, they

22   get paid hourly for certain services of the individuals at

23   Donlin.  There are fees for certain services like printing and

24   there are storage fees for electronic storage.  And those are

25   all laid out.

1            The other thing that happens, as you might imagine

2      with large mailings there will be significant costs at times.

3      That will be passed along to the debtor.  So they will,

4      obviously, pass along the expenses.

5            As far as the process for paying those fees, these

6      will be administrative claims in the case.  There are not going

7      to be applications, but they will provide a copy of their

8      invoices not only to the debtors, but also to the Bankruptcy

9      Administrator.  So there will be the ability to, to see those

10     bills.  And again, the debtor will pay all the costs, which is

11     what is required by 28 U.S.C. 156(c).  The debtor pays the

12     costs.

13           The only other thing I'll mention about the payment of

14     fees is they do have a retainer prepetition that is subject to

15     reconciliation.  The order will allow them, if signed, to

16     reconcile the pre-petition retainer.

17           I'd also note, Your Honor, that, that they did file a

18     disinterestedness declaration or certification.  That's Exhibit

19     B to the motion.  That was signed by Roland Tomforde, who's the

20     Chief Operating Officer of Donlin who's here in the courtroom

21     right there (indicating).  And he's, he's available if Your

22     Honor has questions.

23           There's significant precedent for this type of, of

24     retention, including this District in the Kaiser case and

25     Garlock, and, most recently, in Portraits Innovations, which we

1   cited.  And so we would ask for it to be approved.

2          The order itself -- actually, I have a -- if I could

3   approach, Your Honor, I have a clipped package here.  These are

4   the four orders I am going to present.  These are the

5   blacklines.  I will tell you in advance that some of them are

6   pretty underwhelming because there weren't very many changes,

7   but I did want to provide it.

8          So the first one in the stack should be the, the

9   Donlin order and all we did, really, was add the docket number.

10  So --

11         THE COURT:  Okay.

12         MR. ELLMAN:  --there's really, just to show you

13  there's no change.

14         The one thing I do want to point out about the order,

15  in particular, other than answering questions about it, I think

16  it's Paragraph 15.  You will see -- this is in all the

17  orders -- although this is not an ex parte order, we do have

18  the language that's consistent with the Local Rule 9013-1(f)

19  that gives parties 14 days to move for reconsideration and we,

20  we just put that in all the orders.  We understand that's

21  consistent with local practice.

22         THE COURT:  Okay.

23         MR. ELLMAN:  And so unless you have questions, Your

24  Honor, we'd ask for the, the application to be approved.

25         THE COURT:  Are there any objections?  I didn't note

1    any objections --

2              MR. ELLMAN:  I'm not aware of any, Your Honor.

3              THE COURT:  -- on the docket.

4              All right.  I will approve the debtor's application

5    for an order authorizing the retention of Donlin, Recano &

6    Company as the claims, noticing, and ballot agent.

7              I did have a question.  I understand that -- and I

8    think this may have been addressed -- but the sort of

9    claimants' matrix had been provided to the Information

10   Technology people with our court and they, while they have

11   uploaded it, it's apparently creating havoc in CM-ECF, given

12   the number of claimants who are on that list.  I think it

13   exceeded 200,000 claimants.

14             So my question to you is, in light of approving the

15   retention of Donlin, Recano & Company, is it necessary for us

16   to try to work around that, or can we just take that off, the

17   creditors' matrix, in other words?

18             MR. ELLMAN:  In our view, with the approval of the

19   claims and noticing agent, they will become responsible for

20   that list.

21             THE COURT:  That's what I heard you say.

22             MR. ELLMAN:  Unless the Court feels compelled that it

23   needs to have the list for other reasons, the point, one of the

24   points of this application is to empower Donlin to act in this

25   capacity.

1          THE COURT:  Okay.

2          MR. ELLMAN:  And they obviously have the list and

3    they're able to, you know, to address it through noticing and,

4    and the like.

5          THE COURT:  All right.

6          And I understand that there's a PDF of that claimants'

7    matrix on the docket and I think there was also some concern

8    that something might be auto docketed and somebody might try to

9    serve it by BNC, which would create quite a bill for the

10   bankruptcy court.

11         So I think it would be our great preference to just

12   turn that off and get those out of the matrix.

13         MR. ELLMAN:  That, that makes sense to me, Your Honor.

14         THE COURT:  Okay.

15         MR. ELLMAN:  As I mentioned, the point of this is to

16   empower the claims agent to be paid by the debtor, which is

17   what the statute requires.

18         THE COURT:  All right.

19         MR. ELLMAN:  We agree with that

20         THE COURT:  Then given your approval and with the

21   approval of this application, I think that's what I will

22   instruct the IT folks to do --

23         MR. ELLMAN:  Thank you, Your Honor.

24         THE COURT:   -- as soon as this hearing is over, okay?

25         MR. ELLMAN:  That makes sense.  Thank you.

1          THE COURT:  Uh-huh (indicating an affirmative

2    response).

3          MR. ELLMAN:  Okay.  So we'll move on to Tab 5, which

4    is a motion to approve the filing of the top asbestos law firm

5    list, certain notice procedures, and the case commencement

6    notice.  And so there are those three basic kinds of relief.  I

7    was going to go through each one of them a little bit.

8          First, we're seeking relief on the, on the typical top

9    20 unsecured creditor list, which is required by Rule 1007(d),

10   as in dog.  As the Court is well aware, it requires you to file

11   the top 20 list, the list of the largest unsecured creditors,

12   which is used, primarily, by the Bankruptcy Administrator to

13   form a committee.  And here, in this case, what we have,

14   really, are personal injury claimants, asbestos personal injury

15   claimants.  That's our creditor body.

16         And as Mr. Gordon said, the idea of the case, the

17   point of the case, is to move forward towards a 524(g)

18   restructuring and to do that, we believe what will be appointed

19   will be a, an official committee of asbestos claimants

20   consisting of the law firms representing those plaintiffs.  And

21   we understand the process, in fact, is well underway.  The

22   questionnaires have gone out from the Bankruptcy

23   Administrator's Office and there should be a committee in the

24   near term.

25         So with that in mind, what we had proposed and what we

1   actually filed with our petition was a list of the top 25

2   firms, law firms, with the most significant representations of

3   asbestos claimants.  And we did this based on the volume of

4   cases, the scope of payments we make, and related factors.  We

5   tried to make sure that we had a list that covered, you know,

6   was representative.  It covered all the types of claims that

7   parties make, which, primarily, means different kinds of

8   diseases, mesothelioma, lung cancer, etc.

9          And so we're seeking authority to file that list in

10  lieu of the top 20 list, which would not have much on it.  And

11  this was done in Kaiser Gypsum.  This is not -- this has been

12  done in other asbestos cases and we think it's appropriate.

13         The second thing we're asking for in this motion has

14  to do with notice procedures for asbestos claimants.  And under

15  Section 105(a) and Bankruptcy Rule 2002(m) the Court has the

16  authority to regulate the, the nature of notice.  And here, the

17  request is really very simple.  It's we would like the

18  authority to serve not the claimants themselves who are

19  individuals, but the law firms who represent them, to the

20  extent they're represented by counsel.  If they're pro se,

21  they'll, that's different.  But if they're represented by

22  counsel, we want the authority to serve counsel only.  We think

23  it's consistent with what the law requires, consistent with our

24  responsibilities under the Professional Rules.  That's how,

25  historically, Bestwall's already communicated with, with these

1    parties.  In fact, as we point out in the papers, we don't

2    really have good addresses with individuals and it would be

3    very difficult to, to try to find them with no assurance they

4    would be accurate.

