**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| BESTWALL LLC[1] | : | Case No. 17-31795 (LTB) |
| | : | |
| Debtor. | : | |
| | : | |

**THE DEBTOR'S OBJECTION TO MOTION OF THE OFFICIAL
COMMITTEE OF ASBESTOS CLAIMANTS TO DISMISS
THE CHAPTER 11 CASE, OR ALTERNATIVELY, TRANSFER VENUE**

---

[1]     The last four digits of the Debtor's taxpayer identification number are 5815.  The Debtor's address is 100 Peachtree Street, N.W., Atlanta, GA 30303.

# TABLE OF CONTENTS

                                                          **Page**

INTRODUCTION ............................................................................................ 1

BACKGROUND ............................................................................................. 4

    A.    Bestwall Asbestos Claims ................................................................ 4

    B.    The 2017 Corporate Restructuring ................................................... 6

    C.    Bestwall's Chapter 11 Filing and Proceedings to Date ...................... 7

ARGUMENT ................................................................................................. 10

I.      LEGAL STANDARD .......................................................................... 10

II.    THERE HAS BEEN NO SHOWING OF SUBJECTIVE BAD FAITH ........................ 11

    A.    Bestwall's Chapter 11 Filing Has a Proper Purpose .......................... 11

    B.    The ACC's Arguments of Subjective Bad Faith Are Unsupported and
        Inapposite ....................................................................................... 13

        1.    The 2017 Corporate Restructuring and Bestwall's Chapter 11
            Filing Were Not "Sham Transactions" Designed to "Shield" Assets
            from Asbestos Claimants ......................................................... 13

        2.    Bestwall Is Entitled to Seek Relief Under Section 524(g) to
            Resolve a Deluge of Current and Future Asbestos Claims ........... 17

        3.    The Cases Cited by the ACC Are Inapposite .............................. 22

        4.    Alleged "Forum Shopping" Has No Bearing on Good Faith .......... 25

III.   BESTWALL'S REORGANIZATION IS NOT OBJECTIVELY FUTILE ................... 26

    A.    There Can Be No Dispute That Bestwall Has the Wherewithal to
        Successfully Reorganize .................................................................. 26

    B.    Bestwall Need Not Fund the Entirety of a Section 524(g) Trust Itself and
        Easily Satisfies Any "Ongoing Business Requirement." ...................... 27

IV.   THE ACC CANNOT SATISFY ITS BURDEN TO SHOW THAT VENUE OF
      BESTWALL'S CHAPTER 11 CASE SHOULD BE TRANSFERRED ...................... 29

    A.    The Requirements for Venue in this District Have Been Satisfied ...... 29

    B.    The Interests of Justice Do Not Support a Transfer of Venue ............ 30

    C.    Convenience of the Parties Does Not Support a Transfer of Venue ...... 34

CONCLUSION .............................................................................................. 36

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Brown v. Wells Fargo, NA*,
463 B.R. 332 (M.D.N.C. 2011) ........................................................31

*Carolin v. Miller*,
886 F.2d 693 (4th Cir. 1989) ........................................................ *passim*

*Embark, LLC v. Media, Inc.*,
231 N.C. App. 538 (2014) ........................................................35

*Georgia-Pacific Corp. v. Bostic*,
320 S.W.3d 588 (Tex. App. 2010)........................................................4

*Greenhouse v. MCG Capital Corp.*,
392 F.3d 650 (4th Cir. 2004) ........................................................20

*Host Mgmt., Inc. v. Palace Homeowner's Assoc. Inc.*,
No. 4:91-3121-21, 1992 WL 738794 (D.S.C. July 15, 1992) ................18

*In re Baltimore Food Sys., Inc.*,
71 B.R. 795 (Bankr. D.S.C. 1986) ........................................................30

*In re DDI Corp.*,
Case No. 03-15261 (Bankr. S.D.N.Y. 2003) ........................................28

*In re Dunes Hotel Assocs.*,
188 B.R. 162 (Bankr. D.S.C. 1995)........................................................ *passim*

*In re Durabla Mfg. Co.*,
Case No. 09-14415 (Bankr. D. Del.) ........................................................29

*In re Enron Corp.*,
284 B.R. 376 (Bankr. S.D.N.Y. 2002)........................................30, 31

*In re Federal-Mogul Global, Inc.*,
684 F.3d 355 (3d Cir. 2012)........................................................23, 24

*In re Garlock Sealing Technologies*,
504 B.R. 71 (Bankr. W.D.N.C. 2014)........................................4, 5, 11

*In re Gen. Growth Properties, Inc.*,
409 B.R. 43 (Bankr. S.D.N.Y. 2009)........................................................18

*In re Grand Dakota Partners, LLC*,
573 B.R. 197 (Bankr. W.D.N.C. 2017)........................................................34

*In re Great American Resources, Inc.*,
    85 B.R. 444 (Bankr. N.D. Ohio 1988) .................................................................34

*In re Gulfmark Offshore, Inc.*,
    Case No. 17-11125 (Bankr. D. Del. 2017) ............................................................28

*In re Honeycutt*,
    Case No. 12-06921-8-JRL, 2012 Bankr. LEXIS 5857
    (Bankr. E.D.N.C. Dec. 21, 2012) ..........................................................................30

*In re Integrated Telecom Express, Inc.*,
    384 F.3d 108 (3d Cir. 2004)...........................................................22, 23, 24, 25

*In re Jade Investments, Inc.*,
    Case No. 2:18-bk-50025, 2018 WL 2074459 (Bankr. W.D. Va. May 1, 2018).....................10

*In re Johns-Manville*,
    36 B.R. 727 (Bankr. S.D.N.Y. 1984) ........................................................17, 18, 25

*In re Kaiser Gypsum Co., Inc.*,
    No. 16-31602 (Bankr. W.D.N.C. Jan. 30, 2017) ...............................................33, 36

*In re Land Stewards, L.C.*,
    293 B.R. 364 (Bankr. E.D. Va. 2002)....................................................................30

*In re Mainline Contracting, Inc.*,
    No. 09-07927-8-RDD 2009 WL 3785568 (Bankr. E.D.N.C. Nov. 10, 2009).........................32

*In re Manville Forest Prods. Corp.*,
    896 F.2d 1384 (2d Cir. 1990)................................................................................31

*In re Marshall*,
    721 F.3d 1032 (9th Cir. 2013) ..............................................................................18

*In re Mercury Finance Co.*,
    Case No. 98-20763 (Bankr. N.D. Ill. 1998)..........................................................29

*In re Mid-Valley, Inc.*,
    305 B.R. 425 (Bankr. W.D. Pa. 2004) ...................................................................19

*In re Mid-Valley, Inc.*,
    Case No. 03-355592-JKF (Bankr. W.D. Pa.) ..........................................18, 19, 26, 27

*In re Mount Carbon Metro. Dist.*,
    242 B.R. 18 (Bankr. D. Colo. 1999) ......................................................................18

*In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*,
    876 F. Supp. 2d 616 (D. Md. 2012), *aff'd sub nom.*
    *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874 (4th Cir. 2014)........................20

*In re NC & VA Warranty Co.*,
  554 B.R. 110 (Bankr. M.D.N.C. 2016)..................................................................18

*In re NII Holdings, Inc.*,
  Case No. 02-11505 (Bankr. D. Del. 2002) ............................................................29

*In re North American Refractories Co.*,
  Case No. 02-20198, 2007 WL 7645287 (Bankr. W.D. Pa. Nov. 13, 2007) .....................19, 27

*In re Patriot Coal*,
  482 B.R. 718 (Bankr. S.D.N.Y. 2012)........................................................25, 32, 33

*In re Pavilion Place Assocs.*,
  88 B.R. 32 (Bankr. S.D.N.Y. 1988)................................................................34

*In re PWS Holding Corp.*,
  Case Nos. 98-212-SLR through 98-223-SLR, 1998 Bankr. LEXIS 549
  (Bankr. D. Del. Apr. 28, 1998) ................................................................30, 33

*In re Rent-A-Wreck of America, Inc.*,
  580 B.R. 364 (Bankr. D. Del. 2018) ..................................................22, 23, 24, 25

*In re Specialty Products Holding Corp.*,
  Case No. 10-11780 (Bankr. D. Del. 2010) ............................................................28

*In re SUD Properties, Inc.*,
  462 B.R. 547 (Bankr. E.D.N.C. 2011)...............................................................10

*In re Surf City Investments, LLC*,
  No. 11-01398-8-RDD, 2011 WL 5909489 (Bankr. E.D.N.C. May 6, 2011) .........................11

*In re Thirtieth Place, Inc.*,
  30 B.R. 503 (9th Cir. Bankr. App. 1983)............................................................11

*In re Thorpe, Inc.*,
  Case No. 2:07-19271-BB (Bankr. C.D. Cal. Feb. 1, 2010) .....................................29

*In re W. Asbestos Co.*,
  313 B.R. 832 (Bankr. N.D. Cal. 2003) .............................................................28

*In re Williams Communications Group, Inc.*,
  Case No. 02-11957 (Bankr. S.D.N.Y. 2002) ........................................................29

*In re Woodend, LLC*,
  No. 11-31672, 2011 WL 3741071 (Bankr. W.D.N.C. Aug. 24, 2011).......................10, 13, 26

*In re XO Communications, Inc.*,
  Case No. 02-12947 (Bankr. S.D.N.Y. 2002) ........................................................29

*Santa Fe Minerals, Inc. v. BEPCO, L.P.* ,
   589 F.3d 605 (3d Cir. 2009)............................................................................22, 23

*Stormes v. Discover Bank (In re Stormes)*,
   No. 16-AP-03006, 2016 WL 6839041 (Bankr. S.D.W.Va. Nov. 18, 2016)..........................31

*Tom Togs, Inc. v. Ben Elias Indus. Corp.*,
   318 N.C. 361 (1986) ............................................................................................35

*Williamson Produce, Inc. v. Satcher*,
   122 N.C. App. 589 (1996) ......................................................................................35

*Yolo Capital, Inc. v. Normand*,
   1:17-CV-00180-MR-DLH, 2018 WL 576316 (W.D.N.C. Jan. 26, 2018)..............................31

## STATUTES

11 U.S.C. § 105(a) .................................................................................18, 19, 26

11 U.S.C. § 502..............................................................................................23

11 U.S.C. § 524(g) ............................................................................... *passim*

11 U.S.C. § 1141.........................................................................................28, 29

28 U.S.C. 1408...........................................................................................30, 31

28 U.S.C. 1412..............................................................................................1, 31

Tex. Bus. Orgs. Code § 1.002(55)(A)........................................................................6

## OTHER AUTHORITIES

GAO, *Asbestos Injury Compensation: The Role and Administration of Asbestos
   Trusts* (Sept. 2011)..........................................................................................12

Allison L. Land (Skadden Arps), *Delaware Enacts Amendments to LLC Act and
   Delaware General Corporation Ac*t, Aug. 2, 2018 ................................................14

The above-captioned debtor and debtor in possession (the "Debtor" or "Bestwall") files

this Objection to the *Motion of the Official Committee of Asbestos Claimants to (I) Dismiss*

*the Debtor's Chapter 11 Case For Cause As a Bad Faith Filing Pursuant to 11 U.S.C. §*

*1111(b), or Alternatively, (II) Transfer Venue in the Interests of Justice and for the Convenience*

*of the Parties Pursuant to 28 U.S.C. § 1412* [D.I. 495] (the "Motion").

