**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re<br><br>BESTWALL LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 17-31795 (LTB) |

**THE WALL STREET JOURNAL AFFIDAVIT OF PUBLICATION**
**FOR NOTICE OF DEADLINES FOR FILING OF PROOFS OF CLAIM**

Dated: August 12, 2019
Brooklyn, New York

DONLIN, RECANO & COMPANY, INC.

Nora Morales
Director
6201 15th Avenue
Brooklyn, New York 11219
Telephone: 212-481-1411
Email: nmorales@donlinrecano.com

1 The last four digits of the Debtor's taxpayer identification number are 5815. The Debtor's prior address was 100 Peachtree Street, N.E., Atlanta, Georgia 30303. Pursuant to the *Order Authorizing Actions With Respect to Subleases* [Docket No. 847], effective as of April 15, 2019, the Debtor's address is 133 Peachtree Street, N.E., Atlanta, Georgia 30303.

# AFFIDAVIT

**STATE OF NEW JERSEY )**
**) ss:**
**CITY OF MONMOUTH JUNCTION, in the COUNTY OF MIDDLESEX )**

I, Andrew Introne, being duly sworn, depose and say that I am the Advertising Clerk of the Publisher of THE WALL STREET JOURNAL, a daily national newspaper of general circulation throughout the United States, and that the notice attached to this Affidavit has been regularly published in THE WALL STREET JOURNAL for National distribution for

1 insertion(s) on the following date(s):

AUG-06-2019;

ADVERTISER: Bestwall LLC;

and that the foregoing statements are true and correct to the best of my knowledge.

Sworn to before me this
6 day of August 2019

Notary Public

Keith Oechsner
NOTARY PUBLIC
State of New Jersey
ID # 50106528
My Commission Expires
June 10, 2024

# New Movies Find Profit In Old Music

By Anne Steele
And R.T. Watson

DAVID APPLEBY/PARAMOUNT PICTURES/ASSOCIATED PRESS

Taron Egerton stars as Elton John in 'Rocketman,' one of several recent films that made extensive use of musicians' catalog of hits.

In the recently released documentary "David Crosby: Remember My Name," the rock legend acknowledges that he is keeping active at age 77 partly to keep paying his bills. The documentary itself, featuring plenty of Mr. Crosby's music, fits into that strategy.

Music documentaries are booming, thanks largely to the proliferation of streaming services like Netflix Inc., AT&T Inc.'s HBO and Hulu. At the same time, the massive success of Queen biopic "Bohemian Rhapsody"—which grossed $903.7 million worldwide—has demonstrated how lucrative music-inspired dramas can be, generating windfalls for music companies and musicians.

Bob Dylan, Luciano Pavarotti, Aretha Franklin and Judy Garland are among the subjects of recent or coming documentaries, concert films or biopics. That is on top of Hollywood films built around music by the Beatles, Elton John and Bruce Springsteen.

Music executives say demand has skyrocketed for feature films and documentaries based on artists' lives or inspired by their music, as streaming services grow increasingly hungry for content.

Brian Monaco, chief marketing officer at **Sony** Corp.'s Sony/ATV Music Publishing, said such extensive use of widely known music used to be reserved for major motion pictures. Now, thanks to the rise of platforms like Netflix, the opportunities have multiplied.

"Production companies know there's an audience out there for this," he said. "They're easier to make than ever and cheap, and can sell to these platforms for a decent profit."

Securing the rights for a swath of an artist's songs can range from $10,000 to $10 million, depending on how much music the film is using, and whether the original recordings will be used or the songs will be covered by a new artist. The deals usually entail an upfront licensing fee, and aren't dependent on how the film performs.

Mr. Monaco said the publisher has been in talks for eight deals—three of which have closed—so far this year for movie productions, compared with one to two deals five years ago.

The spate of music-oriented movies comes as the music industry is looking to maximize the value of older tunes in the streaming era.

Placements in commercials, TV shows and films have been key to getting older acts in front of a new and younger audience, and driving up streams of music released decades ago—or, in Mr. Crosby's case, drawing attention to his newer material.

Rights holders of the music, usually record labels and publishers, also have become more hands-on in recent projects, from offering creative input to seeking out more opportunities to promote the music beyond the film. Instead of just granting a license, "we're thinking about what can happen after the [documentary] or biopic comes out," Mr. Monaco said.

A month after "Bohemian Rhapsody" was released, Queen, which had been touring with "American Idol" veteran Adam Lambert as its lead singer, announced a new "Rhapsody Tour." Soon after, the title song from the film became the most-streamed classic rock song of all time.

