**UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| In re:<br><br>BESTWALL LLC,<br><br>　　　　　　　　　Debtor. | Chapter 11<br><br>Case No. 17-31795 (LTB) |

**MOTION OF THE OFFICIAL COMMITTEE OF ASBESTOS
CLAIMANTS TO (I) DISMISS THE CHAPTER 11 CASE FOR CAUSE
PURSUANT TO 11 U.S.C. § 1112(b), OR ALTERNATIVELY, (II) TO SET A
DEADLINE (A) BY WHICH THE DEBTOR MUST CONFIRM A
CHAPTER 11 PLAN OR (B) TO LIFT THE PRELIMINARY
INJUNCTION IN FAVOR OF NEW GP AND THE PROTECTED PARTIES**

The Official Committee of Asbestos Claimants (the "Committee"), by and through its undersigned counsel, respectfully files this motion (the "Motion") (i) to dismiss the Debtor's Chapter 11 case for cause pursuant to 11 U.S.C. § 1112(b), or alternatively, (ii) to set a deadline by which the Debtor must confirm a Chapter 11 plan, and in support thereof, the Committee states as follows:

**PRELIMINARY STATEMENT[1]**

1.　　This case was allegedly commenced to resolve the asbestos liability of the Debtor, "New" Georgia-Pacific ("New GP"), its non-debtor, fully solvent,[2] sister corporation, its direct parent, Georgia-Pacific Holdings, LLC ("GP Holdings"), and Koch Industries ("KI"), the ultimate parent and its owners. The Debtor's asbestos liabilities are extensive and encompass (i) joint compound, a product used expansively in homes and for commercial purposes—a product

---

[1] Capitalized terms used in the Preliminary Statement and not otherwise defined shall have the meanings ascribed to them *infra*.

[2] Transcript of Hearing at 64:6-25; 65:1-6, *In re Bestwall LLC,* Case No. 17-31795 (Bankr. W.D. N.C. Nov. 9, 2018) [D.I. 689].

{00450351.DOCX V. B507.025127;}　　　　　　1

that creates significant dust as part of its intended use, exposing the users as well as both bystanders and those exposed to the clothing of those using the product to asbestos—as well as (ii) a large number of additional asbestos-containing products widely manufactured, sold and/or distributed by Georgia-Pacific, (iii) premises liability arising from its own and other manufacturers' asbestos products that existed at plants and premises operated by Georgia-Pacific, and (iv) talc—an asbestos-containing mineral used as a component in other products, the dangers of which have only recently become fully appreciated.

2. The Chapter 11 Case has been languishing in chapter 11 for over 1½ years. Despite the Debtor's repeated statements that under the Funding Agreement with New GP it has sufficient funds to pay its ongoing business expenses, the administrative costs of chapter 11, and all of its asbestos liabilities, we are no closer to resolving this case than when it was filed in November 2017. The exclusivity periods for the Debtor to propose, solicit, and confirm a plan have now expired and all the Debtor has produced is a shell plan that is unconfirmable on its face. No settlement discussions have occurred since January 2019 and no agreement has been reached by the parties regarding the scope, value, or path forward related to the Debtor's vast asbestos liabilities.

3. Every single day that this Chapter 11 Case remains in bankruptcy is another day that personal injury claimants injured by exposure to the Debtor's asbestos products are unable to pursue recovery against a defendant that asserts that it is fully able to pay its liability. While the claimants are held hostage, New GP is unencumbered by this bankruptcy case. Its operations are unencumbered and it saves money by paying only the administrative costs of this case.[3] New GP has the current use of funds it would otherwise have paid its victims already, which alone will

---

[3] Old GP spent about $200 million in the first ten months of 2017 on defense and indemnity costs for asbestos liabilities. *Informational Brief of Bestwall LLC* ("Debtor's Brief") at p. 5 [D.I. 12]. The Committee estimates that New GP has realized a cost savings of approximately $300 million since the Petition Date.

{00450351.DOCX V. B507.025127;}                    2

substantially reduce their ultimate costs. In sum, the playing field is not level; New GP and Bestwall—through the structure that they contrived—hold all of the cards.

4. A trial seeking the estimation of joint compound that the Debtor is now proposing is a litigation tactic that will serve only to delay recovery to claimants and prolong a resolution of this case.

