**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE. ACCORDINGLY, THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT APPROVES THIS DISCLOSURE STATEMENT. IN ADDITION, THIS DISCLOSURE STATEMENT MAY BE REVISED TO REFLECT EVENTS THAT OCCUR AFTER THE DATE HEREOF BUT PRIOR TO THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| In re: | : |
| | : |
| | : Chapter 11 |
| BESTWALL LLC,[1] | : |
| | : Case No. 17-31795 (LTB) |
| Debtor. | : |
| | : |

## DISCLOSURE STATEMENT FOR THE AMENDED PLAN PROPOSED BY THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS AND THE FUTURE CLAIMANTS' REPRESENTATIVE FOR BESTWALL LLC

---

[1] The last four digits of the Debtor's taxpayer identification number are 5815. The Debtor's address is 133 Peachtree Street, N.W., Atlanta, Georgia 30303.

Glenn C. Thompson (Bar No. 37221)
HAMILTON STEPHENS STEELE
+ MARTIN, PLLC
525 North Tryon Street, Suite 1400
Charlotte, North Carolina 28202
Telephone: (704) 344-1117
Facsimile: (704) 344-1483
Email: gthompson@lawhssm.com

Judy D. Thompson (Bar No. 15617)
Linda W. Simpson (Bar No. 12596)
JD THOMPSON LAW
Post Office Box 33127
Charlotte, North Carolina 28233
Telephone: (828) 489-6578
Email: jdt@jdthompsonlaw.com
        lws@jdthompsonlaw.com

Natalie D. Ramsey (DE Bar No. 5378)
Davis Lee Wright (DE Bar No. 4324)
Laurie A. Krepto (DE Bar No. 4109)
ROBINSON & COLE LLP
1201 North Market Street, Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile: (302) 516-1699
Email: nramsey@rc.com
        dwright@rc.com
        lkrepto@rc.com

*Co-Counsel to the Official Committee of Asbestos Claimants*

Edwin J. Harron
Sharon M. Zieg
YOUNG CONAWAY STARGATT &
TAYLOR LLP
1000 North King Street
P.O. Box 391
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Email: eharron@ycst.com
        szieg@ycst.com

Felton E. Parrish
HULL & CHANDLER, P.A.
1001 Morehead Square Drive, Suite 450
Charlotte, North Carolina 28203
Telephone: (704) 375-8488
Email: fparrish@lawyercarolina.com

*Co-Counsel for the Future Claimants' Representative*

# TABLE OF CONTENTS

Page

ARTICLE I.    INTRODUCTION ................................................................................. 1

    1.1    Voting and Confirmation. .................................................................... 1

ARTICLE II.    OVERVIEW OF THE PLAN ................................................................ 2

    2.1    General Overview ................................................................................ 2
    2.2    Plan Overview ..................................................................................... 3
    2.3    Summary Description of Classes and Treatment ................................ 5
    2.4    The Plan Supplement ......................................................................... 8

ARTICLE III.    GENERAL INFORMATION ............................................................... 8

    3.1    Description and History of Debtor's Business ................................... 8
    3.2    Filing of the Reorganization Case ................................................... 13

ARTICLE IV.    SUMMARY OF LIABILITIES AND RELATED INSURANCE OF
                 THE DEBTOR ................................................................................ 14

    4.1    History and Description of Asbestos Personal Injury Liabilities ..... 14
    4.2    Asbestos Products ............................................................................ 15
    4.3    Description of Insurance Coverage .................................................. 16
    4.4    Other Claims and Equity Interests .................................................. 16

ARTICLE V.    EVENTS DURING THE REORGANIZATION CASE ................. 16

    5.1    Commencement of the Reorganization Case ................................... 16
    5.2    First Day Motions ............................................................................ 16
    5.3    Informational Briefs ........................................................................ 17
    5.4    Retention of Debtor's Professionals ................................................ 17
    5.5    Appointment of the Asbestos PI Committee .................................... 18
    5.6    Appointment of Legal Representative for Future Claimants ........... 18
    5.7    Administrative Matters in the Reorganization Case ........................ 19
    5.8    Adversary Proceedings, Litigation, and Mediation ......................... 21
    5.9    Other Reorganization Case Activity ................................................ 24

ARTICLE VI.    THE PLAN OF REORGANIZATION ............................................. 26

    6.1    Treatment of Administrative Claims, Fee Claims, and Priority Tax
          Claims .............................................................................................. 27
    6.2    Treatment of Classified Claims and Equity Interests – Section 524(g)
          Alternative ....................................................................................... 28
    6.3    Treatment of Classified Claims and Equity Interest – The Unimpairment
          Alternative ....................................................................................... 30
    6.4    Conditions Precedent to the Confirmation of the Plan .................... 31
    6.5    Conditions Precedent to the Effective Date of the Plan .................. 35
    6.6    Means for Implementation of the Section 524(g) Alternative ......... 37

6.7        Means for Implementation of Unimpairment Alternative................................. 44

ARTICLE VII.    THE ASBESTOS PI TRUST AND TRUST DISTRIBUTION
PROCEDURES UNDER THE SECTION 524(g) Alternative........................ 45

ARTICLE VIII.   THE LITIGATION TRUST UNDER THE UNIMPAIRMENT
ALTERNATIVE ............................................................................... 47

ARTICLE IX.    CERTAIN FACTORS TO BE CONSIDERED for the Section 524(g)
Alternative ....................................................................................... 49

9.1        Variance from Financial Projections................................................. 49
9.2        Failure to Confirm the Plan ............................................................. 49
9.3        Non-Occurrence of the Effective Date.............................................. 50
9.4        The Recovery to Holders of Allowed Claims Cannot Be Stated with
Absolute Certainty........................................................................... 50
9.5        The Allowed Amount of Claims May Differ From Current Estimates........... 50
9.6        The Plan Proponents May Object to the Amount or Classification of a
Claim .............................................................................................. 51
9.7        Parties in Interest May Object to the Classification of Claims and
Interests .......................................................................................... 51
9.8        Appointment of [a] Different Trustee[s] and/or Different Members of
the Trust Advisory Committee for the Asbestos Personal Injury Trust ........... 51
9.9        Distributions under the Trust Distribution Procedures ................... 51
9.10       The Asbestos Channeling Injunction .............................................. 52
9.11       Voting Requirements....................................................................... 52
9.12       Funding Agreement Litigation ....................................................... 52
9.13       Georgia-Pacific's Operations May Be Impacted by the Continuing
COVID-19 Pandemic ...................................................................... 52

ARTICLE X.     VOTING PROCEDURES AND REQUIREMENTS ..................................... 53

10.1       Voting Procedures Summary .......................................................... 53
10.2       Voting Deadline .............................................................................. 55
10.3       Holders of Claims Entitled to Vote ................................................ 55
10.4       Vote Required for Acceptance by a Class....................................... 56
10.5       Voting Procedures .......................................................................... 56

ARTICLE XI.    CONFIRMATION OF THE PLAN................................................. 58

11.1       Confirmation Hearing ..................................................................... 58
11.2       Requirements for Confirmation of the Plan ................................... 58

ARTICLE XII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION
OF THE PLAN................................................................................ 61

12.1       Alternative Plan of Reorganization ................................................ 61
12.2       Liquidation under Chapter 7 .......................................................... 61
12.3       Dismissal of Bankruptcy Case ....................................................... 61

ARTICLE XIII.  CERTAIN TAX CONSEQUENCES OF THE PLAN .................................... 62

    13.1    Tax Consequences to the Debtor – Section 524(g) Alternative ....................... 62

    13.2    Tax Consequences to Holders of Asbestos PI Claims .................................... 63

ARTICLE XIV.  CONCLUSION AND RECOMMENDATION ............................................... 64

Exhibit A:      Plan

Exhibit B:      Financial Projections

Exhibit C:      Liquidation Analysis

**IMPORTANT DATES**

Date by which Solicitation Packages must be served:    **[TBD]**
Date by which Claimant Voting Motion must be Filed:    **[TBD]**
Date Ballots must be received:    **[TBD]**
Date by which objections to confirmation of the Plan
must be Filed and served:    **[TBD]**
Date of Confirmation Hearing:    **[TBD]**

**DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES TO, AND CONFIRMATION OF, THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE.

ALL CREDITORS AND EQUITY INTERESTS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS ATTACHED EXHIBITS INCLUDING THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND SCHEDULES ATTACHED TO THE PLAN AND THE PLAN SUPPLEMENT, WHICH CONTROL OVER THE DISCLOSURE STATEMENT IN THE EVENT OF ANY INCONSISTENCY OR INCOMPLETENESS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THIS DATE.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE PROVISIONS OF ANY DOCUMENT ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE, REFERENCE IS MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE BANKRUPTCY RULES AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.

PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS OR EQUITY INTERESTS AGAINST THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING LETTERS ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. NO SOLICITATION OF VOTES MAY BE MADE EXCEPT AFTER DISTRIBUTION OF THIS DISCLOSURE STATEMENT.  NO PERSON HAS BEEN AUTHORIZED TO DISTRIBUTE ANY INFORMATION CONCERNING THE PLAN OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING LETTERS.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.  THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT," AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS.  THESE FORWARD-LOOKING

STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES, AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED IN ARTICLE IX, "CERTAIN FACTORS TO BE CONSIDERED." IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. THE PLAN PROPONENTS DO NOT UNDERTAKE ANY OBLIGATION TO PUBLICLY UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES. THE HISTORICAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN OBTAINED FROM SUCH REPORTS AND OTHER SOURCES OF INFORMATION AS ARE AVAILABLE TO THE PLAN PROPONENTS.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE, OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, EITHER THE DEBTOR OR REORGANIZED BESTWALL.

# ARTICLE I.

# INTRODUCTION

This Disclosure Statement[2] is being furnished by the Plan Proponents as co-proponents of the Amended Chapter 11 Plan of Reorganization of the Official Committee of Asbestos Personal Injury Claimants and the Future Claimants' Representative Under Chapter 11 of the Bankruptcy Code, dated July 22, 2020, pursuant to section 1125 of the Bankruptcy Code, and in connection with the solicitation of votes for acceptance or rejection of the Plan.  A copy of the Plan is attached as **Exhibit A**.

This Disclosure Statement is being transmitted to provide adequate information to enable holders of Claims in Class 4 (Asbestos PI Claims and Settled Claims) and Class 6 (Equity Interests), the Impaired Classes of Claims and Interests entitled to vote on the Plan, to make an informed judgment in exercising their right to vote to accept or reject the Plan.

By order dated [_____], 2020, the Bankruptcy Court approved this Disclosure Statement in accordance with section 1125 of the Bankruptcy Code and found that it contained "adequate information" sufficient to enable a hypothetical investor of the relevant class to make an informed judgment about the Plan and authorized its use in connection with the solicitation of votes with respect to the Plan.  **Approval of this Disclosure Statement does not, however, constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan.**  No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.

1.1   Voting and Confirmation.

Article IX of this Disclosure Statement specifies the deadlines, procedures, and instructions for voting to accept or reject the Plan, as well as the applicable standards for tabulating Ballots (as defined below).  The following is an overview of certain information related to voting that is contained in Article IX of this Disclosure Statement and elsewhere in this Disclosure Statement.

Each holder of a Claim in Class 4 and holders of Interests in Class 6 are entitled to vote to accept or reject the Plan.  Pursuant to the requirements of sections 1126(c) and 524(g) of the Bankruptcy Code, Class 4 shall accept the Plan if at least two-thirds (2/3) in amount and seventy-five percent (75%) in number of those voting Claims in Class 4 (Asbestos PI Claimants) vote to accept the Plan.  For the Section 524(g) Alternative to proceed to confirmation, Class 6 must also accept the Plan. Assuming the requisite acceptances are obtained, the Plan Proponents intend to seek confirmation of the Plan at the Confirmation Hearing scheduled for [          ], 2020, at [   ] a.m. (Prevailing Eastern Time) before the Bankruptcy Court.

Donlin Recano & Company, Inc. (the "**Voting Agent**") has been engaged to assist with the voting process.

---

[2] Capitalized terms used but not defined in this Disclosure Statement have the meanings ascribed to them in Article I of the Plan.  To the extent that a term is defined in this Disclosure Statement and is defined in the Plan, the definition contained in the Plan controls.

The Voting Agent will provide additional copies of all materials and process and tabulate Ballots for Classes 4 and 6.

To be counted, your ballot indicating acceptance or rejection of the Plan must be received by the Voting Agent no later than 4:00 p.m. (prevailing eastern time) on [      ], 2020 (the "**Voting Deadline**"), unless the Plan Proponents, in their sole discretion, extend the period during which votes will be accepted on the Plan, in which case the term "Voting Deadline" shall mean the last date on, and time by which, such period is extended.  **Any executed Ballot that does not indicate either an acceptance or rejection of the Plan or indicates both an acceptance and rejection of the Plan will not be counted as an acceptance or rejection and will not count toward the tabulations required pursuant to either sections 524(g) or 1129 of the Bankruptcy Code.**

Prior to deciding whether and how to vote on the Plan, each holder of a Claim entitled to vote should consider carefully the information in this Disclosure Statement, including Article VIII entitled "*Certain Factors to be Considered.*"

**The Plan Proponents believe that the Plan is in the best interests of all creditors of the Debtor.  The Plan Proponents recommend that all holders of Claims against the Debtor, whose votes are being solicited, submit Ballots to accept the Plan.**

## ARTICLE II.

## OVERVIEW OF THE PLAN

The following is a general overview of how the Plan treats all holders of Claims against, and Equity Interests in, the Debtor.  It is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, financial statements, and notes appearing elsewhere in this Disclosure Statement and in the Plan.  For a more detailed description of the terms and provisions of the Plan, please refer to Article VI of this Disclosure Statement titled "*The Plan of Reorganization.*"

The Asbestos PI Committee and the Future Claimants' Representative are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

2.1   General Overview

The Debtor asserts that it commenced its Reorganization Case to manage the significant potential liabilities arising from claims by plaintiffs alleging personal injuries caused by: (i) asbestos, asbestos-containing, or asbestos-contaminated products or things that have been designed, marketed, manufactured, fabricated, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed or in any other way made available by the Debtor, Old GP, or Old Bestwall; or (ii) present at any premises owned, leased, occupied or operated by the Debtor, Old GP, or Old Bestwall.

2.2    <u>Plan Overview</u>

The Debtor has consistently alleged that it has sought bankruptcy protection to fairly, finally and equitably resolve present and future asbestos claims against it, with this Court's assistance, and through negotiations with the Asbestos PI Committee and the FCR, as soon as possible through a confirmed chapter 11 plan of reorganization. The Debtor has also consistently alleged that the Debtor has adequate funding to pay all its Asbestos PI Claims through the Funding Agreement. Despite many efforts to resolve the Reorganization Case consensually, and despite many representations that this case is not a limited fund case, no progress has been made by the Debtor to date in proposing a confirmable plan. Accordingly, the Plan Proponents are proposing their own Plan.

The Plan contemplates two alternative paths contingent upon (a) asbestos claimants voting to accept the Plan, (b) GP Holdings voting to accept the Plan, and (c) Georgia-Pacific's agreement on assumption and assignment of the Funding Agreement to the Asbestos PI Trust. The two possible scenarios are generally referred to as the § 524(g) Alternative and the Unimpairment Alternative.

(a)    *The Section 524(g) Alternative*

In the event that (a) asbestos claimants vote to accept the Plan, (b) GP Holdings votes to accept the Plan, and (c) Georgia-Pacific agrees to the assumption and assignment of the Funding Agreement to the Asbestos PI Trust upon the conditions set forth in the Plan, the Plan Proponents will file a notice indicating that they are selecting the Section 524(g) Alternative and, as such, pursuant to the Plan, (i) Allowed Claims in Classes 1 through 3 and 5 are unimpaired and shall be in paid in full in Cash on the Effective Date; (ii) Asbestos PI Claims and Settled Claims in Class 4 are impaired and are channeled to the Asbestos PI Trust; and Class 6 Interests (Equity Interests) are impaired.

For purposes of implementing the Section 524(g) Alternative, the following transactions will be consummated: (a) prior to or on the Effective Date, the equity interests of GP Holdings in the Debtor will be reinstated as equity interests in Reorganized Bestwall; (b) on the Effective Date, the Funding Agreement will be assumed by the Debtor, and the Debtor's rights and benefits thereunder will be assigned to the Asbestos PI Trust; (c) the Ambassador Claim and all other Causes of Action, if any, as well as the Mt. Holly Land, will be transferred to the Asbestos PI Trust on the Effective Date.

On the Effective Date, the Trustee(s) of the Asbestos PI Trust will create the Trust Expense Fund and the Trust Claims Fund. The Trust Expense Fund will be used to pay all Asbestos PI Trust Expenses of the Asbestos PI Trust in accordance with the terms and conditions of the Funding Agreement and the Asbestos PI Trust Agreement. The Trust Claims Fund will be used to pay Asbestos PI Claims and Settled Asbestos Claims Liquidated by the Asbestos PI Trust pursuant to the provisions of the Funding Agreement and the Asbestos PI Trust Distribution Procedures.

The Trust Expense Fund will be funded, in part, with any amounts recovered by the Asbestos PI Trust by virtue of the Ambassador Claim and all Causes of Action, if any, and any

distributions of distributable income made to the Asbestos PI Trust from time to time because of the Trust's ownership of the Mt. Holly Land. In addition, on the Effective Date, Georgia-Pacific will wire transfer to the Trust in immediately available funds an amount equal to the Initial Trust Expense Funding. In the event that payment of Asbestos PI Trust Expenses depletes the Trust Expense Fund at any time, and from time to time, Georgia-Pacific will have a continuing obligation under the Funding Agreement to remit to the Asbestos PI Trust Cash sufficient to replenish the Trust Expense Fund such that the balance of the fund is equal to or greater than $35 million.

(b)     *The Channeling Injunction*

Pursuant to section 524(g) of the Bankruptcy Code, under the Section 524(g) Alternative, the Plan and the Confirmation Order shall stay, restrain and enjoin any Entity from taking any actions against any Protected Party for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Asbestos PI Claim or Settled Asbestos Claim, all of which shall be channeled to the Asbestos PI Trust for resolution as set forth in the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures, including staying, restraining and enjoining any Entity from any of the following with respect to any Asbestos PI Claim or Settled Asbestos Claim:

   (1)     commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including a judicial, arbitral, administrative or other proceeding) in any forum against any Protected Party or any property or interests in property of any Protected Party;

   (2)     enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree or other order against any Protected Party or any property or interests in property of any Protected Party;

   (3)     creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party; and

   (4)     setting off, seeking reimbursement of, contribution from or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party with respect to any Asbestos PI Claim or Settled Asbestos Claim.

For the avoidance of doubt, Georgia-Pacific and its Affiliates, other than PlasterCo, BRRC and PlasterCo Canada, are not entitled to any of the protections granted to the Protected Parties.

(c)     *Asbestos PI Trust*

Under the Section 524(g) Alternative, the Plan contemplates the establishment of an Asbestos PI Trust that will assume all Asbestos PI Claims and resolve Asbestos PI Claims in accordance with the Asbestos PI Trust Documents. The Asbestos PI Trust Documents include the

Asbestos PI Trust Agreement, the Trust Distribution Procedures, and all other agreements, instruments, and documents governing the establishment, administration, and operation of the Asbestos PI Trust. The Asbestos PI Trust Agreement is attached to the Plan as Exhibit A, the Trust Distribution Procedures are attached to the Plan as Exhibit B, and other Asbestos PI Trust Documents will be included in the Plan Supplement.

On the Effective Date (unless otherwise noted below), the Asbestos PI Trust will receive the Asbestos PI Trust Assets, which include:

> (1)    the Mt. Holly Land;
>
> (2)    all rights and benefits as Payee under the Funding Agreement;
>
> (3)    the Initial Trust Expense Funding;
>
> (4)    the Ambassador Claim;
>
> (5)    all Causes of Action, if any, commenced by the Asbestos PI Committee during the Reorganization Case and assigned to the Asbestos PI Trust;
>
> (6)    all other assets, rights and benefits assigned, transferred or conveyed to the Asbestos PI Trust from time to time, including all assets, rights and benefits assigned, transferred or conveyed to the Asbestos PI Trust in connection with the Plan; and
>
> (7)    all proceeds of any of the foregoing.