5           So, in our view, the, the better form of notice, the

6    more appropriate form of notice legally is to serve the law

7    firms, which is what we've been doing so far in this case, and

8    we'd ask the Court to approve that relief, as has been done,

9    again, in, in Kaiser Gypsum and in Garlock and other similar

10   asbestos cases.

11          And then last, Your Honor, the third thing this motion

12   asks for is approval of the case commencement notice.  That's

13   attached to the motion as Exhibit A.  We already have an order

14   from Your Honor -- it's Docket No. 21 -- that suspended the

15   entry of the automatic case --

16          THE COURT:  Uh-huh (indicating an affirmative

17   response).

18          MR. ELLMAN:   -- commencement notice on the official

19   form so we could be here today and ask to use a different form.

20          Now what we've proposed in that exhibit is based on

21   Official Form 309F.  It has, it's been customized for this

22   case, but it has the information, I believe, that that form has

23   on it, plus a little bit of additional information and it's

24   customized for this case, including the fact that we have no

25   bar date.  So it mentions that.  It, it does talk about our,

1    you know, the next motion I'm going to present, which is the

2    case management procedures that we, assuming the Court enters

3    them, that we have those so people know about those.

4            But, for the most part, it is an updated and

5    customized version of the official form.  We've talked to the

6    Bankruptcy Administrator about this form.  She was, found it

7    acceptable and once we have the Section 341 meeting date and

8    time and place, we will insert that.  And, of course, subject

9    to your Court, Your Honor approving the motion, we will be in a

10   position to serve that within five business days.

11           And again, I did hand up a, a blackline, which I

12   think, in this case, we added the docket number and we realized

13   we had not referenced the first day declaration.  So you'll see

14   an addition on Page 2 of a reference to that.  But beyond that,

15   it's the same order that we presented with the motion.

16           And with --

17           THE COURT:  Anything further?

18           MR. ELLMAN:  That's, that's all, Your Honor.

19           THE COURT:  Let me ask Ms. Abel if she wants to weigh

20   in on this motion so it does --

21           MS. ABEL:  This is just as good a point as any, not to

22   hijack the debtor's presentation, but I just wanted to address

23   a point of procedure on the formation of the committee.

24           THE COURT:  Uh-huh (indicating an affirmative

25   response).

1        MS. ABEL:  My anticipation -- we are having a meeting

2   at the conclusion of this hearing to begin the process of

3   forming that committee, or at least my recommendation for that

4   committee, and we plan to file a motion with the Court tomorrow

5   that would present our recommendation for your review.  And I

6   understand from talking with your office that we would schedule

7   that for hearing on September 15th, I mean -- sorry -- November

8   15th, at 9:30.

9        So that is, for purposes of the record, for those of

10  you are in attendance, that that is the, the game plan.

11       And otherwise, I don't believe I have anything to add

12  to the --

13       THE COURT:  Okay..

14       MS. ABEL:  -- to the motion.

15       THE COURT:  And otherwise, no objection?

16       MS. ABEL:  Correct, Your Honor.

17       THE COURT:  Okay.

18       MS. ABEL:  Thank you.

19       THE COURT:  And I have set aside Wednesday, November

20  15th, at 9:30, for a hearing on that motion, to the extent

21  that, that one is necessary.

22       So mark that date on your calendars, if you need to do

23  that.

24       And otherwise, it appears to me that it is appropriate

25  to grant the debtor's motion for an order authorizing it to

Case 17-31795   Doc 74   Filed 11/10/17   Entered 11/10/17 13:18:48   Desc Main
Document      Page 49 of 90

1   file the list of the top law firms, approving certain notice

2   procedures, approving the form and manner of notice of

3   commencement of this case.

4          And we'll look for your order in the form consistent

5   with what you've handed up.

6          MR. ELLMAN:  Thank you, Your Honor.  Appreciate it.

7          THE COURT:  Uh-huh (indicating an affirmative

8   response).

9          MR. ELLMAN:  So the third item is Tab 6 in your binder

10  and this is the motion I mentioned a second ago to approve

11  certain case management procedures.

12         Again, given the size of the case, our view is that

13  these types of orders assist in the efficiency and

14  administration of the proceeding.  Of course, while ensuring

15  that proper notice is given to parties and everyone's

16  substantive rights are not affected, it's, it's intended to be

17  procedural and not affect substantive rights.  It's, it's

18  typical to what we have seen in cases.

19         THE COURT:  Uh-huh (indicating an affirmative

20  response).

21         MR. ELLMAN:  I know it's typical to some of the case

22  management orders in this jurisdiction.  We have, again,

23  customized it to use the kind of pieces of other orders that

24  we've used in the past that made sense in this case, in our

25  view.

1          The authority to enter this order, again Section

2     105(a), Section 1021, which deals with the notice and hearing,

3     Bankruptcy Rule 2002(m), which I mentioned earlier about the

4     form or manner of notices.  Also, Bankruptcy Rule 9036, which

5     deals with electronic transmission of service and then Local

6     Rules 1002-2, 5005-1.  Again, those deal with ECF and

7     electronic filing.

8          So all those are, are relevant to the relief.  I would

9     just -- I'm not going -- it's, it's a 14-page order.  I'm not

10    going to go through all of it, but I thought I would highlight

11    a few things and then, obviously, answer any questions the

12    Court has.

13         So one thing it does is establish omnibus hearing

14    dates so we can consolidate proceedings in this matter on set

15    dates.

16         THE COURT:  Uh-huh (indicating an affirmative

17    response).

18         MR. ELLMAN:  We are going to ask in the order, at

19    least as it's drafted, to set up the first three dates -- and

20    we can come back to that -- but we have, we have blanks for

21    that.  And we would file an agenda with the Court two business

22    days ahead of the hearing to assist, again, in organizing the

23    hearing.  That's the first thing.

24         Second thing, motions practice.  Trying to get a

25    routine and a rhythm to the case so people understand what's

1   coming and how to address it.

2          So what the order proposes and, and provides for is

3   motions, along with the initial brief, 21 days before hearing,

4   presuming an omnibus hearing; response to the initial briefing

5   7 days before the hearing; and it provides for replies on the

6   last business day at least 3 days before the hearing.  And what

7   that means is for a Tuesday hearing that would mean Friday

8   would be the day you file because three days is a Saturday

9   or -- yes.  I think I got that right.

10          THE COURT:  Uh-huh (indicating an affirmative

11   response).

12          MR. ELLMAN:  So that, that's the idea for that.

13          So that's kind of the rhythm of the motion practice.

14   It does not limit people, parties in the case, from seeking

15   shortened notice.  It does not impede the ability to seek ex

16   parte orders or no-protest motions under the Local Rules.

17          THE COURT:  Uh-huh (indicating an affirmative

18   response).

19          MR. ELLMAN:  That's all preserved, subject to the

20   other terms of the procedures.  Okay.  That's --

21          The third thing it does is to create service lists for

22   the case.  We've proposed a master service list, which would

23   include who we see as the major parties in the case, the debtor

24   and counsel, the Bankruptcy Administrator, counsel for New GP,

25   Mr. Gordon mentioned, claims and noticing agent, and then, once

1   they exist, counsel for the ACC and the FCR.

2          But on top of that, we expect to be serving parties

3   who file 2002 notices and, obviously, any party affected by the

4   relief, in particular, that's required to get notice, we'll

5   give notice.

6          The service list will be maintained by the claims

7   agent.  It'll be maintained on their website.  It'll be

8   available to everyone on request or just by going to the

9   website.

10          This procedural motion also calls for e-mail service

11   and it does that by virtue of ECF, which already contemplates

12   that.  So parties could participate in that.  And then people,

13   parties filing 2002 requests for notice are going to be

14   required to submit to that effectively by filing that notice or

15   certifying why they can't get e-mail service.  And in our

16   experience, that works very well in cases.