## INTRODUCTION

Dismissal of a chapter 11 case is a drastic measure. In this Circuit, it can be imposed

only when the party seeking dismissal meets a stringent two-part test: it must prove *both*

subjective bad faith *and* objective futility. The Official Committee of Asbestos Claimants (the

"ACC") has proved neither.

There has been no showing of subjective bad faith. Bestwall's filing has a proper

reorganizational purpose. Like dozens of chapter 11 debtors before it, Bestwall commenced this

case to pursue a consensual resolution of asbestos-related claims through a Congressionally

sanctioned mechanism, 11 U.S.C. § 524(g) ("section 524(g)"). Chapter 11 offers the only means

available for an entity besieged by mass asbestos claims to resolve fairly, globally and finally all

claims, both current and future. The ACC ignores these cases entirely, including many that

involve solvent entities that successfully employed section 524(g) with the support of claimants'

representatives. Bestwall's filing is fully consistent with these precedents, including the recent

*Garlock-Coltec* plan of reorganization approved in this District, the approval of which itself

followed a corporate restructuring by Coltec.

The ACC also wholly ignores the protections afforded claimants under section 524(g), as

well as the specific protections in the Funding Agreement entered into as part of the

2017 Corporate Restructuring.[2]  As in any chapter 11 asbestos bankruptcy, Bestwall's goal of

establishing a trust under section 524(g) necessitates the active participation and support of

the claimants, including support from at least 75 percent of current asbestos claimants and

review and input by the Future Claims Representative appointed in this case (the "FCR"),[3] as

well as approval by this Court and the District Court.  And the Funding Agreement assures that

the combined resources of Bestwall and New GP are available to pay Bestwall's asbestos claims.

As a result, the Debtor is able and intends to fund a section 524(g) trust that will pay in full all

asbestos claims for which Bestwall is legally responsible.

     Given these protections, the ACC's central allegation that the 2017 Corporate

Restructuring and Bestwall's chapter 11 filing were "sham transactions" designed to allow

New GP to "abscond with billions of dollars of equity and assets" — while asbestos claimants

are left "to recover only a small fraction of what is rightfully owed to them by Old GP" (Motion

at pp. 2, 4) — has no basis in fact or logic.  At best, the ACC makes a superficial and flawed

suggestion — though no direct assertion — that the 2017 Corporate Restructuring amounted to

a fraudulent transfer, not that Bestwall's chapter 11 petition was a bad faith filing.  But even

the ACC admits, as it must, that any fraudulent transfer action would fail given the benefits and

protections afforded claimants through the Funding Agreement.  *See* Motion at p. 4 (noting that

the 2017 Corporate Restructuring and filing do *not* "run[] afoul of fraudulent transfer laws").

---

[2]     The "Funding Agreement" refers to the funding agreement between Bestwall and its non-debtor affiliate Georgia-Pacific LLC ("New GP"), a copy of which is attached as Exhibit A to the *Declaration of Tyler L. Woolson in Support of First Day Pleadings* [D.I. 12] (the "First Day Declaration" or "First Day Decl.") and as Exhibit A to the Declaration of Gregory M. Gordon ("Gordon Decl.") filed contemporaneously herewith. The Funding Agreement was entered into in connection with the 2017 Corporate Restructuring, as defined and described in the First Day Declaration.

[3]     Notably, the FCR in this case has neither joined the Motion nor otherwise moved to dismiss this case or transfer venue.

Nor has there been any showing of objective futility. Backed by its own assets and the Funding Agreement, Bestwall manifestly has the wherewithal to reorganize under chapter 11 and satisfy all elements of section 524(g), including the ability to provide funding in the manner required by the statute. The ACC's contrary contentions are simply incorrect. This, too, is sufficient to end the dismissal inquiry.

Had there been any doubt about the good faith of Bestwall's filing, the Court need only look at the parties' conduct over the nearly ten months between the filing of this case on November 2, 2017 (the "Petition Date"), and the filing of the Motion. Among other things, the parties retained numerous professionals to assist in evaluating Bestwall's purported asbestos liabilities, exchanged and reviewed millions of pages of documents pertinent to that inquiry and engaged in multiple settlement discussions. Bestwall has fulfilled its obligations as a debtor in possession and funded millions of dollars for the ACC and the FCR to participate in this case. None of this is consistent with the notion that Bestwall has engaged in "sham transactions" for the purpose of harming claimants.

The ACC likewise has failed to meet its burden to upset the Debtor's choice of venue. There is no dispute that venue is appropriate in this District, as Bestwall is a North Carolina limited liability company with virtually all of its assets in North Carolina. Neither the interests of justice nor convenience of the parties support transfer. The ACC ignores the most important consideration: whether transfer would promote an efficient administration of the estate. The inevitable delay and additional costs of restarting these proceedings with a new judge, in a new district, would serve no purpose.

# BACKGROUND

### A.     Bestwall Asbestos Claims

In 1965, Georgia Pacific Corporation, a predecessor to the former Georgia-Pacific LLC

("Old GP"), acquired and merged with Bestwall Gypsum Co. ("Old Bestwall"), which ultimately

led to the history of asbestos litigation that is the subject of this case.  *See* First Day Decl. ¶ 24.

From 1965 until 1977, Old Bestwall manufactured a limited number of asbestos-containing

products, principally joint compound.  *See, e.g.*, *Georgia-Pacific Corp. v. Bostic*, 320 S.W.3d

588, 592 (Tex. App. 2010) ("Georgia–Pacific manufactured and sold joint compound products

that included chrysotile asbestos fibers from the time it acquired Bestwall Gypsum Company in

1965 until 1977, when Georgia–Pacific ceased marketing asbestos-containing joint compound.").

Until the late 1990s, Old GP was an insignificant defendant in asbestos litigation.  It was

named in relatively few cases and its defense and indemnity costs were small.  *See* First Day

Decl. ¶ 26.  Companies that produced large amounts of amphibole asbestos products paid

the overwhelming majority of asbestos-related claims.  *See, e.g.*, *In re Garlock Sealing Techs.*,

504 B.R. 71, 83-84 (Bankr. W.D.N.C. 2014) (noting the second "bankruptcy wave," involving

the filings of the "big dusties," "removed from the [tort] system most of the funding for liability

payments").

But as the primary defendants exited the tort system, plaintiffs increasingly turned to

Old GP and other manufacturers to pay their claims.  The asbestos claims and associated costs of

defense against the defendants remaining in the tort system skyrocketed, with these remaining

defendants paying ever-increasing settlement amounts and incurring substantially higher defense

costs.  The abrupt increase in claims had no basis in science or reality.  The number of

mesothelioma plaintiffs who historically had been exposed to Old Bestwall products did not

change after 1999.  The alleged exposures had taken place decades earlier.  But with the major

4

payers now in bankruptcy, increasing numbers of plaintiffs began to claim that they used Old Bestwall or Old GP products decades before. The court in *Garlock* found compelling evidence that claimants inconsistently and selectively disclosed exposures to bankrupt companies' products, hindering the remaining defendants' ability to defend claims. *See* 504 B.R. at 82-84.

This forced Old GP to defend a significantly greater number of cases and to pay substantially more in settlements. Between 2000 and 2017, Old GP paid, on average, $125,000 per mesothelioma claim, five times more than it had paid in the 1990s. *See* First Day Decl. ¶ 27. Old GP's total indemnity and defense payments reached $184 million in 2015, $174 million in 2016, and $202 million in 2017 through the Petition Date. *Id.* ¶ 29. Old GP and Bestwall together have spent $2.9 billion over the last 40 years defending more than 430,000 asbestos-related personal injury lawsuits, with nearly all of that money spent since the primary defendants began leaving the tort system in the early 2000s. *Id.* ¶¶ 25, 27. Only 30% of this amount was covered by insurance, which was effectively exhausted in 2013. *Id.* ¶ 25.

As of September 30, 2017, approximately 64,000 asbestos-related claims were pending against Bestwall in nearly every state and certain territories of the United States; this includes 22,000 in active litigation. *Id.* ¶ 25. As of the Petition Date, Bestwall employed approximately 50 outside law firms and approximately 40 experts and various vendors to assist in defending this massive docket of asbestos claims. *Id.* ¶ 28. Bestwall projects the asbestos litigation and its attendant financial burdens will continue through at least 2050. *Id.* ¶ 31.

B.      **The 2017 Corporate Restructuring**

On July 31, 2017, Old GP undertook the 2017 Corporate Restructuring. *Id.* ¶ 10.  As a result of this restructuring, Old GP ceased to exist and, under a Texas divisional merger statute, Tex. Bus. Orgs. Code § 1.002(55)(A), two new companies were formed:

     a)     Bestwall, which received certain assets and liabilities of Old GP, including (a) Old GP's asbestos liability and (b) certain assets related to the historical Old Bestwall business; and

     b)     New GP, which received the other businesses, assets and liabilities of Old GP, most of which are unrelated to the historical Old Bestwall business.

*Id.*  Bestwall became the sole entity responsible for Old GP's asbestos-related claims, with the exception of claims made under a workers' compensation statute or similar laws.  *Id.*

In this restructuring, Bestwall received, among others, the following tangible assets:

     a)     Three bank accounts with approximately $32 million in cash at the time the transaction was consummated;

     b)     All contracts of Old GP related to its asbestos-related litigation;

     c)     Certain real estate in Mt. Holly, North Carolina; and

     d)     All equity interests in non-debtor GP Industrial Plasters LLC, a North Carolina limited liability company ("PlasterCo"), which owns certain assets of the historical Old Bestwall business.