"Yesterday," about a struggling musician who wakes up in a world where the Beatles are forgotten and becomes an overnight sensation playing their songs, also features pop star Ed Sheeran, who has helped attract a younger crowd to a film that might have otherwise drawn a mainly baby-boomer audience. The comedy has made $111.5 million world-wide since being released June 28, a solid performance for a modestly budgeted film.

> **8**
> Movie deals for which Sony's music-publishing arm is in talks

Some music companies are taking a more active role in the productions themselves. **Vivendi** SA's **Universal Music Group**, through its PolyGram Entertainment subsidiary, fully financed and served as a producer on the recent documentary "Pavarotti." It also has documentaries in the works on the Motown record label, Wu-Tang Clan and the Go-Go's, plus an animated children's movie based on Bob Marley's music. Separately, Viacom Inc.'s Paramount Pictures is developing a biopic about the late reggae singer with his son Ziggy Marley.

Music documentaries are relatively cheap to make, about $1 million to $5 million, compared with the $40 million to $50 million it costs to make a fictionalized film like "Bohemian Rhapsody," or "Rocketman" about Elton John.

Netflix subscribers are showing a growing appetite for such films, according to a person familiar with the matter.

The streaming service, which recently released concert films from Beyoncé, Taylor Swift and Mr. Springsteen, also distributed Mr. Dylan and Beatles documentaries.

The flow of splashy music movies is set to continue. Later this month, Warner Bros. is releasing in theaters "Blinded by the Light," a comedy set in the 1980s about a British teenager of Pakistani descent and his love of Mr. Springsteen. The studio is also developing an Elvis biopic with director Baz Luhrmann.

Building a movie around beloved music can help scratch studios' itch for familiar source material—the same impulse that has spawned a surge in sequels, prequels and comic-book adaptations. "It's a very busy film world we're marketing into," said Tim Bevan, a producer of "Yesterday."

SONY PICTURES/ASSOCIATED PRESS

'David Crosby: Remember My Name' follows the star at age 77.

ADVERTISEMENT

## The Marketplace

To advertise: 800-366-3975 or WSJ.com/classifieds

### CLASS ACTION

***In re American Realty Capital Properties, Inc. Litigation*,**
**Civil Action No. 1:15-MC-00040-AKH (S.D.N.Y.)**

FOR MORE INFORMATION PLEASE VISIT www.ARCPSecuritiesLitigation.com
or call 1-866-579-5209.

The United States District Court for the Southern District of New York (the "Court") has certified a class action that is pending against American Realty Capital Properties, Inc. ("ARCP" or the "Company"), certain officers and directors of ARCP, ARCP's outside auditor, and the underwriters of certain public offerings of ARCP securities (collectively, "Defendants"). Defendants deny any wrongdoing. IF YOU ARE A CLASS MEMBER, YOUR RIGHTS WILL BE AFFECTED BY THIS CLASS ACTION LAWSUIT, WHICH HAS NOT SETTLED. TRIAL OF THE LITIGATION IS SCHEDULED TO BEGIN IN JANUARY 2020. This card advises you of information about your options. A long-form notice is available on the case website or by calling the number above.

**Who Is Included In The Class?** All persons who purchased or otherwise acquired ARCP common stock, preferred stock, or debt securities ("ARCP Securities") during the period between February 28, 2013 and October 29, 2014 (the "Class Period"). As is explained in the long-form notice, the Defendants and certain other persons and entities are excluded from the Class by definition.

**What Are My Options?** This class action is being litigated and no money has yet been recovered. If you do nothing, you will remain a member of the Class and if there is a future recovery or settlement, you may be eligible for a payment. If you remain a Class member, you will be bound by all orders, whether favorable or unfavorable, that the Court enters in this case, and you may not pursue a lawsuit on your own behalf with regard to any of the issues in this Litigation. Certain Defendants have indicated a willingness to settle before trial. If any member of the Class wishes to explore settlement, that member should communicate, by counsel, with Michael J. Dowd of Robbins Geller Rudman & Dowd LLP, who will then immediately let counsel for the appropriate Defendant(s) know.