5. The recently filed *Motion of the Debtor for Estimation of Current and Future Mesothelioma Claims* [D.I. 875] ("Estimation Motion") makes plain that the reason that this case has not settled—and may never settle—is that the Debtor is seeking an *alternative* to the tort system to value its claims: it seeks a "bankruptcy discount" despite its professed ability to pay the asbestos liabilities in full. It seeks to accomplish this by making disparaging allegations against its victims and their tort counsel—similar to those made in *Garlock*—designed not to achieve a fair settlement, but to instead intimidate the plaintiffs' representatives and to use this case to improperly provide it with leverage that does not exist outside of bankruptcy. The Debtor has already begun its assault on the plaintiffs, stating "large numbers of claimants began identifying and/or exaggerating their alleged exposures to Bestwall's joint compound products" [following what it terms as the "bankruptcy wave"],[4] and "many claimants began obscuring their exposures to the ubiquitous friable amphibole asbestos insulation products of the primary defendants by downplaying, and in some instances denying, their exposures to these products."[5]

6. In short, the Debtor is not seeking to use the estimation process properly to value its liability—it is seeking to use it to try to artificially reduce its liability. This is not a proper purpose for estimation and the Court should not permit the Debtor to proceed with its attempted misuse of this Chapter 11 Case.

---

[4] Estimation Motion, ¶18, p. 7.

[5] Estimation Motion, ¶19, p. 8.

7. If the Debtor is able to run the play that it has proposed, a resolution of this Chapter 11 Case, if any, will take years.

8. The Debtor and New GP should not be permitted to continue such dilatory tactics. This Court should either dismiss this case for failure to prosecute the Chapter 11 Case, or alternatively, set a deadline representing a reasonable time by which time the Debtor should confirm a plan or no longer be permitted to use and abuse the bankruptcy process.

## JURISDICTION

9. This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and may be determined by the Bankruptcy Court. For purposes of a hearing on this Motion, venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory authority for the relief requested is 11 U.S.C. §§ 105(a) and 1112(b) and Rules 1014, 1017(f)(1) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## FACTUAL BACKGROUND

**A.   Procedural Background**

10. On November 2, 2017 (the "Petition Date"), the Debtor commenced these proceedings (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor continues to act as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Case.

11. On November 16, 2017, the Court entered its *Order Appointing Official Committee of Asbestos Claimants* [D. I. 97].

12. The Committee is comprised of individuals suffering with mesothelioma, a debilitating, painful, and ultimately fatal form of asbestos-related cancer, and the estates of individuals who have died as a result of mesothelioma.

13. At a hearing held on January 24, 2019, this Court denied the *Motion of the Official Committee of Asbestos Personal Injury Claimants to (I) Dismiss the Debtor's Chapter 11 Case for Cause as a Bad Faith Filing Pursuant to 11 U.S.C. § 1112(b), or Alternatively, (II) To Transfer Venue in the Interests of Justice and for the Convenience of the Parties Pursuant to 28 U.S.C. § 1412 (*"Motion to Dismiss I*")* [D.I. 495].

14. On June 19, 2019, the Debtor filed the Estimation Motion, which seeks to disregard Old GP's rich history of settling asbestos claims in estimating its liabilities for purposes of proposing a plan of reorganization in favor of a *Garlock*-style approach to estimation designed to reduce and reshape its liabilities through the bankruptcy process.

15. The Estimation Motion embodies Bestwall's true purpose in filing this chapter 11 case – to use the chapter 11 process as a litigation tactic against thousands of asbestos claimants by disavowing its historical settlement decisions, and seeking a contrived, fanciful value for its "legal liability," a made-up term for a made-up concept.[6]

16. Inconsistently, the Debtor argues that this Court should accept a theoretical concept for valuing the Debtor's joint compound-related liability, but argues that the reason for seeking an estimation of joint compound is that it has a "decades-long history of litigation experience."[7]

---

[6] Contemporaneously with this Motion, the Committee is filing an *Objection of the Official Committee of Asbestos Claimants to the Motion of the Debtor for Estimation of Current and Future Mesothelioma Claims*.

[7] Estimation Motion at ¶6, p. 3.

{00450351.DOCX V. B507.025127;}    5

17. The Debtor has also stated its intention to file a number of discovery motions, including a motion for a personal injury questionnaire directed to individuals who have been stayed by the bankruptcy case from pursuing their claims for exposure to Georgia-Pacific products and discovery directed to various asbestos trusts, similar to the discovery conducted in the *Garlock*[8] and *Bondex*[9] cases.