    (d)    *The Unimpairment Alternative*

In the event that (a) asbestos claimants do not vote to accept the Plan, (b) GP Holdings does not vote to accept the Plan, or (c) Georgia-Pacific does not agree to the assumption and assignment of the Funding Agreement to the Asbestos PI Trust, then pursuant to the Plan, no Section 524(g) trust will be created, and no channeling injunction will be issued. All Classes will be unimpaired, and the rights and obligations of all holders of Claims and Interests will remain unaltered. On the Effective Date, a litigation trust will be created to pursue any Causes of Action for the benefit of holders of claims and interests, with any recoveries to be distributed in accordance with the priority scheme of the Bankruptcy Code.

For the reasons detailed in this Disclosure Statement, the Plan Proponents believe that there will be substantially more assets available to resolve Asbestos PI Claims under either alternative to the Plan than would be the case if there were a chapter 7 liquidation. For these and other reasons explained in detail herein, the Plan Proponents believe that all holders of Asbestos PI Claims should vote to accept the Plan.

## 2.3    Summary Description of Classes and Treatment

Except for Administrative Claims and Priority Tax Claims, which are not required to be classified, all Claims and Equity Interests are divided into classes under the Plan. The following

summarizes the treatment of such classified and unclassified Claims and Equity Interests under the Plan under each alternative.  The Plan Proponents reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

     (a)    *Section 524(g) Alternative*

     The summary of classification and treatment of Claims against and Equity Interests in the Debtor under the Section 524(g) Alternative is set forth below in the chart. This chart is only a summary of such classification and treatment under the Section 524(g) Alternative.  Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Equity Interests.

| Class | Designation[3] | Treatment | Impairment and Entitlement to Vote | Estimated Recovery |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | On the Effective Date, each holder of an Allowed Class 1 Claim shall receive Cash in an amount equal to such Allowed Claim plus Post-petition Interest thereon, if any, unless the holder of such Claim agrees to less favorable treatment. The Plan Proponents believe the amount of Class 1 Claims is negligible. | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | 100% |
| 2 | Secured Claims | On the Effective Date, unless otherwise agreed by the holder of an Allowed Class 2 Claim and the Debtor or Reorganized Bestwall, each holder of an Allowed Class 2 Claim, at the option of the Debtor or Reorganized Bestwall, shall be either (a) paid in full in Cash, plus Post-petition Interest thereon; or (b) be Reinstated. Any Allowed Deficiency Claim of a holder of an Allowed Secured Claim shall be entitled to treatment as an Allowed Class 3 Claim.  The Plan Proponents do not believe there are any Class 2 Claims. | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | 100% |
| 3 | General Unsecured Claims | On the Effective Date, each holder of an Allowed Class 3 Claim shall receive Cash in an amount equal to such Allowed Claim plus Post-petition Interest thereon, if any, unless the holder of such Claim agrees to less favorable treatment. | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | 100% |

---

[3] The Plan Proponents reserve the right to eliminate any Class of Claims in the event they determine that there are no Claims in such Class.

| Class | Designation[3] | Treatment | Impairment and Entitlement to Vote | Estimated Recovery |
|---|---|---|---|---|
| | | The Plan Proponents believe the amount of Class 3 Claims is negligible. | | |
| 4 | Asbestos PI Claims | On the Effective Date, all Asbestos PI Claims and Settled Asbestos Claims shall be channeled to the Asbestos PI Trust, which shall be funded pursuant to Article V of the Plan.<br><br>a. All Asbestos PI Claims shall be resolved pursuant to the terms of the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures and to the extent such claims meet the criteria set forth therein, paid pursuant to the Asbestos PI Trust Documents.<br><br>b. All Settled Asbestos Claims shall be resolved pursuant to the terms of the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures and each holder of a Settled Asbestos Claim may opt to receive either (i) the liquidated value of such Settled Asbestos Claim as reflected in, and subject to the terms and conditions of, the applicable settlement agreement or other governing documentation; or (ii) treatment under the Expedited Review Process (as defined in the Asbestos PI Trust Distribution Procedures) or the Individual Review Process (as defined in the Asbestos PI Trust Distribution Procedures). | Impaired<br>(Entitled to Vote) | N/A[4] |
| 5 | Intercompany Claims | On the Effective Date, each Allowed Class 5 Claim shall be either Reinstated, subject to the Restructuring Transactions, or paid in full. | Unimpaired<br>Not Entitled to Vote (Presumed to Accept) | 100% |

---

[4] The Asbestos PI Claims shall be resolved pursuant to the terms of the Trust Distribution Procedures.

| Class | Designation[3] | Treatment | Impairment and Entitlement to Vote | Estimated Recovery |
|---|---|---|---|---|
| 6 | Equity Interests in the Debtor | On the Effective Date, all Equity Interests in the Debtor will become Equity Interests in Reorganized Bestwall, with the same equity ownership such Equity Interests held in the Debtor, subject to the Georgia-Pacific Default. | Impaired | $ |

(b)   *The Unimpairment Alternative*

In the event that (a) Class 4 Claims (Asbestos PI Claims and Settled Asbestos Claims) do not vote to accept the Plan, (b) Class 6 Interests (Equity Interests) do not vote to accept the Plan, or (c) Georgia-Pacific does not agree to the assumption and assignment of the Funding Agreement to the Asbestos PI Trust on the conditions set forth in the Plan, then all Claims in Classes 1 through 6 shall be unimpaired, and the rights and obligations of the holders of such claims shall be Unimpaired and Reinstated. On the Effective Date, the Litigation Trust will be created to pursue any Causes of Action for the benefit of holders of Claims and Interests, with any recoveries to be distributed in accordance with the priority scheme of the Bankruptcy Code.

2.4   The Plan Supplement

Unless otherwise ordered by the Bankruptcy Court, the Plan Proponents will file the Plan Supplement with the Bankruptcy Court no later than seven (7) days prior to the earlier of (i) the deadline for submission of Ballots to vote to accept or reject the Plan, or (ii) the deadline to object to Confirmation of the Plan.  The Plan Supplement will include: (a) the list of the officers and directors of Reorganized Bestwall; (b) the identity of the initial Asbestos PI Trustee Trustee(s); and (c) a list of the initial members of the Trust Advisory Committee.

## ARTICLE III.

## GENERAL INFORMATION

This Article III provides a general overview of the Debtor's corporate history, business operations, organizational structures, and assets.  It also discusses the events leading to the filing of the Reorganization Case.

3.1   Description and History of Debtor's Business

(a)   *General Background of the Debtor*

Old GP was initially incorporated in 1927 as a Georgia corporation under the name Georgia Hardwood Lumber Company, Inc.  It underwent several name changes early in its history: in 1944,

to Georgia Hardwood Lumber Company; in 1948, to Georgia-Pacific Plywood & Lumber Co.; in 1951, to Georgia-Pacific Plywood Company; and in 1956, to Georgia-Pacific Corporation.

In 1965, Old GP acquired Bestwall Gypsum Co., a Maryland corporation ("**Old Bestwall**"). Following the Old Bestwall acquisition, Old GP continued to expand its businesses. Newly acquired or developed assets or operations were integrated with existing assets and businesses. This happened with the Old Bestwall assets and operations, which over time were integrated with other Old GP businesses. At the same time, Old GP periodically reviewed and evaluated the effectiveness of its corporate structure. As a result, Old GP from time to time implemented corporate restructurings.

In December 2005, Koch Industries, Inc. acquired Old GP, then a publicly traded company, and Old GP became a wholly-owned subsidiary of Georgia-Pacific Holdings, LLC, a Delaware limited liability company. On December 29, 2006, Old GP, then a Georgia corporation, reincorporated in Delaware. Two days later, on December 31, 2006, Old GP, converted from a corporation to a limited liability company, renaming itself as Georgia-Pacific LLC.

As described in more detail below, on July 31, 2017, Old GP underwent a corporate restructuring. As a result of that restructuring, Old GP ceased to exist and two new entities were created, each as a direct wholly owned subsidiary of GP Holdings: (a) the Debtor in this case, which received certain of Old GP's assets related to the historical Old Bestwall gypsum business and became solely responsible for certain liabilities of Old GP, including any asbestos-related liabilities of Old GP (other than those liabilities for which the exclusive remedy is provided under a workers' compensation statute or similar laws), and the defense and resolution of claims and lawsuits asserting those liabilities; and (b) Georgia-Pacific, which received all other assets of Old GP and became solely responsible for all other liabilities of Old GP. Following the restructuring, both the Debtor and Georgia-Pacific were named Georgia-Pacific LLC, with the Debtor being a North Carolina limited liability company and Georgia-Pacific being a Delaware limited liability company. Effective November 1, 2017, to avoid confusion that might arise from the shared name upon commencement of this case, the Debtor changed its name from Georgia-Pacific LLC to Bestwall LLC.

Non-debtor GP Holdings is the direct parent of the Debtor as well as non-debtor Georgia-Pacific. The Debtor is the direct parent of non-debtor GP Industrial Plasters LLC, a North Carolina limited liability company ("**PlasterCo**"). In turn, PlasterCo is the direct parent of both non-debtor Blue Rapids Railway Company LLC, a Kansas limited liability company ("**BRRC**"), and non-debtor Industrial Plasters Canada ULC, a Nova Scotia unlimited company ("**PlasterCo Canada**").

The Debtor manages and defends thousands of asbestos-related personal injury claims. The Debtor's subsidiary PlasterCo, together with its wholly owned subsidiaries BRRC and PlasterCo Canada, develops, manufactures, sells and distributes gypsum plaster products, including gypsum floor underlayment, industrial plaster, metal casting plaster, industrial tooling plaster, dental plaster, medical plaster, arts and crafts plaster, pottery plaster and general-purpose plaster. PlasterCo owns or leases three operating facilities, which are located in Blue Rapids, Kansas; Las Vegas, Nevada; and Camden, New Jersey. PlasterCo's subsidiary BRRC operates a short line railway associated with PlasterCo's Blue Rapids, Kansas facility. PlasterCo's subsidiary

PlasterCo Canada holds certain assets for the benefit of the plaster business that are located in Canada.

Georgia-Pacific, through its domestic and foreign subsidiaries, manufactures and sells tissue, pulp, paper, packaging and building products.

The Debtor has no funded indebtedness.

(b)    *Pre-Petition Corporate Restructuring*

On July 31, 2017, Old GP completed the Pre-Petition Corporate Restructuring, which was effectuated through a series of transactions.[5]  On June 26, 2017, PlasterCo and PlasterCo Canada were formed to hold the plaster business.  On July 30, 2017, Old GP purchased from Georgia-Pacific Mt. Holly LLC, an indirect subsidiary of Old GP ("**GP Mt. Holly**"), the land (but not the improvements) at a facility located at Mt. Holly, North Carolina (the "**Mt. Holly Land**") and, in connection therewith, entered a long-term ground lease of that land to GP Mt. Holly (the "**Mt. Holly Lease**").  Then, on July 31, 2017, several transactions were completed in sequence.

(1)    First, the plaster business was separated from other businesses of Old GP through the contribution to PlasterCo of certain U.S. assets and liabilities associated with the plaster business, including the equity interests in BRRC, and the contribution to PlasterCo Canada of certain Canadian assets and liabilities associated with the plaster business.

(2)    The equity interests in PlasterCo Canada then were sold to PlasterCo for approximately CDN$4,000,000, such that PlasterCo Canada, like BRRC, was a direct wholly owned subsidiary of PlasterCo.

(3)    At that point, the equity interests in PlasterCo were sold to Old GP for approximately $145,000,000, such that PlasterCo was a direct wholly owned subsidiary of Old GP.

(4)    Old GP then converted from a Delaware limited liability company to a Texas limited liability company and entered into a funding agreement with GP Holdings (as amended from time to time, the "**Funding Agreement**"), with Old GP as payee and GP Holdings as payor.

(5)    After converting into a Texas limited liability company and entering into the Funding Agreement, Old GP effected a divisional merger under the Texas merger statute.

(6)    Upon the effectiveness of the divisional merger, (a) Old GP ceased to exist, (b) two new Texas limited liability companies—the Debtor and Georgia-Pacific—were created, and (c) all of the assets and liabilities of Old GP were

---

[5] A description of the Pre-Petition Restructuring can be found in the *Declaration of Tyler L. Woolson in Support of First Day Pleading* [Docket No. 2].

allocated between the Debtor and Georgia-Pacific, with certain of Old GP's assets related to the historical Old Bestwall gypsum business and all of Old GP's asbestos-related liabilities (other than those liabilities for which the exclusive remedy is provided under a workers' compensation statute or similar laws) and Old GP's rights as payee under the Funding Agreement being allocated to the Debtor.

(7)     Immediately following the effectiveness of the divisional merger, (a) Georgia-Pacific assumed from GP Holdings the obligations as payor under the Funding Agreement, such that the Funding Agreement became an agreement between the Debtor, as payee, and Georgia-Pacific, as payor and (b) the Debtor and Georgia-Pacific entered into certain other agreements, including the secondment agreement and services agreements discussed further below.

(8)     Thereafter, the Debtor converted from a Texas limited liability company to a North Carolina limited liability company, and Georgia-Pacific converted from a Texas limited liability company to a Delaware limited liability company.

(9)     Finally, the Funding Agreement and various other intercompany agreements of the Debtor, including the secondment and services agreements discussed further below, were amended and restated to reflect the names of the parties to those agreements at the conclusion of the Pre-Petition Corporate Restructuring, with those agreements later being again amended and restated as of November 1, 2017 to reflect (among other updates) the Debtor's name change to Bestwall LLC.

As asserted by the Debtor, the divisional merger purportedly resulted in the Debtor becoming the sole entity responsible for Old GP's asbestos-related claims (other than claims for which the exclusive remedy is provided under a workers' compensation statute or similar laws). In addition, the Debtor received, among others, the following assets:

(1)     Three bank accounts and approximately $32 million in cash;

(2)     All contracts of Old GP related to its asbestos-related litigation, including settlement agreements, service contracts, engagement and retention contracts and two insurance policies with minimal amounts of potential coverage that were issued by insurers that are in insolvency proceedings;

(3)     The Mt. Holly Land and the rights as lessor under the Mt. Holly Lease;

(4)     All equity interests in PlasterCo;

(5)     Causes of action that relate to the assets and liabilities allocated to the Debtor;

(6)     Records exclusively relating to the assets and liabilities allocated to the Debtor; and

(7)     Privileges relating to these matters.

As disclosed in Bestwall's monthly status reports, during the period beginning on the Petition Date and ending on May 31, 2020, Bestwall received cumulative cash receipts equal to $63 million[6] and has made $62 million in cumulative cash disbursements, indicating a $1M cumulative net cash flow over the period.

The Plan Proponents have asserted throughout the Reorganization Case that the Pre-Petition Corporate Restructuring is a sham transaction designed to insulate Georgia-Pacific from its asbestos liabilities and protect its assets.

(c)     *Funding Agreement*

The Debtor's main asset is the Funding Agreement. The Debtor has asserted that the Funding Agreement is not a loan agreement. Instead, without any corresponding repayment obligation by the Debtor, it requires Georgia-Pacific to provide funding to pay for all costs and expenses of the Debtor incurred in the normal course of its business either (a) in the absence of a bankruptcy case or (b) during the pendency of any Reorganization Case, including the costs of administering the Reorganization Case, in both cases to the extent that any cash distributions received by the Debtor from its subsidiaries are insufficient to pay such costs and expenses. In addition, and again in the absence of any corresponding repayment obligation by the Debtor, the Funding Agreement requires Georgia-Pacific to fund any amounts necessary or appropriate to satisfy the Debtor's asbestos-related liabilities in the absence of a bankruptcy case and also obligates Georgia-Pacific, in the event of a chapter 11 filing, to provide the funding for a section 524(g) asbestos trust in the amount required by a confirmed plan of reorganization for the Debtor, again in both cases to the extent that the Debtor's assets are insufficient to provide the requisite trust funding.

The Asbestos PI Committee and the Future Claimants' Representative, with the assistance of FTI, had been negotiating with the Debtor and Georgia-Pacific over proposals for amendment of the Funding Agreement to propose the best way to try to ensure that the Funding Agreement is absolute. As of the date of the filing of this Disclosure Statement, those negotiations have not been successful. As a result, the Asbestos PI Committee and the Future Claimants' Representative will be initiating a civil action before the United States Bankruptcy Court for the Western District of North Carolina seeking relief with respect to additional protections required to secure the Funding Agreement and assure the assumability and assignability of the Funding Agreement to the Asbestos PI Trust.

---

[6] Of this $63M in cash receipts, $60M (95%) represents payments received from Georgia-Pacific pursuant to the Funding Agreement.

(d)    *Services Agreement and Secondment Agreement*[7]

To ensure that the Debtor has access to services necessary to the effective operation of its businesses, in connection with the Prepetition Corporate Restructuring, the Debtor and Georgia-Pacific entered into a services agreement pursuant to which Georgia-Pacific provides the Debtor with certain centralized corporate and administrative services, including legal, accounting, tax, human resources, information technology, risk management and other support services (including information retention and records management).

In addition, the Debtor and Georgia-Pacific entered into a secondment agreement, pursuant to which Georgia-Pacific assigned to the Debtor on a full-time basis, certain of its employees, including the in-house legal team that primarily manages the defense of the asbestos-related claims.  As a result of the divisional merger, the Debtor also is party to a secondment agreement with non-debtor affiliate Georgia-Pacific Building Products LLC, pursuant to which that entity has assigned to the Debtor an employee who provides finance and related services.

(e)    *Cash Pooling Agreement*

PlasterCo, PlasterCo Canada and the Debtor entered into a cash pooling agreement[8] that provides for a coordinated cash system among the Debtor and its subsidiaries. In addition, PlasterCo and Georgia-Pacific entered into a services agreement[9] pursuant to which Georgia-Pacific provides the same array of needed corporate and administrative services to PlasterCo that it provides to the Debtor. Further, although PlasterCo is profitable and generates positive cash flow, PlasterCo and Georgia-Pacific entered into a revolving credit agreement that permits PlasterCo to access capital to address any liquidity needs that may arise because of working capital requirements or timing issues.  Georgia-Pacific and PlasterCo Canada also have entered into a revolving loan arrangement by which Georgia-Pacific provides PlasterCo Canada with access to additional capital.

3.2    Filing of the Reorganization Case

The Debtor filed its voluntary chapter 11 petitions on November 2, 2017, purportedly because of the weight of the asbestos liabilities assigned to it in the Pre-Petition Corporate Restructuring.  The Debtor has no funded indebtedness and its only creditors are asbestos claimants.  The Debtor states that it filed the Reorganization Case with the goal of negotiating,

---

[7] During the course of the Reorganization Case, the Debtor filed a *Motion of the Debtor for Entry of An Order: (A) Approving Amendment to Secondment Agreement with Non-Debtor Affiliate, as of February 1, 2018*; *and (B) Granting Related Relief* [Docket No. 206].

[8] A description of the Debtor's cash management system, deposit practices, and intercompany transactions is found in the *Motion of the Debtor for an Order (I) Approving the Continued Used of Its Bank Accounts, Cash Management System and Business Forms; (II) Granting a Waiver of the Requirements of Section 345(b) of the Bankruptcy Code; and (III) Authorizing The Debtor's Bank to Charge Certain Fees and Other Amounts* [Docket No. 22].

[9] A description of the services agreement is found in the *Motion of the Debtor for an Order Authorizing It to Perform Under Certain Intercompany Agreements with Non-Debtor Affiliates* [Docket No. 30].

obtaining approval of, and consummating a plan of reorganization to establish an appropriately funded trust pursuant to section 524(g) of the Bankruptcy Code.

## ARTICLE IV.

## SUMMARY OF LIABILITIES AND RELATED INSURANCE OF THE DEBTOR

4.1    <u>History and Description of Asbestos Personal Injury Liabilities</u>

The Debtor traces its history to Old Bestwall's gypsum business that was acquired by Old GP in 1965 and then merged into Old GP.  Old Bestwall was a spin-off of Certain-Teed Products Company that manufactured wallboard, joint compound products and industrial plasters.  Old GP continued to sell these products following its acquisition of Old Bestwall and operated this business as the "Gypsum Division."

The Debtor and its predecessor, Old GP, have faced hundreds of thousands of asbestos-related lawsuits dating back to at least 1979.  According to the Debtor, the Debtor and Old GP have spent approximately $2.9 billion over the last nearly 40 years, defending and resolving more than 430,000 personal injury lawsuits relating to alleged asbestos exposure.  The Debtor and Old GP have paid over $2 billion of that amount out of pocket (that is, net of insurance).  Approximately 30% of this amount was covered by insurance before such insurance was almost entirely exhausted in 2013.

As of September 30, 2017, there were approximately 64,000 asbestos-related claims pending against the Debtor in nearly every state and certain territories of the United States, including approximately 22,000 that are being actively litigated and approximately 13,300 claims pending on inactive dockets in various jurisdictions.