17          THE COURT:  Uh-huh (indicating an affirmative

18   response).

19          MR. ELLMAN:  Clearly, parties who don't participate in

20   ECF don't appear in the case.  If they're entitled to notice,

21   they will get paper notice.

22          THE COURT:  Right.

23          MR. ELLMAN:  Because that's what's available.

24          I also wanted to point out in Paragraph 16, in

25   particular, of this, of this order the large sort of all-party

1   case notices are not affected.  So those will be served, like

2   the case commencement notice we talked about, through the mail

3   in the normal course.  Notices about the claims bar date, if

4   there is one, notices about the plan, disclosure statement, all

5   that stuff is not affected by the procedures.

6           And I think that's -- there are other, there's other

7   things that might be interesting to the Court in the

8   procedures, but those are the ones I wanted to highlight.  If,

9   if Your Honor has any questions about it, I'll be happy to

10  answer them.

11          THE COURT:  I reviewed the motion and, and, and some

12  of the things were of great interest to me, but you have

13  touched on the main things that were of interest to me.

14          One thing I will tell you is with respect to the

15  omnibus hearing dates --

16          MR. ELLMAN:  Uh-huh (indicating an affirmative

17  response).

18          THE COURT:  -- I went ahead and looked at my calendar

19  -- and I can do this on the record today -- but I have dates

20  once a month to provide you for the remainder of 2018.  Because

21  I am a planner and I just as soon go ahead and have those dates

22  plotted out.

23          MR. ELLMAN:  So not just this year, but into next year

24  as well?

25          THE COURT:  Right.

1          So I can give you those dates right now, if everybody

2     in the courtroom would like to know those dates.  It's not that

3     many.  I'll just go ahead and list them off, but would ask that

4     you go ahead and include these dates in the order.  Let's see.

5     December 20, 2017, at 9:30.  January 18, 2018, at 10:30.  I

6     believe that's because we already have a hearing set that

7     morning, which shouldn't take too long.

8          And then going forward, all the other times would be

9     9:30, but the dates are:  February 22, 2018, March 22, 2018,

10     April 19, 2018, May 24, 2018, June 21, 2018, July 27, 2018,

11     August 23, 2018, September 20, 2018, October 18, 2018, November

12     16, 2018, and December 20, 2018.  That just helps me for my own

13     planning purposes.

14          So I'd like to go ahead and get those dates sort of

15     set in stone with the understanding that sometimes those dates

16     won't be necessary, we'll have hearings on shortened notice,

17     and, and otherwise.  The only other -- I think most of those

18     dates are falling on a Thursday.

19          MR. ELLMAN:  Okay.

20          THE COURT:  And again, I am a planner.  I like to

21     read.  I like to have as much notice as possible.

22          The only other thing I was going to suggest is with

23     respect to filing the proposed agenda.  Rather than two

24     business days, ask that that be filed three business days,

25     which would be on the Monday before those Thursday hearings.

1          So that's the only other change that I would ask be

2   made to the motion and other than that, I will grant the motion

3   as has been proposed.

4          MR. ELLMAN:  Thank you, Your Honor.

5          THE COURT:  Uh-huh (indicating an affirmative

6   response).

7          MR. ELLMAN:  The, the only thing I would mention on

8   hearing dates, we may need, as we, again previewing a little

9   bit what we're going to be talking about today, but as we get

10  into the TRO --

11         THE COURT:  Right.

12         MR. ELLMAN:  -- if that is granted, we also have a

13  number of what I call second day motions, motions we filed on

14  the first day that are not scheduled today, that we could

15  schedule for December 20th, but it may make sense to have them

16  heard --

17         THE COURT:  Right.  And I've got a few other --

18         MR. ELLMAN:  -- towards the --

19         THE COURT:  -- dates in my pocket.

20         MR. ELLMAN:  -- we were thinking kind of last -- okay.

21  We were thinking end of November, but we can, we can get to

22  that.

23         THE COURT:  These are just sort of the omnibus hearing

24  dates.

25         MR. ELLMAN:  I gotcha.  Okay.

1           Well, thank you, Your Honor.

2           And then as far as, again, the blackline, I think this

3    one's fairly unexciting as well.  It's, it's the same kinds of

4    changes.  We will fill in the, the dates for the hearings, but

5    other than adding reference to the first day declaration, the

6    docket number, and a couple small word changes --

7           THE COURT:  Okay.

8           MR. ELLMAN:  -- it's the same order.

9           THE COURT:  All right.  We will look for that order.

10          MR. ELLMAN:  All right.

11          So that takes us to the, the final of four motions,

12   which is Tab 7.  This is the cash management, cash management

13   motion.  And it's seeking relief under Sections 345 and

14   363(c)(1).  It really has three components.  I'll, I'll go

15   through the three components.

16          The first is the bank accounts.  The Local Rules and

17   the standard operating order contemplate closing all pre-

18   petition bank accounts, opening new bank accounts, and that, to

19   us, would be very disruptive and burdensome.  It would not help

20   us have a smooth transition to this case.  And our bank

21   accounts are at Bank of America, which is, obviously, a strong

22   FDIC-insured institution.  It's on the approved list here in

23   this District.  And so we, we seek to maintain the same bank

24   account.

25          And the standard operating order, just as an aside,

1   has not been entered yet because we're negotiating revisions to

2   that with the Bankruptcy Administrator.  Hopefully, we'll have

3   something to present that's consensual, but at this point

4   we're, we're seeking relief to allow us to continue to using

5   the bank accounts.

6          The second is our cash management system.  And the

7   debtor's cash management system was established to help it and

8   its subsidiaries to manage cash and we're going to ask for that

9   system to be approved with a few changes I'm going to describe.

10  And, and this blackline order actually has some stuff in it

11  that's more interesting.  So that's, that'll be worth going

12  through.

13         But it's a pretty simple system.  It has three

14  accounts that collect, hold, and disburse money.  And so I'm

15  going to go through just the highlights of that system.  But

16  before I do that, I wanted to mention a couple of agreements

17  that are kind of important to understanding the system or that

18  impact the system.

19         One is the funding agreement Mr. Gordon already talked

20  about.  It's the source of funding and that has to integrate

21  with our cash management system.  It's critical to the company.

22         The second one which hasn't been mentioned yet, but is

23  attached to our motion as Exhibit B is the cash pooling

24  agreement.  And this is an agreement that was entered into by

25  the debtor with certain of its subsidiaries to, to maximize the

1   efficiencies of cash pooling and managing cash among the group.

2           And if you have Demonstrative No. 1, Your Honor, that

3   Mr. Gordon used, you'll see the two companies involved are, are

4   GP Industrial Plasters, which is the one right below Bestwall,

5   and then below that the Canadian entity, Industrial Plasters

6   Canada.  So those two entities are part of this cash pooling

7   agreement with Bestwall.  And I, I think our motion refers to

8   them as GP Plasters and Plasters Canada.

9           So with that introduction, I'll talk about the three

10  accounts and how they work at a high level.

11          So we have a concentration account.  That is the

12  central account in the system.  That's where incoming cash is

13  collected and that does include the funding agreement cash.

14  When we, we get money from New GP through the funding

15  agreement, it's deposited here.  And it's worth noting that

16  under the funding agreement -- and, by the way, that funding

17  agreement is attached to Mr. Woolson's declaration as Annex 2.

18  You can, you can see it there, but I think at Page 5 is the

19  best place to see this.  It contemplates we'll keep $5 million

20  of a reserve and that's so the debtor always has immediate

21  access to some cash without having to ask for the money and get

22  it to be transferred.

23          So that $5 million sits in the concentration account

24  and any additional money we ask or seek under the funding

25  agreement that comes in sits in the concentration account.