*Id.* ¶ 18.  The equity in PlasterCo, which is projected to generate annual cash flow (EBITDA) of $18 million starting in 2019, was valued at approximately $145 million prior to the Petition Date. *Id.* ¶ 19.

The 2017 Corporate Restructuring was carefully designed to ensure that Bestwall has the same ability to pay asbestos claims that Old GP had.  *Id.*  As part of the Restructuring, Bestwall became a party to the Funding Agreement with New GP.  *Id.* ¶¶ 16-17.  Without any corresponding repayment obligation by Bestwall, the Funding Agreement requires New GP to provide funding to pay, among other things, the costs of administering Bestwall's chapter 11

case and the contributions for a section 524(g) asbestos trust in the amount required by

a confirmed plan of reorganization for Bestwall to the extent Bestwall's own assets are

insufficient to provide the requisite trust funding.  *Id.* ¶ 20.

The 2017 Corporate Restructuring provided Bestwall with the option of seeking to

resolve the asbestos claims against it (and prior to the restructuring, against Old GP) under

section 524(g) without subjecting New GP and its assets and businesses to an unnecessarily

costly and complex chapter 11 case.  *Id.* ¶ 16.  But, because of the Funding Agreement, all of the

assets and paying power of Old GP remain available to fund any and all established liabilities,

whether through a section 524(g) trust or litigation, just as they were prior to the 2017 Corporate

Restructuring.

### C.     Bestwall's Chapter 11 Filing and Proceedings to Date

After a careful review of its situation and potential options, Bestwall's board concluded

that commencement of a chapter 11 case was prudent, necessary and the best alternative under

the circumstances.  *Id.* ¶ 33.  As stated in its First Day Declaration, Bestwall's goal in this case is

to negotiate, obtain approval of and ultimately consummate a plan of reorganization that would

provide for (1) the creation and funding of a trust established under section 524(g) to pay valid

asbestos-related claims in full and (2) issuance of a channeling injunction under section 524(g)

permanently protecting Bestwall and its affiliates from any further liability arising from or

related to those asbestos-related claims.

Since the inception of the case, Bestwall has followed the course of action described in its

Informational Brief, and in its opening remarks at the first day hearing in the case:  to pursue

a prompt and consensual resolution of its asbestos liabilities consistent with section 524(g).

Bestwall worked cooperatively with the Bankruptcy Administrator to appoint the ACC and then

worked cooperatively with the ACC to identify and obtain appointment of the FCR in this case,
Sander L. Esserman.

While the ACC raised concerns regarding the appropriateness of Bestwall's filing and
the 2017 Corporate Restructuring, the Debtor and the ACC nonetheless were able to reach
agreements to facilitate negotiation of a consensual section 524(g) plan.  Notably, the parties
agreed to (1) the entry of a preliminary injunction in a separate adversary proceeding to enforce
or extend the automatic stay to protect Bestwall's non-debtor affiliates for a set period of time
[Adv. Pro. No. 17-3105 D.I. 30] and (2) an order allowing the ACC to defer the filing of so-
called "Challenge Motions" that might seek the dismissal of this case or its transfer to another
court [D.I. 135].[4]  In further support of ongoing plan negotiations, the parties agreed to multiple
extensions of the preliminary injunction and a series of extensions of the Challenge Date to defer
the filing and litigation of any Challenge Motions.  [Adv. Pro. No. 17-3105 D.I. 32, 33, 36, 41;
D.I. 186, 314, 419, 457.]

In addition, Bestwall has worked cooperatively with the ACC and the FCR to produce
materials in response to informal requests for information that the ACC and the FCR indicated
were needed to conduct settlement negotiations.  Since February 1, 2018, Bestwall has produced
53,451 documents, totaling 195,052 pages, of historic corporate records, transactional
documents, financial statements, certain non-privileged documents from Bestwall's litigation
files and other documents.  Gordon Decl. ¶ 3.  Bestwall has also produced 4,995,583 documents,

---

[4]          The parties' *Agreed Order Regarding Filing of Certain Motions* [D.I. 135] provides that any
Challenge Motion filed by the identified date "shall be timely" (such date, the "Challenge Date").  The order further
provides that "[t]he Debtor reserves and retains all rights to object to or otherwise oppose any Challenge Motion,
other than on the basis that the Challenge Motion was not timely."  *Id.* ¶ 4.

totaling 7,152,525 pages, in a sales records database, and has provided access to Bestwall's

asbestos claims database.  *Id.*[5]

The ACC and the FCR have each retained multiple legal and financial advisors.

The ACC is represented by three law firms in the bankruptcy case and has retained an asbestos

consultant, a financial advisor and a medical science team comprised of four more law firms.

Likewise, the FCR is represented by two law firms and has retained an asbestos claims-

evaluation consultant (and shares a financial advisor with the ACC).  From the Petition Date

through July 31, 2018, professionals engaged by the ACC and the FCR have billed more than

12,400 hours to this case, at a cost of approximately $6.5 million in fees and expenses.  Bestwall

has borne (or will bear, once all invoices have passed their objection periods and been paid), the

entirety of these costs.  Gordon Decl. ¶ 4.

As noted, Bestwall's objective is to reach agreement with representatives of current and

future claimants on a section 524(g) plan of reorganization.  Toward that end, representatives of

Bestwall, New GP, the ACC and the FCR have to date participated in three in-person settlement

meetings.  *Id.* ¶ 5.[6]  The latest such meeting occurred on August 31, 2018.  *Id.*  At this point, no

further settlement meetings have been scheduled, but all the parties have expressed a willingness

to continue discussions at the appropriate time.  *Id.*  There has been no allegation that Bestwall or

New GP has participated in these discussions unreasonably or in bad faith.

Moreover, in the interest of quickly implementing any settlement that may be achieved,

Bestwall has prepared a draft plan of reorganization modeled after consensual plans used in other

---

[5]        Many of the produced materials contain highly confidential and proprietary information, including information on Old GP's settlement of asbestos claims, which information was provided on a "Professional Eyes Only" basis under the agreed protective order entered by this Court.  *Id.*; D.I. 337.

[6]        In addition to three in-person settlement meetings, representatives for Bestwall, New GP and the ACC attended an in-person introductory meeting in Chicago shortly after the filing of the case.  *Id.* ¶ 5.

asbestos bankruptcies. *Id.* ¶ 6. Bestwall provided the draft to the ACC and the FCR on

August 13, 2018 and invited the parties to provide comments or engage in a dialog about plan

terms. *Id.*

    Since filing this case, Bestwall has fulfilled all of its obligations under chapter 11. It has

paid all statutory fees; filed all required statements, schedules and monthly reports; and timely

paid all invoices received from creditor constituencies. Its good faith is evident.

## ARGUMENT

## I.   LEGAL STANDARD

    The Fourth Circuit has cautioned that dismissals "denying access at the very portals of

bankruptcy, before an ongoing proceeding has even begun to develop the total shape of

the debtor's situation, are inherently drastic and not lightly to be made." *Carolin v. Miller*,

886 F.2d 693, 700 (4th Cir. 1989). "[T]he Fourth Circuit standard for dismissal of a Chapter 11

case as a bad faith filing is one of the most stringent articulated by the federal courts." *In re Jade*

*Invs., Inc.*, Case No. 2:18-bk-50025, 2018 WL 2074459, at *1 (Bankr. S.D. Va. May 1, 2018)

(quoting *In re Dunes Hotel Assocs.*, 188 B.R. 162, 168 (Bankr. D.S.C. 1995)). Here, the early

"shape" of Bestwall's situation and these proceedings only reinforces the good faith of the filing.

    In the Fourth Circuit, the party moving to dismiss a chapter 11 case as a bad faith filing

"must prove: (i) that the Chapter 11 case is objectively futile, *and* (ii) that the debtor filed the

Chapter 11 case in subjective bad faith." *Dunes Hotel*, 188 B.R. at 168 (citing *Carolin*, 886 F.2d

at 700).

    The moving party "has the burden of proof to establish cause for dismissal." *In re*

*Woodend, LLC*, No. 11-31672, 2011 WL 3741071, at *3 (Bankr. W.D.N.C. Aug. 24, 2011)

(citing *In re Landmark Atl. Hess Farm, LLC*, 448 B.R. 707 (Bankr. Md. 2011)); *see also In re*

*SUD Props., Inc.*, 462 B.R. 547, 551 (Bankr. E.D.N.C. 2011) ("First Bank [the movant] bears the

burden of demonstrating both objective futility and subjective bad faith by a preponderance of the evidence."); *In re Surf City Invs., LLC*, No. 11-01398-8-RDD, 2011 WL 5909489, at *4 (Bankr. E.D.N.C. May 6, 2011) (same).  "The *Carolin* court made clear that the burden of establishing this two-pronged requirement is very high."  *Dunes Hotel*, 188 B.R. at 168.

The ACC has failed to meet its burden on either prong.

## II.   THERE HAS BEEN NO SHOWING OF SUBJECTIVE BAD FAITH.

### A.   Bestwall's Chapter 11 Filing Has a Proper Purpose.

The "aim" of the subjective bad faith inquiry is "to determine whether the petitioner's real motivation is 'to abuse the reorganization process' and 'to cause hardship or to delay creditors by resort to the Chapter 11 device merely for the purpose of invoking the automatic stay, without any intent or ability to reorganize his financial activities.'"  *Carolin*, 886 F.2d at 702 (quoting *In re Thirtieth Place, Inc.*, 30 B.R. 503, 505 (9th Cir. Bankr. App. 1983)).

The purpose of Bestwall's filing has been clear and transparent from the outset. As detailed in its Informational Brief, Bestwell seeks chapter 11 relief to equitably and permanently address the tens of thousands of asbestos-related claims against it and to treat all claimants fairly, consistent with section 524(g).  [D.I. 12 at 8.]  This includes some 64,000 pending claims and tens of thousands more expected in the future.  Bestwall cannot possibly defend all of these claims through trial, leading it — like other asbestos defendants — to settle claims simply to avoid the costs of defense.  *See Garlock*, 504 B.R. at 84-87 (discussing the factors leading the debtor to settle unmeritorious claims).  Even the ACC acknowledges that "Bestwall's asbestos-related liabilities are undoubtedly substantial."  Motion ¶ 19.  The costs to defend and resolve these cases only continue to increase, reaching approximately $200 million in the ten months of 2017 leading up to Bestwall's chapter 11 filing.