If you DO NOT want to remain a Class member and be legally bound by anything that happens in this case or participate in any future recovery, you must exclude yourself from the Class. To exclude yourself, you must send a letter by first-class mail stating that you "request exclusion from the Class in *In re American Realty Capital Properties, Inc. Litigation*, Civ. Action No. 1:15-MC-00040-AKH (S.D.N.Y.)." Your request must: (i) state the name, address, and telephone number of the person or entity requesting exclusion; (ii) identify the number of shares or units of ARCP Securities purchased or acquired and/or sold during the Class Period; and (iii) be signed by the person or entity requesting exclusion or an authorized representative. You must mail your exclusion request, postmarked by no later than October 28, 2019, to: ARCP Securities Litigation, Notice Administrator, c/o Gilardi & Co. LLC, 3301 Kerner Blvd, San Rafael, CA 94901. You may contact the Administrator or Class Counsel, Robbins Geller Rudman & Dowd LLP, with any questions. (Visit www.ARCPSecuritiesLitigation.com; www.rgrdlaw.com.) Class members are represented by Class Counsel. You will not be personally responsible for their fees and expenses. If the case results in a recovery, however, Class Counsel will apply to the Court to be paid some portion of whatever is recovered for the Class. You may also hire your own attorney, at your own expense.

**For a full description of the Litigation, including identification of the Class Representatives, Defendants, Class Counsel, and the allegations of securities fraud, as well as related Court documents, please visit www.ARCPSecuritiesLitigation.com. Please keep your investment records and any other documents concerning ARCP Securities purchased during the Class Period you may have, and notify the Administrator of any change in address.**

Do not contact the Court with questions.

### BANKRUPTCIES

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| In re: BESTWALL LLC,[1] Debtor. | Chapter 11 Case No. 17-31795 (LTB) |
| --- | --- |

**NOTICE OF DEADLINES FOR FILING OF PROOFS OF CLAIM**
**GENERAL BAR DATE IS OCTOBER 7, 2019 AT 5:00 P.M., EASTERN TIME**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On October 30, 2018, the United States Bankruptcy Court for the Western District of North Carolina (the "Court") entered an order [Docket No. 661] (the "Bar Date Order") establishing certain deadlines for the filing of proofs of claim in the above-captioned chapter 11 case of Bestwall LLC (the "Debtor"). Electronic copies of all documents filed in the Debtor's chapter 11 case, including the Bar Date Order, may be obtained free of charge at https://www.donlinrecano.com/Bestwall, or for a fee on the Court's website, http://ecf.ncwb.uscourts.gov.

By the Bar Date Order, the Court established **October 7, 2019 at 5:00 p.m., prevailing Eastern Time** (the "General Bar Date"), as the general deadline for all Entities, including Governmental Units, to file proofs of claim in the Debtor's chapter 11 case for all claims against the Debtor that arose or are deemed to have arisen prior to November 2, 2017, including claims arising under section 503(b)(9) of title 11 of the United States Code (the "Bankruptcy Code"), except as otherwise provided in the Bar Date Order and expressly excluding Asbestos Claims (as defined below). As described therein, the Bar Date Order also establishes different bar dates for certain categories of claims.

Except as provided herein, the General Bar Date applies to all General Claims against the Debtor. **Please review the Bar Date Order for instructions on how to file a proof of claim in the Debtor's chapter 11 case.** All proofs of claim must be received by the General Bar Date in order to be accepted as timely.

**KEY DEFINITIONS.** As used in this Notice, the term **"General Claim"** shall mean any Claim that arose, or is deemed to have arisen, prior to November 2, 2017, other than an Asbestos Claim.

As used in this Notice, the term **"Asbestos Claim"** means any claim (as defined in section 101(5) of the Bankruptcy Code) for costs or damages, including with respect to bodily injury, death, sickness, disease, emotional distress, fear of cancer, medical monitoring or other personal injuries (whether physical, emotional or otherwise), for which the Debtor is alleged to be liable, directly or indirectly, arising out of or relating to the presence of or exposure to asbestos or asbestos-containing products, including, without limitation: (a) any products previously manufactured, sold and/or distributed by any predecessors to the Debtor; or (b) any materials present at any premises owned, leased, occupied or operated by any Entity for whose products, acts, omissions, business or operations the Debtor has, or is alleged to have, liability. Asbestos Claims include all such claims, whether: (a) in tort, contract, warranty, restitution, conspiracy, contribution, indemnity, guarantee, subrogation or any other theory of law, equity or admiralty; (b) seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative or any other costs or damages; or (c) seeking any legal, equitable or other relief of any kind whatsoever. Asbestos Claims also include any such claims that have been resolved or are subject to resolution pursuant to any agreement, or any such claims that are based on a judgment or verdict. Asbestos Claims do not include (a) any claim of an insurer with respect to amounts allegedly due under any insurance policies, including policies that might have provided coverage for Asbestos Claims, or (b) any claim by any present or former employee of a predecessor or affiliate of the Debtor for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing compensation to an employee from an employer.