18. The parties have agreed that any discovery motions will be filed after the Court decides whether it will permit an estimation trial in these proceedings. A hearing on the Committee's Objection to the Estimation Motion is scheduled for September 19, 2019. Should the Court agree to proceed with an estimation, litigation of—and ultimately a decision on—the discovery motions alone could take months to resolve.[10]

19. The exclusive periods for the Debtor to file and solicit acceptances of a plan under section 1121(d) of the Bankruptcy Code have expired.[11] The Debtor filed a *Plan of Reorganization of Bestwall LLC* ("Proposed Plan") [D.I. 860] on May 2, 2019. However, the

---

[8] *In re Garlock Sealing Technologies, LLC, et al. ("Garlock"),* Chapter 11 Case No. 10-31607 (Bankr. W.D.N.C. 2010) (Jointly Administered).

[9] *In re Specialty Products Holding Corp, et al.,* Chapter 11 Case No. 10-11780 (Bankr. D. Del. 2010) (Jointly Administered).

[10] For example, in *Bondex,* the *Motion of the Debtors Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure for an Order Directing Submission of Information by Current Asbestos Claimants* [D.I. 436] was filed by on October 11, 2010. The Court held ten (10) hearings [November 15, 2010, December 13, 2010, January 10, 2011, February 14, 2011, February 28, 2011, March 28, 2011, April 18, 2011, April 19, 2011, May 24, 2011 and July 6, 2011] to consider the motion and numerous objections and responses to the motion [D.I. 493, 498, 507, 509, 511, 547, 659, 820, 861, 862, 863, 919, 934, 935, 936 and 1007] before issuing an *Order Granting in Part and Denying in Part the Debtors' Motion for an order Directing Submission of Information by Current Asbestos Claimants* on July 20, 2011 [D.I. 1466]. Unsatisfied with the information (or lack thereof) received in the questionnaires, the Debtor then filed the *Debtors' Motion to Compel Mesothelioma Claimants to Cure Deficiencies in Personal Injury Questionnaires* [D.I. 1917] and *Debtors' Motion to Compel Submission of Personal Injury Questionnaires* [D.I. 1918]. Each motion generated significant objections and responses [D.I. 1952, 1954, 1957, 1958, 1961, 1965, 1967, 1969, 1970, 1973, 1975, 1980, 1981, 1989, 1990, 1992, 1994, 1995, 1996, 1997, 2002, 2004, 2005, 2006, 2007, 2008, 2009, 2031, 2035, 2040, and 2100] which culminated in a hearing held on January 29, 2012 and an Order entered on February 14, 2012 [D.I. 2135]. This was just one of four Rule 2004 motions filed by the Debtors in *Bondex*. At the end of all this time consuming and expensive litigation, very little information gathered by the Debtors was ever used at the estimation trial.

[11] The 120 day exclusive period to file a plan expired on May 2, 2019 and the 180 day period to solicit acceptances of a plan expired on July 2, 2019. *See Debtor's Fourth Motion for an Order Extending the Exclusive Periods to File a Plan of Reorganization & Solicit Acceptances Thereof* [D.I. 781].

Proposed Plan is incomplete and unconfirmable on its face. It is merely a shell document with the key operative provisions to be added at a later time—namely the terms for compensation for asbestos victims. The Plan cannot be solicited without these provisions. Indeed, it appears clear that the Plan was filed merely to create the appearance that the Debtor was advancing the case.[12]

20. However, twenty-one (21) months after filing for chapter 11, the Debtor is nowhere near a conclusion of the Chapter 11 Case, and instead, the last 1½ years were spent devising ways to hold claimants hostage in bankruptcy hoping that they will cave into submission to the Debtor's demands. No substantive settlement discussions have taken place since January 2019. The only issue presently agreed to by the parties is that they are at an impasse in their settlement negotiations.

21. Delay causes real harm to the asbestos plaintiffs, while providing substantial benefit to New GP, and its corporate parents. The Estimation Motion lays bare the objectives of this case—it is intended not to reach a fair settlement—it is intended to provide Bestwall and New GP with the opportunity to argue for a substantial discount from its tort system liability.[13] Not only does Bestwall intend to intimidate or starve the victims into a lower settlement—its Estimation Motion makes clear that it will try to *impose* that relief on the victims if it is

---

[12] In the Estimation Motion, the Debtor states that the "ACC and FCR have each advised the Debtor that the Plan is largely acceptable. . . ". (Estimation Motion p. 2, n.2). However, that statement is like saying that because the Committee has approved the packaging, the contents must be fine. Here, the contents (*i.e.*, the actual substance of the plan) are missing, so it does not matter what the packaging (*i.e.*, the plan document) looks like.