The Debtor has asserted that it expects that thousands of additional claims will be filed or asserted against it every year for decades to come.

In the years between 2000 and 2017, Old GP paid on average $125,000 per mesothelioma claim, which was up to five (5) times on average the amount it typically paid in the 1990s.  In addition, Old GP and the Debtor were required to engage many outside professionals, including defense firms and experts.  In that regard, the Debtor managed roughly 50 outside defense firms around the country, including approximately 35 local counsel and 15 special counsel and trial counsel.  From 2012 to 2016, an average of approximately 660 attorneys, paralegals and other timekeepers at these firms billed Old GP approximately 150,000 hours each year to defend its asbestos lawsuits.  That was in addition to the time of nearly 40 experts and various data management and discovery vendors.  The costs of defending Old GP's asbestos lawsuits in 2016 exceeded $40 million.

During the 2012 to 2016 period, Old GP incurred asbestos-related defense and indemnity costs of approximately $160 million a year on average.  The Debtor asserts that during 2015 and 2016, its total costs were the highest in over a decade—approximately $184 million in 2015 and $174 million in 2016.  From January 2017 through October 31, 2017, the Debtor asserts that it and Old GP had total costs of approximately $200 million.

The asbestos litigation and its attendant financial burdens are projected to continue through at least 2050. The Debtor has asserted that its future costs in the tort system will be substantially worse than even the most conservative projections.

All these factors, and the prospect of even higher costs in the tort system for decades to come, allegedly prompted the Debtor's consideration of a chapter 11 filing. The Debtor has alleged that its goal in this Reorganization Case is to negotiate, obtain approval of and ultimately consummate a plan of reorganization that would, among other things, provide for (a) the creation and funding of a trust established under section 524(g) of the Bankruptcy Code to pay valid asbestos-related claims and (b) issuance of an injunction under section 524(g) of the Bankruptcy Code that will permanently protect the Debtor and its affiliates from any further asbestos claims arising from products manufactured and sold by, or operations or conduct of, Old Bestwall or Old GP.

The Plan Proponents estimate that from the Petition Date through May 30, 2020, the Debtor has saved anywhere from $387.9 million to $558.4 million in litigation costs, which savings continue to increase the longer the Debtor stays in bankruptcy.

## 4.2    Asbestos Products

The majority of the Debtor's exposures claims are related to joint compound; however, the Debtor manufactured and distributed many other asbestos-contaminated products including: (i) Kalite, a dry powder intended to be used as an acoustical plaster, (ii) Laminating Compound, a paste used to laminate wallboard, (iii) Lite Acoustic, a powder intended for use as an acoustical plaster, (iv) Patching Plaster, a powder used to patch certain plasters, (v) Ready Mix, a paste used in wallboard construction to finish walls and ceilings, (vi) Spackling Compound, a powder used to patch or repair walls and ceilings, (vii) Speed Set/One Day/one day, a powder used in wallboard construction to finish walls and ceilings, (viii) Texture, a powder used to give a textured, decorative appearance to walls or ceilings, (ix) Topping Compound, a powder used in wallboard construction to finish walls or ceilings, (x) Triple Duty Joint Compound (including brand names Triple Duty Wallboard Joint Compound and Triple Duty Joint Compound-Vinyl Based Adhesive), a powder used in wallboard construction to finish walls and ceilings, (xi) asbestos pellets, as an additive to certain paperboard sold to various converting companies; and (xii) industrial resins.

Georgia-Pacific also purchased and sold asbestos-containing products manufactured by other companies used in conventional building products such as asbestos cement board, various roofing and roof coating products and asbestos siding.

In addition to sales under its own name, Georgia-Pacific sold asbestos-containing products to companies such as Johns-Manville, Flintkote, Kaiser Gypsum, Big Horn Gypsum Company and many others for sale under their own names. Old GP operated more than 175 distribution centers, which also sold asbestos products manufactured by companies other than Georgia-Pacific.

Expanding Georgia-Pacific's culpability for asbestos disease even more, asbestos containing talc was included as an ingredient in many Georgia-Pacific products including, at a minimum, All Purpose Joint Compound, Bedding Compound, Central Mix, Ready Mix, Speed Set, Texture, Topping Compound, Triple Duty Joint Compound, Metal Casting plasters used in

various industrial casting, tooling and molding applications, Prepared Trowel Finish, a pre-mixed gypsum finish coat plaster, and additional joint system and industrial plaster products.

4.3     Description of Insurance Coverage

The Debtor has no insurance coverage for Asbestos PI Claims.  The Debtor had claims in two insurance liquidations identified in its Schedules: (i) Midland Insurance; and (ii) Ambassador Insurance Company.  The claim against Midland Insurance was sold to a claim's purchaser during the Reorganization Case as set forth below.  The Ambassador Claim will be transferred to the Asbestos PI Trust.

4.4     Other Claims and Equity Interests

As contemplated by the Section 524(g) Alternative of the Plan, all holders of Claims in Class 1 (Priority Claims), Class 2 (Secured Claims), Class 3 (General Unsecured Claims) and Class 5 (Intercompany Claims), if any, shall be paid in full in Cash on the Effective Date.  The Plan Proponents believe these claims are negligible.  Holders of Equity Interests in the Debtor will become Equity Interests in Reorganized Bestwall, with the same equity ownership such Equity Interests held in the Debtor, subject to the Georgia-Pacific Default.  Under the Unimpairment Alternative, all Claims in Classes 1 through 6 shall be unimpaired, and the rights and obligations of the holders of such claims shall be Unimpaired and Reinstated.

## ARTICLE V.

## EVENTS DURING THE REORGANIZATION CASE

The following is a general description of the major events occurring during the Reorganization Case.

5.1     Commencement of the Reorganization Case

The Debtor filed its voluntary chapter 11 petitions on November 2, 2017.

Bestwall has continued to remain in charge of managing its affairs as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code since the Petition Date.

5.2     First Day Motions

On the Petition Date, the Debtor Filed numerous motions seeking typical "first-day" relief in Reorganization Cases, as well as a declaration in support thereof. The purported purpose of such motions was to ensure that the Debtor was able to transition into the chapter 11 process and function smoothly while the Reorganization Case was progressing.

In particular, the "first day" motions sought authority to:  (a) appoint Donlin Recano and Company, Inc. as claims, noticing and ballot agent; (b) file a (i) consolidated list of the top asbestos plaintiffs' firms with the largest scope or number of asbestos cases in lieu of the list of twenty (20) largest unsecured creditors; (ii) approving notice procedures; and (iii) approving form and manner of notice of commencement of Reorganization Case; (c) suspending entry and service of standard

notice of case commencement; (d) establishing certain notice, case management and administrative procedures; (e) extension of time to file the Schedules and Statements; (f) continue use of the existing cash management system and bank accounts and waiver of the requirements of section 345 of the Bankruptcy Code; (g) authority to perform under certain intercompany agreements with Non-Debtor Affiliates; and (h) to establish procedures for interim compensation and reimbursement of expenses of professionals. The relief sought in each of the motions was eventually granted by the Bankruptcy Court.

5.3    Informational Briefs

On the Petition Date, the Debtor filed *the Informational Brief of Bestwall LLC* [Docket No. 12] wherein the Debtor set forth its position regarding such issues as the basis for its asbestos liability, its historical experience in the asbestos tort system, the difference between chrysotile fibers contained in joint compound and other asbestos fibers, and its plan for proceeding in the Reorganization Case. It also contains a lengthy discussion of the bankruptcy case, *In re Garlock Sealing Technologies, LLC* ("***Garlock* bankruptcy case**") and a discussion of five cases previously settled by the Debtor that were selected by the Debtor solely for the purpose of alleging misrepresentation of exposures to asbestos. The Debtor contends that these five cases, as well as similar cases, tainted the settlement of its pre-petition asbestos personal injury cases.

On August 19, 2019, the Asbestos PI Committee filed the *Informational Brief of the Official Committee of Asbestos Claimants of Bestwall LLC* [Docket No. 939]. Among other things, the Asbestos PI Committee provided a fulsome description of the Debtor's asbestos products and conduct in the asbestos tort system, along with an analysis of the toxicity of chrysotile fibers contained in joint compound, as well as other products produced by the Debtor, and a discussion of the Debtor's talc products. The Asbestos PI Committee also explained how the Reorganization Case differed from the *Garlock* bankruptcy case and provided a discussion of the five plaintiffs selected by the Debtor and the evidence contained in its review of the files which refuted the Debtor's view of these five cases.

On November 14, 2019, the *Debtor's Response to Informational Brief of the Official Committee Asbestos Claimants of Bestwall LLC* was filed with the Court [Docket No. 1034]. Among other things, the Debtor responds to the Asbestos PI Committee's analysis of the increase in claims against co-defendants during the bankruptcy wave and the science of asbestos fibers. The Debtor also attempts to refute the Asbestos PI Committee's argument that Old GP acted inappropriately regarding its knowledge of the health hazards of asbestos and disclosed Old GP's sponsorship of science research appropriately. The Debtor also asserts that the Asbestos PI Committee mischaracterized the significance of trust claims and ballots in its discussion of the five plaintiffs and the relevance of the estimation decision in *Garlock* with the ultimate trust funding in the case.

5.4    Retention of Debtor's Professionals

The Debtor retained (i) Jones Day as primary reorganization counsel; (ii) Robinson, Bradshaw & Hinson, P.A. as special counsel for asbestos claims estimation matters and local bankruptcy counsel; (iii) King & Spalding LLP as special counsel; (iv) Schachter Harris LLP as special litigation counsel; and (v) Bates White as asbestos consultants. The Bankruptcy Court has

also authorized the Debtor to engage other law firms and professionals in the ordinary course of business.

5.5     Appointment of the Asbestos PI Committee

The Asbestos PI Committee was appointed by the Bankruptcy Court in the Reorganization Case pursuant to section 1102 of the Bankruptcy Code on November 16, 2017.  The members of the Asbestos PI Committee as of the date of the Plan are: (a) Linda Hofferber, c/o Matthew Bergman, Esq., Bergman Draper Oslund; (b) Elizabeth Ann Harding, Special Administrator of Steven Lanphear, Deceased, c/o Beth A. Gori, Esq., Gori Julian & Associates, PC; (c) Estate of Jeffrey A. Watts, c/o Christian Hartley, Esq., Maune Raichle Hartley French & Mudd, LLC; (d) Rick Benson, c/o Andrew O'Brien, Esq., O'Brien Law Firm, PC; (e) Nikol Chuidian, Special Administrator of Cresante Perreras, Deceased, c/o Steven Kazan, Esq., Kazan, McClain, Satterley & Greenwood, PLC; (f) Barbara McAlpine, Independent Administrator of the Estate of Martin Edward McAlpine, c/o Maura Kolb, Esq., The Lanier Law Firm; (g) John Harvey Dixon, c/o Armand J. Volta, Jr., Esq., Law Offices of Peter G. Angelos, P.C.; (h) Rick Bengston, c/o Michael Shepard, Esq., Shepard Law; (i) Richard S. Trumbull, c/o Lisa Busch, Esq., Weitz & Luxenberg, P.C.; and (j) Patricia Deetz, Special Administrator of Dave Deetz, Deceased, c/o John D. Cooney, Esq., Cooney & Conway.

The Asbestos PI Committee initially retained Montgomery, McCracken, Walker & Rhoads, LLP as its primary bankruptcy counsel.  When the attorneys handling the Reorganization Case for the Asbestos PI Committee left Montgomery, McCracken, Walker & Rhoads, LLP and joined Robinson & Cole LLP, Montgomery, McCracken, Walker & Rhoads, LLP withdrew as counsel and was replaced by Robinson & Cole LLP.  The Asbestos PI Committee also retained (i) Hamilton Stephens Steel & Martin PLLC and JD Thompson Law as North Carolina co-counsel; (ii) Legal Analysis Systems, Inc. as asbestos consultants; and (iii) FTI Consulting, Inc. as financial advisor.

The Asbestos PI Committee also retained (a) Kazan, McClain, Satterley & Greenwood, A Professional Law Corporation; (b) Maune Raichle Hartley French & Mudd, LLC; (c) Ruckdeschel Law Firm, LLC; and (d) Weitz & Luxenberg PC, as Special Litigation Counsel for any medical science matters arising in connection with an estimation hearing.

5.6     Appointment of Legal Representative for Future Claimants

Pursuant to a Bankruptcy Court Order dated February 23, 2018, Sander L. Esserman was appointed as the legal representative for persons who might subsequently assert asbestos-related Demands.  The Future Claimants' Representative retained (i) the law firm of Young Conaway Stargatt & Taylor, LLP as his primary bankruptcy counsel; (ii) Hull Chandler, P.A. as his North Carolina co-counsel; (iii) Ankura Consulting Group, LLC as his claims evaluation consultants; and (iv) FTI Consulting as financial advisor, sharing such services with the Asbestos PI Committee.

5.7    Administrative Matters in the Reorganization Case

(a)    *Exclusive Periods for the Debtor to Propose and Solicit Plan Acceptance*

The Debtor sought and obtained four extensions of the periods during which it could propose and solicit acceptances of a chapter 11 plan beyond the initial 120-day and 180-day periods for plan proposal and solicitation set forth in section 1121 of the Bankruptcy Code. The first order was entered on March 26, 2018 [Docket No. 336], the second order was entered on August 1, 2018 [Docket No. 478], and the third order was entered on January 7, 2019 [Docket No. 750]. The Bankruptcy Court granted a final extension of the exclusive period during which the Debtor could propose a plan of reorganization through May 2, 2019 and extended the solicitation period for acceptances of such a plan through July 2, 2019 by order entered on March 26, 2019 [Docket No. 799]. On May 2, 2019, the Debtor filed a plan of reorganization that contained no substantive provisions.[10]   However, the Debtor never pursued the plan other than filing it. Accordingly, the exclusive periods of the Debtor to file and solicit a Debtor-sponsored plan in the Reorganization Cases expired.

(b)    *Sublease Amendment*

As part of the Pre-Petition Corporate Restructuring, the Debtor and Georgia-Pacific entered into (a) the Second Amended and Restated Sublease Agreement dated as of November 1, 2017, but effective as of July 31, 2017, (the "**GP Center Sublease**"), pursuant to which Georgia-Pacific subleased to the Debtor certain office space in the building located at 133 Peachtree Street, N.E., Atlanta, Georgia 30303 (the "**GP Center**"); and (b) the 100 Peachtree Sublease, pursuant to which Georgia-Pacific subleases to the Debtor certain space in the building located at 100 Peachtree Street, Atlanta, Georgia 30303 (the "**100 Peachtree Building**").

On April 4, 2019, the Debtor filed the *Motion of the Debtor to Authorize Actions With Respect to Subleases* [Docket No. 824] wherein the Debtor sought an order authorizing it to (a) amend and restate the GP Center Sublease Second (the "**Amendment**"); and (b) pursuant to the Termination of Sublease Agreement, dated to be effective as of April 15, 2019 (the "**Termination Agreement**"), terminate the 100 Peachtree Sublease.

Since the consummation of the Pre-Petition Corporate Restructuring, the Debtor has used the subleased space in the 100 Peachtree Building as its headquarters and the subleased space on the 39th floor of the GP Center as office space for its legal team of seconded employees. The GP Center had been undergoing extensive renovations and floor-by-floor, the GP Center was being reconfigured and modernized to facilitate an efficient, collaborative working environment. The Debtor and Georgia-Pacific had been in discussions regarding a potential move of the seconded employees who utilize the subleased space on the 39th floor of the GP Center to newly renovated space in the building and agreed to move the seconded employees to new space on the 24th floor of the GP Center. To facilitate that move, the Debtor and Georgia-Pacific negotiated and agreed to the Amendment and termination Agreement which was approved by an order of the Court dated April 26, 2019 [Docket No. 847].

---

[10] Plan of Reorganization of Bestwall LLC [Docket No. 860].

(c)    *Extension of Period to Remove Claims*

The Debtor has sought and obtained seven unopposed extensions of the deadline by which it may file notices of removal under Bankruptcy Rules 9006(b) and 9027(a).  The first order was entered on January 23, 2018 [Docket No. 187], the second order was entered on May 8, 2018 [Docket No. 405], the third order was entered on September 19, 2018 [Docket No. 627], the fourth order was entered January 22, 2019 [Docket No.  760], the fifth order was entered on May 21, 2019 [Docket No. 868], and the sixth order was entered on November 18, 2019 [Docket No. 1036]. Most recently, the Bankruptcy Court extended the period during which the Debtor may file notices of removal civil through and including October 30, 2020 by order entered on May 20, 2020 [Docket No. 1170].

(d)    *Filing of Schedules of Assets and Liabilities and Statements of Financial Affairs*

On December 18, 2017, the Debtor Filed its Schedules.[11] The Debtor's Schedules provide summaries of the assets held by the Debtor, as well as a listing of the secured, unsecured priority, and unsecured non-priority claims pending against the Debtor during the period prior to the Petition Date, based upon the Debtor's books and records.

The Plan Proponents dispute the accuracy of the Debtor's Schedules and reserve their rights to contest the Claims and/or amounts identified on the Debtor's Schedules including any amendments thereto.

(e)    *Establishment of Bar Date for General Unsecured Claims Other than Asbestos Claims*

The Bankruptcy Court entered an order on October 30, 2018 [Docket No. 661] (the "**General Bar Date Order**") approving the Motion of the Debtor for an Order (I) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim Other Than with Respect to Asbestos Personal Injury Claims and (II) Approving Form and Manner of Notice Thereof [Docket No. 615]. Thereafter, October 7, 2019 was established as the last date by which claimants could assert any Claims against the Debtor that arose prior to the Petition Date other than Asbestos Claims (the "**General Bar Date**"),"[12] and including certain other Claims explicitly excluded in the General

---

[11] *Statement for Financial Affairs - Non-Individual /Global Notes and Statement of Limitations, Methodologies, and Specific Disclosures Regarding the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs* [Docket No. 155] and *Schedule H, Schedule G, Schedule E/F, Schedule D, Schedule A/B/Global Notes and Statement of Limitations, Methodologies, and Specific Disclosures Regarding the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs (Schedules)* [Docket No. 156].

[12] As used in the General Bar Date Order, the term "Asbestos Claim " means any claim (as defined in section 101(5) of the Bankruptcy Code) for costs or damages, including with respect to bodily injury, death, sickness, disease, emotional distress, fear of cancer, medical monitoring or other personal injuries (whether physical, emotional or otherwise), for which the Debtor is alleged to be liable, directly or indirectly, arising out of or relating to the presence of or exposure to asbestos or asbestos-containing products, including, without limitation: (a) any products previously manufactured, sold and/or distributed by any predecessors to the Debtor; or (b) any materials present at any premises owned, leased, occupied or operated by any entity for whose products, acts, omissions, business or operations the Debtor has, or is alleged to have,

Bar Date Order.  The General Bar Date Order also set bar dates for any Claims resulting from any future rejections by the Debtor of executory contracts and unexpired leases.

5.8    Adversary Proceedings, Litigation, and Mediation

    (a)    *The Preliminary Injunction Adversary Proceeding*

    On November 2, 2017, the Debtor commenced Adversary Proceeding No. 17-03105 by filing a Complaint (Docket No. 1) and Motion for Order (I) Preliminarily Enjoining Certain Actions Against Non-Debtors, or (II) In the Alternative, Declaring That the Automatic Stay Applies to Such Actions and (III) Granting A Temporary Restraining Order Pending a Full Hearing on the Motion [Docket No. 3]. The Court entered the Order Granting Temporary Restraining Order and Continuing Motion for Preliminary Injunction on November 18, 2017 and set a hearing on the preliminary injunction.  By five (5) Agreed Orders entered on December 17, 2017 [Docket No. 30], February 14, 2018 [Docket No. 32], March 29, 2018 [Docket No. 33], May 31, 2018 [Docket No. 36], and July 31, 2018 [Docket No. 41], the automatic stay was extended to certain non-Debtors.

    On August 15, 2018, Objections to the Debtor's Motion for Order (I) Preliminarily Enjoining Certain Actions Against Non-Debtors, or (II) In the Alternative, Declaring That the Automatic Stay Applies to Such Actions and (III) Granting A Temporary Restraining Order Pending a Full Hearing on the Motion were filed by the Official Committee of Asbestos Personal Injury Claimants [Docket No. 47] and the Future Claimants' Representative [Docket No. 49]. Numerous asbestos claimants joined in the objections.  The Asbestos PI Committee and Future Claimants Representative raised multiple objections to the Preliminary Injunction including, among other things, that Georgia-Pacific was directly liable for the Asbestos PI Claims, that the Texas divisive merger statute was preempted by the Bankruptcy Code, and that granting the preliminary injunction was not fair and equitable considering the facts of the Reorganization Case.