1          Other money coming into the concentration account

2    would include dividends or distributions from the subsidiaries.

3    If they make a distribution, that becomes the estate's money.

4    Any payments under services agreements that are paid to the

5    estate, that's the estate's money.  It sits in the

6    concentration account.

7          Then the third thing is the cash that is not the

8    estate's cash.  It's the cash of GP Plasters and Plasters

9    Canada that through cash pooling they, they keep in the cash,

10   the concentration account to be managed by the parent.  That

11   money is also in this account, but it's not the estate's money.

12   It just, it's held there.

13         And so the way that cash pooling works for GP

14   Plasters, the immediate subsidiary, they have a, an automatic

15   sweep every day of the money that's in their main account.  So

16   when they get money at the end of the day, it sweeps up and it

17   ends up in the concentration account of Bestwall.  Bestwall

18   accounts for every dollar.  They keep strict records.  If, if

19   Plasters needs money, it makes a request, which is, basically,

20   an electronic request.  The money moves back down the chain to

21   be used by the subsidiary.  And they can only get money that is

22   their money that happens to be in the concentration account.

23   There's no loans.  There's no advances.  If the subsidiary, GP

24   Plasters, needs money that isn't available in the concentration

25   account, they have a revolving line of credit with New GP.

1            So on this, on this chart to the right of Bestwall,

2    they have, they get money from here.  Doesn't involve the

3    debtor.  Comes directly from that.

4            And very similar for Plasters Canada, which is the,

5    the second-tier subsidiary, except it's not so automatic.

6    There's no sweep arrangement.  Plasters Canada, when they have

7    extra money, excess cash, they will send it up the chain, again

8    a more manual system.  It'll be held in the concentration

9    account.  If they need money, they ask for it.  It gets sent

10   back down.  Again, no loans, no advances.  And if Plasters

11   Canada needs money, they also have, you know, on this chart,

12   they have their own, you know, relationship with New GP and

13   they'd get money that way.  So the only thing they get from the

14   estate is their own money.

15           So that's how the concentration account works.

16           The other thing I'll mention about the concentration

17   account it, it is not typically used for disbursements except

18   in one situation, which is wire transfers.  So wire transfers

19   can leave that account.  But for everything else, they have a

20   disbursement account.  That's the second of their accounts.

21   That's managed by a company called Pace Claims Services LLC and

22   that pays everything out, anything that's not by wire transfer.

23   That would be all the professional fees.  It all goes through

24   there.  That's a zero-balance account.  It doesn't hold money.

25   It doesn't keep money.  If they're going to make a disbursement

1    of a hundred dollars, the hundred dollars comes in and goes

2    back out.

3            And then the last account is what we call a segregated

4    account and this is just holding money.  This is $15 million.

5    That is part of the initial funding of Bestwall and it's being

6    held to help fund the 524(g) trust.  That the expected use of

7    this fund, of this money.

8            So the changes that we discussed with the Bankruptcy

9    Administrator pretty much all go to the 345 waiver and how

10   we're going to deal with the fact that if we have $15 million

11   in the account, that's obviously well above the FDIC insurance

12   limit.  And so we've agreed to do a couple of things that are,

13   when we get to the order, are reflected in the order.

14           So first thing is that segregated account.  All of the

15   money in that segregated account, the $15 million that's from

16   the initial funding of the company that we're just holding, all

17   that money is going to be invested in Treasuries, effectively

18   backed by the full faith and credit of the United States.

19   Every dollar in that account's going to be addressed through an

20   investment in, in Treasuries.

21           In the concentration account, you may recall I

22   mentioned the $5 million of reserve money we're keeping in

23   there.  We've agreed with the Bankruptcy Administrator to put

24   half of that, well, I should say, not less than half -- we

25   could put more -- but not less than at least half of that

1    money, $2-1/2 million, also into Treasuries.  Now the money

2    that will not be in Treasuries will include the subsidiaries'

3    money, the Plasters Canada and GP Plasters, not the estate's

4    money.  We're not going to touch that money.  It's just going

5    to stay in the account and move back and forth as needed.  And

6    any -- you know, the, whatever part of the reserve we don't put

7    in there and any additional cash coming in will not go into the

8    Treasuries.  It'll be sitting in that account, but they will be

9    subject to a program with Bank of America where they will

10   collateralize the amounts in excess of the FDIC limits.  And

11   the order provides for an ongoing, ongoing notice process with

12   the Bankruptcy Administrator's Office to see how much the

13   balances are in there to make sure we're within the collateral

14   limits.  If there's an issue, we'll address that at a later

15   time.  But --

16        THE COURT:  Uh-huh (indicating an affirmative

17   response).

18        MR. ELLMAN:  -- for now, we believe this will be

19   sufficient to protect all the money.  The Bankruptcy

20   Administrator seems satisfied with that.

21        The only other part of the, of the cash management

22   system I think worth mentioning is, as you'll see in, in the

23   order and the motion, we're asking to pay the bank fees and do

24   some sort of basic things that banks always require us to do to

25   make the system work.  They know they can charge our fees.

1  They know if we tell them to pay a check that it's okay, that

2  they're not going to get in trouble.

3          And with all -- with all those -- with those changes

4  and those additional points, we ask for the system to be

5  approved, again similar to what's been done in other cases,

6  like <u>Kaiser Gypsum</u>, like <u>Garlock</u>, in this District as an

7  ordinary-course practice.

8          And then there's one last thing we're asking for in

9  this motion, a third form of relief, which is pretty simple,

10  which is not to have to put the DIP, you know, DIP designation

11  on business forms, etc., etc.  And we have made one change to

12  that in consultation with the Bankruptcy Administrator's

13  Office.  They're fine with us not putting DIP language on our

14  business forms and checks, but they did ask that we add to the

15  signature cards with the bank for each of the accounts the

16  clear designation debtor in possession, which we have done.

17  And that is reflected in the order as well.

18          THE COURT:  Okay.

19          MR. ELLMAN:  And so it might be worth just flipping

20  through the order 'cause there are a few changes in this order.

21  I can point out where they are.

22          THE COURT:  Okay.

23          MR. ELLMAN:  And then if you have any questions.

24          Page 2 is just docket numbers and small changes.  The,

25  the real meat of it is on Page 3 --

1        THE COURT:  Uh-huh (indicating an affirmative

2   response).

3        MR. ELLMAN:  -- which is Paragraphs 4, 5, and 6.

4        Paragraph 4, in addition to referring to the changes

5   that are in 5 and 6, does make clear that the subsidiary cash

6   is not property of the estate.  I just wanted to make sure that

7   was very clear.

8        And then Paragraphs 5 and 6 deal with the investments

9   in the Treasuries in the two different accounts.  Paragraph 5

10  deals with the segregated account.  Paragraph 6 deals with the

11  concentration account and it also includes the keeping, the

12  provision about keeping the Bankruptcy Administrator informed

13  on a monthly basis.  That's, that's in those two paragraphs.

14       And then if you look at Paragraph 10, that includes

15  the language about the signature cards that I mentioned.

16       And the last change I wanted to mention is in

17  Paragraph 16.  And in Paragraph 16 all that really does is

18  makes it, makes it clear that we can enter into the broker's

19  standard agreement, which is the thing that allows us to invest

20  in Treasuries.  We've shared a copy of that with the Bankruptcy

21  Administrator.  She was fine with the form of agreement.  I

22  think it's just their form.  I don't think we have any

23  particular ability to, to change the form, but, but it was in

24  the form acceptable to the Bankruptcy Administrator.

25       So with those changes, we'd ask for the order to be

1    entered, Your Honor.

2              THE COURT:  All right.  Let's let Ms. Abel speak for

3    herself.  It's usually at this point.