Modeled after the reorganization approved in the landmark *Johns-Manville* bankruptcy case, Congress enacted section 524(g) as part of the Bankruptcy Reform Act of 1994 to provide a path forward for companies seeking a permanent resolution of an increasing deluge of current and future asbestos claims. It includes several important protections for current and future asbestos claimants. Among other things, 75 percent or more of current asbestos claimants must have voted to accept the treatment of asbestos claims proposed under the bankruptcy plan, and a representative must be appointed to represent the interests of future claimants. *See* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb), 524(g)(4)(B)(i). Any reorganization plan under section 524(g) must be approved as fair and equitable by both a bankruptcy court and a federal district court, or a federal district court in the first instance. *See* 11 U.S.C. § 524(g)(3)(A), 524(g)(4)(B)(ii). Moreover, any company seeking to avail itself of section 524(g) must bear the costs of professionals employed by the claimants' representatives.

As noted by the ACC, "only the Bankruptcy Code" can provide permanent "relief from legacy [asbestos] liabilities." Motion at p. 3. More than 60 asbestos trusts have been established since section 524(g) was enacted, including by most of Bestwall's principal joint compound competitors. *See* GAO, *Asbestos Injury Compensation: The Role and Administration of Asbestos Trusts* at 3 (2011); First Day Decl. ¶ 30. That Bestwall likewise would seek to resolve permanently its asbestos claims using this alternative can hardly be characterized as an effort "to cause hardship or to delay creditors" or pursue some "reprehensible purpose." *Carolin*, 886 F.2d at 698, 702. Indeed, Bestwall intends that its trust will pay in full all asbestos claims for which it has legal liability, an intention made clear since the commencement of this case. [D.I. 12 at 8.]

12

**B.**    **The ACC's Arguments of Subjective Bad Faith Are Unsupported and Inapposite.**

Despite acknowledging that "a finding of bad faith is a fact-intensive inquiry," Motion ¶ 30, the ACC offers no evidence that Bestwall's "real motivation" in filing its chapter 11 petition was anything other than a desire to seek a consensual, equitable and permanent resolution of its asbestos liabilities through establishment of a section 524(g) trust. *See Woodend*, 2011 WL 3741071 at *3 ("the movant must provide proof of 'the subjective bad faith of the petitioner in invoking this form of bankruptcy protection'") (quoting *Carolin*, 886 F.2d at 694).

Lacking any evidence of subjective bad faith, the ACC posits implausible motivations behind the 2017 Corporate Restructuring and Bestwall's chapter 11 filing, suggests limitations on section 524(g) that do not exist in law or practice and relies on inapposite precedent.

1.    The 2017 Corporate Restructuring and Bestwall's Chapter 11 Filing Were Not "Sham Transactions" Designed to "Shield" Assets from Asbestos Claimants.

The ACC derides the 2017 Corporate Restructuring and Bestwall's chapter 11 filing as "sham transactions" with a "single purpose:  to abscond with billions of dollars of equity and assets after divesting itself of billions of dollars of Georgia-Pacific Asbestos Liabilities … while leaving tens of thousands of asbestos victims — sick and dying asbestos victims — to recover only a small fraction of what is rightfully owed to them by Old GP."  Motion at pp. 2, 4. The ACC's unsupported allegations are belied by the indisputable facts, the realities of asbestos bankruptcies seeking to establish a section 524(g) trust, and the ACC's own admissions and conduct during the pendency of this case.

13

The 2017 Corporate Restructuring complied fully with applicable state law, in particular the Texas divisional merger statute.[7]  The ACC does not argue — nor could it — that the 2017 Corporate Restructuring did not comply with applicable law.  Moreover, the 2017 Corporate Restructuring was transparently described in Bestwall's First Day Declaration, among other court papers.  All of the documents implementing the 2017 Corporate Restructuring have been provided to the ACC and the FCR for their review.  There is no basis to suggest that the 2017 Corporate Restructuring was an "attempt[] to avoid the scrutiny and transparency mandated by the bankruptcy process."  Motion at p. 3.

Nor is there any basis to suggest that the 2017 Corporate Restructuring was designed to "shield" the assets of Old GP or New GP from asbestos claimants.  To the contrary, the Funding Agreement assures that Bestwall will have the same resources and ability to satisfy asbestos claims as did Old GP prior to the restructuring.  While the ACC acknowledges that the Funding Agreement obligates New GP to provide an "apparently unlimited … level of funding sufficient to satisfy Bestwall's normal business obligations as they come due (including chapter 11 fees and expenses)," it suggests that "it is less clear with regard to the protections available to Bestwall to protect the funding."  *Id.* at 10.  The ACC ignores protections in the Funding Agreement that assure that value remains available.  For example, section 4(b) of the Funding Agreement provides that New GP may not sell or otherwise dispose of substantially all of its assets unless the transferee assumes New GP's obligations under the Funding Agreement in a manner acceptable to Bestwall.  *See also* Funding Agreement § 3(a) (providing representations and warranties from New GP to Bestwall), § 4(a) (requiring that New GP provide periodic

---

[7]    The Texas divisional merger statute was recently replicated in Delaware by the adoption of a similar law.  *See* Allison L. Land (Skadden Arps), *Delaware Enacts Amendments to LLC Act and Delaware General Corporation Act*, Aug. 2, 2018, *available at* https://www.skadden.com/insights/publications/2018/08/delaware-enacts-amendments.

14

financial information to Bestwall), § 7 (providing Bestwall with remedies should New GP default on its obligations), § 13 (providing that New GP's obligations under the agreement may not be transferred without Bestwall's written consent).

Notwithstanding its unfounded attacks on the Funding Agreement, the ACC admits that the 2017 Corporate Restructuring does not "technically run[] afoul of fraudulent transfer laws." Motion at p. 4. That is precisely because the assets allocated to New GP remain available to fund asbestos claims through the Funding Agreement. There is therefore no basis to suggest that sufficient assets will not be available to fund a section 524(g) trust in an amount necessary to properly compensate current and future claimants who have valid claims.[8]

Bestwall has also made clear that it would work to address any legitimate concerns the ACC or the FCR might have regarding the Funding Agreement. *See* Tr. of Feb. 22, 2018 Hrg. at 40 ("[T]he transaction was designed intentionally in a way to assure that the paying power of the enterprise remained behind, you know, any obligation and to whatever extent the company has to asbestos claimants and I [Mr. Gordon, counsel for the Debtor] said to Ms. Ramsey and I'll say it here in court that if the Committee or the Future Claimants' Representative feel or identify any holes in that agreement to please let us know and we'll work on addressing that."). Months later, the ACC has not identified any proposed changes to the Funding Agreement for the Debtor or New GP to consider and instead simply ignores the protections already embedded in that agreement.

---

[8]    The ACC's attacks on the Funding Agreement also are inconsistent with its objection to Bestwall's motion for a preliminary injunction. There, the ACC asserts that "the Funding Agreement ultimately obligates new GP to fund the full extent of Bestwall's liability for the Georgia-Pacific Asbestos Liabilities," creating "an entirely circular relationship." [Adv. Pro. No 17-3105 D.I. 47 at 42.] *See also id.* at 43 ("The Debtor is financially and legally neutral in connection with liability for and payment of Georgia-Pacific Asbestos Claims. The Debtor does not need the protection of freedom from asbestos litigation—New GP will defend and pay for asbestos claims.").

The ACC's allegations also ignore the nature of this chapter 11 proceeding and the nature of section 524(g) relief sought by the Debtor.  Bestwall's objectives in this case cannot be achieved without the active participation and support of claimant representatives, the consent of a substantial majority of claimants themselves, and the approval of this court and the District Court.  Accordingly, any suggestion that Bestwall could "abscond with billions of dollars of equity and assets" at the expense of asbestos claimants is neither feasible nor credible.

Likewise, the ACC's claim that Bestwall filed its petition "to avoid the tort system through the extension of the automatic stay," Motion ¶ 37, is unfounded.  In any asbestos bankruptcy, chapter 11 will impose an automatic stay over all cases pending in the tort system.  The stay is critical to the objective of this case:  payment of all valid current and future claimants in full and on a fair and equitable basis under a section 524(g) reorganization plan that establishes a trust.  That reflects the proper functioning of the bankruptcy process.  It is not evidence of bad faith.

If there is any remaining doubt about Bestwall's good faith in filing for chapter 11 protection, the Court need only review the parties' conduct in the nearly ten months between the Petition Date and the filing of the Motion.  *Supra* at 7-10.  This conduct cannot even remotely be squared with the suggestion that the 2017 Corporate Restructuring and Bestwall's chapter 11 filing were "sham transactions" designed to leave asbestos claimants "to recover only a small fraction of what is rightfully owed to them by Old GP."  Motion at pp. 2, 4.  As noted, the ACC engaged estimation and financial consultants, requested and spent hundreds of hours reviewing information relevant to Bestwall's asbestos claims, and participated in good-faith settlement negotiations with Bestwall and New GP.

16

To be clear, Bestwall does not contend the Motion is untimely.  Rather, it submits that the

Motion's timing speaks to its absence of merit:

> Throughout this 16-month period, the Asbestos Committee, at considerable expense to the debtor, has engaged its own counsel and epidemiologists and, jointly with the Unsecured Creditors Committee, engaged an investment banking firm to prepare projections of future income in aid of plan formulation.  It is only now that negotiations have become seemingly deadlocked that the Asbestos Committee has reverted to its original position of attacking the filing.  If there was merit in the motion to dismiss on grounds of lack of good faith, it could have been fervently pressed a year ago instead of tolerating this alleged misuse of the courts.…
>
> This Court must therefore bear in mind the strategical motivations underlying the pursuit of these motions at this time as well as recognize the progress toward a successful, perhaps consensual, reorganization that has already taken place.

*In re Johns-Manville*, 36 B.R. 727, 731 (Bankr. S.D.N.Y. 1984).

> 2.    Bestwall Is Entitled to Seek Relief Under Section 524(g) to Resolve a Deluge of Current and Future Asbestos Claims.

While the ACC stops short of arguing that an entity must be insolvent, or unable to

defend and pay asbestos claims in the tort system as settlements and judgments come due, to

qualify for section 524(g) bankruptcy relief, it nonetheless suggests that Bestwall "lacks a proper

basis for filing its bankruptcy cases" because it has "not indicated that Old GP was in financial

distress."  Motion ¶ 36; ¶ 21 (noting that Bestwall sought chapter 11 "even though its

predecessor was solvent and paying its asbestos liabilities as they came due").