As used in this Notice, the terms "**Entity**," "**Governmental Unit,**" "**affiliate**" and "**Claim**" or "**claim**" have the meanings given to them under section 101 of the Bankruptcy Code.

**WHO MUST FILE A PROOF OF CLAIM.** The following Entities must file proofs of claim on or before the General Bar Date: (a) any Entity (i) whose prepetition General Claim against the Debtor is not listed in the Debtor's schedules of assets and liabilities or statement of financial affairs [Docket Nos. 155, 156] (collectively, the "Schedules") or is listed as "disputed," "contingent" or "unliquidated" and (ii) that desires to participate in the Debtor's chapter 11 case or share in any distribution in the chapter 11 case; and (b) any Entity that (i) believes its prepetition General Claim is improperly classified in the Schedules or is listed in an incorrect amount and (ii) desires to have its prepetition General Claim allowed in a classification or amount other than that identified in the Schedules. If it is unclear from the Schedules whether your prepetition General Claim is disputed, contingent or unliquidated as to amount or is otherwise properly listed and classified, you must file a proof of claim on or before the applicable Bar Date. Any Entity that relies on the information in the Schedules bears responsibility for determining that its General Claim is accurately listed therein.

**PROOFS OF CLAIM NOT REQUIRED TO BE FILED BY THE GENERAL BAR DATE.** The Bar Date Order further provides that the following Entities need not file proofs of claim by the General Bar Date: (a) any Entity holding or asserting an Asbestos Claim; (b) any Entity that already has properly filed a proof of claim against the Debtor in accordance with (i) the procedures described in the Bar Date Order or (ii) Rule 3001-1 of the Rules of Practice and Procedure of the United States Bankruptcy Court for the Western District of North Carolina; (c) any Entity (i) whose General Claim against the Debtor is not listed as disputed, contingent or unliquidated in the Schedules and (ii) that agrees with the nature, classification and amount of its General Claim as identified in the Schedules; (d) any Entity whose claim against the Debtor previously has been allowed by, or paid pursuant to, an order of the Court; (e) any of the Debtor's non-debtor affiliates who may have a claim against the Debtor; and (f) any Entity holding or asserting an administrative expense claim against the Debtor under sections 503(b) and 507(a)(2) of the Bankruptcy Code, except that any administrative priority claims under section 503(b)(9) of the Bankruptcy Code must be filed by the General Bar Date.

**CONSEQUENCES OF FAILURE TO FILE A PROOF OF CLAIM BY THE APPLICABLE BAR DATE.** EXCEPT AS OTHERWISE ORDERED BY THE COURT, ANY ENTITY THAT IS REQUIRED TO FILE A PROOF OF CLAIM WITH RESPECT TO A PARTICULAR CLAIM AGAINST THE DEBTOR BUT THAT FAILS TO DO SO BY THE APPLICABLE BAR DATE DESCRIBED IN THIS NOTICE OR THE BAR DATE ORDER SHALL BE FOREVER BARRED, ESTOPPED AND ENJOINED FROM THE FOLLOWING: (A) ASSERTING ANY SUCH CLAIM AGAINST THE DEBTOR OR ITS ESTATE OR PROPERTY THAT (I) IS IN AN AMOUNT THAT EXCEEDS THE AMOUNT, IF ANY, THAT IS IDENTIFIED IN THE SCHEDULES ON BEHALF OF SUCH ENTITY AS UNDISPUTED, NONCONTINGENT AND LIQUIDATED OR (II) IS OF A DIFFERENT NATURE OR CLASSIFICATION THAN ANY SUCH CLAIM IDENTIFIED IN THE SCHEDULES ON BEHALF OF SUCH ENTITY (ANY SUCH CLAIM IN THIS SUBPARAGRAPH (A) BEING REFERRED TO IN THIS NOTICE AS AN "UNSCHEDULED CLAIM"); OR (B) VOTING ON, OR RECEIVING DISTRIBUTIONS UNDER, ANY CHAPTER 11 PLAN IN THE DEBTOR'S CHAPTER 11 CASE IN RESPECT OF AN UNSCHEDULED CLAIM.