[13] *See, e.g., Richard Booker v. Vanderbilt Minerals*, Case No. RG15796166, (Sup. Ct. of Calif., County of Alameda) ($22.1 million in damages (including $4.6 million in punitive damages) awarded to plaintiff's family for death from mesothelioma caused by asbestos-containing talc); *Stephen Lanzo III and Kendra Lanzo v. Amax Minerals Co., et al.*, Docket No. MIL-7385-16 (Sup. Ct. of State of N.J., Middlesex County) ($39 million in compensatory damages and $80 million in punitive damages awarded against defendants for mesothelioma talc case).

successful in having the Court reach an estimation *estimate* that it likes.[14]  The Debtor's approach is inconsistent with good faith, equity and the laudable purposes of section 524(g).

**B.    Corporate Background and Present Corporate Structure**

22.    Bestwall's asbestos liabilities (the "Georgia-Pacific Asbestos Liabilities") are the result of a 2017 corporate restructuring (the "Corporate Restructuring")[15] wherein its predecessor, Georgia Pacific LLC (Bestwall, collectively, with all its predecessor entities leading to the Corporate Restructuring are referred to herein as "Old GP") purportedly assigned all of Old GP's asbestos liabilities to Bestwall.  The Corporate Restructuring, carefully planned and carried out in anticipation of the bankruptcy filing, was designed to provide the other successor of the Corporate Restructuring, New GP, with the benefits of bankruptcy protection without requiring it to submit to bankruptcy jurisdiction.[16]

23.    As part of the Corporate Restructuring, the Debtor became a holding company for a new subsidiary, GP Industrial Plasters LLC ("PlasterCo"), a North Carolina limited liability company.  PlasterCo develops, manufactures, sells, and distributes gypsum plaster products and owns or leases three operating facilities, none of which are located in North Carolina.  PlasterCo is, in turn, a holding company for two other entities: Industrial Plasters Canada ULC ("PlasterCo Canada"), a Nova Scotia unlimited company, and Blue Rapids Railway Company LLC ("BRRC"), a Kansas limited liability company.  BRRC operates a short line railway system

---

[14] Estimation Motion at ¶7, p. 4 ("Even in the absence of an agreement following the Court's decision, however, the Debtor believes that the proposed estimation will be an important step forward towards confirmation of a section 524(g) plan.")

[15] An in depth discussion of the Corporate Restructuring is also set forth in the *Motion to Dismiss I*.

[16] *See Declaration of Tyler C. Woolson In Support of First Day Pleadings* ("Woolson Decl.") at pp. 3-11 [D.I. 2]; *Informational Brief of the Official Committee of Asbestos Claimants of Bestwall LLC* ("Committee Brief") at pp. 6-9 which is being filed contemporaneously herewith.

{00450351.DOCX V. B507.025127;}    8

associated with PlasterCo's facility in Kansas. PlasterCo Canada holds assets for the benefit of the plaster business that are located in Canada.

24. As a holding company, Bestwall has no ongoing business operations, no employees,[17] no funded indebtedness, and minimal, if any, insurance assets.[18] In fact, its sole corporate purpose is to manage and defend thousands of claims related to the Georgia-Pacific Asbestos Liabilities through the bankruptcy process and the development of a section 524(g) asbestos claimants' trust.

25. Bestwall pays for its expenses through $32 million in cash and a funding agreement with New GP ("Funding Agreement"), which Bestwall obtained as part of the Corporate Restructuring. The Funding Agreement is not a loan agreement; Bestwall has *no obligation* to repay New GP for the advanced funds. Under the Funding Agreement, New GP provides for all costs and expenses incurred to administer the Chapter 11 Case as well as ordinary operating expenses. (Woolson Decl. Annex 1, Funding Agreement, p. 5). New GP is also obligated to cover Bestwall's Georgia-Pacific Asbestos Liabilities necessary to fund a trust under section 524(g) of the Bankruptcy Code and ancillary costs in connection therewith. (Woolson Decl. Annex 1, Funding Agreement, ¶¶A-I).