    A hearing on preliminary injunction was held on November 9, 2018.  The Court issued an oral decision denying the objections and granting the preliminary injunction on January 24, 2019 and issued a *Memorandum Opinion and Order Granting the Debtor's Request for Preliminary Injunctive Relief* [Docket No. 164].  On January 31, 2020, the Court entered *Order Granting in Part, Denying in Part Motion of the Official Committee of Asbestos Claimants to Reconsider and Amend the Memorandum Opinion and Order Granting the Debtors Request for Preliminary*

---

liability. Asbestos Claims include all such claims, whether: (a) in tort, contract, warranty, restitution, conspiracy, contribution, indemnity, guarantee, subrogation or any other theory of law, equity or admiralty; (b) seeking compensatory, special, economic, non-economic, punitive, exemplary, administrative or any other costs or damages; or (c) seeking any legal, equitable or other relief of any kind whatsoever. Asbestos Claims also include any such claims that have been resolved or are subject to resolution pursuant to any agreement, or any such claims that are based on a judgment or verdict. Asbestos Claims do not include (a) any claim of an insurer with respect to amounts allegedly due under any insurance policies, including policies that might have provided coverage for Asbestos Claims, or (b) any claim by any present or former employee of a predecessor or affiliate (as defined in section 101(2) of the Bankruptcy Code) of the Debtor for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing compensation to an employee from an employer. [Docket No. 661].

*Injunctive Relief* [Docket No. 190]. The Asbestos PI Committee and the Future Claimants' Representative appealed the denial of the preliminary injunction and filed their opening briefs on April 15, 2020. The appeal is presently pending in the District Court.

    (b)    *Motion to Dismiss for Bad Faith*

On August 14, 2018, the *Motion of the Official Committee of Asbestos Claimants to Dismiss Bankruptcy Case for Bad Faith Filing Pursuant to 11 U.S.C. Sec. 1112(b) or Alternatively, to Transfer Venue in the Interest of Justice and for the Convenience of the Parties Pursuant to 28 U.S.C. § 1412* [Docket No. 495] ("**Motion to Dismiss I**") was filed with the Court.

In the Fourth Circuit, a Court may dismiss a Chapter 11 filing for cause where there is "subjective bad faith on the part of the debtor, in that the motive for filing the Chapter petition was to abuse the reorganization process, coupled with an objective element that reorganization is in fact unrealistic".[13] The Asbestos PI Committee argued that both elements were evident in the Reorganization Case. More specifically, the Asbestos PI Committee sought to dismiss the Reorganization Case asserting that Debtor's bankruptcy proceeding was little more than a bad-faith litigation tactic as evidenced by its gerrymandering of assets and liabilities pursuant to a unique provision of Texas corporate law that precipitated the Pre-Petition Corporate Restructuring. The Asbestos PI Committee also asserted that Debtor filed the Reorganization Case to manipulate the provisions of the Bankruptcy Code, exploit venue loopholes, and gain approval from a court in a jurisdiction it perceived is a favorable jurisdiction for asbestos-related bankruptcies all for the benefit of the Debtor's corporate shareholder, affiliates, and ultimate corporate parent.

The Bankruptcy Court heard arguments on the Motion to Dismiss I on November 9, 2018. Ruling from the bench at a hearing held on January 24, 2019, Judge Beyer denied the Motion to Dismiss I on the basis that the Funding Agreement made the Debtor financially able to propose a confirmable plan (technically "not objectively futile"). However, Judge Beyer was sufficiently concerned with the subjective bad faith element that she expressly reserved on the issue of the Debtor's subjective bad faith in connection with any plan process.

A follow-up Memorandum Opinion and Order Denying the Official Committee of Asbestos Claimants' Motion for Dismissal, or Alternatively, Venue Transfer ("**Order Denying Dismissal**") was entered on July 29, 2019 [Docket No. 891]. The Asbestos PI Committee then sought certification of a direct appeal to the Fourth Circuit for the Order Denying Dismissal. Judge Beyer granted direct certification for the Order Denying Dismissal at a hearing held on September 4, 2019. Following additional briefing before the Fourth Circuit, it denied direct appeal on November 14, 2019, and the appeal was transferred to the District Court. Additional briefing has been completed and the matter is now pending before the District Court.

    (c)    *Estimation Motion*

On June 19, 2019, the Debtor filed the *Motion of the Debtor for Estimation of Current and Future Mesothelioma Claims* ("**Estimation Motion**"*)* [Docket No. 875]. The Debtor asserted that

---

[13] *In re Superior Siding & Window, Inc. v. Associated Materials, Inc.*, 14 F.3d 240, 242 (4th Cir. 1994) (citing *Carolin Corp. v. Miller*, 886 F.2d 693, 700-02 (4th Cir. 1989)).

any estimation of the asbestos mesothelioma claims against it must assess the Debtor's legal liability under applicable non-bankruptcy law for such claims, and that the Court should analyze and examine the mesothelioma claims to estimate the Debtor's expected legal liability. More specifically, the Debtor alleged that like the *Garlock* bankruptcy case*,* for a long time it settled claims to avoid defense costs; and, also as in the *Garlock* bankruptcy case, the Debtor believed its settlements were infected by the withholding and manipulation of exposure evidence. Accordingly, the Debtor wanted to embark on lengthy, time-consuming and expensive discovery as part of an estimation process to estimate what it deemed its "legal liability" for mesothelioma claims.

Both the Asbestos PI Committee [Docket No. 937] and the Future Claimants' Representative [Docket No. 936] objected to the Estimation Motion. The Asbestos PI Committee asserted, among other things, that considering the Debtor's access to the Funding Agreement and its unlimited funds and the fact that the Debtor already knew the estimations of asbestos liabilities of both the Asbestos PI Committee and the Future Claimants' Representative, an estimation trial was pointless and would not advance the case. The Future Claimants' Representative asserted, among other things, that there was no need for an estimation because there were adequate resources to pay all asbestos claims in full and that use of the estimation process by the Debtor to cap its obligations and leverage asbestos claimants into accepting a lower value than available in the tort system was an improper use of the estimation process.

The Court held an extensive initial hearing on the Estimation Motion on November 20, 2019, along with the Motion to Dismiss II (see (d) below). Instead of ruling on those motions, the Court directed the parties to mediation and put the Reorganization Case on hold pending efforts to consensually resolve the case. Judge Beyer agreed to revisit the Estimation Motion, as well as the Motion to Dismiss II at a later date should mediation fail. Considering the failure of the parties to reach a settlement at mediation (see below (e)), the Court held a status conference on the Estimation Motion on May 21, 2020. At that hearing, the Court heard arguments on the evidence the Debtor proposed to provide in connection with a rehearing on the Estimation Motion. The Court scheduled a further hearing for June 17, 2020 at which point the Court limited the scope of the Debtor's proposed evidentiary declarations. The Court has determined it will address the Estimation Motion and the Motion to Dismiss II at a hearing scheduled to begin on August 19, 2020. As of the date of this Disclosure Statement, that hearing has not occurred.

(d)     *Motion to Dismiss for Failure to Prosecute*

On August 16, 2019, the Asbestos PI Committee filed the Motion of the Official Committee of Asbestos Claimants to Dismiss the Debtor's Reorganization Case for Cause pursuant to 11 U.S.C. § 1112(b), or Alternatively, (ii) to Set a Deadline by which the Debtor M ust C onfirm a Chapter 11 Plan ("**Motion to Dismiss II**") [Docket No. 938] asserting that the Reorganization Case should be dismissed because the Debtor has failed to timely prosecute this Reorganization Case and instead has engaged in dilatory tactics to delay payments to its victims. Alternatively, the Asbestos PI Committee asserts that the Debtor should either promptly file a plan that provides for full payment of its liabilities or it should promptly negotiate a resolution.

During the November 20, 2019 hearing, the Court did not make a ruling regarding the Motion to Dismiss II but ordered the parties to mediation. A decision on the Motion to Dismiss II will proceed during the August 19, 2020 hearing.

(e)     *Settlement Discussions/Mediation*

Because the Debtor came into this bankruptcy asserting that it wanted a settlement, and because it has the financial wherewithal to settle all the liability in full, the Asbestos PI Committee and Future Claimants' Representative spent a year of the Reorganization Case exploring settlement while placing any litigation on hold to dedicate their efforts to a consensual resolution. For the five months from March 2018 through July 2018, the parties pursued settlement negotiations and deferred litigation. Having made virtually no progress in their attempt to engage in meaningful settlement negotiations, in August 2018, the Asbestos PI Committee filed the Motion to Dismiss I and Preliminary Injunction Objection. See sections (a) and (b) above for resolution of these motions.

With the Bankruptcy Court's decision to delay a decision on the Estimation Motion and Motion to Dismiss II while the parties were ordered to mediation at the November 20, 2019 hearing, the Reorganization Case entered a second phase of settlement discussions. The initial period for mediation was to conclude in February 2020 before the February omnibus hearing. At the conclusion of the first mediation period, the Asbestos PI Committee and Future Claimants' Representative agreed to extend the mediation through May 14, 2020. Accordingly, the case was again placed in settlement mode for another six months. Unable to reach a resolution of the Reorganization Case, mediation was concluded unsuccessfully on April 28, 2020.

(f)     *The Funding Agreement Adversary Proceeding*

The Debtor has publicly stated that it believes the Funding Agreement may not be assigned to the Asbestos PI Trust. The Plan Proponents will be initiating litigation in the Bankruptcy Court seeking relief with respect to additional protections required to secure the Funding Agreement and assure the assumability and assignability of the Funding Agreement to the Asbestos PI Trust. The Plan Proponents will commence this litigation because of the importance the Funding Agreement in this case and because the Funding Agreement is an integral part of the Plan.

5.9     Other Reorganization Case Activity

(a)     *Sale of Midland Insurance Claim*

On February 1, 2018, the Debtor filed a Motion for an Order Authorizing It to Sell Midland Insurance Claim, Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and the Terms of the Assignment Agreement. [Docket No. 204].

In 1982, the former Georgia-Pacific LLC purchased a one-year, $5,000,000 excess insurance policy from Midland Insurance Company. In 1986, Midland's business and affairs were ordered to be liquidated and all of Midland's outstanding policy and other insurance obligations terminated. Midland's liquidation proceedings remained pending, and in 2013, an order was entered for Old GP allowing their claim in the total amount of $5,000,000 ("**Midland Claim**"). Old GP did receive an initial distribution in the amount of $1,250,000, but as a result of the Pre-

Petition Corporate Restructuring, the Debtor succeeded to certain of Old GP's assets, including the Midland Claim.

By the motion, the Debtor sought approval to sell the Midland Claim to Liquidity Solutions, Inc. for a total cash consideration of $750,000 pursuant to sections 363(b)(1), 105(a), and 6004(f)(1) of the Bankruptcy Code.  Together with the initial distribution, the sale would provide the Debtor with a 40% recovery on the Midland Claim. Pursuant to an order dated March 26, 2018, the Court approved the sale free and clear of all liens, claims, encumbrances and other interests pursuant to section 363(f) [Docket No. 334].

(b)      *Investigation into Pre-Petition Corporate Restructuring and Asbestos Products*

Through informal discovery, the Debtor has produced over 142,000 pages of documents and a sales database consisting of over 500,000 pages.  These documents include, but are not limited to: (1) corporate documents, including filings, memoranda, and inter- and intra-company agreements related to the Texas divisive merger); (2) extensive health and safety memoranda and correspondence by, between and among plant managers manufacturing and using joint compound and related products; (3) extensive correspondence and memoranda by, between and among plant managers and various corporate trade or health and safety organizations concerning, among other things, the use, handling and health and safety issues surrounding  joint compound and related products; (4) extensive correspondence and memoranda by, between and among executives and plant managers and local, state and federal health and safety authorities regarding  joint compound, related products and product plant safety conditions; (5) pleadings, interrogatory responses, document request responses, trial and deposition testimony in asbestos joint compound cases; and (6) periodic financial reports and disclosures of the Debtor entities and Georgia-Pacific.

Other areas of focus include reviewing of all provided materials on product formulation and efforts to reformulate both asbestos and talc (and the sourcing thereof), as well as a review of the Debtor-provided case materials on the five identified plaintiffs from the Debtor's Informational Brief.

Accordingly, the Asbestos PI Committee and Future Claimants' Representative have a thorough analysis of the divisive merger statute, the structure of Bestwall and its asbestos-remote successor and the bankruptcy filing of a strawman, as well as the Debtor's products and liabilities.

There has been no discovery on an estimation hearing.

Accordingly, the Asbestos PI Committee and Future Claimants' Representative have a thorough analysis of the divisive merger statute, the structure of Bestwall and its asbestos-remote successor and the bankruptcy filing of a strawman, as well as the Debtor's products and liabilities. The Asbestos PI Committee and Future Claimants' Representative have preserved certain causes of action related to this analysis.

# ARTICLE VI.

## THE PLAN OF REORGANIZATION

The confirmation of a plan of reorganization is the principal objective of a Reorganization Case.  A plan of reorganization sets forth the means for treating claims against, and equity interests in, a debtor.  Confirmation of a plan of reorganization by a bankruptcy court makes it binding on the debtor, any person or entity acquiring property under the plan, and any creditor of, or equity interest holder in, the debtor, whether or not such creditor or equity interest holder has accepted the plan or received or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in a plan itself or in a confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan of reorganization.

This Section of this Disclosure Statement summarizes certain relevant provisions of the Plan.  This Section is intentionally not a recitation of the entirety of the Plan, a copy of which is attached hereto as Exhibit A.

For additional information regarding the Plan not discussed in this Section, please refer to the following select Plan provisions:

| Topic | Plan Provision |
|---|---|
| Treatment of Executory Contracts and Unexpired Leases | Article VII |
| Distributions Under the Plan on Account of Claims | Article VIII |
| Resolution of Disputed Claims Other than Asbestos Personal Injury Claims | Article IX |
| Acceptance or Rejection of Plan; Effect of Rejection by One or More Classes of Claims or Equity Interests | Article IV |
| Effect of Confirmation | Article XII |
| Jurisdiction of Bankruptcy Court | Article XII |
| Miscellaneous Provisions | Article XIII |

THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN OF THE SUBSTANTIVE PROVISIONS OF THE PLAN ALTERNATIVES, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN.  THE PLAN PROPONENTS URGE ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS TO READ AND STUDY CAREFULLY THE PLAN, A COPY OF WHICH IS ATTACHED AS EXHIBIT A TO THIS DISCLOSURE STATEMENT.

6.1    Treatment of Administrative Claims, Fee Claims, and Priority Tax Claims

(a)    *Administrative Claims*

{00499579.DOCX V. B507.025127;}    26

      (1)    <u>Allowed Administrative Claims</u>

Except as specified in Article III of the Plan, and subject to the Bar Date provisions herein, unless otherwise agreed by the holder of an Administrative Claim and the Debtor or Reorganized Bestwall, each holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Administrative Claim, Cash equal to the allowed amount of such Administrative Claim either (i) as soon as practicable after the Effective Date or (ii) if the Administrative Claim is not allowed as of the Effective Date, within 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order or a Stipulation of Amount and Nature of Claim is executed by Reorganized Bestwall and the holder of the Administrative Claim. Administrative Claims that represent liabilities incurred by the Debtor in the ordinary course of its business during the Reorganization Case shall, to the extent not paid on or before the Effective Date, be paid by Reorganized Bestwall in the ordinary course of its business and in accordance with any terms and conditions of any agreements related thereto.

      (2)    <u>Administrative Claims Bar Date</u>

Unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Debtor, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than sixty (60) days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date shall be forever barred from asserting such Administrative Claims against the Debtor, Reorganized Bestwall or its property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the requesting party by one-hundred and twenty (120) days after the Effective Date.

      (3)    <u>Professional Fee Claims</u>

Professionals or other Entities asserting a Fee Claim for services rendered before the Effective Date must File a Final Fee Application and serve it on Reorganized Bestwall and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Fee Order or other order of the Bankruptcy Court no later than 90 days after the Effective Date; <u>provided</u>, <u>however</u>, that any Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court review or approval, pursuant to the Ordinary Course Professionals Order (except as otherwise provided in that order). A Professional may include any outstanding, non-Filed monthly or interim request for payment of a Fee Claim pursuant to the Fee Order in its Final Fee Application. Objections to any Final Fee Application must be Filed and served on Reorganized Bestwall and the requesting party by the later of (1) 80 days after the Effective Date or (2) 30 days after the Filing of the applicable Final Fee Application. To the extent necessary, the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court, including the Fee Order, regarding the payment of Fee Claims. Any pending Filed interim requests for a Fee Claim pursuant to the Fee Order shall be resolved in the ordinary course in accordance with the Fee Order or, if sooner, in connection with the particular Professional's Final Fee Application. Allowed Fee Claims will be paid in full in Cash in an amount

equal to the unpaid portion of the Allowed Fee Claim (i) on the Effective Date or (ii) upon such other terms as may be agreed upon by the holder of such Fee Claim.  Any fees and expenses incurred by Reorganized Bestwall subsequent to the Confirmation Date for services rendered by any Professional may be paid by Reorganized Bestwall without notice to parties-in-interest or application to the Bankruptcy Court.

    (b)    *Allowed Priority Tax Claims*

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the Debtor or Reorganized Bestwall, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction of its Priority Tax Claim, payment in full in Cash of the allowed amount of the Priority Tax Claim plus Post-petition Interest, if any, on the later of the Effective Date or as soon as practicable after the date when such Claim becomes an Allowed Claim.

6.2    <u>Treatment of Classified Claims and Equity Interests – Section 524(g) Alternative</u>

In the event that (a) Class 4 Claims (Asbestos PI Claims and Settled Asbestos Claims) vote to accept the Plan, (b) Class 6 Interests (Equity Interests) vote to accept the Plan, and (c) Georgia-Pacific agrees to the assumption and assignment of the Funding Agreement to the Asbestos PI Trust on the conditions set forth in the Plan, then the treatment of classified Claims shall be as follows:

    (a)    *Class 1 – Priority Non-Tax Claims*

        (1)    <u>Classification</u>: Class 1 consists of all Priority Non-Tax Claims against the Debtor.

        (2)    <u>Treatment</u>: On the Effective Date, each holder of an Allowed Class 1 Claim shall receive Cash in an amount equal to such Allowed Claim plus Post-petition Interest thereon, if any, unless the holder of such Claim agrees to less favorable treatment.

        (3)    <u>Voting</u>: Class 1 is Unimpaired, and each holder of an Allowed Claim in Class 1 is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Each holder of an Allowed Claim in Class 1 is not entitled to vote to accept or reject the Plan.

        The Plan Proponents believe the amount of Class 1 Claims is negligible.

    (b)    *Class 2 – Secured Claims*

        (1)    <u>Classification</u>: Class 2 consists of all Secured Claims against the Debtor.

        (2)    <u>Treatment</u>: On the Effective Date, unless otherwise agreed by the holder of an Allowed Class 2 Claim and the Debtor or Reorganized Bestwall, each holder of an Allowed Class 2 Claim, at the option of the Debtor or Reorganized Bestwall, shall be either (a) paid in full in Cash, plus Post-

petition Interest thereon; or (b) be Reinstated.  Any Allowed Deficiency
Claim of a holder of an Allowed Secured Claim shall be entitled to treatment
as an Allowed Class 3 Claim.

(3)     <u>Voting</u>: Class 2 is Unimpaired, and each holder of an Allowed Claim in
Class 2 is presumed to accept the Plan pursuant to section 1126(f) of the
Bankruptcy Code.  Each holder of an Allowed Claim in Class 2 is not
entitled to vote to accept or reject the Plan.

The Plan Proponents do not believe there are any Class 2 Claims.

(c)     *Class 3 – General Unsecured Claims*

(1)     <u>Classification</u>: Class 3 consists of all General Unsecured Claim against the
Debtor.

(2)     <u>Treatment</u>: Each holder of an Allowed Unsecured Claim against the Debtor
shall be paid the Allowed Amount of its Unsecured Claim on the
Distribution Date.  Such payment shall be (i) in full, in Cash, plus post-
petition interest at the federal judgment rate in effect on the Petition Date,
or (ii) upon such other less favorable terms as may be mutually agreed upon
between the holder of such General Unsecured Claim and the Debtor or
Reorganized Bestwall.

(3)     <u>Voting</u>: Class 3 is Unimpaired, and each holder of an Allowed Claim in
Class 3 is presumed to accept the Plan pursuant to section 1126(f) of the
Bankruptcy Code.  Each holder of an Allowed Claim in Class 3 is not
entitled to vote to accept or reject the Plan.