4              MS. ABEL:  Mr. Ellman has covered our issues and we've

5    worked on the form of order over the last several days.  And so

6    his presentation covers our issues.

7              THE COURT:  Okay.

8              With all of that, then, I will grant the debtor's

9    motion for an order approving the continued use of its bank

10   accounts, granting the waiver of the requirements of 345(b),

11   and authorizing the debtor's bank to charge certain fees and

12   other amounts consistent with the changes that you've noted on

13   the record as well as have been blacklined in the proposed

14   order that you handed up.

15             MR. ELLMAN:  Thank you, Your Honor.

16             THE COURT:  Thank you.

17             MR. ELLMAN:  With that, I'll turn the, the lack of

18   podium back to Mr. Gordon to talk about the TRO.

19             THE COURT:  All right.

20             You know, we're constructing an annex and we'll start

21   doing that, apparently, in the spring, which will give us an

22   opportunity to design new courtrooms, which there will be many

23   of, apparently.  But one of the things they have talked about

24   is putting a podium in all of the courtrooms, one that can be

25   taken in and out.

1          So it may be a few years down the road, but, if you

2    wait long enough, we'll get that podium for you.

3          MR. GORDON:  Well, I think the good news, Your Honor,

4    is it's hard to slouch up here.

5          THE COURT:  That's right.

6          MR. GORDON:  So, Your Honor, if I could, with your

7    permission, I'd like to take up our request for the entry of a

8    temporary restraining order.

9          THE COURT:  Uh-huh (indicating an affirmative

10   response).

11         MR. GORDON:  So, Your Honor, by this motion, at least

12   as it relates to today, we seek the entry of a temporary

13   restraining order under Section 105(a) of the Bankruptcy Code

14   extending the automatic stay to enjoin the continuation or

15   commencement by the plaintiffs.  And I should pause there for a

16   second 'cause I find this very confusing.

17         When I'm using the "plaintiffs," I'm talking about the

18   plaintiffs in the asbestos cases against Bestwall.

19   Unfortunately, 'cause we had to file an adversary proceeding,

20   they're referred in the papers as "defendants," but for

21   purposes of today I think it's probably easier if I call them

22   plaintiffs.

23         THE COURT:  I'm with you.

24         MR. GORDON:  Okay.

25         So we seek to enjoin the continuation or commencement

1    of any action by the plaintiffs seeking to hold the debtors --

2    well, I should say, various protected parties -- liable for

3    asbestos-related claims for which the debtor, or Bestwall, is

4    responsible.

5         So again, to say that again, this is just to restrain

6    or enjoin the continuation or commencement of asbestos-related

7    claims against protected parties in situations where those

8    claims are actually claims against the Bestwall entity.  And

9    again, to pause here.  The protected parties list, which we've

10   appended to the motion includes the entity we referred to this

11   morning as New GP.  It also refers to the entity we referred to

12   as Old GP and then we've also included in the list all domestic

13   subsidiaries of New GP.  We've included the subsidiaries of

14   Bestwall and then we've included the companies up the chain

15   from Bestwall, up the ownership chain, all the way up to the

16   top, which is Koch Industries at the top, is the ultimate

17   parent company.

18        So there's two aspects of the relief.  One is this

19   request for a 105(a) temporary restraining order.  The other is

20   for a declaratory judgment -- this is in the alternative -- for

21   a declaratory judgment under Section 320, 362(a) determining

22   that the automatic stay applies of its own force to the

23   litigation of these claims.  And again, I'm going to call them

24   Bestwall Asbestos Claims in an effort to be less confusing

25   about this.

1          In support of the motion, Your Honor, we're offering

2     the declaration of Mr. Woolson, which was put into evidence in

3     connection with Mr. Ellman's motions.  We're also offering the

4     declaration of Mr. Mercer, who you met at the outset of the

5     proceeding.  He's the Chief Legal Officer of the debtor.

6          So before I forget, Your Honor, I'd like to move those

7     declarations into evidence at this point in support of our

8     request for the entry of a temporary restraining order.

9          THE COURT:  Any objection to the Court admitting those

10    declarations into evidence?

11     (No response)

12         THE COURT:  I don't see that there are any.  So I'll

13    admit both of those declarations into evidence in the adversary

14    proceeding.

15     (Debtor's Exhibits A and B admitted in evidence)

16         MR. GORDON:  Thank you, Your Honor.

17         THE COURT:  Uh-huh (indicating an affirmative

18    response).

19         MR. GORDON:  Your Honor, the relief we're seeking has

20    been routinely granted in every, literally every asbestos

21    chapter 11 case, or at least I'm aware.  It's becoming a theme

22    here this morning, but, or this afternoon, but it was granted

23    by Judge Hodges in Garlock and it was granted by, this relief

24    was granted by Judge Whitley in the Kaiser Gypsum case.  And I

25    think these requests are routinely granted in chapter 11 cases

1    because, frankly, absent the relief, Your Honor, the central

2    purpose of the case, which is to achieve a comprehensive

3    resolution of all asbestos claims, would be defeated.  And what

4    I mean by that is if we didn't get this relief, literally the

5    plaintiffs would have the ability to litigate and attempt to

6    recover on their claims in a piecemeal fashion outside of this

7    Court, which, in our view, completely undercuts what we're here

8    for, which is to have all these claims brought into this court,

9    comprehensively resolved here, and resolved in an equitable or

10   uniform way.

11          So again, I think, absent the relief, it's hard to

12   have, it's hard to pursue the objective that we would want to

13   pursue in this case and that's why I think these have been

14   routinely granted.

15          So I'm not going to, Your Honor, go back over the

16   facts I went over before, but, obviously, we're in a situation

17   where we have tens of thousands of pending claims.  We have a

18   situation where as a result of the corporate restructuring the

19   debtor is the entity that's solely responsible for those

20   claims.  We've advised, or prior to the time we filed we

21   advised the plaintiffs' bar generally in the tort litigation

22   that, in fact, this restructuring had occurred and that the

23   debtor was the entity solely responsible for the claims.

24   Nonetheless, the claims were continuing in the tort system,

25   both against the old entity, Old GP, as well as there are

1   efforts underway to amend or to sue New GP in these cases.

2   And, in fact, I think at the time we filed there are over 150

3   cases already where claims were being asserted against New GP

4   and, of course, in virtually every other case claims are

5   continuing against Old GP.

6        And I will say in that respect, Your Honor, I learned

7   something new in terms of litigation and that is there's a

8   Federal Rule of Civil Procedure, 25(c), which Your Honor may be

9   familiar with, but it basically provides, as I recall, that if

10  the interest of the defendant is transferred during a

11  proceeding, it's our, you know, an existing proceeding,

12  basically the party, the plaintiff, can continue against the

13  entity that was originally named.  So litigation can continue

14  against the named party even though that named party may have

15  transferred its interest during the course of the case.  And

16  there are state law equivalents, I think, in virtually every

17  state court, or at least in many of them that provide the same

18  thing.

19       So it's not unusual that the cases would proceed

20  against the old entity and, in fact, we didn't resist that,

21  frankly, in the litigation when the efforts were continuing in

22  that regard.

23       We believe, Your Honor, the automatic stay applies to

24  all the protected parties, including Old GP and New GP.  But

25  nonetheless, we're asking the Court for the relief today either

1    through the TRO or a declaratory judgment because we believe,

2    Your Honor, that we need clear guidance to both the plaintiffs

3    and to the state courts that all efforts to pursue Bestwall

4    Asbestos Claims, whether against the debtor, Old GP, New GP,

5    any of these other affiliates.  All those efforts, all those

6    claims would be stayed.