Whether in connection with section 524(g) or otherwise, "neither insolvency nor

the inability of the Debtor to satisfy its debts is an absolute requirement before (bankruptcy)

relief can be sought."  *Dunes Hotels*, 188 B.R. at 169 (quoting *Host Mgmt., Inc. v. Palace*

*Homeowner's Assoc. Inc.*, No. 4:91-3121-21, 1992 WL 738794, at *3 (D.S.C. July 15, 1992)).[9]

Nor does the Bankruptcy Code "require any particular degree of financial distress as a condition

precedent to a petition seeking relief." *In re Gen. Growth Props., Inc.*, 409 B.R. 43, 61 (Bankr.

S.D.N.Y. 2009) (citing *United States v. Huebner*, 48 F.3d 376, 379 (9th Cir. 1994)).  Any

suggestion that Bestwall's bankruptcy petition was filed in bad faith because either it or Old GP

was solvent, or not in sufficient financial distress, is not supported by controlling law.

Any such suggestion also would ignore multiple instances of solvent entities, each of

which had been defending and paying claims in the tort system, resolving mass tort liabilities

through claimant-supported and court-approved asbestos trusts established under section 524(g).

For example, *In re Mid-Valley, Inc.*, Case No. 03-35592-JKF (Bankr. W.D. Pa.), involved

eight debtors, all subsidiaries of Halliburton, facing in excess of 240,000 pending and future

asbestos claims.  *See* Mid-Valley Discl. Stmt. at 20-22 (Decl. Ex. B).[10]  In their first-day papers,

the debtors stated that "[t]his is not your typical chapter 11 case and does not involve debtors in

financial distress."  Stanski First-Day Aff. ¶ 4 (Decl. Ex. C).[11]  They further acknowledged filing

chapter 11 "to avail themselves of the protections under section 105 and 524(g) of

---

[9]      *See also In re Marshall*, 721 F.3d 1032, 1052 (9th Cir. 2013) (affirming bankruptcy court
conclusion that, "[a]s a statutory matter, it is clear that the bankruptcy law does not require that a bankruptcy debtor
be insolvent, either in the balance sheet sense (more liabilities than assets) or in the liquidity sense (unable to pay the
debtor's debts as they come due), to file a chapter 11 case or proceed to the confirmation of a plan of
reorganization"); *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 32 (Bankr. D. Colo. 1999) ("A Chapter 11 debtor
need not be insolvent to be eligible for relief.  Indeed, Chapter 11 cases can be initiated for any of an infinite variety
of business reasons."); *In re Johns-Manville*, 36 B.R. at 732 ("[I]t should also be noted that neither Section 109 nor
any other provision relating to voluntary petitions by companies contains any insolvency requirement.") (citing *In re
Century City, Inc.*, 8 B.R. 25, 31 (Bankr. D.N.J. 1980)).

[10]      Documentary exhibits cited in support of this Objection are attached to the Gordon Decl. and are
cited herein as "Decl. Ex."  "It is well settled that a court may take judicial notice of related pleadings and
proceedings in other courts."  *In re NC & VA Warranty Co.*, 554 B.R. 110, 120–21 (Bankr. M.D.N.C. 2016) (citing
cases).

[11]      The Disclosure Statement showed $7.1 billion in assets and $5 billion in liabilities.  *See* Decl.
Ex. B at D-3.

the Bankruptcy Code and not due to any financial difficulties." Cornelison First-Day Aff. ¶ 30

(Decl. Ex. D).

Certain of the Mid-Valley debtors' insurers moved to dismiss the chapter 11 case,

contending that the "Debtors by their own admission are solvent and are not distressed by

the existence of asbestos liability." *In re Mid-Valley, Inc.*, 305 B.R. 425, 429 (Bankr. W.D. Pa.

2004). Judge Fitzgerald, who ruled that the insurers lacked standing to seek a dismissal,

observed that the "Bankruptcy Code does not require that a debtor be insolvent" and noted that

the "fact of solvency does not require a finding that the bankruptcy filing was in bad faith." *Id.*

at 429-31. Judge Fitzgerald ultimately approved the Mid-Valley plan. Decl. Ex. E. Notably,

counsel representing certain of the claimants in *Mid-Valley* — including the FCR in this case,

Mr. Esserman — strenuously opposed the insurers' dismissal arguments. *See Response of Tort*

*Victims Represented by Baron & Budd and Silber Pearlman to the Motions to Dismiss Filed by*

*Various Insurers* (Decl. Ex. F).[12]

Another example of a solvent entity using section 524(g) can be found in *In re North*

*American Refractories Co.*, Case No. 02-20198 (Bankr. W.D. Pa.) ("*NARCO*"), where

Honeywell resolved its direct liability on up to 116,000 pending and future asbestos claims.[13]

---

[12]     Counsel urged the court to "utterly reject" the contention that "'teetering on the verge of a fatal financial plummet' is required before a debtor may seek chapter 11 protection …." *Id.* at 12. Counsel argued the *Mid-Valley* chapter 11 case was "possessed of a clear reorganization purpose: the invocation of 11 U.S.C. §§ 524(g) and 105(a) to ensure equitable treatment of present and future mass tort claimants and provide a mutually acceptable global resolution of crippling mass tort litigation." *Id.* at 25; *see also id.* at 3, 9 (stating section 524(g) was "designed for precisely" for the situation faced by the Mid-Valley debtors, noting they were "ideal candidates for § 524(g) protection" given their ability to "ensure both fair and equitable recovery for present and future claimants and the enduring financial viability of the reorganized debtor"). Counsel acknowledged the crushing demands placed on any company facing thousands of asbestos-related claims, observing that "any one" of these claims "might lead to liability in the tens or even hundreds of millions of dollars, and which, in aggregate, could threaten the financial viability of even the healthiest company." *Id.* at 3.

[13]     *See* Honeywell 2001 10-K at 26-28 (Decl. Ex. G). Honeywell's direct liability stemmed from its prior ownership of NARCO. As explained in Judge Fitzgerald's opinion approving the NARCO plan, when Honeywell (then known as Allied Chemical) sold NARCO in 1986, the Purchase Agreement governing the sale provided that it would retain direct liability for a category of products defined as the "Discontinued Products." Nos.

At the time, Honeywell reported assets of $24 billion and liabilities of $15 billion; its equity market capitalization was approximately $28 billion.  *See id.* at 26; Gordon Decl. ¶ 12; Decl. Ex. H.[14]  Honeywell, which had been sharing defense and indemnity costs with the debtor, facilitated the debtor's bankruptcy filing and ultimately received a channeling injunction under section 524(g).  *See In re N. Am. Refractories Co.*, Nos. 02-20198, -21626, 2007 WL 7645287 at *2-3, 23 (Bankr. W.D. Pa. Nov. 13, 2007).

The *Garlock* proceeding in this District provides another example.  Through a modified plan of reorganization supplementing the initial *Garlock* plan, Coltec (Garlock's equity owner) separately resolved some 25,000 pending and future asbestos claims alleging direct liability against Coltec and/or its operating divisions.  *See* Coltec Discl. Stmt. at 26-31 (Decl. Ex. I).  Coltec reported over $1.4 billion in assets and $738 million in liabilities and was plainly solvent.  *Id.* at 21-22.  Notably, as is the case with Old GP here, Coltec did not file its entire business for chapter 11.  Instead, shortly before the chapter 11 filing, Coltec merged into OldCo, LLC, a new, wholly owned indirect subsidiary of EnPro (Coltec's equity owner), with OldCo then distributing substantially all of its assets to a NewCo, retaining only its asbestos liabilities, certain insurance rights, and the assets of a small consulting business.  *Id.* at 31-33.  NewCo agreed to contribute $30 million to fund OldCo's initial payment to an asbestos trust and then entered into a

_____

(continued…)

02-20198, 02-21626, 2007 WL 7645287, at *2 (Bankr. W.D. Pa. Nov. 13, 2007).  The parties to the Purchase Agreement immediately disagreed on who was responsible on the thousands of asbestos claims alleging exposure to the NARCO asbestos-containing products, rendering it impossible to determine which of them was responsible on a particular claim.  *Id.* at *2-3.

[14]      "Judicial notice is appropriate of the content of S.E.C. filings, to the extent that this establishes that the statements therein were made, and the fact that these documents were filed with the agency." *In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 626 n.7 (D. Md. 2012), *aff'd sub nom. Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874 (4th Cir. 2014) (citation omitted).  Courts may also take judicial notice of stock prices.  *See Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655 n.4 (4th Cir. 2004).

20

"Keepwell" agreement with OldCo, through which NewCo committed to make further

contributions to OldCo as necessary to maintain its solvency and provide for its financial

stability.  *Id.*  The Keepwell agreement is analogous in purpose to the Funding Agreement here.

Bankruptcy Judge Whitley proposed Findings of Fact and Conclusions of Law approving

the modified plan of reorganization, which District Judge Mullen approved on June 12, 2017.[15]

The modified plan included the support of the *Ad Hoc* Coltec Asbestos Claimants Committee

and the *Ad Hoc* Coltec Future Asbestos Claimants' Representative.  *Id.* at 1.

*In re W.R. Grace & Co.*, Case No. 01- 1139, 1140 (Bankr. D. Del.), *USG Corp.*, Case No.

01-2094 (Bankr. D. Del.), and *United Gilsonite Laboratories*, Case No. 5:11-bk-02032 (Bankr.

M.D. Pa.), provide further examples.  *See* Gordon Decl. ¶¶ 15-20; Decl. Exs. L, M, O, P, Q.  In

each case, the debtor's contemporaneous financial reports or first-day filings indicate that the

purpose of the chapter 11 filing was to utilize section 524(g) to resolve its asbestos liabilities,

and not due to any articulated insolvency or financial distress.[16]

Nonetheless, the sheer volume of current asbestos claims that Bestwall faced, coupled

with the projected continuing crush of claims through 2050 and beyond, satisfies whatever

unarticulated level of financial distress the ACC maintains is required for a company to seek

resolution under section 524(g).  Bestwall currently faces some 64,000 pending asbestos claims

---

[15]   *See Order (A) Confirming the Modified Joint Plan of Reorganization of Garlock Sealing Technologies, LLC et al. and OldCo LLC, Successor by Merger to Coltec Industries, (B) Adopting the Bankruptcy Court's Proposed Findings of Fact and Conclusions of Law, and (C) Issuing Asbestos Channeling Injunction* (Decl. Ex. J).