**ADDITIONAL INFORMATION.** For additional information regarding the filing of a proof of claim, you may contact Donlin Recano at (212) 771-1128 or (877) 864-5058 (toll free). You also may contact Donlin Recano by email at bestwallinfo@donlinrecano.com or by writing to Donlin, Recano & Company, Inc., Re: Bestwall LLC, P.O. Box 199043 Blythebourne Station, Brooklyn, New York 11219. The claims register for the Debtor will be available for review during normal business hours in Donlin Recano's offices at 6201 15th Avenue, Brooklyn, New York 11219. Copies of the proof of claim form that you should use may be obtained by contacting Donlin Recano or visiting Donlin Recano's website, at: https://www.donlinrecano.com/Clients/bw/Static/ProofOfClaim.

**YOU ARE ENCOURAGED TO CAREFULLY REVIEW THE BAR DATE ORDER AND RELATED MATERIALS ON THE DONLIN RECANO WEBSITE. YOU MAY WISH TO CONSULT AN ATTORNEY REGARDING THIS MATTER.**

Dated: July 30, 2019 BY ORDER OF THE COURT

[1] The last four digits of the Debtor's taxpayer identification number are 5815. The Debtor's address is 133 Peachtree Street, N.E., Atlanta, Georgia 30303.

### BUSINESS OPPORTUNITIES

**VERMONT COUNTRY STORE FOR SALE**
**GAS, DELI, GROCERIES, BEER,WINE**
*Turn-Key Operation*
Years of continuous growth
**Above the store:** Large 2 story 3 bd home + A separate large office area
**CONTACT: Rgr530815@GMAIL.COM**
*SERIOUS INQUIRIES ONLY*

### CAREERS

**M & A BUSINESS BROKERS**
**Sell & Show Businesses**
Six Figure Commissions
As Independent Contractor
Work From Home / Outside Sales
Leads Furnished • Training • Since 1985
Send Letter & Resume to:
brokers@gottesman-company.com
Visit our website: gottesman-company.com
United States • Canada • Europe

### TRAVEL

**Save Up To 60%**
**First & Business**
**INTERNATIONAL**
Major Airlines, Corporate Travel
Never Fly Coach Again!
**www.cooktravel.net**
**(888)-473-3941**

THE WALL STREET JOURNAL.
THE MARKETPLACE

ADVERTISE TODAY
(800) 366-3975
For more information visit:
wsj.com/classifieds

© 2019 Dow Jones & Company, Inc.
All Rights Reserved.

# *Newspaper Chains to Combine*

*Continued from page B1*

owned by Japanese telecommunications-and-investing giant SoftBank Group Corp.

In a sign that GateHouse plans to follow its well-worn playbook and look hard for overlapping costs to cut, the companies said they expect to eliminate roughly $275 million to $300 million of expenses annually—a big number considering the size of the deal.

In a call with investors Monday, Mr. Reed said that approximately 25% of the combined company's revenue will be digital. He described the combination as "a unique opportunity to reposition both companies for long-term growth and, importantly, to support quality journalism."

Bernie Lunzer, president of the NewsGuild-CWA, said the union had working relationships with both GateHouse and Gannett, but that he was "concerned about what the merger will mean for journalism," citing the potential for job cuts.

NewsGuild has about 21,000 members, including about 1,500 who work for Gannett and GateHouse, he said.

Doug Arthur, a media analyst with Huber Research Partners, described the merger as "messy" and said there will be challenges ahead.

"You're meshing two managements with different approaches and layering in a new outside chief executive," said Mr. Arthur, referring to Mr. Bascobert.

Leon Black's **Apollo Global Management** LLC is helping fund the purchase through a $1.79 billion term loan, the companies said. The loan comes with a steep 11.5% annual interest rate, which will put pressure on the combined company to contain costs.

The Wall Street Journal reported in May that Gannett and GateHouse had held merger talks and reported last month that the companies were nearing a deal to combine.

The deal is expected to close by the end of 2019, pending regulatory approval and approval from both companies' shareholders. Gannett shareholders will own roughly 49.5% of the combined company, with New Media shareholders owning the rest.

Gannett, which also publishes such newspapers as the Arizona Republic and the Detroit Free Press, earlier this year rejected a $12-a-share buyout offer from hedge-fund-backed **Digital First Media**—officially known as MNG Enterprises Inc.—partly on the grounds that it didn't appear to have credible funding. Digital First had argued Gannett was being mismanaged and urged it to consider its offer or find another buyer.

Gannett reported financial results concurrently with announcing the deal. It said net income surged 64% to $26.7 million in the second quarter from the year-earlier period, boosted by $32.8 million of gains on property sales. Revenue fell 9.6% to $660.3 million. New Media's second-quarter net income fell 76% to $2.8 million from $11.7 million a year earlier. Revenue rose 4%.

*—Matt Wirz contributed to this article.*