26. In short, the Debtor's corporate existence and ability to pay its asbestos liabilities depends solely upon New GP. Nevertheless, the Debtor has stated on numerous occasions that it

---

[17] Bestwall receives certain centralized corporate and administrative services including legal, accounting, tax, human resources, information and technology, risk management, and other support services from New GP. New GP has also assigned an in-house legal team to handle the asbestos liabilities. PlasterCo and New GP are parties to a similar services agreement. PlasterCo, PlasterCo Canada, and Bestwall have entered into a cash pooling agreement that provides for a coordinated cash system among Bestwall and its subsidiaries. While PlasterCo does generate cash, should it need additional capital, it has entered into a revolving credit agreement with New GP which allows it to access such capital.

[18] *See Schedules of Assets and Liabilities* [D.I. 156], Schedule A/B, Part 11, at Question 74 (identifying disputed insurance-related causes of action); *Id.* at Question 77 (identifying undisputed and liquidated cause of action).

has sufficient wherewithal to pay in full the Georgia-Pacific Asbestos Liabilities.[19] What is intended by "pay in full" is clearly the operative question in this Chapter 11 Case. Based on its joint compound settlement history and combined with its potential talc liabilities, the Georgia-Pacific Asbestos Liabilities are undeniably immense and number in the billions of dollars.

C.      **Asbestos Liability**[20]

27.     Old GP spent approximately $2.9 billion over the 40 years leading to the Petition Date defending more than 430,000 asbestos-related personal injury lawsuits. The vast majority of its liquidated liability arose in the 18 years prior to the Petition Date. (Debtor Brief at p. 6). As of September 30, 2017, just prior to the Petition Date, there were approximately 64,000 pending asbestos-related personal injury claims against it in nearly every state and territory in the United States. Bestwall anticipates thousands of additional asbestos claims based on exposure to just joint compound will be asserted every year for decades to come. (Debtor Brief at p. 7).

28.     Asbestos-related diseases kill over 39,000 Americans annually and about 220,000 or more are estimated to die from such illnesses worldwide each year. (Committee Brief at p. 24). The median latency period for mesothelioma is approximately 45 years. (Committee Brief at pp. 24-25). Thus, asbestos diseases caused by Old GP's asbestos-containing products will continue to manifest over the next forty or more years, or until at least 2062. (Committee Brief at p. 25).

---

[19] *See, e.g.,* Woolson Decl. ¶20, pp. 9-10 ("[T]he Funding Agreement requires New GP to fund any amounts necessary or appropriate to satisfy the Debtor's asbestos-related liabilities in the absence of a bankruptcy case and also obligates New GP, in the event of a chapter 11 filing, to provide the funding for a section 524(g) asbestos trust in the amount required by a confirmed plan of reorganization."); Debtor's Brief at p. 8 ("[T]he combination of assets owned by Bestwall and a funding agreement that is in place with New GP ensures that the Debtor has the same financial resources and ability to satisfy asbestos claims as Old GP had prior to the 2017 Corporate Restructuring.").

[20] Background information on joint compound, chrysotile asbestos, and the conduct of Old GP in covering up the manufacture and sale of its dangerous products are set forth more fully in the Committee Brief. (Committee Brief at pp. 10-70).

29. A large portion of the Georgia-Pacific Asbestos Liabilities arising from, among other things, joint compound relate to a gypsum business that manufactured wallboard, joint compound, and industrial plasters known as Bestwall Gypsum, which was acquired by Old GP in 1965[21] and then merged into Old GP. (Debtor Brief at p. 3). Following Old GP's acquisition, it continued to manufacture and distribute asbestos-containing materials, including joint compound. (Debtor Brief at p. 3). The Debtor admits that Bestwall Gypsum used asbestos in its joint compound products until at least July, 1977, when the Consumer Products Safety Commission banned the use of asbestos in joint compound. (Debtor Brief at p. 3). The first lawsuits against Old GP were filed in 1979. (Debtor Brief at p. 18).

30. Bestwall's joint compounds were used in new construction, remodeling, and home repair and exposed millions of people to asbestos, including entire families through do it yourself ("DIY") projects, as well as professional drywallers and laborers working in construction, residential improvement, and demolition. (Committee Brief at p. 15). Indeed, Old GP's advertising and instructions encouraged the use of joint compound without protective clothing and dust masks, allowing unlimited exposure. The ads notably featured young children at play just below the site where joint compound was being used or participating in the construction projects themselves. (Committee Brief at pp. 11-15). The process employed to apply joint compounds required mixing, sanding, and sweeping, all of which generated significant dust. (Committee Brief at pp. 25-30). Individuals exposed to air-borne asbestos on jobsites often brought the asbestos fibers home on their clothing and hair, thereby exposing secondary victims including spouses and children to asbestos which contaminated their homes for years. (Committee Brief at pp. 15-22).