The Plan Proponents believe the amount of Class 3 Claims is negligible.

(d)     *Class 4 – Asbestos PI Claims and Settled Asbestos Claims*

(1)     <u>Classification</u>: Class 4 consists of all Asbestos PI Claims and Settled
Asbestos Claims.

(2)     <u>Treatment</u>: On the Effective Date, all Asbestos PI Claims and Settled
Asbestos Claims shall be channeled to the Asbestos PI Trust, which shall
be funded pursuant to Article V of the Plan.

(a)     All Asbestos PI Claims shall be resolved pursuant to the terms of
the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures and to
the extent such claims meet the criteria set forth therein, paid pursuant to the Asbestos PI
Trust Documents.

(b)     All Settled Asbestos Claims shall be resolved pursuant to the terms
of the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures and
each holder of a Settled Asbestos Claim may opt to receive either (i) the liquidated value

of such Settled Asbestos Claim as reflected in, and subject to the terms and conditions of, the applicable settlement agreement or other governing documentation; or (ii) treatment under the Expedited Review Process (as defined in the Asbestos PI Trust Distribution Procedures) or the Individual Review Process (as defined in the Asbestos PI Trust Distribution Procedures).

      (3)    <u>Voting</u>: Class 4 is Impaired, and each holder of an Allowed Claim in Class 4 is entitled to vote to accept or reject the Plan.

  (e)    *Class 5 – Intercompany Claims*

      (1)    <u>Classification</u>: Class 5 consists of all Intercompany Claims.

      (2)    <u>Treatment</u>: On or after the Effective Date, all Intercompany Claims shall be either Reinstated, subject to the Restructuring Transactions, or paid in full.

      (3)    <u>Voting</u>: Class 5 is Unimpaired and each holder of an Allowed Claim in Class 5 is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Each holder of an Allowed Claim in Class 5 is not entitled to accept or reject the Plan.

  (f)    *Class 6 – Equity Interests*

      (1)    <u>Classification</u>: Class 6 consists of all Equity Interests in the Debtor.

      (2)    <u>Treatment</u>: On the Effective Date, all Equity Interests in the Debtor will become Equity Interests in Reorganized Bestwall, with the same equity ownership such Equity Interests held in the Debtor, subject to the Georgia-Pacific Default.

      (3)    <u>Voting</u>: Class 6 is Impaired.  Each holder of an Allowed Equity Interest in Class 6 is entitled to vote to accept or reject the Plan.

6.3    <u>Treatment of Classified Claims and Equity Interest – The Unimpairment Alternative</u>

In the event that (a) Class 4 Claims (Asbestos PI Claims and Settled Asbestos Claims) do not vote to accept the Plan, (b) Class 6 Interests (Equity Interests) do not vote to accept the Plan, or (c) Georgia-Pacific does not agree to the assumption and assignment of the Funding Agreement to the Asbestos PI Trust on the conditions set forth in the Plan, then all Claims in Classes 1 through 6 shall be unimpaired, and the rights and obligations of the holders of such claims shall be Unimpaired and Reinstated. On the Effective Date, the Litigation Trust will be created to pursue any Causes of Action for the benefit of holders of Claims and Interests, with any recoveries to be distributed in accordance with the priority scheme of the Bankruptcy Code.

6.4    <u>Conditions Precedent to the Confirmation of the Plan</u>

Confirmation of the Plan shall not occur unless each of the following conditions has been satisfied or waived pursuant to Article IX of the Plan:

(a)     The Confirmation Order shall have been entered by the Bankruptcy Court and the District Court acting jointly, or by the Bankruptcy Court or the District Court acting separately (and, if the Confirmation Order is entered separately by the Bankruptcy Court, shall have been fully affirmed by the District Court), and shall be reasonably acceptable in form and substance to the Plan Proponents.

(b)     All Exhibits to the Plan shall be in form and substance acceptable to the Plan Proponents.

(c)     For the Section 524(g) Alternative to be selected by the Plan Proponents, the following conditions must be satisfied, and a notice must be filed at least seven (7) days prior to confirmation:

(1)     The Holders of Class 4 Asbestos PI Claims and Settled Claims shall have voted to accept the Plan.

(2)     The Holders of Class 6 Interests shall have voted to accept the Plan.

(3)     Georgia-Pacific shall have consented to assumption and assignment of the Funding Agreement on the terms and conditions set forth in the Plan and shall have executed security agreements satisfactory to the Plan Proponents to provide assurance that the Funding Agreement will be honored and can be enforced after the Effective Date. Alternatively, the Bankruptcy Court shall have determined that the Funding Agreement may be assigned to the Asbestos PI Trust and the Plan Proponents' concerns as to the long-term viability have been resolved.

(4)     The Bankruptcy Court and the District Court acting jointly, or the Bankruptcy Court or the District Court acting separately shall have made the following findings, each of which shall be contained in the Confirmation Order and each of which, if the Confirmation Order is entered separately by the Bankruptcy Court, shall be fully affirmed by the District Court:

(a)     The Asbestos Channeling Injunction is to be implemented in connection with the Plan and the Asbestos PI Trust.

(b)     The Asbestos PI Trust, as of the Effective Date, shall assume all liability and responsibility, financial and otherwise, for all Asbestos PI Claims and Settled Asbestos Claims, except as otherwise expressly provided in the Plan or the Asbestos PI Trust Agreement.

(c)     As of the Petition Date, the Debtor had been named as a defendant in personal injury or wrongful death actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.

(d)     The Asbestos PI Trust will be funded via payments made by Georgia-Pacific pursuant to the terms of the Funding Agreement, by proceeds derived from the Causes of Action, if any, assigned to the Asbestos PI Trust, by proceeds of the Ambassador Claim, and by distributions derived from the operations of Reorganized Bestwall.

(e)     The Asbestos PI Trust shall own the Mt. Holly Land.

(f)     The Asbestos PI Trust shall use its rights to proceeds under the Funding Agreement to pay Asbestos PI Claims, including Demands.

(g)     It is expected that the Asbestos PI Trust through the Asbestos PI Trust Distribution Procedures and the Funding Agreement shall be able to pay all Asbestos PI Claims the full liquidated value of their claims.

(h)     Subject to the limitations expressly set forth herein, all transfers of assets of the Debtor contemplated under the Plan shall be free and clear of all Claims and Encumbrances against or on such assets.

(i)     Any transfers effected or entered into, or to be affected or entered into, under the Plan shall be and are exempt under section 1146(a) of the Bankruptcy Code from any state, city or other municipality transfer taxes, mortgage recording taxes and any other stamp or similar tax.

(j)     The settlements, transactions and agreements to be affected pursuant to the Plan, including, without limitation, the Asbestos PI Trust Agreement, and the Asbestos PI Trust Distribution Procedures are approved in all respects.

(k)     The transfers of property to the Asbestos PI Trust (A) are and will be legal, valid, and effective transfers of property; (B) do not and will not constitute avoidable transfers under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law; and (C) do not and will not subject the Asbestos PI Trustee(s) to any liability by reason of such transfer under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation        n, any laws affecting successor or transferee liability.

(l)     The Asbestos PI Trust will have all rights to receive distributions because of its ownership of the Mt. Holly Land.

(m)     The Plan complies with section 524(g) of the Bankruptcy Code in all respects.

(n)     As to future Demands:

(i)     The Debtor is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Claims that are addressed by the Asbestos Channeling Injunction.

(ii)    The actual amounts, numbers and timing of such future Demands cannot be determined.

(iii)    Pursuit of such Demands outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with Claims and future Demands.

(o)    The terms of the Asbestos Channeling Injunction, including any provisions barring actions against third parties pursuant to section 524(g)(4)(A) of the Bankruptcy Code, are set out in the Plan.

(p)    The Plan establishes in Class 4 (Asbestos PI Claims and Settled Asbestos Claims) a separate class of the claimants whose Claims are to be addressed by the Asbestos PI Trust.

(q)    Class 4 (Asbestos PI Claims and Settled Asbestos Claims) have voted, by at least two-thirds in amount and 75% in number of those voting, in favor of the Plan.

(r)    Pursuant to court orders or otherwise, the Asbestos PI Trust shall operate through mechanisms, such as structured, periodic or supplemental payments, distributions, matrices or periodic review of estimates of the numbers and values of Asbestos PI Claims, that provide reasonable assurance that the Asbestos PI Trust shall value, and be in a financial position to pay, Asbestos PI Claims, including Demands, in substantially the same manner.

(s)    Each Protected Party is identifiable from the terms of the Asbestos Channeling Injunction by name or as part of an identifiable group, and each Protected Party is or may be alleged to be directly or indirectly liable for the conduct of Claims against or Demands on the Debtor.

(t)    The Future Claimants' Representative was appointed as part of the proceedings leading to issuance of the Asbestos Channeling Injunction for the purpose of protecting the rights of all persons, whether known or unknown, that might subsequently assert, directly or indirectly, against the Debtor an Asbestos PI Claim that is a Demand addressed by the Asbestos Channeling Injunction and transferred to the Asbestos PI Trust.

(u)    Identifying each Protected Party (by name or as part of an identifiable group, as applicable) in the Asbestos Channeling Injunction is fair and equitable with respect to individuals that might subsequently assert Demands against each such Protected Party, in light of the benefits provided, or to be provided, to the Asbestos PI Trust by or on behalf of any such Protected Party.

(v)    The Plan and the Asbestos PI Trust Documents comply with section 524(g) of the Bankruptcy Code in all respects, and the Asbestos PI Trust Documents are fully consistent with the Plan.

(w)     The Plan, including the Asbestos PI Injunction, and its Exhibits are a fair, equitable and reasonable resolution of the liability of the Debtor for the Asbestos PI Claims.

(x)     The Future Claimants' Representative has adequately and completely fulfilled his duties, responsibilities and obligations as the representative for, and to protect the rights of, all persons, whether known or unknown, that might subsequently assert, directly or indirectly, against the Debtor an Asbestos PI Claim that is a Demand addressed by the Asbestos Channeling Injunction and transferred to the Asbestos PI Trust in accordance with section 524(g) of the Bankruptcy Code.

(y)     Adequate and sufficient notice of the Plan and the Confirmation Hearing, as well as all deadlines for objecting to the Plan, has been given to (i) all known creditors and holders of Interests; (ii) parties that requested notice in accordance with Bankruptcy Rule 2002 (including the Asbestos PI Committee and the Future Claimants' Representative); (iii) all parties to Unexpired Leases and Executory Contracts with the Debtor; (iv) all taxing authorities listed on the Debtor's Schedules or in the Debtor's Claims database; (v) the Department of the Treasury by service upon the District Director of the IRS; (vi) state attorneys general and state departments of revenue for states in which the Debtor has conducted business; and (vii) the Securities and Exchange Commission, (A) in accordance with the solicitation procedures governing such service and (B) in substantial compliance with Bankruptcy Rules 2002(b), 3017 and 3020(b).  Such transmittal and service were adequate and sufficient to bind, among other parties, each holder of an Asbestos PI Claim and each party represented by the Future Claimants' Representative, and no other or further notice is or shall be required.

(z)     Each holder of an Asbestos PI Claim and each party represented by the Asbestos PI Committee or the Future Claimants' Representative has been afforded due process based on the notice referenced herein, the appointment of the Future Claimants' Representative, and the Plan's compliance with section 524(g) of the Bankruptcy Code.

(aa)    The Bankruptcy Court and the District Court, as required, shall have entered the Asbestos Channeling Injunction, which may be included in the Confirmation Order and which shall be in form and substance acceptable to the Plan Proponents.

(bb)    In order to promote resolution of Asbestos PI Claims through the Asbestos PI Trust mechanism (in lieu of claimants pursuing claims directly against Georgia-Pacific and its Affiliates in the first instance), the statute of limitations applicable to each Asbestos PI Claim shall be tolled during the period commencing on the date such Asbestos PI Claim is submitted to the Asbestos PI Trust by submission of a proof of claim form that includes the claimant's name, address, social security number and asbestos-related disease and for thirty (30) days after the date on which such claimant receives notice that Georgia-Pacific has objected to the payment of such Asbestos PI Claim.

(cc)    Georgia-Pacific's failure to assert a Georgia-Pacific Objection (as defined in the Asbestos PI Trust Distribution Procedures) or timely submit payment to the Asbestos PI Trust for any Asbestos PI Claim included on a Demand for Payment as set

forth in the Asbestos PI Trust Distribution Procedures (including failure to timely submit payment for an Asbestos PI Claim resolved pursuant to an Arbitration Resolution (as defined in the Asbestos PI Trust Distribution Procedures) or as a Liquidated Tort System Claim (as defined in the Asbestos PI Trust Distribution Procedures)) and the Plan, shall constitute a breach of Georgia-Pacific's obligations under the Plan and the Funding Agreement. Following such breach, the Asbestos PI Trust may commence suit against Georgia-Pacific for such relief as it deems appropriate, which may include but is not limited to breach of the Funding Agreement or specific performance.  In such event, Georgia-Pacific shall (a) immediately escrow the full amount of any such unpaid Demand for Payment in an interest-bearing account; and (b) shall be responsible for reasonable attorney fees and costs associated with pursuing relief on behalf of the Asbestos PI Trust and claimants, interest compounded daily based on the greater of the prevailing federal judgment rate or an annual rate of 15%, punitive damages and other extraordinary relief as appropriate.  In the discretion of the Asbestos PI Trust, the Asbestos PI Trust may assign to any affected claimant the right of such claimant to pursue recovery from Georgia-Pacific directly with respect to a breach related to the Claimant's Asbestos PI Claim. In such event, the claimant may elect to sue Georgia-Pacific on his or her Conditionally Settled Claim or may reject such settlement and sue Georgia-Pacific in the tort system as set forth in the Asbestos PI Trust Distribution Procedures for resolution of his or her Asbestos PI Claim. Nothing in the Plan, the Confirmation Order, the Asbestos PI Trust Agreement or the Asbestos PI Trust Distribution Procedures gives a claimant the right to pursue any action against the Asbestos PI Trust in the event of a default by Georgia-Pacific.

6.5    Conditions Precedent to the Effective Date of the Plan

(a)    *In the event the Section 524(g) Alternative is to be implemented:*

(1)    The District Court or the Bankruptcy Court and the District Court acting jointly shall have entered an order (contemplated to be part of the Confirmation Order) in form and substance reasonably acceptable to the Plan Proponents approving and authorizing the Debtor and Reorganized Bestwall to take all actions necessary or appropriate to effectuate, implement and consummate the Plan and the Restructuring Transactions, including the execution, delivery and performance of contracts, instruments, releases and other agreements or documents created in connection with the Plan and the Restructuring Transactions (including the Asbestos PI Trust Documents) and approving the Asbestos Channeling Injunction in form and substance acceptable to the Plan Proponents.

(2)    The Confirmation Order has been entered by the Bankruptcy Court and the District Court acting jointly, or by the Bankruptcy Court or the District Court acting separately (and, if the Confirmation Order is separately entered by the Bankruptcy Court, has been fully affirmed by the District Court) and shall have become a Final Order.

(3)    The Confirmation Order and the Asbestos Channeling Injunction shall be in full force and effect, and no order is in effect staying or enjoining the

implementation or enforcement of the Plan, the Confirmation Order or the Asbestos Channeling Injunction.

(4)    No request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

(5)    The Asbestos PI Trustee shall have been selected and shall have executed and delivered the Asbestos PI Trust Agreement.

(6)    Each of the documents and agreements contemplated by the provisions of and Exhibits to the Plan to be executed and delivered as of the Effective Date shall have been fully executed and delivered in form and substance acceptable to the Plan Proponents and shall be fully enforceable in accordance with their terms.

(7)    Georgia-Pacific shall have Funded the Claims Reserve and the Trust Expense Fund and shall have otherwise made such other payments and disbursements as are required under the Plan.

(8)    The Effective Date shall occur as of 12:01 a.m., prevailing Eastern Time on the date that the Plan Proponents file a notice with the Bankruptcy Court stating that the Effective Date has occurred because each of the conditions to the Effective Date has been satisfied or waived in accordance with the Plan.

(b)    *In the event that the Unimpairment Alternative is to be implemented:*

(1)    The Confirmation Order has been entered by the Bankruptcy Court and shall have become a Final Order.

(2)    No request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

(3)    The Litigation Trustee shall have been selected and shall have executed and delivered the Litigation Trust Agreement.

(4)    Each of the documents and agreements contemplated by the provisions of and Exhibits to the Plan to be executed and delivered as of the Effective Date shall have been fully executed and delivered in form and substance acceptable to the Plan Proponents and shall be fully enforceable in accordance with their terms.

(5)    The Effective Date shall occur as of 12:01 a.m., prevailing Eastern Time on the date that the Plan Proponents files a notice with the Bankruptcy Court stating that the Effective Date has occurred because each of the conditions

to the Effective Date has been satisfied or waived in accordance with the Plan.

6.6   Means for Implementation of the Section 524(g) Alternative

(a)   *General*

On or after the Confirmation Date, each of the Plan Proponents shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable them to implement the provisions of the Plan on the Effective Date, including, without limitation, the creation of the Asbestos PI Trust and the preparations for the transfer of the Asbestos PI Trust Assets to the Asbestos PI Trust.

(b)   *Operations of the Debtor Between Confirmation and the Effective Date*

The Debtor shall continue to operate as a debtor and debtor-in-possession during the period from the Confirmation Date through and until the Effective Date.

(c)   *Charter and Bylaws*

As of the Effective Date, the Articles of Organization and the Amended and Restated Operating Agreement of Reorganized Bestwall will be in such form as the Debtor, Asbestos PI Committee and Future Claimants' Representative may determine.  The Articles of Organization and Amended and Restated Operating Agreement of Reorganized Bestwall shall, inter alia, prohibit the issuance of nonvoting equity securities by Reorganized Bestwall to the extent required by section 1123(a) of the Bankruptcy Code.

(d)   *Corporate Action*

All matters provided for under the Plan involving the corporate structure of the Debtor or Reorganized Bestwall, or any corporate action to be taken by, or required of the Debtor or Reorganized Bestwall, shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action or vote by the member(s) or manager(s) of such entities.

(e)   *Reinstatement of Equity in Reorganized Bestwall*

The equity interests of GP Holdings in the Debtor will be reinstated as equity interests in Reorganized Bestwall, subject to a Georgia-Pacific Default.  In the event of a Georgia-Pacific Default, 100% of the issued and outstanding equity interests in Reorganized Bestwall will immediately and without further action vest in the Asbestos PI Trust.

(f)   *Post-Effective Date Governance and Vesting of Assets*

On the Effective Date, after the Reserves have been funded and all Asbestos Personal Injury Trust Assets have been transferred to the Asbestos PI Trust (as applicable), the equity interests of GP Holdings in the Debtor will be reinstated as equity interests in Reorganized Bestwall.

Except as otherwise provided in the Plan or as may be provided in the Plan Supplement or the Confirmation Order, Reorganized Bestwall shall continue its existence as a separate entity after the Effective Date, with all the powers thereof, pursuant to the applicable law in the jurisdiction in which Reorganized Bestwall is incorporated and pursuant to the Amended Charter Documents and any other formation documents in effect following the Effective Date, and such documents are deemed to be adopted pursuant to the Plan and require no further action or approval. Moreover, on the Effective Date, the officers and directors of Reorganized Bestwall shall consist of the individuals that will be identified in the Plan Supplement.

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property of Reorganized Bestwall other than property constituting Asbestos PI Trust Assets, including but not limited to, all Causes of Action and any property acquired by the Debtor pursuant to the Plan, shall vest in Reorganized Bestwall, free and clear of all Claims, interests, Liens, other Encumbrances, and liabilities of any kind. On and after the Effective Date, except as otherwise provided in the Plan, Reorganized Bestwall may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, interests, or Causes of Action without supervision or approval by the Bankruptcy Court, or notice to any other Entity, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

On the Effective Date, and if applicable, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, all assets of the Debtor that constitute Asbestos PI Trust Assets shall vest in the Asbestos PI Trust pursuant to the terms of the Plan. The Asbestos PI Trust shall own such assets, as of the Effective Date, free and clear of all Claims, interests, Liens, other Encumbrances, and liabilities of any kind.

(g)    *Restructuring Transactions*

On or prior to the Effective Date, the Debtor shall take such actions as the Asbestos PI Committee and the Future Claimants' Representative determines to be necessary or appropriate to effectuate, implement and consummate the Plan and the Restructuring Transactions set forth on Exhibit D to the Plan; provided, however, that no Restructuring Transactions shall be implemented prior to the Effective Date except as expressly provided on Exhibit D to the Plan. The actions to effectuate, implement and consummate the Restructuring Transactions may include: (a) the execution and delivery of appropriate agreements or other documents that carry out the provisions of the Plan and that satisfy the applicable requirements of applicable state law; and (b) the filing of appropriate instruments pursuant to applicable state law.