7         So, Your Honor, there's two principal bases on which

8    we seek the relief.  The first, as I indicated, is pursuant to

9    Section 105(a) of the Bankruptcy Code.  We cite in our papers

10   the A. H. Robins case, which has a discussion about 105.  It

11   recognized that courts have broad authority under Section 105,

12   as it said, "to enjoin parties other than the bankrupt from

13   commencing or continuing the litigation."  It also found that

14   the injunction as to third-party litigation is appropriate for

15   "the failure to enjoin would affect the bankruptcy estate and

16   would adversely or detrimentally influence and pressure the

17   debtor through those third parties."

18        We think that's exactly what would happen here.  As I

19   indicated earlier, if the relief were not granted, our ability

20   to achieve our objective in this case, the comprehensive

21   resolution of all claims, would be utterly thwarted and we

22   believe as well, Your Honor -- and you'll see this in the

23   Mercer declaration -- that the debtor would be distracted

24   having to participate in these cases.  It would feel pressure

25   to defend these claims in other courts across the country.

1          Your Honor, the -- it -- the consideration of the

2     traditional injunction factors, the four factors, in our view,

3     clearly demonstrates our entitlement to a temporary restraining

4     order.

5          Factor No. 1 is the reasonable likelihood of

6     successful reorganization.  We are obviously at the very outset

7     of the case.  Of course, we feel very strongly that we'll be

8     successful.  You probably wouldn't be surprised by that, but we

9     do think at this point there's reasons to be optimistic about

10    getting to a successful result.  First of all, Your Honor, I, I

11    think the debtor has the exact array of issues for which

12    Section 524(g) was specifically designed and it was designed

13    for exactly this kind of case, a company who's beset by, you

14    know, literally tens of thousands of claims with a long future

15    in sight in terms of the continuation of those claims.

16         In addition, we have an entity that we believe -- and

17    I think it was made clear, hopefully, through my recitation of

18    the assets of Bestwall -- that it clearly has the financial

19    wherewithal to fund a trust, or it has the sources available to

20    fund the trust.  It's got its own assets, its own business,

21    plus it has, obviously, the funding agreement as well.

22         Moreover, Your Honor, I think there's reasons to be

23    optimistic because many other similarly situated companies have

24    filed chapter 11 to establish a Section 524(g) trust.  All of

25    these companies were in similar circumstances.  Many of them, I

 1   think, had fewer claims, probably, than this company.  Some

 2   probably had more, but in many, many of those cases I think the

 3   large majority of those companies were successful in confirming

 4   524(g) plans of reorganization and establishing a trust for the

 5   payment of asbestos claims.

 6          So I think the first factor we can clearly satisfy.

 7          The second factor is an imminent risk of irreparable

 8   harm.  I'd say here, Your Honor, this risk is significant.  We

 9   pointed out in the papers -- and I think it's again in the

10   Mercer declaration -- that there's a contractual obligation on

11   the part of the debtor to indemnify New GP against Bestwall

12   Asbestos Claims.  That obligation was undertaken as part of the

13   divisional merger that I described to Your Honor earlier.

14          We think, Your Honor, it's also likely that there are

15   common law obligations that the debtor would have to other

16   affiliates if those affiliates were also sued on Bestwall

17   Asbestos Claims.  And remember, these would be affiliates that

18   never manufactured or sold a Bestwall asbestos-containing

19   product.  The only entity that has that liability is, is

20   Bestwall.

21          So, Your Honor, because we have these indemnity

22   obligations a judgment against a protected party would, would

23   basically have the effect of fixing the claim against the

24   debtor.  Because there, if you take a claim that's unliquidated

25   or disputed, it will be turned into a fixed claim that would

1  then be asserted against the estate by virtue of the

2  indemnification obligation.  And when you think about that,

3  Your Honor, it really means the debtor is, effectively, the

4  real party defendant in those cases and if the stay weren't in

5  place, in effect, the benefits of the automatic stay would be

6  eliminated from the standpoint of Bestwall.

7          In addition, Your Honor, we tried to point out that

8  allowing these claims to proceed in other courts against these

9  protected parties would create collateral estoppel and res

10  judicata risks, but also create risks of evidentiary prejudice.

11  There could be fact findings made in those cases that might

12  ultimately be binding on the debtor.

13          Further, Your Honor, as I think I alluded to earlier,

14  we have a significant concern about the diversion of personnel

15  that we think are key to this process.  We believe because of

16  the potential impact of this litigation, if this litigation

17  were allowed to proceed against the protected parties, the

18  debtor would have no choice but to participate in the

19  litigation.  That means, among other things, formulating

20  defense strategies, defending depositions, producing documents,

21  preparing witnesses, and all other types of litigation-related

22  tasks.  Mr. Mercer and his team would be required to spend,

23  potentially, a significant portion of their time managing and

24  defending these claims that are proceeding in other courts

25  around the country.  And, you know, as we pointed out again in

1  the papers, his team was consumed by the defense and management

2  of these claims prior to filing and if, if the door is allowed

3  open here, we believe that that's going to occur again as we

4  move forward and that will harm our ability to do what we need

5  to do in this case, which is to ultimately reach a 524(g)

6  resolution.

7           Further, Your Honor, we believe that the irreparable

8  harm to the debtor substantially outweighs any prejudice to the

9  defendants.  First of all, Your Honor, the, the claims against

10  the debtor are already stayed.  So we already have, the bulk of

11  the claims would be stayed, anyway.  In addition, Your Honor,

12  we would submit that it's very certain that the claims against

13  Old GP are stayed as well because, if you think about it, Your

14  Honor, although lawsuits are continuing against Old GP, it

15  doesn't exist any longer and, therefore, those lawsuits could

16  only have one purpose, which is to establish liability against

17  Bestwall.  And so we think the stay already applies there.

18           So, in fact, there's already a stay in place for the

19  large majority of claims and so we're already seeking -- all

20  we're doing is seeking to expand that to make certain that

21  nobody's out in front of anyone else, that everyone's in the

22  same place, that ultimately these claims can be treated in an

23  equitable and uniform manner.

24           The other thing I would, that we tried to point out in

25  the papers, Your Honor, that although some plaintiffs may be

1    delayed -- you know, there may be trials upcoming in the near

2    term.  In their efforts to recover from the debtor, typically

3    these cases involve multiple defendants.  So we didn't want

4    Your Honor to at least understand that notwithstanding a delay

5    here, they would still have the ability to pursue other

6    defendants in the tort system.  They would still have the

7    ability to pursue bankruptcy trusts, to the extent they have

8    claims against those trusts.  The stay would just be limited to

9    claims against Bestwall or, you know, claims related to, claims

10   against other parties related to the Bestwall liability.

11          Further, Your Honor, we would submit, you know, based

12   on a long time, a long history of, of experience, that the

13   litigation in the tort system is, in and of itself,

14   inefficient.  It's uncertain.  It does, in many cases, take

15   considerable time and, of course, we're, we're striving to get

16   to the end here with a trust that will process and pay claims

17   pursuant to trust distribution procedures that are typically

18   put together by the representatives for the claimants.  And

19   those will, of course, cover the claims of future claimants who

20   haven't even filed claims yet.  So there won't be any delay

21   with respect to them.

22          Moreover, Your Honor, the litigation against the

23   protected parties poses the risk that the holders of current

24   claims will receive recoveries -- I kind of covered this before

25   -- but will receive recoveries different from what the

1   remainder of the claimants would ultimately receive under the

2   trust distribution procedures in a trust.  And again, part of

3   the idea here -- and I think it's fundamental to bankruptcy,

4   generally -- is to achieve a resolution that fairly and

5   uniformly treats all claimants who are similarly situated and

6   that would be undermined, I think, if the stay were not in

7   place.