[16]   *See* Decl. Ex. K at I-5, I-6 (W.R. Grace's filing was motivated by a "strategic" review of whether to "continu[e] to defend asbestos litigation through the court system versus voluntarily seeking a resolution of such litigation through reorganization under Chapter 11"); Decl. Ex. N at 21 (USG's purpose in filing was to "resolve asbestos-related claims in a fair and equitable manner, to protect the long-term value of the Debtors' businesses, and to maintain the Debtors' leadership in their markets"); Decl. Ex. R at ¶ 7 ("UGL has not sought the protection of this Court because it is in need of financial restructuring.  Instead, it has been forced into chapter 11 as a result of a flood of asbestos-related complaints …").  Bankruptcy courts approved section 524(g) trusts and channeling injunctions in each of these cases.  *See* Decl. Exs. S, T, U.  As shown in Declaration Exhibit V, there is extensive overlap between the counsel for members of the ACC in those cases and the counsel for members of the ACC here.

and reasonably anticipates tens of thousands of additional claims in the decades to come.  This is consistent with, and in many cases exceeds, the magnitude of asbestos litigation faced by companies who have successfully resolved claims under section 524(g).

    3.    The Cases Cited by the ACC Are Inapposite.

The ACC's support for its allegations of subjective bad faith rests largely with three cases from the Third Circuit:  *In re Integrated Telecom Express, Inc.*, 384 F.3d 108 (3d Cir. 2004); *Santa Fe Minerals, Inc. v. BEPCO, L.P. (In re 15375 Memorial Corp.)*, 589 F.3d 605 (3d Cir. 2009); and *In re Rent-A-Wreck of America, Inc.*, 580 B.R. 364 (Bankr. D. Del. 2018).  *See* Motion at pp. 15-18.  These decisions bear no resemblance to this case.

*First*, these decisions applied a less demanding test for dismissal than the stringent two-pronged test used in the Fourth Circuit.  In the Third Circuit, courts "focus on two inquiries that are particularly relevant to the question of good faith:  (1) whether the petition serves a valid bankruptcy purpose," *e.g.*, by preserving a going concern or maximizing the value of the debtor's estate, "and (2) whether the petition is filed merely to obtain a tactical litigation advantage." *15375 Memorial*, 589 F.2d at 618 (citations and quotation omitted).  Moreover, in the Third Circuit, "the burden is on the bankruptcy petitioner to establish that its petition has been filed in good faith."  *Integrated Telecom*, 384 F.3d at 118 (citation omitted).  By contrast, the Fourth Circuit places a "very high" burden *on the movant* to prove that "(i) that the Chapter 11 case is objectively futile, *and* (ii) that the debtor filed the Chapter 11 case in subjective bad faith." *Dunes Hotel*, 188 B.R. at 168 (citing *Carolin*, 886 F.2d at 700).  *Both* objectively futility and subjective bad faith must be shown.

*Second*, and most importantly, none of the ACC's three cases involved an asbestos bankruptcy seeking to utilize the Congressionally sanctioned mechanism of section 524(g) to resolve thousands of pending and future asbestos claims.  The Third Circuit has acknowledged

that the use of chapter 11 and section 524(g) provides an alternative to litigating asbestos claims

in the tort system:

> A consequence of the failure to create a comprehensive resolution
> to asbestos litigation has been a reliance on the Bankruptcy Code
> to provide some predictability and regularity in addressing mass
> tort liability. Bankruptcy has proven an attractive alternative to the
> tort system for corporations because it permits a global resolution
> and discharge of current and future liability, while claimants'
> interests are protected by the bankruptcy court's power to use
> future earnings to compensate similarly situated tort claimants
> equitably.

*In re Federal-Mogul Global, Inc.*, 684 F.3d 355, 359 (3d Cir. 2012).

The cases cited by the ACC stand in stark contrast. In *Integrated Telecom*, "smoking gun"

evidence showed that the *sole purpose* of the filing was to take advantage of a provision in

the Bankruptcy Code, section 502(b)(6), limiting the landlord's claim for future lease payments

from $26 million to $4.3 million. *See* 384 F.3d at 112-16. The debtor filed bankruptcy only

after threatening the landlord that it would do so unless the landlord accepted an $8 million

settlement). *See id.* Likewise, in *15375 Memorial*, the Third Circuit upheld the bankruptcy

court's finding, after a three-day trial, that the debtor's filing was motivated entirely by a desire

to protect its parent and affiliated entities from liability in a *single* case. *See* 589 F.3d at 609, 626

("Given this mix of facts and the Debtors' sudden decision to file for bankruptcy despite their

having been dormant and without employees or offices for several years, we cannot escape

the conclusion that the filings were a litigation tactic."). Finally, the bankruptcy court in *Rent-A-*

*Wreck* found that the debtor filed for chapter 11 to reject a single franchise agreement, open up

lucrative territory for insiders and resolve a single long-pending litigation. *See* 580 B.R. at 382-

84 ("[The] Debtors' purpose in filing these cases is nothing more than a straightforward attempt

to take value that belongs to Mr. Schwarz and give it to Bundy.").

23

Bestwall's filing does not aim to transfer assets that might otherwise be available to pay creditors, reduce the value of any creditor's claim through a provision of the Bankruptcy Code or insulate any Bestwall affiliate from liability.  Nor is Bestwall's case about obtaining an advantage in a discrete dispute.  Instead, the aim here is to reach a consensual and equitable resolution of a continuing deluge of asbestos claims.  If Bestwall's reorganization plan is approved, claimants will no longer need to litigate their claims in state and federal courts, but instead will have a streamlined administrative process to recover on account of their claims, in all cases pursuant to procedures approved by their legal representatives.  *See Federal-Mogul*, 684 F.3d at 362 ("Furthermore, the trusts appear to have fulfilled Congress's expectation that they would serve the interests of both current and future asbestos claimants and corporations saddled with asbestos liability.  In particular, observers have noted the trusts' effectiveness in remedying some of the intractable pathologies of asbestos litigation, especially given the continued lack of a viable alternative providing a just and comprehensive resolution. Empirical research suggests the trusts considerably reduce transaction costs and attorneys' fees over comparable rates in the tort system.") (citing studies).

*Third*, the financial distress associated with the tens of thousands of asbestos claims pending against Bestwall presents a far greater burden on the debtor than was the case in the decisions cited by the ACC.  In *Integrated Telecom*, the debtor — which had already dissolved and held cash that far exceeded its potential liability — was subject only to a landlord's claim for future rent and potential liability on a securities claim that had been capped at $5 million.  *See* 384 F.3d at 112.  Notably, the Third Circuit expressly contrasted the debtor's relative lack of litigation exposure to that faced by a debtor in an asbestos bankruptcy.  *Id*. at 125 ("This case is therefore entirely distinguishable from cases such as *Johns-Manville*, where the debtor faced

24

'approximately 16,000 lawsuits pending as of the filing date,' with the prospect of the 'filing of

an even more staggering number of suits over the course of 20-30 years") (quoting *In re Johns-*

*Manville*, 36 B.R. at 729).  Similarly, in *Rent-A-Wreck*, the court expressly noted the lack of

material litigation against the debtor as one of the factors leading to dismissal.  *See* 580 B.R. at

381 ("Here, any litigation threat is not an unmanageable number of large claims or even a

judgment that Debtors would be unable to satisfy.").

### 4.    Alleged "Forum Shopping" Has No Bearing on Good Faith.

The ACC's claim that Bestwall's alleged "forum shopping" provides "indicia of

subjective bad-faith," Motion ¶ 42, is misplaced and irrelevant to the question of bad faith.  As

discussed *infra*, a chapter 11 debtor's choice of venue is presumed appropriate and should be

afforded great weight and deference.  The ACC admits that this Court is a "technically"

appropriate forum for Bestwall's bankruptcy filing.  *Id.* ¶¶ 47-48, 52.  The ACC cites no

authority to support its assertion that a debtor's selection of one appropriate forum over another

provides any "indicia of subjective bad-faith," *id.* ¶ 42, and Bestwall is aware of none.

Indeed, in *In re Patriot Coal Corp.*, 482 B.R. 718 (Bankr. S.D.N.Y. 2012), which

the ACC relies upon to argue for a transfer of venue, the court found that the debtor did *not* act in

bad faith by filing its chapter 11 case in New York.  *Id.* at 742.  The court found it appropriate to

file a bankruptcy case in the "optimal venue," commenting that "it could be argued that doing so

was entirely consistent with, or even required by, the Debtors' fiduciary duties."  *Id.*

For the foregoing reasons, the ACC has failed to carry its burden to prove that Bestwall

filed its petition with subjective bad faith.  The Motion to dismiss must therefore be denied.

## III.    BESTWALL'S REORGANIZATION IS NOT OBJECTIVELY FUTILE.

### A.    There Can Be No Dispute That Bestwall Has the Wherewithal to Successfully Reorganize.

While the lack of subjective bad faith ends the inquiry under *Carolin*, there also is no credible case here of "objective futility."  *Carolin*, 886 F.2d at 701.  Per *Carolin*, the "objective futility inquiry" should "concentrate on assessing whether there is no going concern to preserve … and … no hope of rehabilitation, except according to the debtor's 'terminal euphoria.'"  *Id.* at 701-02 (quotation and citation omitted); *see also Woodend*, 2011 WL 3741071 at *3 (objective futility prong "focuses on the debtor's financial stability, whether there exists a going concern to preserve, and whether there exists any realistic hope of rehabilitation") (citing *Carolin*, 886 F.2d at 701).  The ACC makes only a modest effort to argue — much less prove — that Bestwall's reorganization is objectively futile.  It plainly is not.

As an initial matter, the ACC makes no argument that resolving a torrent of asbestos claims through section 524(g) of the Bankruptcy Code would somehow not qualify as a valid reorganizational purpose.  As noted, claimant's counsel in *Mid-Valley* expressly argued otherwise.  *See* Decl. Ex. F at 25 (stating the *Mid-Valley* case was "possessed of a clear reorganization purpose:  the invocation of 11 U.S.C. §§ 524(g) and 105(a) to ensure equitable treatment of present and future mass tort claimants and provide a mutually acceptable global resolution of crippling mass tort litigation").  This case has a valid reorganization purpose.