---

[21] By 2005, KI had full knowledge of the dangers of asbestos and the potential resulting liability, all of which was undoubtedly reflected in the price it paid for the purchase of Old GP.

31. In addition to asbestos-containing joint compound, Bestwall and its predecessors manufactured and distributed numerous other asbestos-containing products including processed asbestos fiber, paperboard, wallboard, industrial resins, industrial insulation products, fire proofing, asbestos cloth, roofing products, siding, thermal insulation, fire doors containing Kaylo-brand amosite, and other products contaminated with talc asbestos. (Committee Brief at pp. 2, n.3; 30-31).

32. Old GP also sold asbestos-containing products to companies such as Johns-Manville, Flintkote and Big Horn Gypsum Company, which repackaged GP products and sold them under the buyers' labels. (Committee Brief at pp. 2-3). Old GP also distributed asbestos-containing materials from other companies through its distribution centers. (Committee Brief at pp. 2-3). Additionally, Old GP's (and perhaps New GP's) use of talc in both gypsum-related products and consumer products is a further source of significant potential liability by Bestwall.

33. Indeed, millions of people have likely been exposed to other asbestos-containing products manufactured and distributed by Old GP. These liabilities extend not only to claims against its predecessors in the past forty (40) years for its joint compound and other asbestos-containing products, but to future, unknown claims, i.e., "demands," that will continue to be asserted for at least another forty (40) years, including claims related to its talc use which have never been tested in the tort system.

## LEGAL ARGUMENT

### I. Cause Exists Under 11 U.S.C.§ 1112(b) for this Case To Be Dismissed

34. Section 1112(b) of the Bankruptcy Code provides for a bankruptcy case to be dismissed for "cause" and states as follows:

> [o]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 *or dismiss*

>*the case under this chapter,* whichever is in the best interests of the estate and creditors, *for cause* ….

11 U.S.C. § 1112(b) (*emphasis added*).

35.  Application of § 1112(b) is a two-step, burden shifting process. *In re Korn*, 523 B.R. 453, 464-65 (Bankr. E.D. Pa. 2014). In the first step, the movant bears the burden of proving "cause" to convert or dismiss by a preponderance of the evidence. *Id.* While the Bankruptcy Code does not explicitly define "cause" for purposes of § 1112(b), a list of illustrative—but not exhaustive—examples of what constitutes cause can be found in § 1112(b)(4). *Id.*; *In re Paterno,* 511 B.R. 62, 66 (Bankr. M.D.N.C. 2014). The Court, however, is not limited to these enumerated examples in making a decision and may consider other grounds for cause depending on the facts and stage of the bankruptcy case. *Id.*; *see also In re Creech,* 538 B.R. 245, 248 (Bankr. E.D.N.C. 2015) ("[d]etermining the existence of cause entails a fact-specific inquiry of the debtor's post-petition circumstances").

36.  In evaluating the existence of cause, "the court should remain cognizant of the two recognized policies of chapter 11 reorganizations: preserving going concerns and maximizing property available to satisfy creditors." *In re Landmark Atl. Hess Farm, LLC*, 448 B.R. 707, 713 (Bankr. D. Md. 2011). Thus, a determination regarding the existence of cause under § 1112(b) is a factual inquiry in which the Court may exercise discretion. *Korn*, 523 B.R. at 465. However, a single example of "cause" is sufficient to warrant dismissal of a chapter 11 case under § 1112(b)(1). *In re Raintree Healthcare of Forsyth LLC*, 2018 WL 770367, *8 (Bankr. M.D.N.C. 2018) (citing *In re Creekside Sr. Apts., L.P*, 489 B.R. 51, 60 (6th Cir. BAP 2013)). Indeed, once cause is established, the Court's discretion is limited and it must grant some form of relief unless § 1112(b)(2), the second step of the analysis, applies. *Korn*, 523 B.R. at 465.

37. Section 1112(b)(2) shifts the burden of proof to the respondent who must produce evidence of "unusual circumstances" sufficient to establish that dismissal or conversion is not in the best interests of the creditors or the estate. *Raintree Healthcare*, 2018 WL 770367 at *8 (citation omitted); *Korn*, 523 B.R. at 464. Such unusual circumstances cannot be facts that are common to chapter 11 cases generally. *Landmark Atl. Hess Farm,* 448 B.R. at 712.