(h)    *Resolution of Asbestos PI Claims*

Asbestos PI Claims shall be resolved by the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures.

(i)    *Sources of Consideration for Plan Distributions*

On the Effective Date, Georgia-Pacific shall remit to the Debtor (a) an amount sufficient for the Debtor to pay all Allowed Administrative Claims, Allowed Priority Tax Claims, and all Allowed Claims in Class 1 (Priority Claims), Class 2 (Secured Claims), Class 3 (General Unsecured Claims), and Class 5 (Intercompany Claims), and (b) an amount sufficient for the Debtor to fund the Claims Reserve in an amount equal to [      ], net of the balance of the Funding Account (as such balance exists as of the Effective Date).  All Allowed Claims in Classes Class 1 (Priority Claims), Class 2 (Secured Claims), Class 3 (General Unsecured Claims), and Class 5 (Intercompany Claims) and all Administrative Claims and Priority Tax Claims that are Allowed as of the Effective Date shall be paid in full in Cash as provided in Article VII of the Plan, unless the holders of such Claims agree to a different treatment.  All Administrative Claims, Priority Tax Claims, and all Allowed Claims in Class 1 (Priority Claims), Class 2 (Secured Claims), Class 3 (General Unsecured Claims), and Class 5 (Intercompany Claims) that are Allowed after the Effective Date shall be paid from the Claims Reserve, in full in Cash, within the time required under Article III of the Plan, unless the holders of such Claims agree to a different treatment.  In the event a balance exists in the Claims Reserve after all Administrative Claims and Priority Tax Claims have been paid in full, such balance shall be transferred to the Asbestos PI Trust's Trust Expense Fund.

(j)   *Assignment of Funding Agreement*

On the Effective Date, the Funding Agreement and all of the Debtor's rights and benefits as payee thereunder shall be assumed by the Debtor and assigned to the Asbestos PI Trust.  All Asbestos PI Claims and Settled Asbestos Claims shall be channeled to the Asbestos PI Trust and paid in accordance with the Asbestos PI Trust Distribution Procedures.

(k)   *Funding by the Asbestos PI Trust*

The Asbestos PI Trust shall have no obligation to fund costs and expenses other than those set forth in the Plan and/or the Asbestos PI Trust Documents, as applicable.

(l)   *Modification of the Plan*

To the extent permissible under section 1127 of the Bankruptcy Code, any proposed amendments to or modifications of the Plan under section 1127 of the Bankruptcy Code or as otherwise permitted by law will be submitted jointly by the Plan Proponents, without additional disclosure pursuant to section 1125 of the Bankruptcy Code at any time prior to substantial consummation of the Plan, unless section 1127 of the Bankruptcy Code requires additional disclosure. To the extent permissible under section 1127(b) of the Bankruptcy Code, following substantial consummation of the Plan, the Plan Proponents may remedy any defects or omissions or reconcile any inconsistencies in the Plan Documents for the purpose of implementing the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan, so long as (a) the interests of the holders of Allowed Claims are not adversely affected thereby; (b) any such modifications are non-material.  Post-Effective Date, any holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified or supplemented pursuant to the Plan, unless the Bankruptcy Court rules otherwise.

(m)   *Revocation or Withdrawal of the Plan*

The Plan Proponents reserve the right to revoke and withdraw the Plan prior to entry of the Confirmation Order. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation of the Plan does not occur, then, the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor, or any other Entity (including the Plan Proponents), or to prejudice in any manner the rights of such Debtor, or such Entity (including the Plan Proponents) in any further proceedings involving such Debtor.

(n)     *Certain Technical Modifications.*

Prior to the Effective Date, the Plan Proponents collectively may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, to the extent permissible under section 1127 of the Bankruptcy Code; provided, however, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests under the Plan.

(o)     *Releases, Injunctions and Exculpation.*

The release, injunction and exculpation provisions are set forth in Article XII of the Plan, and a summary of such provisions is provided below.

(1)     **Discharge and Injunctions**

(a)     **Discharge of Claims Against.   Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, Confirmation of the Plan shall discharge the Debtor to the fullest extent permitted by Bankruptcy Code sections 524 and 1141(d)(1).**

(b)     **Discharge Injunction.   Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged pursuant to the terms of the Plan shall be permanently enjoined from taking any of the following actions on account of any such discharged Claim, debt or liability: (i) commencing or continuing in any manner any action or other proceeding against the Debtor or Reorganized Bestwall, or any of their respective property, other than to enforce any right to a Distribution pursuant to the Plan; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor or Reorganized Bestwall, or any of their respective property, other than as permitted pursuant to (i) above; (iii) creating, perfecting or enforcing any lien or encumbrance against the Debtor or Reorganized Bestwall, or any of their property; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor or Reorganized Bestwall; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.   Notwithstanding the prior sentence, Georgia-Pacific's failure to fund the Trust Expense Fund as required by Article V, Section J.2., and the Asbestos PI Trust subsequent assignment of its enforcement rights to an affected claimant to pursue recovery in the tort system, shall invalidate any injunction provided**

*by this subsection, but only to the extent necessary to Liquidate and recover against Georgia-Pacific.*

(2) *Releases*

(a) *Releases by the Debtor and Estate.*  *Without limiting any other provision of the Plan, as of the Effective Date, the Debtor and Reorganized Bestwall, on behalf of themselves and the Estate and their respective successors and assigns, and any and all Entities who may purport to claim by, though, for or because of them, shall be deemed to forever release, waive and discharge all claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, against holders of Asbestos PI Claims or Settled Asbestos Claims who received payments in respect of their claims from the Debtor or any Affiliate or predecessor of the Debtor (including Old GP) prior to the Petition Date, and their professionals (but only with respect to their representation of or work for such holders in connection with such payments), including, without limitation, Causes of Action, in each case arising out of, based upon or resulting from payments to holders of Asbestos PI Claims from the Debtor or any Affiliate or predecessor of the Debtor (including Old GP) prior to the Petition Date on account of such claims.*

(b) *Releases by Holders of Claims.*  *Without limiting any other provision of the Plan or the Bankruptcy Code, as of the Effective Date, in consideration for, among other things, the obligations of the Debtor, the Reorganized Bestwall, and Georgia-Pacific under the Plan, each holder of a Claim or Interest that votes in favor of the Plan or is deemed to accept the Plan shall be deemed to forever release, waive and discharge all claims, commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, against any of the Protected Parties arising out of, based upon or resulting from, directly or indirectly, in whole or in part, any act, omission, transaction or other occurrence taking place on or prior to the Effective Date and in any way relating to the Debtor, the Prepetition Corporate Restructuring, the Reorganization Case or the Plan (which release shall be in addition to the discharge of Claims provided herein and under the Confirmation Order and the Bankruptcy Code).  Notwithstanding the prior sentence, if Georgia-Pacific fails to fund the Trust Expense Fund as required by Article V, Section J.2., and the Asbestos PI Trust opts to assign its enforcement rights to an affected claimant to pursue recovery in the tort system, any release provided to any Protected Party pursuant to this subsection is hereby waived, nullified, or lifted with respect to the affected claimant, but only to the extent necessary to Liquidate and recover against Georgia-Pacific.*

(c) *Injunction Related to Releases.*  *As further provided in Article X of the Plan, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any claims,*

*commitments, obligations, suits, judgments, damages, demands, debts, causes of action and liabilities released pursuant to the Plan. Notwithstanding the prior sentence, if Georgia-Pacific fails to fund the Trust Expense Fund as required by Article V, Section J.2., and the Asbestos PI Trust opts to assign its enforcement rights to an affected claimant to pursue recovery in the tort system, any release provided to the Debtor, Reorganized Bestwall, or any Protected Party pursuant to the Plan is hereby waived, nullified, or lifted with respect to the affected claimant, but only to the extent necessary to Liquidate and recover against Georgia-Pacific, and the affected claimant may proceed without the hinderance of any injunction.*

(p)     **Channeling Injunction**

(1)     ***Terms.*** *Pursuant to section 524(g) of the Bankruptcy Code, and except as specifically set forth herein regarding the conditional nature of such releases, the Plan and the Confirmation Order shall permanently and forever stay, restrain and enjoin any Entity from taking any actions against any Protected Party for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Asbestos PI Claim, all of which shall be channeled to the Asbestos PI Trust for resolution as set forth in the Asbestos PI Trust Agreement and the related Asbestos PI Trust Distribution Procedures, including permanently and forever staying, restraining and enjoining any Entity from any of the following with respect to any Asbestos PI Claim:*

(a)     *commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including a judicial, arbitral, administrative or other proceeding) in any forum against any Protected Party or any property or interests in property of any Protected Party;*

(b)     *enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree or other order against any Protected Party or any property or interests in property of any Protected Party;*

(c)     *creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party;*

(d)     *setting off, seeking reimbursement of, contribution from or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and*

(e)     *proceeding in any manner in any place with regard to any matter that is subject to resolution pursuant to the Asbestos PI Trust Documents, except in compliance therewith.*

(2) *Georgia-Pacific's Failure to Fund.* *For the avoidance of doubt, Georgia-Pacific's failure to fund the Trust Expense Fund as required by Article V, Section J.2., and the Asbestos PI Trust subsequent assignment of its enforcement rights to an affected claimant to pursue recovery in the tort system, shall invalidate any injunction provided by this subsection to the Debtor, Reorganized Bestwall, or any Protected Party, but only to the extent necessary to Liquidate and recover against Georgia-Pacific.*

(3) *Reservations.* *Notwithstanding anything to the contrary in the Plan, this Channeling Injunction shall not impair:*

(a) *the rights of holders of Asbestos PI Claims to assert such Asbestos PI Claims solely against the Asbestos PI Trust or otherwise in accordance with the Trust Distribution Procedures;*

(b) *the rights of holders of Asbestos PI Claims to assert such claims against anyone other than a Protected Party;*

(c) *the rights of Persons to assert any Claim, debt, obligation or liability for payment of Asbestos PI Trust Expenses solely against the Asbestos PI Trust or otherwise in accordance with the Trust Distribution Procedures; or*

(d) *the Asbestos PI Trust from enforcing its rights explicitly provided to it under the Plan and the Asbestos PI Trust Documents.*

(4) *Modifications.* *There shall be no modification, dissolution, or termination of the Channeling Injunction, which shall be a permanent injunction.*

(5) *Non-Limitation Channeling Injunction.* *Nothing in the Plan or the Asbestos PI Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction issued in connection with the Plan or the Asbestos PI Trust's assumption of all liability with respect to Asbestos PI Injury Claims.*

(6) *Bankruptcy Rule 3016 Compliance.* *The Plan Proponents' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.*

(7) *Protected Parties.* *Any Protected Party may enforce the Channeling Injunction as a defense to any Claim brought against such Protected Party that is enjoined under the Plan as to such Protected Party and may seek to enforce such injunction in a court of competent jurisdiction.*

(q)     ***Exculpation***

***Neither the Asbestos PI Committee and the Future Claimants' Representative and with respect to each of the foregoing, their current or former members, Professionals, employees, officers, agents, attorneys, accountants, financial advisors, representatives or other professionals, solely in their capacity as such, shall have or incur any liability to any Person or Entity for any act or omission in connection with, relating to, or arising out of the Reorganization Case, the negotiation of the Plan, the Disclosure Statement, the releases and Injunctions, the pursuit of Confirmation of the Plan, the administration, consummation and implementation of the Plan or the property to be distributed under the Plan, or the management or operation of the Debtor (except for any liability that results primarily from such Person's or Entity's gross negligence, bad faith or willful misconduct. In all respects, each and all of such Persons, firms and Entities shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Reorganization Case, the Plan, and the administration of each of them.***

6.7     Means for Implementation of Unimpairment Alternative

In the event that the Plan Proponents select the Unimpairment Alternative, the terms of Article VI of the Plan shall be implemented and not those of Article V.

(a)     *Means of Implementation*

The Debtor's obligations under the Plan will be funded by (i) the Debtor's existing cash on hand, (ii) revenue and other value derived from the Debtor's operating assets; (iii) any financing arrangements entered into prior to or subsequent to the Effective Date and (iv) the Funding Agreement.

(b)     *No Discharge of Claims or Termination of Interests*

Confirmation of the Plan will not discharge the Debtor from any Claims or terminate any Interests.

(c)     *Revesting of Assets in the Debtor*

On the Effective Date, all Revested Assets shall be revested in the Debtor in accordance with the terms of the Plan, excluding the Causes of Actions to be transferred to the Litigation Trust pursuant to the terms of the Plan. To the extent required to implement the vesting of the Revested Assets in the Debtor as provided for herein, all persons including Governmental Authorities shall cooperate with the Debtor, the Estate, and the Litigation Trustee to implement the transfer of the Revested Assets from the Estate to the Debtor. Nothing in the Plan will alter, modify or override any provisions in, or actions taken pursuant to, any of the Orders entered by the Bankruptcy Court authorizing the Debtor to use cash collateral.

(d)     *Assumption of the Funding Agreement*

On the Effective Date, the Funding Agreement and all the Debtor's rights and benefits as payee thereunder shall be assumed by the Debtor.

(e)    *Litigation Trust.*

Creation of the Litigation Trust. On or before the Effective Date, the Litigation Trust shall be formed pursuant to the Litigation Trust Agreement and the filing of a certificate of trust with the Delaware Secretary of State.

## ARTICLE VII.

## THE ASBESTOS PI TRUST AND TRUST DISTRIBUTION PROCEDURES UNDER THE SECTION 524(G) ALTERNATIVE

On the Effective Date, the Asbestos PI Trust shall be created in accordance with the Plan Documents. The purposes of the Asbestos PI Trust shall be to assume all Asbestos PI Claims and to use the Asbestos PI Trust Assets and, among other things: (a) to preserve, hold, manage, and maximize the assets of Asbestos PI Trust; and (b) to direct the processing, liquidation, and payment of all compensable Asbestos PI Claims in accordance with the Asbestos PI Trust Documents. The Asbestos PI Trust will resolve Asbestos PI Claims in accordance with the Asbestos PI Trust Documents in such a way that holders of Asbestos PI Claims are treated fairly, equitably, and reasonably and otherwise comply in all respects with the requirements of section 524(g)(2)(B)(i) of the Bankruptcy Code.

The Asbestos PI Trust Distribution Procedures, which are attached to the Plan as Exhibit A, set forth procedures for processing and paying the Asbestos PI Claims. These procedures will be binding on the holders of all Asbestos PI Claims. The Asbestos PI Trust Distribution Procedures provide, among other things, for the resolution of Asbestos PI Claims pursuant to the terms of the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures, and that resolution of an Asbestos PI Claim by the Asbestos PI Trust will result in a full release of such Claim against the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures.

On the Effective Date, Asbestos PI Claims and Settled Asbestos Claims will be channeled to the Asbestos PI Trust and Liquidated in accordance with the Asbestos PI Trust Distribution Procedures to be adopted upon the Effective Date. The Asbestos PI Trust Distribution Procedures will provide for an Expedited Review Process (as defined in the Asbestos PI Trust Distribution Procedures) through which holders of Asbestos PI Claims who satisfy the designated Medical/Exposure Criteria (as defined in the Asbestos PI Trust Distribution Procedures) will be entitled to receive a Scheduled Value (as defined in the Asbestos PI Trust Distribution Procedures) for different categories of Asbestos PI Claims. There will also be an Individual Review Process (as defined in the Asbestos PI Trust Distribution Procedures). Settled Asbestos Claims may opt to receive either (i) the Liquidated value of their claim pursuant to the terms of their respective settlements; or (ii) treatment under the Expedited Review Process or Individual Review Process (as defined in the Asbestos PI Trust Distribution Procedures).

As soon as reasonably practicable following the end of each calendar month, the Asbestos PI Trust will deliver to Georgia-Pacific a Demand for Payment of Conditionally Settled Claims. Within 30 calendar days after receipt of each Demand for Payment, Georgia-Pacific will (i) deliver to the Asbestos PI Trust a statement identifying each of the Asbestos PI Claims and Settled

Asbestos Claims included in the Demand for Payment to which Georgia-Pacific objects, and (ii) transfer to the Trust Claims Fund an amount of Cash equal to the Liquidated value of each Asbestos PI Claim and Settled Asbestos Claim included in the Demand for Payment to which Georgia-Pacific does not object.

Within ten (10) days following the expiration of the applicable Assessment Period (as defined in the Asbestos PI Trust Distribution Procedures), the Asbestos PI Trust shall either notify the claimant that (1) the claim has been approved for payment in which case the Asbestos PI Trust will issue payment as soon as reasonably practicable; or (2) the claimant may (a) exit to the tort system for resolution of his or her Asbestos PI Claim as set forth in the Asbestos PI Trust Distribution Procedures or, alternatively, (b) agree, subject to Georgia-Pacific also agreeing, to submit his or her Asbestos PI Claim to binding arbitration for resolution. If a claimant elects binding arbitration, the Asbestos PI Trust shall notify Georgia-Pacific of the claimant's election, and Georgia-Pacific shall have ten (10) days to consent to binding arbitration. If Georgia-Pacific consents, the Asbestos PI Claim will be finally determined through binding arbitration. If Georgia-Pacific does not consent to binding arbitration, by a writing delivered to the Asbestos PI Trust by overnight mail, signature required, or by electronic delivery, receipt of which is confirmed by the Asbestos PI Trust, within the 10-day period, the claimant may immediately, and without further action, exit to the tort system to resolve his or her Asbestos PI Claim as set forth in the Asbestos PI Trust Distribution Procedures. If and when any such claimant obtains a judgment, award, settlement, or other resolution with respect to such claimant's Asbestos PI Claim or Settled Asbestos Claim, the claimant shall submit evidence of the liquidated Asbestos PI Claim or Settled Asbestos PI Claim to the Asbestos PI Trust to be included in the next Demand for Payment.

Georgia-Pacific's failure to assert a Georgia-Pacific objection or timely submit payment to the Asbestos PI Trust for any Asbestos PI Claim included on a Demand for Payment shall constitute a breach of Georgia-Pacific's obligations under the Plan. As set forth in the Plan, following such breach the Asbestos PI Trust may commence suit against Georgia-Pacific for such relief as it deems appropriate, which may include but is not limited to breach of the Funding Agreement or seeking specific performance of same. In such event, Georgia-Pacific shall (a) immediately escrow the full amount of any such unpaid Demand for Payment in an interest-bearing account; and (b) shall be responsible for reasonable attorney fees and costs associated with pursuing relief on behalf of the Asbestos PI Trust and claimants, interest compounded daily based on the greater of the prevailing federal judgment rate or an annual rate of 15%, punitive damages and other extraordinary relief as appropriate. In the discretion of the Asbestos PI Trust, the Asbestos PI Trust may assign to any affected claimant the right of such claimant to pursue recovery from Georgia-Pacific directly with respect to a breach related to the Claimant's Asbestos PI Claim. In such event, the claimant may elect to sue Georgia-Pacific with respect to his or her Conditionally Settled Claim or may reject such settlement and sue Georgia-Pacific in the tort system for resolution of his or her Asbestos PI Claim.

Furthermore, potential claimants should be aware that any funds they recover from the Asbestos PI Trust, or against any "primary plan" as defined in the Medicare Secondary Payer Statute, 42 U.S.C. § 1395y(b) (the "**MSPS**"), could be subject to repayment obligations owing or potentially owing under the MSPS or related rules, regulations, or guidelines. Potential claimants should also be aware that, as a condition of receiving payment from the Asbestos PI Trust or any "primary plan" as defined by the MSPS, the claimants may be asked to certify that they will comply

with any obligations owing or potentially owing under the MSPS or related rules, regulations, or guidelines.

## ARTICLE VIII.

## THE LITIGATION TRUST UNDER THE UNIMPAIRMENT ALTERNATIVE

On the Effective Date, all Causes of Action, including but not limited to, the Ambassador Claim, shall be vested in the Litigation Trust free and clear of Liens, Claims, encumbrances, charges, interests of Holders of Claims and Equity Interests and other interests. To the extent required to implement the vesting of the Causes of Action in the Litigation Trust as provided for herein, all persons including Governmental Authorities shall cooperate with the Debtor, the Estate, and the Litigation Trustee to implement the transfer of the Causes of Action from the Debtor to the Litigation Trust.

Because the Litigation Trust is being established for the benefit of all Holders of Claims and Interests, no beneficial interests shall be issued to any specific Holder and distributions shall be made to Holders of Claims and Interests of record in these cases once they are Allowed pursuant to the terms of the Plan.