8           The other thing I'd just point out on this, in

9   balancing the relative harms, you know, the injunction's only

10  temporary.  The TRO, in particular, is only temporary.  It's

11  only, maybe, 14 or 28 days, depending on what, or somewhere in

12  between, depending on what Your Honor rules, if we get to that

13  point.  But it only halts the litigation until the point we get

14  to a chapter 11 plan.  It doesn't cut it off, altogether.  It

15  doesn't eliminate a source of funding.  The source of funding

16  is there.  It's just a question of how these claims ultimately

17  get resolved and what way will they be processed and paid at

18  the end of the day pursuant to a resolution reached with the

19  parties.

20          So we would submit, Your Honor, although there will

21  be, invariably, some delay to certain claimants, that delay to

22  some claimants will be far outweighed by the prejudice to us

23  if, in fact, we don't really have a case in the sense that,

24  although we're trying to comprehensively address claims here,

25  at the same time we have to defend claims elsewhere.

1        And, Your Honor, I said it before, but I'll say it

2   again, but I think it's relevant here.  We are committed to

3   moving as fast as we can in this case.  You know, we recognize

4   that in many cases it takes a while, but, hopefully, here, and

5   we're going to do our best to try to get to a resolution as

6   fast as we possibly, possibly can.

7        So again, we think we prevail on the third factor.

8        And then the fourth, Your Honor, is that the relief

9   further the public interest in ensuring a successful

10  reorganization.  Again, I think this goes back to what I said

11  before.  Purposes of the case is to get to a comprehensive

12  resolution.  That purpose would be in severe jeopardy if, in

13  fact, we couldn't address all the claims here, but, instead,

14  have to go outside of this court.

15       So, Your Honor, in short, I think it, we believe it's

16  very clear that all four injunction factors would support the

17  entry of a temporary restraining order to the extent requested

18  in the motion.

19       And then, just briefly, Your Honor, alternatively,

20  we're asking Your Honor to consider entering a declaratory

21  judgment that the automatic stay applies of its own force to

22  prohibit prosecution of Bestwall Asbestos Claims against the

23  protected parties.  I've already talked about Old GP.  I think

24  it's clear because it doesn't exist anymore.  The claims

25  against Old GP are stayed because there can't be any other

1    purpose for pursuing those claims except to pursue a claim

2    against Bestwall.  And then as to the others, we think, Your

3    Honor, it's, it's clear, or at least there's a very good

4    argument that the claims are stayed because the types of claims

5    that would be asserted against those protected parties will be

6    property of the estate.

7            And we laid this argument out in the brief, but when

8    you think about the types of claims that would likely be

9    asserted in order to impose the liability on a party that

10   didn't manufacture or sell Bestwall asbestos-containing

11   products, you're talking about alter-ego claims, which have

12   been found to be property of the estate.  You're talking about

13   successor liability claims that are found to be, have been

14   found to be property of the estate.  You're talking about

15   fraudulent transfer claims that have been found to be property

16   of the estate.  And in the case of fraudulent transfer claims,

17   a number of those have already been filed, were already filed

18   in the tort system against New GP before this case was

19   initiated.

20           And I'd also point out in the case of fraudulent

21   transfer claims I suppose you could argue whether those are

22   property of the estate, but whether they are or they're not I

23   think it is clear that it's the debtor that has the standing to

24   bring those claims, anyway.  The individual creditors don't

25   have the standing during a bankruptcy to pursue fraudulent

1    transfer claims against another party.

2           So we think for that reason that the automatic stay,

3    there is a, there is a strong basis to find that the automatic

4    stay applies of its own force.

5           In addition, the one other thing I'll say about the

6    automatic stay, we've got the A. H. Robins case as well and the

7    A. H. Robins case, although, ultimately, I think a 105(a) case,

8    has a number of statements in there that suggest, I think, a

9    view of the Fourth Circuit that, in fact, the stay would apply

10   in situations like this.  The court did talk about the stay

11   applying in a situation where a third party had an absolute

12   indemnity from the debtor, very similar to what we have here.

13   In fact, I think the court said, "To refuse the application of

14   a statutory stay in that case would defeat the very purpose and

15   intent of the statute."

16          So I think there's a basis there as well under the,

17   just the language in Owens Corn, language under A. H. Robins --

18   it's been a long day. At least I was in the asbestos world.  I

19   could have come up with something a lot worse than that.

20          So, Your Honor, I think, ultimately, at the end of the

21   day, whether Your Honor relies on the Court's broad 105 power

22   or whether you conclude that the automatic stay applies of its

23   own accord, we would submit that the relief requested should be

24   granted and it should be granted, primarily, because, if it's

25   not, we're going to have a hard time even getting out of the

1   starting gate in terms of what our ultimate objective is, which

2   is to achieve a total resolution of all the claims.

3        And then finally, Your Honor, I'd just say with

4   respect to the temporary restraining order the need for this

5   relief is immediate, given the number of claims we have,

6   literally with 22,000 active cases.  Activity's occurring on a

7   daily basis in the tort system.  We have hearings set almost

8   daily, answer deadlines daily, discovery deadlines, and the

9   like.  So there is an immediate need for the relief.

10        And also, I think, Your Honor, it's clear that, again,

11   we would be compelled, the debtor would be, feel compelled to

12   actively monitor and participate in these claims if, in fact,

13   that relief were not granted.

14        And then lastly, Your Honor, I just wanted to point

15   out the notice -- Mr. Ellman alluded to this -- but we did give

16   notice to all the law firms of which we're aware, literally the

17   whole list of law firms.  We did it by overnight mail and we

18   served it twice 'cause we served the papers initially and then

19   once we had the order approving the expedited request for a

20   hearing, we served it again.

21        So we believe we've had, even though it's a very short

22   time period, we believe we've had very fulsome notice under the

23   circumstances.

24        So, Your Honor, we would request that you enter the

25   temporary restraining order that we've asked for.

1    THE COURT:  With respect to the entry of a temporary

2  restraining order, I don't know if you want to go ahead and

3  talk about a continued hearing on -- and I think consistent

4  with, frankly, what Judge Hodges and Judge Whitley did in the

5  Garlock case and the Kaiser case, I'll grant the debtor's

6  motion for a TRO -- but with respect to a continued hearing on

7  a motion for a preliminary injunction, what were your thoughts

8  about that?

9    MR. GORDON:  Well, in the papers we actually ask you

10  to consider going beyond the 14 days.

11    THE COURT:  Right.

12    MR. GORDON:  And we have the right to request it for

13  good cause.  To us, the, the principal concern there is that

14  the committee should be in place and ideally, the future

15  claimants' representative should be in place.  Because,

16  obviously, Your Honor will want to hear their views with

17  respect to this relief.  It's very important to the overall

18  case.

19    And so we were proposing to, to give us 28 days to

20  make sure not only is the committee in place, but it's retained

21  professionals and is ready to go.  And that might also give us

22  enough time to have a future claimants' representative in place

23  with counsel as well.

24    Otherwise, though, you know, we can work with that,

25  Your Honor.  We, we just can't really have a gap.  We need to

1   have the relief and, you know, we can take the hearing again

2   whenever appropriate.  But we thought more time might be

3   helpful to the plaintiffs.

4          THE COURT:  Okay.  And, and I agree.

5          And I, and I think the other sort of cause for

6   extending the TRO beyond the 14 days is just the fact of the

7   time of year that this case has been filed and the shortage of

8   hearing dates and special settings we already have.

9          MR. GORDON:  Okay.

10          THE COURT:  So in that regard, as I told Mr. Ellman, I

11   had dates in my back pocket.  And December 5th, I think, is 28

12   days and so would go ahead and I think it will be appropriate

13   to have the hearing on the motion for a preliminary injunction

14   on December 5th, at 9:30.