This case bears no resemblance to the type of single asset, hopelessly insolvent cases that represent the typical chapter 11 case dismissed on grounds of bad faith and objective futility.  Indeed, this case presents *none* of "[t]he indicia of a bad faith filing usually examined by the courts" which are "indicative of a bad-faith failing."  *Dunes Hotel*, 188 B.R. at 171-72.  This is not a "single asset" case where a creditor's lien encumbers the asset.  *Id.*  Bestwall has

numerous unsecured creditors, including thousands of asbestos claimants, and is a far cry from a

bankruptcy representing a "two-party dispute." *Id.* Bestwall utilizes seconded employees to run

its business, owns ongoing active businesses, and receives cash flow. *Id.* And nothing about the

timing of Bestwall's filing signals an intent to frustrate a creditor's enforcement of its rights or to

otherwise forestall the loss of property. *Id.*

There can be no legitimate dispute that Bestwall has the ability to reorganize and

establish a trust that meets each of the statutory requirements of section 524(g). Bestwall has

substantial assets (*supra* at 6-7) and, most importantly, the full ability to meet all of its

obligations, whatever those obligations may be, through these assets and the Funding

Agreement, and continue as a going concern.

**B.      Bestwall Need Not Fund the Entirety of a Section 524(g) Trust Itself and
Easily Satisfies Any "Ongoing Business Requirement."**

The ACC's premature confirmation arguments fare no better. There is no basis to argue

that section 524(g) is "simply not available to Bestwall" given a purported inability of Bestwall

to fund the trust with a security, as required by 11 U.S.C. § 524(g)(2)(B)(i)(II). Motion ¶¶ 39-41.

Section 524(g)(2)(B)(i)(II) requires that a trust be funded "in whole *or in part* by the securities of

1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make

future payments" (emphasis added). There is no requirement that Bestwall fund the *entirety* of a

section 524(g) trust with its own assets or securities. Indeed, there are multiple section 524(g)

cases — including but not limited to the *Mid-Valley*, *NARCO* and *W.R. Grace* cases discussed

above — where trust funding was provided by non-debtors.

Even outside of the Funding Agreement, Bestwall owns substantial assets and operating

businesses that produce cash flow. These include bank accounts that contain approximately $20

million in cash, real estate that generates monthly lease revenue and, most materially, the equity

27

interest in non-debtor PlasterCo, valued at approximately $145 million and projected to generate $18 million in annual EBITDA in 2019 and beyond.  *See* First Day Decl. ¶ 19; Monthly Status Report (July 2018) [D.I. 617].  Unlike the debtor *In re W. Asbestos Co.*, 313 B.R. 832 (Bankr. N.D. Cal. 2003), relied upon by the ACC, Bestwall is not a "defunct company."  Bestwall owns a substantial operating business that generates cash flow; it has the ability to make future payments as required by 11 U.S.C. § 524(g)(2)(B)(i)(II).  The ACC's completely unsupported suggestion (Motion ¶ 40) that Bestwall has no cash flow or value that would contribute to the funding of a trust is simply groundless.

For the same reasons, *i.e.*, Bestwall owns assets and businesses that generate revenue, Bestwall satisfies any applicable "ongoing business requirement" in sections 524(g) and 1141(d)(3) of the Bankruptcy Code.[17]  The ACC suggests that Bestwall's status as a holding company somehow implies that it lacks substance and cannot satisfy any ongoing business requirement.  Motion ¶ 44.  The ACC ignores, however, the substantial operations owned by Bestwall through its non-debtor subsidiaries.  And there is nothing novel about a holding company filing for chapter 11 relief.  Numerous chapter 11 debtors, including those who have successfully established section 524(g) trusts, were holding companies with non-debtor operating subsidiaries.[18]

---

[17]    Notably, the FCR in this case is on record in advocating that there should be no "ongoing business requirement" in section 524(g) cases.  *See* Sander L. Esserman & David J. Parsons, *The Case for Broad Access to 11 U.S.C. § 524(g) in Light of the Third Circuit's Ongoing Business Requiring Dicta in* Combustion Engineering, 62 NYU Annual Survey of American Law 187), available at http://www.law.nyu.edu/sites/ default/files/ecm_pro_064605.pdf (arguing that the absence of such a requirement "broadens the availability of relief and maximizes creditor recovery" and "provides a greater sense of clarity and certainty concerning the availability of § 524(g) to companies facing asbestos liability").

[18]    *See, e.g., In re Gulfmark Offshore, Inc.*, Case No. 17-11125 (Bankr. D. Del. 2017); *In re Specialty Prods. Holding Corp.*, Case No. 10-11780 (Bankr. D. Del. 2010); *In re DDi Corp.*, Case No. 03-15261 (Bankr. S.D.N.Y. 2003); *In re XO Commc'ns, Inc.*, Case No. 02-12947 (Bankr. S.D.N.Y. 2002); *In re Williams Commc'ns Grp., Inc.*, Case No. 02-11957 (Bankr. S.D.N.Y. 2002); *In re NII Holdings, Inc.*, Case No. 02-11505 (Bankr. D. Del. 2002); *In re Mercury Finance Co.*, Case No. 98-20763 (Bankr. N.D. Ill. 1998).

But Bestwall has more.  In addition to subsidiary stock worth approximately

$145 million, it has tens of millions of dollars in cash of its own and it has the Funding

Agreement, which permits it to draw from New GP an uncapped amount of money to pay

the costs of this chapter 11 case and fund the Debtor's liabilities to the extent that the Debtor's

assets are insufficient to do so.  As such, this case is anything but "objectively futile"; Bestwall

has the resources with which to reorganize.[19]

## IV.   THE ACC CANNOT SATISFY ITS BURDEN TO SHOW THAT VENUE OF BESTWALL'S CHAPTER 11 CASE SHOULD BE TRANSFERRED.

### A.   The Requirements for Venue in this District Have Been Satisfied.

The ACC acknowledges, as it must, that venue of the Debtor's case is valid and "proper"

in this District under 28 U.S.C. § 1408.  Bestwall is a North Carolina limited liability company

with virtually all of its assets, and all of its tangible assets, in North Carolina, including (1) real

estate in Mt. Holly, North Carolina just outside of Charlotte; (2) its cash, which is held in bank

accounts in Charlotte; and (3) its ownership in PlasterCo, also a North Carolina limited liability

---

[19]     Lastly, even if the facts were different and Bestwall had no ongoing business operations, dismissal for failure to satisfy any "ongoing business requirement" would at a minimum be premature.  Section 1141(d)(3) only requires that a debtor be engaged in an ongoing business at the time of plan confirmation to be eligible for a discharge.  Likewise, the funding requirements of section 524(g) only need to be satisfied by a debtor at the time of plan confirmation.  As a result, a debtor can add an operating business or cash flow stream at a later date to satisfy sections 1141(d)(3) and 524(g), and debtors in fact have added operations or cash flow streams at later stages in chapter 11 cases to meet these.  *See, e.g., In re Thorpe, Inc.*, Case No. 2:07-19271-BB, *Findings of Fact and Conclusions of Law in Support of Fifth Amended Joint Plan of Reorganization of Thorpe Insulation and Pacific Insulation Company* at 10 (Bankr. C.D. Cal. Feb. 1, 2010) (holding section 1141(d)(3) was satisfied where asbestos bankruptcy debtors' plan of reorganization proposed to merge a nonoperating debtor and an operating debtor) (Decl. Ex. W).  Indeed, in another asbestos bankruptcy, the ACC in that case acknowledged the ability to merge a debtor with a nondebtor operating entity as part of a plan of reorganization to satisfy any ongoing business requirement. *See In re Durabla Mfg. Co.*, Case No. 09-14415 (Bankr. D. Del.), *Memorandum of Law Submitted by the Official Committee of Unsecured Creditors in Response to the Court' Directive of July 7, 2010* at 12-14 [D.I. 192] (July 27, 2010) (Decl. Ex. X).

company, which, along with the Funding Agreement (governed by North Carolina law), are its

primary assets.[20]

Where, as here, the venue of a chapter 11 case is valid, the "debtor's [] choice of forum

[is to] be accorded substantial weight and deference." *In re PWS Holding Corp.*, Case Nos. 98-

212-SLR through 98-223-SLR, 1998 Bankr. LEXIS 549, at *4-5 (Bankr. D. Del. Apr. 28, 1998);

*see also In re Enron Corp.*, 284 B.R. 376, 386 (Bankr. S.D.N.Y. 2002) (same). "[W]here the

existing venue is entirely appropriate, this Court exercises its power to transfer cases cautiously."

*In re Land Stewards, L.C.*, 293 B.R. 364, 369 (Bankr. E.D. Va. 2002).

A debtor's choice of forum is presumed to be "a proper district for venue purposes and

the party challenging a debtor's choice must show by a preponderance of the evidence that

the venue is improper." *In re Honeycutt*, No. 12-06921-8-JRL, 2012 Bankr. LEXIS 5857, at *6-

7 (Bankr. E.D.N.C. Dec. 21, 2012) (citations omitted); *see also In re Baltimore Food Sys., Inc.*,

71 B.R. 795, 798 (Bankr. D.S.C. 1986).

The ACC seeks a transfer of venue of the Debtor's chapter 11 case pursuant to 28 U.S.C.

§ 1412, which provides that a case properly filed in a district may be transferred either (a) in

the interests of justice or (b) for the convenience of the parties. The ACC has failed to carry its

burden to demonstrate that either one of these conditions warrants transfer here.

**B.     The Interests of Justice Do Not Support a Transfer of Venue.**

The interest of justice standard "is applied based on the facts and circumstances of each

case." *Enron Corp.*, 284 B.R. at 403 (citation omitted). Courts consider a variety of factors.[21]

---

[20]     The ACC's claim that PlasterCo is "nothing more than a holding company," Motion ¶ 47, is false.
PlasterCo is an operating business that has been valued at approximately $145 million. *See* First Day Decl. ¶ 19.

[21]     These include: (1) whether transfer promotes the economic and efficient administration of
the bankruptcy estate; (2) whether transfer facilitates judicial economy; (3) the parties' ability to receive a fair trial
in either venue; (4) whether either forum has an interest in deciding controversies within its jurisdictional borders;

Ultimately, the key consideration is "what will promote the efficient administration of the estate, judicial economy, timeliness and fairness."[22]   The ACC cites the relevant factors but then ignores them.   Most notably, there are no arguments in the Motion, nor could there be, that venue of this case should be transferred to promote the efficient administration of the estate, judicial economy, or timeliness.   The Motion disregards the key issue entirely.

Instead, the ACC simply attacks what it suggests is the motivation for Bestwall's venue selection and argues that in "fairness" the case should be transferred to Delaware, the ACC's preferred venue.   But the District of Delaware is highly suspect as a venue that would have been available to Bestwall under 28 U.S.C. § 1408.   Bestwall is neither organized in Delaware nor has its principal place of business or its principal assets there.[23]   Any proposal to transfer Bestwall from this District, where it is domiciled and has the substantial majority of its assets, to Delaware, where it has no assets or operations, would not promote "justice" or "fairness."   Instead, the ACC plainly prefers to depart from this Court, and replace Bestwall's choice of venue with its own.