38. The text of the § 1112(b)(2) also commands that the respondent has the burden of establishing *three (3) additional* elements for a case to remain in chapter 11 if there is a finding of unusual circumstances: (i) there is a reasonable likelihood that a plan will be confirmed within a reasonable period of time; (ii) there is a reasonable justification for the act or omission establishing grounds for cause; and (iii) that omission or action will be cured in a reasonable amount of time. *See* 11 U.S.C. § 1112(b)(2)(A), (B)(i) and (ii); *Korn*, 523 B.R. at 465. Thus, the respondent must establish that it will file a plan and cure any acts or omissions *within a reasonable amount of time.*

39. Here, the Debtor has failed to timely prosecute this Chapter 11 Case. While the Debtor contends that an estimation will permit the parties to engage in fruitful settlement discussions, the Committee believes that an estimation will provide absolutely no benefit in this case for the reasons set forth in the Committee's Objection to the Estimation Motion. Moreover, the Debtor can pay all of its asbestos liabilities. Therefore, it should either promptly file a plan that provides for full payment of its liabilities or it should promptly negotiate a resolution. It should not be permitted to continue to hold the claimants off while it uses this process to delay and deny payment to its victims.

40. The exclusive periods to file, solicit acceptances of, and confirm a plan under § 1121(d)(2) have expired. The Debtor has filed a skeletal plan which is unconfirmable on its face.

While the Debtor (or any party) may propose a plan outside the strictures of § 1121(d)(2), the fact that the Debtor can pay 100% of its liability presents a challenge.[22] This is yet another careful design of the 2017 Corporate Restructuring. The result driven by this fact creates a *de facto* extension of the exclusivity periods whereby the Debtor is able to keep this case in bankruptcy purgatory and exclusivity essentially runs indefinitely at the whim of the Debtor. *See In re Landmark Park Plaza Ltd. P'ship,* 167 B.R. 752, 756 (Bankr. D. Conn. 1994) (court overruled debtor's objection to filing of rival creditor plan after expiration of exclusivity periods finding that such opposition was tantamount to a *de facto* extension of the exclusivity). Neither the Bankruptcy Code nor sound bankruptcy policy sanction such delay and singular control over the chapter 11 process by a debtor and neither should this Court.

41. The legislative history § 1121(d) recognizes a congressional balancing act of a debtor's right to have the first opportunity to propose a plan in tune with the rehabilitative function of chapter 11 with "the legitimate interests of creditors, whose money is in the enterprise as much as the debtor's, to have a say in the future of the company." *Landmark Park Plaza*, 167 B.R. at 756 (*citing* H.R. Rep. No. 595, 95th Cong., 1st Sess. 231-32 (1977), *reprinted in* 1978 U.S. Code Cong. & Adm. News, pp. 5963, 6191). The exclusivity periods should not be employed as a tactical device to pressure parties to yield to unsatisfactory proposals. *Id.* at 756 (citing S.Rep. No. 989, 95th Cong. 2d Sess. 118 (1978) *reprinted in* 1978 U.S. Code Cong. & Adm. News pp. 5787, 5904 (footnotes omitted)). Indeed, Congress limited exclusivity to eliminate a debtor's undue bargaining power resulting in holding creditors hostages. *In re Washington-St. Tammany Elec. Coop., Inc.,* 97 B.R. 852, 855 (E.D. La. 1989) (citations omitted).

---

[22] The most appropriate plan would be a full pass-through of asbestos liability, which is tantamount to a case dismissal.

42. Here, the Debtor has evidenced its desire to indefinitely delay in proposing a plan. Instead, it intends to re-litigate its asbestos settlement history and seek extensive discovery on issues that the Committee believes do not relate to estimation of its asbestos liabilities, as well as delay discovery on its other liabilities, including its talc liabilities. To allow the Chapter 11 Case to continue at the Debtor's whim for years is a backdoor way of extending exclusivity for the Debtor indefinitely, which the Bankruptcy Code clearly does not countenance.

43. Moreover, keeping in mind the two policies of chapter 11 reorganizations—preserving going concerns and maximizing property available to satisfy creditors—dismissal is appropriate.

44. First, there is no preservation of a going concern at issue here. The Debtor is a holding company; it has no business operations, no employees, no debt, no insurance, and no creditors—other than asbestos claimants. There is no "going concern" to salvage, no jobs to preserve, and no traditional trade creditors hoping to continue to do business with a reorganized entity in this Chapter 11 Case.