The Litigation Trustee shall administer the Litigation Trust and shall have the powers and duties set forth in the Litigation Trust Agreement. From and after the Effective Date, the Litigation Trustee shall be authorized to, and shall, take all actions required to implement the Litigation Trust Agreement and the Plan. The Litigation Trustee shall, at any time and from time to time, have authority to retain, on behalf of the Litigation Trust, any counsel, financial advisors, claims agent, auditors, or other professionals it deems appropriate. The Litigation Trust may select any such professionals in its sole discretion, and without regard to their prior employment in any capacity in the Chapter 11 Cases on behalf of the Debtor, the Estate, the Asbestos PI Committee, or the Future Claimants' Representative.

The Litigation Trustee shall be, and hereby is, appointed as the representative of the Estate pursuant to sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code with respect to the Causes of Action and as such shall be vested with the sole authority and power (subject to the Litigation Trust Agreement) to: (a) administer, hold, and liquidate the Causes of Action; and (b) administer, investigate, prosecute, settle, and abandon all Causes of Action in the name of, and for the benefit of, the Estate, subject to the limitations set forth in the Plan. The Litigation Trustee shall have the right to prosecute the Causes of Action as the authorized representative of the Debtor and the Estate. As the representative of the Estate, the Litigation Trustee shall succeed to all of the rights and powers of the Debtor and the Estate with respect to the Causes of Action, and the Litigation Trustee shall be substituted for and shall replace the named plaintiff as the party in interest in all Causes of Action pending as of the Effective Date. No current or former shareholder of the Debtor shall have the right to prosecute any Causes of Action. As of the Effective Date, subject to the Litigation Trust Agreement, the Litigation Trustee shall be authorized to exercise and perform the rights, powers, and duties held by the Debtor's Estate with respect to the Causes of Action, including, without limitation, the authority under section 1123(b)(3) of the Bankruptcy Code to provide for settlement, adjustment, retention, and enforcement of claims and interests of the Estate, without the consent or approval of any third party, and without any further Order of the

Bankruptcy Court, except as otherwise provided in the Plan or the Confirmation Order. Subject to the Litigation Trust Agreement, the Litigation Trustee will decide whether to pursue each cause of action based upon its merits, the cost to prosecute the claim and the resources available. Subject to the Litigation Trust Agreement, the Litigation Trustee may retain counsel on a contingency fee basis or seek financing for the cost to prosecute some or all of the causes of action, abandon or decide not to pursue some or all causes of action.

Amounts recovered by the Causes of Action shall be used first to pay the expenses of the Litigation Trust incurred in pursuing the Causes of Action and any surplus shall be distributed to the beneficiaries of the Litigation Trust on account of such holders Allowed Claims and Interests as provided for in the Plan. If holders of Allowed Claims and Interests are paid in full under the terms of the Plan, and there remain amounts recovered by the Litigation Trustee for Distribution, then the remaining funds shall be turned over to the Debtor for Distribution in the same manner as the Revested Assets.

The Litigation Trust will be established, in accordance with Treasury Regulation section 301.7701-4(d) and Revenue Procedure 94-45, to liquidate the Causes of Action. The Litigation Trust shall be formed solely for such purpose and shall have no objective to engage in or continue the conduct of a trade or business. The Litigation Trust is intended to qualify as a liquidating trust that is a grantor trust and therefore not a separate taxable entity for federal income tax purposes. The Holders of Claims and Interests shall be treated for federal income tax purposes as the grantors and deemed owners of the Litigation Trust and the Litigation Trustee and such Holders shall report consistently therewith.

All Post-Effective Date Expenses of the Litigation Trustee and Litigation Trust shall initially be expenses of the Debtor, and the Debtor shall arrange for the advancement of such expenses to the Litigation Trustee. The expenses so advanced shall then be repaid to the Debtor before Distributions to holders of Claims and Interests are made from the Litigation Trust.

Unless a favorable ruling letter is obtained from the IRS providing that any further extension would not adversely affect the status of the Litigation Trust as a liquidating trust for federal income tax purposes, the Litigation Trust shall be dissolved no later than five (5) years from the Effective Date, unless the Bankruptcy Court, upon motion made prior to such fifth (5th) anniversary, determines that an extension for a fixed period of not more than three (3) years (including any prior extensions) is necessary for the purposes for which the Litigation Trust was formed. Upon the filing of a motion for extension of the date of dissolution of the Litigation Trust, such date automatically shall be deemed extended until entry by the Bankruptcy Court of an Order resolving such motion or until the motion is withdrawn.

To the extent the Litigation Trust Beneficial Interests in the Litigation Trust are deemed to be "securities," the issuance of such Litigation Trust Beneficial Interests under the Plan is exempt, pursuant to section 1145 of the Bankruptcy Code, from registration under the Securities Act of 1933, as amended, and any applicable state and local laws mandating the registration of securities.

Neither the Litigation Trustee, nor any of its members or designees, nor any of its duly designated agents or representatives, nor its employees, shall be liable for the act or omission of any other member, designee, agent, or representative of such entity, nor shall any member be liable

for any act or omission to be taken or not taken, other than acts resulting from such person's willful misconduct or gross negligence. Absent willful misconduct, intentional misconduct, gross negligence or fraud in connection therewith, no party in interest shall have a cause of action against the Litigation Trustee, or its directors, officers, employees, agents, consultants, trustees or professionals.

## ARTICLE IX.

## CERTAIN FACTORS TO BE CONSIDERED FOR THE SECTION 524(G) ALTERNATIVE

**Holders of Claims against the Debtor should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith or incorporated by reference, prior to voting to accept or reject the Plan. These factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.**

9.1   Variance from Financial Projections

The summarized financial projections contained in Exhibit B are dependent upon numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of Reorganized Bestwall and Georgia-Pacific, general business and economic conditions, and other matters, many of which are beyond the control of the Plan Proponents. Accordingly, there can be no assurance that such assumptions will prove to be valid. In addition, unanticipated and unforeseeable events and/or circumstances occurring subsequent to the preparation of the financial projections may affect the actual financial results of Reorganized Bestwall. Although the Plan Proponents believe that the financial projections contained in Exhibit B are reasonable and attainable, some or all the estimates will vary, and variations between the actual financial results and those projected may be material.

9.2   Failure to Confirm the Plan

Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the plan will not be followed by liquidation or the need for further financial reorganization of the Debtor, and that the value of distributions to dissenting holders of Claims and Equity Interests may not be less than the value such holders would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. Although the Plan Proponents believe that the Plan will meet these tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Bankruptcy Code also requires that a Plan must provide the same treatment for each claim or interest in a class, unless a holder agrees to a less favorable treatment of its claim or interest. The Plan Proponents believe that they have complied with the requirements of the Bankruptcy Code by their classification and treatment of various holders of Claims and Equity Interests under the Plan. However, if a member of a Class objects to its treatment or if the Bankruptcy Court finds that the Plan does not comply with the requirements of the Bankruptcy Code, confirmation of the Plan could be delayed or prevented. In addition, each Impaired Class

that will (or may) be entitled to receive property under the Plan will have the opportunity to vote to accept or reject the Plan.

Further, section 1122 of the Bankruptcy Code provides that a plan may place a claim or interest in a particular class only if the claim or interest is substantially similar to the other claims or interests in that class. The Plan Proponents believe that the classification of Claims and Equity Interests under the Plan complies with the requirements of the Bankruptcy Code because the Classes established under the Plan each encompass Claims or Equity Interests that are substantially similar to similarly classified Claims or Equity Interests. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

9.3     Non-Occurrence of the Effective Date

The Plan provides that there are several conditions precedent to the occurrence of the Effective Date. The Plan Proponents cannot assure you as to the timing of the Effective Date. If the conditions precedent to the Effective Date have not been satisfied or waived, the Bankruptcy Court may vacate the Confirmation Order. In that event, the Plan would be deemed null and void and the Plan Proponents may propose or solicit votes on an alternative reorganization plan that may not be as favorable to parties in interest as the Plan.

9.4     The Recovery to Holders of Allowed Claims Cannot Be Stated with Absolute Certainty

Due to the inherent uncertainties associated with projecting financial results and litigation outcomes, the projections contained in this Disclosure Statement should not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the Plan Proponents believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. Also, because the Liquidation Analysis (as defined below), distribution projections, and other information contained herein and attached hereto are estimates only, the timing and amount of actual distributions to holders of Allowed Claims, if applicable, may be affected by many factors that cannot be predicted.

The Claims estimates set forth herein are based on various assumptions. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect. Such differences may adversely affect the percentage of recovery to holders of Allowed Claims and Equity Interests, if applicable, under the Plan. Moreover, the estimated recoveries set forth herein are necessarily based on numerous assumptions, the realization of many of which are beyond the Plan Proponents' control.

9.5     The Allowed Amount of Claims May Differ From Current Estimates

There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual amount of Allowed Claims may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated in this Disclosure Statement. Furthermore, a number of additional Claims may be filed, including on account of rejection damages for

Executory Contracts and Unexpired Leases rejected pursuant to the Plan. Any such claims may result in a greater amount of Allowed Claims than estimated in this Disclosure Statement.

## 9.6   The Plan Proponents May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Plan Proponents reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection may therefore not receive its expected share of the estimated distributions described in this Disclosure Statement.

## 9.7   Parties in Interest May Object to the Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if the claim or interest is substantially similar to the other claims or interests in that class. The Plan Proponents believe that the classification of Claims and Equity Interests under the Plan complies with the requirements of the Bankruptcy Code because the Classes established under the Plan each encompass Claims or Equity Interests that are substantially similar to similarly classified Claims or Equity Interests. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

## 9.8   Appointment of [a] Different Trustee[s] and/or Different Members of the Trust Advisory Committee for the Asbestos Personal Injury Trust

Prior to the Confirmation Hearing, the Plan Proponents shall (i) identify one or more individuals as the initial Trustee[s] of the Asbestos PI Trust and (ii) propose certain individuals as the initial members of the Trust Advisory Committee. The Bankruptcy Court, however, may reject or otherwise decline to approve the appointment of such proposed Trustee[s], or one or more of the proposed members of the Trust Advisory Committee. In that case, an alternate Trustee[s] and/or alternative proposed members of the Trust Advisory Committee would have to be nominated, potentially resulting in significant delays in the occurrence of the Confirmation Date and Effective Date. The selection of a different Trustee[s] or different Trust Advisory Committee Members also could materially affect administration of the Asbestos PI Trust.

## 9.9   Distributions under the Trust Distribution Procedures

The Asbestos PI Claims will be resolved pursuant to the Asbestos PI Trust Documents. There can be no certainty as to the precise amounts that will be distributed by the Asbestos PI Trust in any particular period or when Asbestos PI Claims will be resolved by the Asbestos PI Trust. While the Asbestos PI Trust will be funded by interim payments under the Funding Agreement, there is no guarantee that Georgia-Pacific will continue to fund the Asbestos PI Trust or that any litigation commenced against Georgia-Pacific to fund the Asbestos PI Trust will be successful and, in any event, may cause significant delays in Asbestos PI Claimants receiving compensation for the claims under the Asbestos PI Trust.

Holders of Asbestos PI Claims who (a) are Medicare beneficiaries and (b) receive a distribution from the Asbestos PI Trust may be required to reimburse Medicare for medical

expenses paid on behalf of such holder.[14]  Additionally, excessive legal fees may not qualify as a "procurement cost" within the meaning of 42 C.F.R. § 411.37(a)(1)(i), which may affect a holder of an Asbestos PI Claim's reimbursement obligations.

9.10    The Asbestos Channeling Injunction

The Asbestos Channeling Injunction, which, among other things, bars the assertion of any Asbestos PI Claims against the Protected Parties, is a necessary element of the Plan.  Although the Plan, the Asbestos PI Trust Agreement, and the Asbestos PI Trust Distribution Procedures all have been drafted with the intention of complying with sections 524(g) and (h) of the Bankruptcy Code, and satisfaction of the conditions imposed by sections 524(g) and (h) is a condition precedent to confirmation of the Plan, there is no guarantee that the validity and enforceability of the Channeling Injunction or sections 524(g) and (h) or the application of the Channeling Injunction to Asbestos PI Claims will not be challenged, either before or after confirmation of the Plan.

9.11    Voting Requirements

If sufficient votes are not received to enable the Bankruptcy Court to confirm the Plan pursuant to both sections 524(g) and 1129 of the Bankruptcy Code, the Plan Proponents and/or the Debtor may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

9.12    Funding Agreement Litigation

The Debtor contends that the Funding Agreement cannot be assigned to the Asbestos PI Trust to provide funding in the manner anticipated in the Plan.  The Plan Proponents will be initiating litigation in the Bankruptcy Court seeking relief with respect to additional protections required to secure the Funding Agreement and assure the assumability and assignability of the Funding Agreement to the Asbestos PI Trust. If the Bankruptcy Court rules against the Plan Proponents in the Funding Agreement Litigation, the Plan Proponents may propose or solicit votes on an alternative reorganization plan that may not be as favorable to parties in interest as the Plan.

9.13    Georgia-Pacific's Operations May Be Impacted by the Continuing COVID-19 Pandemic

The continued spread of COVID-19 could have a significant impact on Georgia Pacific's business both in the context of consumer demand and production capacity. This pandemic could dampen global growth and ultimately lead to an economic recession.  Such a scenario would negatively impact Georgia-Pacific's financial performance under the Funding Agreement, and affect the underlying financial projections contained in Exhibit B.

---

[14] See 42 U.S.C. § 1395y(b)(2)(B)(ii); 42 C.F.R. § 411.22.

## ARTICLE X.

## VOTING PROCEDURES AND REQUIREMENTS

10.1    Voting Procedures Summary[15]

The following section describes in summary fashion the procedures and requirements that have been established for voting on the Plan.  Those procedures and requirements establish, among other things, the place to send completed ballots, in the forms approved by the Bankruptcy Court in the Voting Procedures Order, used in voting on the Plan (each, a "**Ballot**"), together with the deadline for returning completed Ballots for voting on the Plan and the deadline for objecting to the Plan.  The Plan Proponents have distributed Solicitation Packages in connection with the foregoing containing:

(a)     a cover letter describing the contents of the Solicitation Package and the enclosed USB flash drive (described below), and instructions for obtaining (free of charge) printed copies of the materials provided in electronic format;

(b)     the Confirmation Hearing Notice;

(c)     a USB flash drive containing a copy of this Disclosure Statement with all exhibits, including the Plan with its exhibits (to the extent such exhibits were filed with the Bankruptcy Court before the Solicitation Date);

(d)     the Voting Procedures Order (without exhibits), which, among other things, approves this Disclosure Statement as containing adequate information, establishes the voting procedures (the "**Voting Procedures**"), schedules the Confirmation Hearing, and sets the voting deadline and the deadline for objecting to confirmation of the Plan;

(e)     solely for holders of Asbestos PI Claims and Equity Interests, an appropriate Ballot and voting instructions for the same;

(f)     solely for holders of Asbestos PI Claims and Equity Interests, a pre-addressed, return envelope for completed Ballots; and

(g)     solely for holders of Asbestos PI Claims, a letter from the Chair of the Asbestos PI Committee and the Future Claimants' Representative urging such claimants to vote to accept the Plan.

The Voting Procedures Order, the Voting Procedures, the Confirmation Hearing Notice, and the instructions attached to your Ballot should be read in connection with this Section of this Disclosure Statement as they set forth the Voting Procedures and deadlines in detail.  If you are a holder of a Claim who is entitled to vote on the Plan and you or your attorney did not receive a

---

[15] Capitalized terms used but not defined in this Article IX have the meanings ascribed to them in the Voting Procedures Order.

Ballot, received a damaged Ballot, or lost your Ballot, please contact the Voting Agent (i) by telephone at (212) 481-1411; (ii) by e-mail at [bestwallballots@donlinrecano.com]; (iii) by visiting their website at [https://cases.donlinrecano.com/bestwall]; or (iv) by writing at Bestwall Ballot Processing Center, c/o Donlin Recano & Company, 6201, 15th Avenue, Brooklyn, NY 11219

The Voting Procedures set forth a process by which attorneys representing holders of Asbestos PI Claims, as listed on the Schedules (collectively, the "**Firms**"), will receive copies of the Asbestos PI Claim Solicitation Notice and the Certified Plan Solicitation Directive. The Asbestos PI Claim Solicitation Notice will notify the Firms of the options proposed for soliciting votes on the Plan in respect of Asbestos PI Claims and request that each Firm complete and return the Certified Plan Solicitation Directive to the Voting Agent on or before a date not more than 17 calendar days after the Solicitation Date.

The Certified Plan Solicitation Directive permits each Firm to direct the Voting Agent with regard to the solicitation of votes on the Plan from individuals, estates, or Entities who or which hold Asbestos PI Claims (collectively, the "**Clients**") according to one of the following procedures:

(a)     *Master Ballot Solicitation Method*

If a Firm certifies that it has the authority under applicable law to vote on behalf of its Clients, the Firm may direct the Voting Agent to serve the Firm with one Solicitation Package and one Master Ballot on which the Firm must record the votes on the Plan for each of its Clients. If the Firm elects this procedure, the Firm may also request that, for informational purposes, the Voting Agent serve Solicitation Packages (without a Ballot) on its Clients, together with a cover letter to be provided by the Firm.

(b)     *Direct Solicitation Method*

If a Firm does not have the authority to vote on behalf of its Clients, or if a Firm prefers to have each of its Clients cast their own votes on the Plan, such Firm may direct the Voting Agent to solicit votes on the Plan directly from its Clients, and may provide the Voting Agent with a cover letter to be transmitted to such Clients in connection with such solicitation.

(c)     *Indirect Solicitation Method*

If a Firm does not have the authority to vote on behalf of its Clients or the attorney prefers the Clients cast their own votes on the Plan, the attorney may direct the Voting Agent to deliver the Solicitation Packages to the Firm, which will, in turn, deliver the Solicitation Packages to its Clients. If the Firm selects this method: (i) the Voting Agent will cause the requested number of Solicitation Packages, including appropriate Ballots, to be served on the Firm; (ii) the Firm must deliver the Solicitation Packages to the Clients within three Business Days after receipt; and (iii) the Firm must file an affidavit of service with the Court, and send a copy of such affidavit to the Voting Agent, within three Business Days of such service. The Firms will not be required to list the names and addresses of the Clients served on the affidavit of service. The affidavit of service only needs to state that service was completed, the date(s) that service was completed, and the

attorney has provided or will provide the Voting Agent with the required lists of Clients, as described in the Solicitation Procedures.

(d) *Hybrid Solicitation Method*

If a Firm certifies that it has the authority under applicable law to vote, and intends to exercise that power, only for certain of the Clients (collectively, the "**Master Ballot Clients**"), the Firm may direct the Voting Agent to serve the Firm with one Solicitation Package and one Master Ballot on which the Firm must record the votes with respect to the Plan for the Master Ballot Clients. The Firm also may request that, for informational purposes, the Voting Agent serve Solicitation Packages (without a Ballot) on the Master Ballot Clients, together with a cover letter to be provided by the Firm. With respect to such Firm's other Clients that are not Master Ballot Clients (collectively, the "**Individual Ballot Clients**"), the Firm must elect the procedure under either the Direct Solicitation Method (subsection (b) above) or the Indirect Solicitation Method (subsection (c) above).

If you are entitled to vote on the Plan, a form of Ballot for your Claim has been provided to you, unless otherwise provided to a Firm, as contemplated by the Certified Plan Solicitation Directive. Holders of Asbestos PI Claims or their attorneys, as applicable, should have received a Class 4 Ballot (relating to Asbestos PI Claims). The Plan Proponents have prepared, and the Bankruptcy Court has approved the Voting Procedures. You should refer to the Voting Procedures sent with this Disclosure Statement to determine precisely those procedures that apply with respect to the return of your Ballot.

Completed and signed Ballots can be submitted by mail using the envelope included in the Solicitation Package, or by hand delivery or overnight courier to: Bestwall Ballot Processing Center, c/o Donlin Recano & Company, 6201 15th Avenue, Brooklyn, NY 11219. As set forth in the Voting Procedures, no other forms of electronic delivery of Ballots, *e.g.*, facsimile, will be accepted.