15          MR. GORDON:  All right.

16          Your Honor, one other thing, if I could, I should

17   mention is that we've had conversations today with

18   Ms. Ramsey -- and I'm sure she will speak for herself at some

19   point here -- but she requested certain changes be made to the

20   form of order itself.  And primarily, she raised concerns about

21   proposed fact findings that, that we had in the order for fear

22   that those might become binding at a hearing on a preliminary

23   injunction.  That wasn't the intent, but we're certainly

24   prepared to accept her, her changes and, and eliminate some of

25   those findings.

1          So I do have a proposed form of order that --

2          THE COURT:  Okay.

3          MR. GORDON:  -- I can provide at the appropriate time

4     that has the redline.

5          THE COURT:  Okay.  All right.

6          Ms. Ramsey.

7          MS. RAMSEY:  Thank you, Your Honor.  Natalie Ramsey

8     for the law firms of Simmons Hanly Conroy and Kazen, McClain,

9     Satterley & Greenwood.

10         Your Honor, as Mr. Gordon said, with the changes that

11    the debtor has agreed to make, my clients consent to the entry

12    of the temporary restraining order requested today.  We

13    recognize the case is very new.  This is the third business day

14    of the case.  There isn't a committee in place yet.  There has

15    been no discovery provided yet by the debtors and my clients

16    and many of the other claimant representatives are still coming

17    up to speed on the case.

18         But we did want to make clear to the Court today that

19    although we're not objecting to the interim relief that is

20    sought here, until a committee is in place and can address

21    this, this fully we are concerned about many of the things that

22    Mr. Gordon has represented to the Court today and is contained

23    in the preliminary filings made by the debtor.

24         As reflected in the first day pleadings and in

25    Mr. Gordon's remarks, this case has been carefully planned from

1   the specific manner in which Georgia-Pacific was taken to

2   Texas, reordered, sent, part of it sent back here, part of it

3   sent back to Delaware, to the selection of this forum for the

4   bankruptcy case, to the indemnification and funding agreements

5   between New GP and the debtor.  All of that suggests that a

6   great deal of thought and legal strategy has gone into the way

7   that this case has been filed and my clients are concerned

8   about the path that this case has taken.

9        THE COURT:  Uh-huh (indicating an affirmative

10  response).

11       MS. RAMSEY:  105 injunctions are standard in asbestos

12  cases to extend the stay and provide the debtor with an

13  opportunity to reach a consensual deal, but this case presents

14  very unique facts and we think they are facts that require

15  exploration and we expect that what the Court may find coming

16  down the road, either in connection with this adversary or in

17  some other pleadings before the Court, are challenges to the

18  corporate restructuring that have taken place and we wanted to

19  make sure that the Court was aware today that the consent and

20  the silence that you're hearing with respect to the TRO was not

21  an indication that people are comfortable with the way that

22  this case has been planned and proceeded and filed.

23       THE COURT:  Okay.

24       MS. RAMSEY:  Thank you, Your Honor.

25       THE COURT:  Uh-huh (indicating an affirmative

1    response).  And duly noted.

2          Having said that, though, you've reviewed the order

3    that's been proposed by Mr. Gordon with the blacklined changes

4    and are okay with that or --

5          MS. RAMSEY:  I, I have not seen the order, Your Honor.

6    I have discussed it with Mr. Prieto and we went through the

7    changes.

8          THE COURT:  Okay.

9          MS. RAMSEY:  I'll take a quick look now.  There

10   weren't --

11         Mr. GORDON:  Your Honor, may I approach?

12         THE COURT:  Yes, sir.  Thank you.

13      (Pause)

14         MS. RAMSEY:  Yes, Your Honor.  This reflects the

15   changes we agreed to.

16         THE COURT:  Okay.  All right.

17         Then, again, having granted the motion, Mr. Gordon,

18   we'll look for you to upload the order with those proposed

19   changes.

20         MR. GORDON:  Would you like a clean version before I

21   leave or --

22         THE COURT:  No, sir.

23         MR. GORDON:  Okay.

24         THE COURT:  Thank you.

25         MR. GORDON:  Got lots of extras.

1        THE COURT:  And I think that does leave us, then, with

2   the debtor's motion for approval of service procedures for

3   summons and complaint.

4        MR. GORDON:  Could we have a second, Your Honor?

5        THE COURT:  Yes, sir.

6        We can take a brief recess, actually.

7        MR. GORDON:  Okay.

8        THE COURT:  And we will be right back.

9     (Recess from 3:49 p.m., until 3:55 p.m.)

10                      AFTER RECESS

11        MR. GORDON:  Your Honor, you caught me by surprise on

12   that.  My apologies.

13        THE COURT:  That's all right.

14        MR. GORDON:  I know one of the people to my left is

15   responsible for that gaffe and we'll -- we'll -- we'll track,

16   we'll track that down later.

17        So, Your Honor, this is just a straightforward motion.

18        THE COURT:  Right.

19        MR. GORDON:  We, we've done this, I think, in every

20   case and I think the plaintiffs' bar prefers this.  We're just

21   asking you to approve it.  We can send this, you know, we can

22   serve just the counsel as opposed to the plaintiffs themselves

23   and then counsel will take, take care of that.

24        THE COURT:  I --

25        MR. GORDON:  But it's pretty straightforward.

1          THE COURT:  I figured that's what you'd say, but I

2     thought you might want to argue the motion.

3          And I will grant the debtor's motion in the adversary

4     as well for approval of service procedures for the summons and

5     complaint.

6          And I do think that that addresses all of the matters

7     that are on today's calendar.  Unless, Mr. Gordon -- I think

8     Mr. Ellman sort of forecast, perhaps, there might be a need or

9     a request for other hearing dates.  And so I'll hear from you

10    in that regard.

11         MR. ELLMAN:  Your Honor, I think that we do have three

12    other, I believe it's three other motions pending --

13         THE COURT:  Uh-huh (indicating an affirmative

14    response).

15         MR. ELLMAN:  -- that are, again what I would call

16    second day motions, filed on the first day but to be heard on a

17    subsequent hearing day.

18         And so we would like to get a, a date on the calendar

19    for those motions.  It could be December 5th, which is the date

20    you mentioned.  I don't know that I have the time of day of

21    that hearing on the, on the 5th of December.

22         THE COURT:  9, that would be 9:30.

23         MR. ELLMAN:  9:30.  We could use that date.

24         You also mentioned November 15th, but that may be, may

25    make more sense to wait until after the committee is in place

1    for these three motions.

2           So if it makes sense to Your Honor, I think we could

3    use December 5th as the -- we could notice those three motions

4    for that date.

5           THE COURT:  Okay.

6           MR. ELLMAN:  It's not an omnibus date, but it, it

7    makes sense to me to get those motions heard.

8           THE COURT:  I agree.

9           Unless I hear objection, strenuous objection by

10   somebody right now, I will go ahead and set aside December 5th

11   for hearings in this case, okay?

12          MR. ELLMAN:  Thank you.

13          THE COURT:  All right.  I believe that that takes care

14   of the matters that we have on the calendar for today and we

15   will look to see you back, some of you, all of you -- I don't

16   know -- a week from -- well, I guess it would be November 15th,

17   at 9:30.

18          So safe travels to all of you.

19          With that, we will recess.  Thank you.

20      (Proceedings concluded at 3:58 p.m.)

21

22

23

24

25

1                          <u>CERTIFICATE</u>

2          I, court approved transcriber, certify that the

3   foregoing is a correct transcript from the official electronic

4   sound recording of the proceedings in the above-entitled

5   matter.

6   /s/ *Janice Russell*                    November 10, 2017

7   Janice Russell, Transcriber                   Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25