---

(continued…)

(5) whether transfer would affect the enforceability of any judgment rendered; and (6) whether the Debtor's original choice of forum should be disturbed.  *See Brown v. Wells Fargo, NA*, 463 B.R. 332, 338 (M.D.N.C. 2011).

[22]      *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1391 (2d Cir. 1990); *see also Yolo Capital, Inc. v. Normand*, No. 1:17-CV-00180-MR-DLH, 2018 WL 576316, at *2 (W.D.N.C. Jan. 26, 2018) ("Not all of these [interest of justice] factors are weighed equally, however, as the most important of these factors is the economic and efficient administration of the estate.") (citing *Hilton Worldwide, Inc. v. Global Benefits Admin. Comm. v. Caesars Entm't Corp.*, 532 B.R. 259, 274 (E.D.Va. 2015)); *Stormes v. Discover Bank (In re Stormes)*, No. 16-AP-03006, 2016 WL 6839041, at *2 (Bankr. S.D.W.Va. Nov. 18, 2016) (acknowledging the most important factor in the interest of justice analysis is the economic and efficient administration of the estate) (citations omitted).

[23]      The ACC argues, without support, that the Funding Agreement is a "receivable" that somehow resides in Delaware.  This definitive statement is not supported by case law.  *See, e.g.*, *In re Mainline Contracting, Inc.*, No. 09-07927-8-RDD 2009 WL 3785568, at *2 (Bankr. E.D.N.C. Nov. 10, 2009) (looking at the relevant physical situs of the obligor as the location of an account receivable; *i.e.*, here, as to New GP, Atlanta, where New GP has its headquarters).

31

The ACC cites only a single case — *Patriot Coal* from the Southern District of New York — to support its venue transfer request. That case is distinguishable and does not support a transfer of venue here. In *Patriot Coal*, the debtors created, on the eve of bankruptcy, two New York domiciled shell entities with essentially no assets to take advantage of the "affiliate filing rule" to permit the entire corporate family to file in New York. The New York entities were not the relevant entities for the chapter 11 restructuring (*i.e.*, they were not the entities with the operations and debt in need of restructuring); they were just a tool to allow affiliates with businesses outside of New York to file in the preferred court. Here, Bestwall did not take advantage of the status of any of its affiliates to manufacture venue. In fact, no affiliates filed at all, and Bestwall is the only debtor.

Further, despite the ACC's arguments, Bestwall is not a shell company, as were the entities created in *Patriot Coal*. Instead, Bestwall has substantial assets (which the ACC acknowledges elsewhere). *See* Motion ¶ 44. As a result, there were important legal consequences to the selection of a state to govern the Debtor's formation. Among other things, the decision to organize Bestwall in North Carolina (1) subjected it to the laws of North Carolina, (2) impacted its fiduciary obligations and the standards that govern indemnification and exculpation of its officers and directors, (3) required the payment of franchise taxes to North Carolina and (4) created oversight of Bestwall by North Carolina governmental authorities. As a result, Bestwall accepted not just the potential benefits of organizing in North Carolina, but any legal burdens as well.[24] This was not the case in *Patriot Coal*, where the newly created entities had no true assets.

---

[24]    *See PWS Holding Corp.*, 1998 Bankr. LEXIS 549, at *14 ("[M]any businesses incorporate in states in which they conduct little, if any, business. With the choice of citizenship comes various rights and

Notably, Bestwall is not itself an operating company like the primary debtors in *Patriot Coal*. As a result, where its chapter 11 case should be venued "in the interest of justice" is a less relevant question than when a debtor files in a jurisdiction that is separate from where it actually conducts its operations. This Court expressly recognized as much in its decision denying a transfer of venue of another pending asbestos case, *In re Kaiser Gypsum Co., Inc.*, No. 16-31602 (Bankr. W.D.N.C. Jan. 30, 2017) ("*Kaiser Gypsum*"). *See Order Denying Motion of Certain Kaiser Gypsum Claimants to Transfer Chapter 11 Cases to the United States District Court for the Western District of Washington* [D.I. 348] (Decl. Ex. Y). As in *Kaiser Gypsum*, there is no compelling basis to transfer venue in the interests of justice because Bestwall is not operating a business with numerous employees, vendors, customers, and tangible assets in a separate location, which was the concern leading to a venue transfer in *Patriot Coal*.

Most importantly, retaining the case in this District best promotes the efficient administration of Bestwall's estate because, among other things, it avoids the superfluous administrative expenses and delay associated with transferring a case that has been pending in this District for over a year (by the time of the hearing on the Motion) to a court in another district. *See In re Pavilion Place Assocs.*, 88 B.R. 32, 35 (Bankr. S.D.N.Y. 1988) (explaining that "transfer is a cumbersome disruption of the chapter 11 process.") (citations omitted).

---

(continued...)

responsibilities. Significantly, a business must subject itself to personal jurisdiction in the courts of its state of incorporation.").

**C.** **Convenience of the Parties Does Not Support a Transfer of Venue.**

The ACC also argues that this case should be transferred to the District of Delaware "for the convenience of the parties." The ACC again cites to the factors considered by courts, but fails to identify any relevant facts supporting a transfer under the relevant factors.[25]

Bestwall's creditors are not located in, or clustered around, Delaware. They are spread throughout the country. *See* First Day Decl. ¶¶ 25, 42. As such, Delaware is no more convenient to asbestos claimants than North Carolina or any other state. None of Bestwall's representatives are located in Delaware. In fact, Bestwall's headquarters in Atlanta is more than three times closer to Charlotte (approximately 245 miles) than to Delaware (approximately 770 miles). None of the known potential witnesses in this case, including any representatives of Bestwall or New GP, are located in Delaware.

The ACC offers no evidence to the contrary, but instead argues that convenience of the parties is supported by the location of its own counsel and counsel to the FCR in Delaware. Location of counsel to a party in interest selected by that party *after* the filing of the chapter 11 case has no bearing on venue. *See In re Great Am. Res., Inc.*, 85 B.R. 444, 446 (Bankr. N.D. Ohio 1988) ("venue decisions should not merely shift the inconvenience from one party to another") (citations omitted).

Similarly, none of Bestwall's tangible assets are located in Delaware; they instead are located in North Carolina. As noted, the ACC argues that the Funding Agreement is the Debtor's largest asset, and should be treated as a "receivable" that is "located" in Delaware. *See* Motion ¶¶ 47, 56. The ACC fails to cite any legal authority in support of this position.

---

[25]    These factors are:  (1) proximity of creditors of every kind to the court; (2) proximity of the debtor to the court; (3) proximity of witnesses necessary to the administration of the estate; (4) location of the assets; (5) the economic administration of the estate; and (6) necessity for ancillary administration of liquidation should occur. *In re Grand Dakota Partners, LLC*, 573 B.R. 197, 201-02 (Bankr. W.D.N.C. 2017).

Bestwall's contractual rights under the Funding Agreement are an intangible asset with no physical location. Where the intangible asset is located for venue purposes is not clearly defined, but the "location" of this intangible asset has nothing to do with whether it is more convenient for the parties for this case to be venued somewhere other than this District. This said, the Funding Agreement is governed by North Carolina law (Funding Agreement § 9) and is enforceable against New GP in North Carolina pursuant to North Carolina's "long arm" statute. *See, e.g.*, *Embark, LLC v. 1105 Media, Inc.*, 231 N.C. App. 538, 544 (2014); *Williamson Produce, Inc. v. Satcher*, 122 N.C. App. 589, 594 (1996); *Tom Togs, Inc. v. Ben Elias Indus. Corp.*, 318 N.C. 361, 367 (1986).

The ACC notes that New GP is organized in Delaware, and Old GP was organized there. *See* Motion ¶ 56. Of course, neither Old GP nor New GP is the Debtor, and Old GP no longer even exists. Moreover, the fact that New GP is organized in Delaware has nothing to do with the "convenience of the parties," particularly since New GP also is headquartered in Atlanta, which is substantially closer to this District than Delaware. The ACC's statement that there are "significant connections" to Delaware that would justify transfer of this case there based on the "convenience of the parties" (Motion ¶ 57) is simply untrue.

Finally, the ACC argues that "economic and efficient administration of the estate" supports transfer to the District of Delaware. The ACC's position is that the case should be transferred to Delaware because "courts within the Third Circuit … have significant experience with, and a comprehensive body of case law governing, asbestos bankruptcies." Motion ¶ 56. Nowhere does the ACC cite any case law that stands for the proposition that the existence of case law in another jurisdiction justifies the transfer of a properly venued chapter 11 case "for the convenience of the parties." Nonetheless, the ACC also ignores the substantial experience

courts in this jurisdiction have with asbestos related chapter 11 cases, including the *Garlock* and *Kaiser Gypsum* chapter 11 cases, as well as the body of law that exists from the Fourth Circuit on mass tort cases, including from the proceedings in *A.H. Robins*.

## CONCLUSION

For the foregoing reasons, the Court should deny the Motion.

Dated:  September 28, 2018
Charlotte, North Carolina

Respectfully submitted,

/s / Garland S. Cassada
Garland S. Cassada (N.C. Bar No. 12352)
Jonathan C. Krisko (N.C. Bar No. 28625)
Richard C. Worf, Jr. (N.C. Bar No. 37143)
Robinson, Bradshaw & Hinson, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina  28246
E-mail:  gcassada@robinsonbradshaw.com
         jkrisko@robinsonbradshaw.com
         rworf@robinsonbradshaw.com

-and-

Gregory M. Gordon (TX 08435300)
Dan B. Prieto (TX 24048744)
Amanda Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100
E-mail:   gmgordon@jonesday.com
          dbprieto@jonesday.com
          asrush@jonesday.com

-and-

Jeffrey B. Ellman (GA 141828)
Brad B. Erens (IL 620664)
JONES DAY
Suite 800
1420 Peachtree Street, N.E.
Atlanta, Georgia 30309
Telephone:  (404) 521-3939
Facsimile:  (404) 581-8330
E-mail:   jbellman@jonesday.com
          bberens@jonesday.com

-and-

James M. Jones (NY 5522115)
David S. Torborg (DC 475598)
C. Kevin Marshall (DC 476266)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
E-mail:jmjones@jonesday.com
        dstorborg@jonesday.com
        ckmarshall@jonesday.com

ATTORNEYS FOR THE DEBTOR
AND DEBTOR IN POSSESSION