45. Second, staying in bankruptcy does not maximize the recovery to creditors. The Debtor has stated on numerous occasions that, under the Funding Agreement, it has sufficient funds to pay the Georgia-Pacific Liabilities. Prior to filing, Old GP continued to settle and pay claims in the ordinary course of business. This was not a case where insurance funds were dwindling and the debtor was experiencing a cash flow problem. New GP is a multi-billion dollar enterprise. However, the Debtor's financial wherewithal depends on New GP—an entity over which this Court has absolutely no control or oversight. A prompt dismissal will prevent loss of value in the Funding Agreement. A continued Bestwall bankruptcy puts assets at risk.

46. The chapter 11 case is in essence, a two-party case: the debtor and its personal-injury claimants. Languishing in chapter 11 for years simply to permit the Debtor time to attempt to force its asbestos victims into submission for the benefit of New GP, GP Holdings, and KI—the real parties who hold the purse strings here—is not maximizing property available to creditors. Indeed, it is the complete opposite. The Debtor's primary asset is at risk. Many claimants lose their lives while waiting and are consequently losing rights to compensation. Sick claimants are without a resource to assist in paying for their medical care. Families are suffering. More claimants are diagnosed each day. Claimants should be able to return to the tort system and seek just compensation.

47. All these facts and the posture of the case lead to one inexorable conclusion: cause exists to dismiss for failure to timely prosecute this Chapter 11 Case. *See, e.g., In re Integrated Pet Foods, Inc.*, 2004 WL 2252119, *8-9 (Bankr. E.D. Pa. 2004) (converting case with materially deficient disclosure statement for failure to prosecute even where court noted demise of a going concern and concomitant loss of jobs would follow conversion); *In re Bacon*, 52 B.R. 52, 53 (Bank. N.D. Iowa 1985) (failure to prosecute case in expeditious manner to the detriment of creditors is cause to dismiss case). Because proposal of a plan in the absence of a settlement must necessarily pay all creditors in full, the Chapter 11 Case should be dismissed so that claimants' rights are not further harmed.

II. **Alternatively, this Court Should Set a Deadline by Which the Debtor Should Confirm A Plan in These Proceedings or Return to the Tort System**

48. The Debtor should be forced to conclude this Chapter 11 Case as expeditiously as possible or go back to the tort system. It should not be able to control the trajectory of this case and delay the ultimate resolution of this Chapter 11 Case through dilatory and wasteful discovery antics.

38. If the Court is not inclined to dismiss the Chapter 11 Case immediately, then it should impose a deadline by which either the Debtor must confirm a chapter 11 plan or the preliminary injunction in favor of New GP and the Protected Parties will dissolve. The Committee proposes that the Court set a deadline of March 31, 2020 for dismissal of this case in the event that the Debtor has not confirmed a consensual chapter 11 plan or for dissolution of the preliminary injunction in favor of New GP and the Protected Parties. Such a deadline represents more than a reasonable amount of time to conclude this Chapter 11 Case as may be required by § 1112(b)(2)(A) and (B) and is just and appropriate under the facts of this Chapter 11 Case.

## CONCLUSION

WHEREFORE, for reasons set forth herein, the Committee respectfully requests that the Court enter an order in the form annexed hereto (i) dismissing the Chapter 11 Case for cause under section 1112(b); or alternatively, (ii) setting March 31, 2020 as the deadline by which the Debtor must confirm a chapter 11 plan; and (iii) granting such other relief as is just and appropriate.

Dated: Charlotte, North Carolina
August 16, 2019

HAMILTON STEPHENS STEELE
+ MARTIN, PLLC

/s/ *Glenn C. Thompson*
Glenn C. Thompson (Bar No. 37221)
525 North Tryon Street, Suite 1400
Charlotte, North Carolina 28202
Telephone: (704) 344-1117
Facsimile: (704) 344-1483
gthompson@lawhssm.com

Judy D. Thompson (Bar No. 15617)
Linda W. Simpson (Bar No. 12596)
JD THOMPSON LAW
Post Office Box 33127
Charlotte, North Carolina 28233
Telephone: (828) 489-6578
jdt@jdthompsonlaw.com
lws@jdthompsonlaw.com

Natalie D. Ramsey (DE Bar No. 5378)
Davis Lee Wright (DE Bar No. 4324)
Laurie A. Krepto (DE Bar No. 4109)
ROBINSON & COLE LLP
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 295-4800
nramsey@rc.com
dwright@rc.com
lkrepto@rc.com

*Counsel to the Official Committee of Asbestos Claimants*