10.2   Voting Deadline

**To be considered for purposes of accepting or rejecting the Plan, all Ballots must be <u>received by</u> the Voting Agent no later than the Voting Deadline of 4:00 p.m. (prevailing Eastern Time) on [    ], 2020. Only those Ballots actually received by the Voting Agent before the Voting Deadline will be counted as either accepting or rejecting the Plan.**

10.3   Holders of Claims Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or equity interest entitles the holder thereof, or (b) notwithstanding any legal right to an accelerated payment of such claim or equity interest, the plan: (1) cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy); (2) reinstates the maturity of such claim or equity interest as it existed before the default; (3) compensates the holder of such claim or equity interest for any damages from such holder's reasonable reliance on such legal right to an accelerated payment; and (4) does not

otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Holders of claims and equity interests in impaired classes are generally entitled to vote to accept or reject a plan. However, if the holder of an impaired claim or equity interest will not receive any distribution under the plan in respect of such claim or equity interest, the Bankruptcy Code deems such holder to have rejected the plan (unless such holder has agreed to such treatment) and provides that the holder of such claim or equity interest is not entitled to vote. If the claim or equity interest is not impaired, the Bankruptcy Code conclusively presumes that the holder of such claim or equity interest has accepted the plan and provides that the holder is not entitled to vote.

**Class 4 and Class 6 Are Impaired by the Plan and are the only Classes entitled to vote on the Plan.** All other Classes are Unimpaired and presumed to have accepted the Plan.

10.4    Vote Required for Acceptance by a Class

Pursuant to sections 1126(c) and 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code, Class 4 (Asbestos PI Injury Claims) shall have accepted the Plan only if at least two-thirds (2/3) in amount and seventy-five percent (75%) in number of Asbestos PI Claims actually voting on the Plan have voted to accept the Plan in accordance with the Voting Procedures Order.

10.5    Voting Procedures

(a)    *Ballots*

All votes to accept or reject the Plan with respect to Class 4 must be cast by properly submitting the duly completed and executed form of Ballot designated for such Claims. Holders of Claims in Class 4 or their attorneys (as applicable) voting on the Plan should complete and sign the appropriate Ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept" the Plan or "Reject" the Plan. In addition, if any holder of a Claim elects not to grant the releases set forth in Article XII of the Plan, then it should check the appropriate box on its Ballot and follow the instructions contained in the Ballot.

**As set forth in the Voting Procedures, improperly completed Ballots will not be counted. By way of example and not limitation, any Ballot received which is not signed or which contains insufficient information to permit the identification of the claimant will be an invalid Ballot and will not be counted for purposes of determining acceptance or rejection of the Plan.**

Ballots must be delivered to the Voting Agent, at its address set forth above in Section 10.1 and received by the Voting Deadline. **The method of such delivery is at the election and risk of the voter.** Although the method of delivery is at the risk of the voter, for the convenience of each holder of an Asbestos PI Claim entitled to vote on the Plan or such holder's attorney, as applicable and in accordance with the Certified Plan Solicitation Directive, the Solicitation Package contains a pre-stamped and addressed envelope for return of such holder's Ballot by first class mail through the United States Postal Service. If such delivery is by mail, it is recommended that voters use an air courier with a guaranteed next day delivery or registered mail, properly

insured, with return receipt requested.  In all cases, sufficient time should be allowed to ensure timely delivery.

**If you are entitled to vote and you or your attorney (as applicable) did not receive a Ballot, received a damaged Ballot or lost your Ballot, please contact the Voting Agent in the manner set forth above.  For additional information regarding the voting process, please refer to the Voting Procedures Order, the Voting Procedures, the Confirmation Hearing Notice, and the instructions attached to your Ballot (to the extent a Ballot was not otherwise received by your attorney pursuant to the Certified Plan Solicitation Directive).**

**Please refer to the Voting Procedures and Voting Procedures Order for more information regarding the voting of Asbestos PI Injury Claims.**

(b)    *Withdrawal of Votes and Multiple Votes on the Plan*

Any voter that delivers a valid Ballot may withdraw his, her, or its vote by delivering a written notice of withdrawal to the Voting Agent before the Voting Deadline or such later date as agreed by the Plan Proponents in their sole discretion.  To be valid, the notice of withdrawal must be signed by the party who signed the Ballot to be revoked.  The Plan Proponents reserve the right to contest any withdrawals.

In addition, the following procedures for voting will be used by the Plan Proponents to address multiple Ballots.

(1)    If multiple Ballots are received from different holders purporting to hold the same Claim, in the absence of contrary information establishing which claimant held such Claim as of the Voting Deadline, the latest-dated otherwise valid Ballot that is received before the Voting Deadline (or such later date as agreed by the Plan Proponents) will be the Ballot that is counted.

(2)    If multiple Ballots are received from the holder of a Claim and someone purporting to be his, her, or its attorney or agent, the Ballot received from the holder of the Claim will be the Ballot that is counted, and the vote of the purported attorney or agent will not be counted.

(3)    If multiple Ballots are received from a holder of a Claim for the same Claim, the latest-dated otherwise valid Ballot that is received before the Voting Deadline (or such later date as agreed by the Plan Proponents) will be the Ballot that is counted as a vote to accept or reject the Plan; if multiple Ballots are received from an attorney or agent with respect to the same Claim (but not from the holder thereof), the latest-dated otherwise valid Ballot that is received before the Voting Deadline (or such later date as agreed by the Plan Proponents) will be the Ballot that is counted as a vote to accept or reject the Plan.

Finally, if two or more Master Ballots are received from separate attorneys, each of whom purports to represent the same holder of a Claim, the vote of the holder appearing on both Master

Ballots will be counted only once and only if such votes are consistent with respect to acceptance or rejection of the Plan.  In the event that the votes are not consistent, none of the votes will be counted.

The Plan Proponents will not be obligated to recognize any withdrawal, revocation, or change of any vote received after the Voting Deadline (or such later date as agreed by the Plan Proponents).

## ARTICLE XI.

## CONFIRMATION OF THE PLAN

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### 11.1   Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan of reorganization.  By order of the Bankruptcy Court, the Confirmation Hearing is scheduled for [          1], 2020 at [    ] a.m. (Prevailing Eastern Time) before the Honorable Laura T. Beyer, United States Bankruptcy Judge for the Western District of North Carolina, in the United States Bankruptcy Court for the Western District of North Carolina, 401 West Trade Street, Room 111, Charlotte, NC 28202.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequently adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan of reorganization.  Any objection to confirmation of the Plan must be filed with the Bankruptcy Court no later than **[_____], 2020 at [4:00 p.m.] (Prevailing Eastern Time)**, and will be governed by Bankruptcy Rules 3020(b) and 9014 and the Local Rules.  **Unless an objection is timely and properly served and filed, it may not be considered by the Bankruptcy Court.**

### 11.2   Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan (a) is accepted by all Impaired Classes of Claims and Equity Interests, or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (b) is feasible; and (c) is in the "best interests" of holders of Claims and Interests that are Impaired under the Plan.

(a)     *Acceptance*

Class 4 is Impaired under the Plan, and the holders of Claims in such Class are entitled to vote on the Plan.  Therefore, such Class must accept the Plan for it to be confirmed without application of the "fair and equitable test," described below, to such Class.  Class 6 is Impaired

under the Plan.  Confirmation of the Plan will require application of the "fair and equitable test" as to Class 6 unless the Class accepts the Plan.

Classes 1, 2, 3, and 5 are Unimpaired under the Plan and are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, confirmation of the Plan will not require application of the "fair and equitable test," described below, as to those Classes.

(b)      *Issuance of Injunction Pursuant to Sections 524(g) and 105(a) of the Bankruptcy Code*

With respect to the Section 524(g) Alternative, the Bankruptcy Court shall be asked to issue the Asbestos Channeling Injunction if the Plan has been accepted by at least two-thirds (2/3) in amount of those holders of Class 4 Claims actually voting on the Plan, in accordance with section 1126(c) of the Bankruptcy Code, and seventy-five percent (75%) in number of those holders of Class 4 Claims actually voting on the Plan, in accordance with section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.  The amount of the Claim for each Class 4 Claim holder for voting purposes shall be as set forth in the Voting Procedures Order.

If the Bankruptcy Court or the District Court does not enter the Channeling Injunction, the Effective Date for the Section 524(g) Alternative shall not occur.

(c)      *Feasibility*

The Bankruptcy Code also requires as a condition to confirmation of a plan of reorganization that the confirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization of the reorganized debtor.  For purposes of determining whether the Plan meets this requirement, the Plan Proponents have analyzed the ability of the Debtor and Reorganized Bestwall to meet its obligations under the Plan.  The Plan Proponents believe that Reorganized Bestwall will be able to make all payments required pursuant to the Plan, and therefore, that confirmation of the Plan is not likely to be followed by the need for further reorganization.

To support their belief in the feasibility of the Plan, the Plan Proponents have relied upon the financial projections, attached hereto as Exhibit B.[16]  The financial projections indicate that Reorganized Bestwall should have sufficient Cash prior to the Effective Date to fund the Reserves and adequate cash flow post-Effective Date to fund operations, as applicable.  Accordingly, the Plan Proponents believe that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

The financial projections are based on various assumptions, including Confirmation of the Plan in accordance with its terms, no material adverse changes in general business and economic conditions, and other matters, some of which will be beyond the control of Reorganized Bestwall. The financial projections should be read in conjunction with Article VIII above, entitled "*Certain*

---

[16] The financial projections for Reorganized Bestwall will be filed prior to August 19, 2020, the proposed deadline to object to this Disclosure Statement.

*Factors to be Considered*," and with the assumptions, qualifications and footnotes to the tables containing the Financial Projections set forth in Exhibit B.

(d)     *"Best Interests Test"*

The "Best Interests Test" under section 1129 of the Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each holder of Impaired claims or Impaired equity interests either (a) accept the Plan or (b) receive property with a value not less than the amount such holder would receive in a chapter 7 liquidation. As reflected in the analysis attached hereto as Exhibit C (the "**Liquidation Analysis**"), the Plan Proponents believe that under the Plan, holders of Impaired Claims and Impaired Equity Interests will receive property with a value equal to or in excess of the value such holders would receive in a liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

Classes 4 and 6 are impaired under the Plan. The holders of Asbestos PI Claims must accept the Plan in order for the Plan to be confirmed, thereby satisfying clause (a) above.

The Plan Proponents have prepared the attached Liquidation Analysis to demonstrate the Plan's compliance with the provisions of section 1129(a)(7) of the Bankruptcy Code. The Liquidation Analysis is based upon a number of reasonable assumptions that, ultimately, are subject to significant uncertainties and contingencies. The Plan Proponents cannot assure you that these assumptions would be accepted by a Bankruptcy Court. **Actual liquidation proceeds could be materially lower or higher than the amounts set forth below. No representation or warranty can or is being made with respect to the actual proceeds that could be received in a chapter 7 liquidation of the debtors. The liquidation valuations have been prepared solely for purposes of estimating proceeds available in a chapter 7 liquidation of the Estates and do not represent values that may be appropriate for any other purpose. Nothing contained in these valuations is intended to or may be asserted to constitute a concession or admission of the Plan Proponents for any other purpose.**

Here, the Plan is in the best interests of the Debtor's creditors (including holders of Asbestos PI Claims) [and Equity Interests] and meets the requirements of section 1129(a)(7) of the Bankruptcy Code. The Plan Proponents expect that there will be substantially more assets available to pay holders of Claims under the Plan than would be the case if there were no Plan. Moreover, the Plan is the result of an extensively negotiated settlement, which avoids costly litigation that would deplete the funds available for creditors. These factors, among others, demonstrate that the Plan provides greater recoveries to creditors than would be realized in a chapter 7 liquidation, the costs of which would deplete much of the recoveries from the liquidation of the Debtor's assets. Based on the Liquidation Analysis, the Plan Proponents believe that holders of Claims will receive equal or greater value as of the Effective Date than such holders would receive in a chapter 7 liquidation.

Accordingly, the Plan Proponents believe that confirmation of the Plan will provide creditors in the Impaired Class with value that is not less than (and, in certain cases, substantially greater than) the amount that such holder would so receive or retain if the Debtor was liquidated under chapter 7. The Plan meets the "best interests" test.

# ARTICLE XII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, alternatives to the Plan include: (a) continuation in chapter 11 and formulation of an alternative plan or plans of reorganization, (b) liquidation of the Debtor under chapter 7 of the Bankruptcy Code, or (c) dismissal of the Debtor's bankruptcy case.  Each of these possibilities is discussed in turn below.

### 12.1    Alternative Plan of Reorganization

The Plan is the product of extensive negotiations among the Plan Proponents and reflects a balance of the respective interests held by the parties.  If the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate a different plan of reorganization.  During the negotiations prior to the filing of the Plan, however, the Plan Proponents explored various alternatives to the Plan and believe that the Plan enables the Reorganized Bestwall to emerge from the Reorganization Case more successfully and expeditiously than any alternative plan, while preserving and maximizing the Debtor's assets, and allowing claimants of the Debtor to realize the highest recoveries under the circumstances.

### 12.2    Liquidation under Chapter 7

If the Plan is not confirmed, the Reorganization Case could be converted to liquidation cases under chapter 7 of the Bankruptcy Code.  In chapter 7, a trustee would be appointed to promptly liquidate the assets of the Debtor.

As described above in the Liquidation Analysis, the Plan Proponents believe that a liquidation under chapter 7 would result in a substantial diminution in the value of the Debtor's Estate.  The Plan Proponents further believe that it is likely that distributions in a chapter 7 liquidation would not occur for a substantial time, primarily due to, among other things, the time required to liquidate the Debtor's assets.

### 12.3    Dismissal of Bankruptcy Case

If the Plan is not confirmed, the Plan Proponents may seek to continue prosecuting the Motion to Dismiss II or initiate another effort to have the Debtor's bankruptcy case dismissed and have the Debtor returned to the various state court litigations.  The Plan Proponents believe that while a return to the state law tort system is superficially appealing, dismissal would increase the litigation burden facing individual plaintiffs as such plaintiffs may need to challenge the divisive merger transaction in order to recover from Georgia-Pacific or engage in litigation with Bestwall to ensure payment pursuant to the Funding Agreement.

# ARTICLE XIII.

## CERTAIN TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences expected to result from the consummation of the Plan. This discussion is only for general information purposes and only describes the expected tax consequences to holders of Asbestos PI Claims. It is not a complete analysis of all potential federal income tax consequences and does not address any tax consequences arising under any state, local or foreign tax laws or federal estate or gift tax laws. This discussion is based on the Internal Revenue Code of 1986, as amended (the "**IRC**" or "**Tax Code**"), Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the Internal Revenue Service (the "**IRS**"), all as in effect on the date of this Disclosure Statement. These authorities may change, possibly retroactively, resulting in federal income tax consequences different from those discussed below. No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance that the IRS will not take a contrary position regarding the federal income tax consequences resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

This discussion does not address all federal income tax considerations that may be relevant to a holder considering that holder's circumstances. In addition, it does not address considerations relevant to holders' subject to special rules under the federal income tax laws, such as holders subject to the alternative minimum tax, holders who utilize installment method reporting with respect to their Claims, non-U.S. holders and U.S. holders who have a functional currency other than the U.S. dollar. This discussion also does not address the U.S. federal income tax consequences to holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to accept or deemed to reject the Plan. Additionally, this discussion does not address any consideration being received other than in a person's capacity as a holder of a Claim.

**Holders should consult their own tax advisors regarding the U.S. federal income tax consequences to them of the consummation of the Plan and the receipt of amounts from the Asbestos PI Trust, as well as any tax consequences arising under any state, local or foreign tax laws, or any other federal tax laws. The Debtor and Reorganized Bestwall shall not be liable to any person with respect to the tax liability of a holder or its Affiliates.**

13.1    Tax Consequences to the Debtor – Section 524(g) Alternative

(a)    *Treatment of the Asbestos PI Trust*

It is anticipated that the Asbestos PI Trust will be a "qualified settlement fund" within the meaning of the Treasury Regulations promulgated under Section 468B of the Tax Code. Such Treasury Regulations provide that a fund, account, or trust will be a qualified settlement fund if three conditions are met. First, the fund, account, or trust must be established pursuant to an order of or be approved by a government authority, including a court, and must be subject to the continuing jurisdiction of that government authority. A court order giving preliminary approval to a fund, account, or trust will satisfy this requirement even though the order is subject to review

or revision.  Second, the fund, account, or trust must be established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one claim asserting liability arising, among other things, out of a tort.  Third, the fund, account, or trust must be a trust under applicable state law or have its assets physically segregated from the other assets of the transferor and persons related to the transferor.  The Asbestos PI Trust has been established with the express purpose of satisfying the requirements of a qualified settlement fund and will be treated as a separate taxable entity.  Its modified gross income will generally be subject to U.S. federal income tax at the highest rate applicable to estates and trusts (currently 37%).  For purposes of determining the Asbestos PI Trust's modified gross income, payments to the Asbestos PI Trust and payments from the Asbestos PI Trust to holders of Asbestos PI Claims in settlement of their Claims will not be considered.

13.2    Tax Consequences to Holders of Asbestos PI Claims

The tax consequences of payments received by holders of Asbestos PI Claims will depend on the individual nature of each such Claim and the circumstances and facts applicable to such holder at the time each such payment is made.  To the extent that payments from the Asbestos PI Trust to holders of Asbestos PI Claims constitute damages received by such holders on account of physical injuries or physical sickness, such payments should not constitute gross income to such recipients under Section 104 of the Tax Code, except to the extent that such payments are attributable to medical expense deductions allowed under Section 213 of the Tax Code for a prior taxable year.  To the extent that any payments from the Asbestos PI Trust to holders of Asbestos PI Claims constitute damages received by such holders because of claims other than physical injuries (such as lost wages) or received as interest (or any other amounts not excludable from income under Section 104 of the Tax Code), such payments will be includible in gross income to such holders.

All distributions to holders of Asbestos PI Claims under the Plan are subject to any applicable withholding.  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate.  Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number ("**TIN**"), (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**The foregoing is intended to be a summary only and not a substitute for careful tax planning with a tax advisor.  The federal, state, local and foreign income tax consequences of the Plan are complex and, in some cases, uncertain.  Such consequences also may vary based on the individual circumstances of each holder of an Asbestos PI Claim.  Accordingly, each holder of a Claim is strongly urged to consult with its, his or her own tax advisor regarding the federal, state, local and foreign income tax consequences of the Plan.**

**Furthermore, any U.S. federal tax discussion contained in this Disclosure Statement, the Plan and any Plan Documents, and any exhibits or attachments to any such documents, was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such taxpayer by the Internal Revenue Service.**

## ARTICLE XIV.

## CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that the Plan is in the best interests of all holders of Claims and urge all holders of Impaired Claims in Class 4 and holders of Equity Interests in Class 6 entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be actually received on or before 4 p.m. (Prevailing Eastern Time), on [ ], 2020.

Dated: July 22, 2020
Charlotte, North Carolina

Respectfully submitted,

OFFICIAL COMMITTEE OF
PERSONAL INJURY ASBESTOS
CLAIMANTS

By: _____
    Steven Kazan, Chair

FUTURE CLAIMANTS'
REPRESENTANTIVE

By:

_____
    Sander L. Esserman, Esquire

***COUNSEL FOR THE PLAN PROPONENTS***

**CO-COUNSEL FOR THE
ASBESTOS PI COMMITTEE:**

Natalie D. Ramsey
Davis Wright
Laurie Krepto
ROBINSON & COLE LLP
1201 North Market Street, Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile: (302) 516-1600
Email:  nramsey@rc.com
      dwright@rc.com
      lkrepto@rc.com

-and-

Glenn C. Thompson
HAMILTON STEPHENS STEELE
+ MARTIN, PLLC
525 North Tryon Street, Suite 1400
Charlotte, North Carolina 28202
Telephone: (704) 344-1117
Facsimile: (704) 344-1483
Email: gthompson@lawhssm.com

Judy D. Thompson
Linda W. Simpson
JD THOMPSON LAW
Post Office Box 33127
Charlotte, North Carolina 28233
Telephone: (828) 489-6578
Email: jdt@jdthompsonlaw.com
      lws@jdthompsonlaw.com

**CO-COUNSEL FOR THE FCR:**

Edwin J. Harron
Sharon M. Zieg
YOUNG CONAWAY STARGATT &
TAYLOR LLP
1000 North King Street
P.O. Box 391
Telephone: (302) 571-6600
Wilmington, Delaware 19801
Email: eharron@ycst.com
        szieg@ycst.com

-and-

Felton E. Parrish
HULL & CHANDLER, P.A.
1001 Morehead Square Drive, Suite 450
Charlotte, North Carolina 28203
Telephone: (704) 375-8488
Email: fparrish@lawyercarolina.com

## EXHIBIT A

**The Plan**

## EXHIBIT B

**Financial Projections**

(to be filed at a later date)

# **EXHIBIT C**

**Liquidation Analysis**