**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re:<br><br>BESTWALL LLC,[1]<br><br>　　　　　　　　　Debtor. | Chapter 11<br><br>Case No. 17-31795 (LTB) |

**OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS' MOTION (I) OBJECTION TO AND MOTION TO STRIKE SUBPOENAS ISSUED BY DEBTOR TO ALDRICH PUMP LLC, DBMP LLC, MURRAY BOILERS LLC, AND PADDOCK ENTERPRISES, LLC; OR (II) IN THE ALTERNATIVE, TO DETERMINE THAT THE DEBTOR HAS WAIVED PRIVILEGE TO THE CASE FILES OF ANY MATCHED CLAIMANT**

The Official Committee of Asbestos Claimants (the "Committee"), by and through its undersigned counsel, objects to and moves to strike the Subpoenas to Produce Documents, Information, or Objects or Permit Inspection of Premises in Bankruptcy Case (Or Adversary Proceeding) (the "Subpoenas"), served on Aldrich Pump LLC, Paddock Enterprises, LLC, DBMP LLC, and Murray Boiler LLC (collectively, the "Subpoenaed Parties") by Bestwall LLC (the "Debtor" or "Bestwall"), copies of which are attached hereto as Exhibit A. The Subpoenas seek the production of "all electronic information and data contained in any claims database within [Subpoenaed Party's] possession, custody or control whose purpose is or was to track mesothelioma claims against [Subpoenaed Party or affiliates of Subpoenaed Party] before the Petition Date" related to an extensive list of tens of thousands of Bestwall's prepetition settled claims. *See* Subpoena, Ex. A ¶ 4.

---

[1] The last four digits of the Debtor's taxpayer identification number are 5815. The Debtor's address is 133 Peachtree Street, N.W., Atlanta, Georgia 30303.

The Subpoenas are classic examples of a "witch hunt"—"an intensive inquiry, originally or purportedly to discover and expose dishonesty, subversion, or other wrongdoing, the scope and conclusions of which often include and bring harm to innocent persons or their reputations through reliance on hearsay or circumstantial evidence"[2]—designed to impugn the integrity of tens of thousands of Bestwall's prepetition settled claimants (and by extension, the present and future claimants, the state court system, and bankruptcy court-overseen asbestos personal injury trusts) without Bestwall ever demonstrating that those same tens of thousands of Bestwall prepetition settled claimants were actually involved in dishonesty, wrongdoing, "evidence suppression," or other conduct that the Debtor seeks to characterize as "fraudulent."

The Court should not give the Debtor free reign to proceed with this witch-hunt, especially where it is not able to *demonstrate* that the information it is seeking relates to ***any specific claimant*** that the Debtor is able to specifically allege "evidence suppression" or similar conduct.  The Debtor issued the Subpoenas—along with its Trust Discovery subpoenas—on the justification that it has maintained since the Petition Date that it has evidence of widespread fraud in its prepetition claims settlements; but inconsistently argues that the discovery is necessary to determine the existence of such behavior.  Now turning to the other debtors in pending bankruptcy cases with overlapping professionals, including importantly Bates White, the Debtor has sought information from those debtors' confidential claimant databases to continue its effort to review every single file in its settlement history not to objectively assess whether it knew everything it should have known before settling—but instead to try to find something it did not know so that it can accuse a claimant of misconduct. It is a simply a bridge too far to permit the Subpoenas—which appear to be an end

---

[2] Dictionary.com, LLC, https://www.dictionary.com/browse/witch-hunt (last visited Mar. 21, 2022); *see also* Webster's Third New International Dictionary Unabridged 2626 (56th printing Jan. 2020) (defining witch-hunt as "an investigation or campaign against dissenters conducted on the pretext of protecting the public welfare and resulting in public persecution and defamation of character").

run around the issues the Debtor faces in the Delaware District Court. The Court should strike the Subpoenas issued to Aldrich Pump LLC, DBMP LLC, Murray Boilers LLC, and Paddock Enterprises, LLC.

Tellingly, the Debtor has only sought to subpoena other debtors in pending bankruptcy cases.[3] This is unusual because the Debtor has taken the position that the purported "evidence suppression" would relate to tens, if not hundreds, of additional solvent tort system co-defendants, but the Debtor has not sought to serve discovery on those co-defendants. Allowing the Subpoenas to stand now would undoubtedly result in other interested parties, the press, and other co-defendants likewise subpoenaing bankruptcy entities for confidential information—bankruptcy should not change the confidentiality of each debtors' claims resolution database or be a forum for discovery for litigation objectives of entities whose purposes lie outside the bankruptcy case.[4]

Finally, if the Court denies the Committee's motion, it nevertheless should order that the Debtor has waived privilege with respect to the claims files of *each and every* Bestwall settled claimant that matches in the databases of the Subpoenaed Parties. By definition, the Debtor is seeking to use the information gained from the Subpoenaed Parties to support its litigation position that there has been "evidence suppression." The Court has stated that at some point it will find that an at-issue waiver has occurred and that the Committee is therefore entitled to the Debtor's privileged documents. If the Court permits the Subpoenas to go forward, then that time is now—

---

[3] As the Court is aware, the Aldrich Pump LLC and Murray Boilers LLC bankruptcy cases are jointly administered and pending before Judge Whitley. *See In re Aldrich Pump LLC, et al.*, Case No. 20-30608. Likewise, DBMP LLC's bankruptcy case is also pending before Judge Whitley. *See In re DBMP LLC*, Case No. 20-30080. Paddock Enterprises, LLC's case is pending before Judge Silverstein of the United States Bankruptcy Court for the District of Delaware. *See In re Paddock Enters., LLC*, Case No. 20-10028 (Bankr. D. Del.).

[4] The Committee also notes that the Debtor's issuance of the Subpoenas further demonstrates that the Debtor's desire to impose a sample on the Committee is inequitable as the Debtor appears to have no intention of constraining its own discovery to any sample.

at least for the Bestwall settled claimants that match in the Subpoenaed Parties' databases. The Debtor should not be permitted to continue to have it both ways.

The Committee urges the Court to strike the Subpoenas and prohibit Bestwall from seeking the requested information from the Subpoenaed Parties.

## ARGUMENT

1. Pursuant to Federal Rule of Civil Procedure 45 ("Rule 45"), Courts in the Western District of North Carolina have the authority to quash or modify a subpoena:

> When a subpoena "subjects a person to undue burden," the district court "where compliance is required must quash or modify" that subpoena. Fed. R. Civ. P. 45(d)(3)(A)(iv). "The determination of the reasonableness of a subpoena requires the court to balance the interests served by demanding compliance with the subpoena against the interests furthered by quashing it, weighing the benefits and burdens, considering whether the information is necessary and whether it is available from another source." *Eshelman v. Puma Biotechnology, Inc.*, 2017 WL 5919625, at *4 (E.D.N.C. Nov. 30, 2017).

*La Michoacana Nat., LLC v. Maestre*, No. 3:17-CV-727-RJC-DCK, 2021 WL 638989, at *1 (W.D.N.C. Feb. 18, 2021). Further, Rule 45(d)(3)(A)(iii) requires courts to quash a subpoena that seeks "disclosure of privileged or other protected matter." *See* Fed. R. Civ. P. 45(c)(3)(A)(iii). Under this Rule, a court can quash a subpoena that seeks highly personal or confidential personal information. *Wilshire v. Love*, 2015 WL 1482251 (S.D. W. Va. 2015) (quashing subpoena requesting records that may contain "highly personal, highly sensitive, or embarrassing information.").

2. Although the Committee is not the party to whom the Subpoena was directed, it can seek protection from "discovery by the overlapping and interrelated provisions of Rule 26 and 45 of the Federal Rules of Civil Procedure. A non-party moving to quash a subpoena is in the same position as a party moving for a protective order that such discovery not be allowed."

*Insulate America v. Masco Corp.*, 227 F.R.D. 427, 432 (W.D.N.C. 2005). Here, as the entity which represents the interests of the present claimants in this case, and is the party to the estimation proceeding, the Committee also has a direct interest in the Subpoenas. "The court hearing the motion is required to apply the balancing standards: relevance, need, confidentiality and harm. Even if the information sought is relevant, discovery is not allowed where no need is shown, or where compliance is unduly burdensome, or where the potential harm caused by production outweighs the benefit." *Id*. Here, the Subpoenas should be stricken because the disclosure of this highly confidential information continues the Debtor's effort to engage in a witch-hunt against current and future claimants—the Debtor is seeking to impugn all individuals who seek to hold it responsible for its knowing manufacture and distribution of a deadly carcinogen based on hearsay or circumstantial evidence. The settled claimants are not before this Court—because the Debtor failed to notice them—and the Court must protect the tens of thousands of Bestwall's prepetition settled claimants from harm and the Debtor's overreach.

3. If Bestwall is permitted to pursue discovery through Subpoenas that seek information from the confidential asbestos databases of other entities in pending bankruptcy cases, it is almost certain that discovery directed to Bestwall and against the Bestwall present claimants will follow.

**I.    The Subpoenas Should be Disallowed as They Seek Disclosure of Highly Personal, Confidential and/or Privileged Information.**

4. The Committee objects to and seeks to strike the Subpoenas as they seek production of the most confidential and privileged personal information, and therefore the Committee seeks to prohibit any information from the Subpoenaed Parties' asbestos claims databases being provided to Bestwall. Further, settlement information related to asbestos claims contained in the

Subpoenaed Parties' database may be privileged or subject to separate agreements between the Subpoenaed Parties or their predecessors, and the claimants which prohibit any disclosure.

5. Under § 107(c), a bankruptcy court "may protect an individual, with respect to . . . [certain] types of information to the extent the court finds that disclosure . . . would create undue risk of identity theft or other unlawful injury to the individual or the individual's property." The types of information include "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual." 18 U.S.C. § 1028(d).  A bankruptcy court also "may protect" under § 107(c) any "[o]ther information" in a paper that contains any "means of identification."  Congress agreed that public access to large caches of personally identifiable information such as the asbestos claims databases would create a risk of identity theft—"Identity theft is a predictable outcome when criminals have virtually unfettered access to an obvious public database of people who are already vulnerable in public bankruptcy court files." 151 Cong. Rec. S2,141.

6. It is not determinative to the analysis whether some or all of this information may be available elsewhere, including publicly filed complaints, as the asbestos victims still maintain a right to keep their information protected. "[T]here is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country and a computerized summary located in a single clearinghouse of information." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 764 (1989).  "In an organized society, there are few facts that are not at one time or another divulged to another," but that does not mean that there is no interest in saving them from further disclosure.  *See Ostergren v. Cuccinelli*, 615 F.3d 263, 284 (4th Cir. 2010) (quoting *Reporters Comm.*, 489 U.S. 749, 763 (1989)). And "[a]n individual's interest in controlling the dissemination

of information regarding personal matters does not dissolve simply because that information may be available to the public in some form." *U.S. Dep't of Defense v. Fed. Labor Relations Auth.*, 510 U.S. 487, 500 (1994).

7. Apart from sensitive personally identifying information, the entire purpose of the asbestos claims databases is to track asbestos-related diseases in victims. Courts have recognized a strong privacy interest in such medical information and taken that "right to privacy . . . [into] consideration in the balancing process that courts conduct in deciding whether to file a document under seal." *See Everett v. Nort*, 547 F. App'x 117, 122 n.9 (3d Cir. 2013); *In re Motions for Access of Garlock Sealing Techs. LLC*, 488 B.R. 281, 301 (D. Del. 2013), as corrected (Mar. 15, 2013) ("privacy interests of the individuals identified in the 2019 Exhibits weigh against disclosure of the 2019 Exhibits to Garlock. The Bankruptcy Court was properly concerned with issues of privacy and possible identity theft.").

8. Under § 107(c), a bankruptcy court can deny access to a person's name when, for example, that name appears in a filing that would necessarily associate them with a medical condition. *See In re L.K.*, No. 1-05-13887-dem, 2009 WL 1955455, at *2 (Bankr. E.D.N.Y. July 6, 2009) (prohibiting publication of debtor's full name under § 107 because association of name with medical condition would be "detriment[al]"). Courts have noted, "[w]e may not mind that a person knows a general fact about us, and yet feel our privacy invaded if he knows the details. For instance, a casual acquaintance may comfortably know that I am sick, but it would violate my privacy if he knew the nature of the illness." *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 n.5 (3d Cir. 1980) (internal quotation marks omitted) (quoting Charles Fried, *Privacy*, 77 Yale L.J. 475, 483 (1968) (footnote omitted)). And yet this is precisely the information that the Debtor seeks to causally trade amongst asbestos defendants.

9. Sensitive identifying information of a highly personal nature including names, addresses, social security numbers, medical diagnoses, other identifiers, and "other information," is ubiquitous in the asbestos claims databases sought by the Debtor's Subpoenas. The release by the Subpoenaed Parties of their asbestos claims databases would pose an undue risk to the privacy interests of those asbestos victims, which is a basis for protecting information under § 107. *See, e.g.*, *In re Peregrine Sys., Inc.*, 311 B.R. 679, 690 (D. Del. 2004) ("The bankruptcy court was appropriately concerned with the privacy interests of third parties who were not before the court, and it is well established that a court has the power and discretion to strike a document in order to protect legitimate interests."); *see In re Pittsburgh Corning Corp.*, Case No. 04-1814, 2005 WL 6128987, at *10 (W.D. Pa. Sept. 27, 2005), *aff'd*, 260 F. App'x 463 (3d Cir. 2008) (The Bankruptcy Court was free to hold that "countervailing concerns justify the continued protection of the information.").

10. Additionally, the purposes of any party seeking access to sensitive information are and always have been relevant to the question of access. *See also In re Motions for Access of Garlock Sealing Techs. LLC*, 488 B.R. 281, 302 (D. Del. 2013) (conditioning access based on purposes for which the 2019 Exhibits were requested). Section 107(c) specifically permits a court to protect information "to the extent the court finds that [its] disclosure . . . would create undue risk of identity theft or other unlawful injury." An entity's purposes are relevant to this balancing test. *See, e.g.*, *Orion Pictures Corp.*, 21 F.3d at 27 (applying § 107 and stating that "[i]n limited circumstances, courts must deny access to judicial documents--generally where open inspection may be used as a vehicle for improper purposes"); *In re Rivera*, 524 B.R. 438, 442 (Bankr. D.P.R. 2015) (access may be denied under § 107 "if access is sought for an improper purpose"); *In re Williams*, Case Number 15-71767, 2017 WL 6278764 at *2 (Bankr. W.D. Va. 2017) ("Section

107(a) of the Bankruptcy Code codifies the public's common law right to inspect and copy judicial records . . . [but] [t]his common law right is not absolute, however, and concealment may be necessary if access is sought for an improper purpose."); *see also Kaiser*, 327 B.R. at 560. It would therefore be appropriate for the Court to consider the Debtor's purpose for seeking this information before granting the Subpoenas.

11. Here, the protection of information is particularly critical because the Debtor and the Subpoenaed Parties' goals are aligned. Each of Bestwall, DBMP, Aldrich and Murray engaged in a divisional merger and have sought estimation. Each retained Bates White as its estimation expert. Bates White vowed to maintain the separateness of the databases and not to use information from one case in another. Now, Bestwall seeks to undo that critical aspect of Bates White's retention.

12. Further, all of the subpoenaed parties but Paddock Enterprises LLC have retained Jones Day as lead bankruptcy counsel.[5] DBMP and Bestwall have each retained the same special asbestos counsel, Robinson Bradshaw.

13. Therefore, it falls to the Committee to challenge the Subpoenas and highlight the potential pitfalls that will result if the Court fails to strike the Subpoenas.

14. The fact that Bestwall embarked on this effort against potentially friendly targets together with the fact that it did not seek to obtain the same information from entities that are actively defending asbestos litigation in the tort system alone raises significant concern.

15. While the Committee believes that this information is privileged, confidential, and should be protected, should the Court grant the Subpoenas in some form, protocols should be implemented to protect against the risk of damages the requested scale and manner of the

---

[5] Paddock Enterprises, LLC is represented by Latham & Watkins, LLP.

production imposes on the asbestos claimants, relating to a possible data breach with regard to their social security numbers and other personal confidential information. That the Debtor is seeking to aggregate this information would have the effect—intended or consequential—of making it a desirable target for other debtors, active defendants, or any other entity that is seeking to bully victims from pursuing their right to seek compensation from an admitted tortfeasor. If the Court does not strike the Subpoenas, it should strictly limit the manner of acquiring the information and its use so that any impingement on the asbestos claimants' privacy rights is minimized and the inquiry is no more revealing of personal information than is required in the Court's judgment to achieve legitimate discovery objectives material to the Court's ordered estimation proceeding.

16. These arguments regarding privilege and confidentiality are not novel to this bankruptcy, in fact the Court has ordered that similar claimant information, where obtained, be treated as confidential and subject to use restrictions. *Order Pursuant to Bankruptcy Rule 2004 Directing Submission of Personal Injury Questionnaires by Pending Mesothelioma Claimants and Governing the Confidentiality of Responses* [Dkt. No. 1670]. Additionally, protective orders governing the confidentiality of these databases and the claimants' underlying personal information have been entered in certain of the respective Subpoenaed Parties' bankruptcy cases. *See* Agreed Protective Order Governing Confidential Information [Dkt. No. 345], *In re Aldrich Pump LLC, et al.*, Case No. 20-30608 (Bankr. W.D.N.C. Sept. 23, 2020) and Agreed Protective Order Governing Confidential Information, *In re DBMP LLC* [Dkt. No. 251], Case No. 20-30080 (Bankr. W.D. N.C. Apr. 13, 2020). In this case, the asbestos claims databases have been subject to and reviewed on a professionals' eyes-only basis for the Committee and FCR law firms and their respective estimation experts, making it particularly concerning that the Debtor—who is also

counsel for the Subpoenaed Parties in their bankruptcy cases—is seeking wholesale release of the Subpoenaed Parties' comparable asbestos claimant information.

17.     These confidentiality protections make clear that the asbestos claims databases are not to serve as information clearinghouses or "public libraries" for entities that wish to obtain confidential claimant information for their own purposes. Based on these prior lengths the parties have agreed to and the courts have ordered to protect this information, it would be rational for each Subpoenaed Party and their counsel, as well as any claimant whose confidential information could be disclosed, to take reasonable and necessary steps to protect the confidentiality of the claim database information when that information is sought by third parties.

18.     Other courts that have addressed similar concerns have put strict limitations of the use of personal information, which these asbestos claim databases indubitably contain. In particular *In re Owens Corning*, 560 B.R. 229 (Bankr. D. Del. 2016), *aff'd by In re Motions Seeking Access to 2019 Statements*, 585 B.R. 733 (D. Del. 2018), *aff'd by In re AC&S Inc.*, 775 Fed. App'x 78 (3d Cir. 2019) (the "Access Decision") refused to grant Honeywell and Ford unlimited access to Bankruptcy Rule 2019 exhibits. Instead the Court granted access solely for a three-month period, after which the Bankruptcy Rule 2019 exhibits had to be destroyed. Honeywell and Ford were further prohibited from sharing the identity of individuals by name or other identifying means. Among other restrictions, the Access Order required the removal of the retention agreements and all but the last four digits of social security numbers, and it imposed the costs associated with the efforts of the facilitator on Appellants.[6]

---

[6] The Delaware District Court considered these cases when granting the Delaware Trusts' motion to quash due to privilege and confidentiality concerns. *See generally* Bestwall District Court Trust Discovery Decision. Similarly, in the GM case, when presented with similar requests, Judge Gerber took note of the sensitivity of the information sought and drove the parties to an agreed order that implemented such a protocol. Judge Gerber noted that "the extent to which the request imposes an unreasonable burden and the extent to which disclosure of the information might prejudice individual tort litigants in the future, one-on-one litigation down the road" was among his primary concerns. With that concern in mind, he said, "I wonder whether providing the information in the manner [the asbestos committee's counsel] proposed, akin to the way we did it in *Chemtura*, might not be

## II. The Discovery Sought By the Debtor Is Not Proportional to the Needs of the Case.

19. Both party and non-party civil discovery is limited by the scope of Federal Rule of Civil Procedure 26(b)(1). *Va. Dep't of Corrections v. Jordan*, 921 F.3d 180, 188 (4th Cir. 2019). Discovery must be "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1); *Va. Dep't of Corrections*, 921 F.3d at 188-189; *see also Stone v. Trump*, 453 F. Supp. 3d 758, 766 (D. Md. 2020) ("To be relevant, the information must relate to a claim or defense and be proportional to the needs of the case.").

20. The Subpoenas present yet another aspect and additional expansion to the asbestos claims data the Debtor purports to need for estimation purposes. In the underlying tort system, however, as a co-defendant to the Subpoenaed Parties in certain asbestos cases, the Debtor had

---

materially more burdensome, and might better protect individual tort litigants' confidentiality." Hr'g Tr. at 100:9-13, *In re Motors Liquidation Co.*, Case No. 09-50026 (Bankr. S.D.N.Y.); *id*. at 101:21-25 attached as Exhibit B. When he authorized trust discovery to occur, he did so with the admonition that the parties were to work to implement such a protocol, noting that doing so would be "better in that compliance is likely to be more focused on the real issues, almost as fast in delivery of data, and likely faster with respect to data analysis, and more protective of individual asbestos litigant confidentiality." *Id*. at 105:16-20. Ultimately, the *Motors* court entered an order that required anonymization of the data. *See In re Motors Liquidation Co*., Case No. 09-50026 (Bankr. S.D.N.Y.), *Order Concerning ACC's Request for Anonymity Protocol* attached as Exhibit C. Likewise, in *Garlock*, this Court followed the same course in its ruling on non-mesothelioma discovery requests in that case. After lengthy argument about the motion which included discussion of an anonymization protocol, the Court noted that:

> we give heightened consideration to balancing the benefits to the potential harm and that, I think, for several reasons we need to be a little bit careful here. We're talking about inherently sensitive information in these databases that relate to third parties, the trust claimants. That includes personal identifiers, medical information, medical records, potentially financial and economic information about them and their families, and dissemination improperly could do harm to those people in a variety of ways, ranging from identity theft to, effectively, misuse in the tort system by other defendants.

*See* Hr'g Tr., *In re Garlock Sealing Techs., LLC* (Bankr. W.D.N.C. June 17, 2015) [Docket No. 4683] at 6:16-24. The Court thus concluded that it needed to be "extremely careful about that and believe that we need to make a heightened showing of use and need here." *Id*. at 7:1-2. Following Judge Gerber's lead, this Court concluded that "Basically, I'm inclined to allow discovery of all of the data, all of the relevant data—and we'll come back to that—on all claimants, but I want to anonymize the information before we get too far in the case." *Id*. at 7:20-23. The Court directed the parties to submit an order that followed the protocol in *GM*. *Id*. at 7:13-9:3. The Court ruled from the bench. *See* Hr'g Tr., *In re Garlock Sealing Techs., LLC* (Bankr. W.D.N.C. June 30, 2015) [Docket No. 4691].

access to the same sources of information as the Subpoenaed Parties, rendering the defendant-specific information in the Subpoenaed Parties' hands of diminishing value, particularly considering the information it has already requested from other sources. To the extent that the Debtor wants a complete re-do of its litigation history, that is an inappropriate goal of estimation.

21. The Debtor has made no showing that it sought complete information before settling. In fact, it acknowledges that it did not seek information on other exposures for the approximately 40% of cases it settled through docket or group settlements. It has made no showing for cases individually settled that it does not have the information it seeks from others in its own files, or could not obtain that information from the public record in the underlying tort litigation. At a minimum, the Debtor should not be permitted to seek information from other sources without a showing of need.

### III. The Subpoenas Are an Inappropriate Attempt to Circumvent the Delaware District Court Trust Discovery Order.

22. The Subpoenas seek information from the Subpoenaed Parties that is substantially similar to the information sought by the Trust Subpoenas.

23. The Court has previously instructed the Debtor that "the new subpoenas [issued in connection with Trust discovery] should also comply with Judge Connolly's June 17th decision which requires the 10 percent random sampling and the pre-production anonymization." Hearing Tr. 37:14-17 (Aug. 31, 2021). The instant Subpoenas seek to avoid these safeguards.

24. As of the date of this Objection, the Committee is not aware of any objection to the Subpoenas that have been made by the Subpoenaed Parties. As far as the Committee is aware of and based on a meet and confer with Bestwall's counsel and communications with counsel representing DBMP for both this Debtor and the certain Subpoenaed Parties advised by Bestwall's, at least three of the Subpoenaed Parties intend to produce to the Debtor the information from the

13

Subpoenaed Parties' asbestos claim databases per the Subpoena's request by the return date of April 1, 2022.

25. The Debtor's should not be permitted to avoid the Delaware District Court's Order by manipulating the system and these Subpoenas should not be permitted.

**IV. The Debtor Has Not Properly Noticed the Subpoenas.**

26. Rule 45 requires that a notice of subpoena be served on *all* parties to a case. Fed. R. Civ. P. 45(a)(4) (emphasis added). Simply posting the notice of service of the Subpoenas on the docket fails to absolve the Debtor of its duty to notice the service of the Subpoenas on all the parties in the bankruptcy case. Under the current notice procedures set forth in this case, only those parties on the Master Service List have received notice of the Subpoenas. *See Order Establishing Certain Notice, Case Management and Administrative Procedures* [Dkt. No. 65]. None of the Bestwall claimants affected by this subpoena, or their counsel, have been notified of the service of the subpoenas by the Debtor.

27. The claimants identified in the Subpoenas should have a right to notice and an opportunity to challenge the Debtor's attempts to obtain the claimant information from the Subpoenaed Parties. *See* Comments to Rule 45 ("The purpose of such notice is to afford other parties an opportunity to object to the production or inspection, or to serve a demand for additional documents or things." Fed. R. Civ. P. 45, N. of Advisory Comm. on Dec. 1991 Amend. of R. at Subd. (b)(1).

**V.     The Information Sought is Part of Koch Industries Ongoing Efforts to "Reform" Asbestos Liability Legislation.**

28.     The sensitive, confidential information of claimants is relevant to the Debtor's ultimate parent's—Koch Industries, Inc.—pervasive effort to reform asbestos liability laws.[7]

29.     Koch Industries, Inc., the Koch family as owners, its subsidiaries, and its affiliates (together "Koch") have been working to reshape state and federal asbestos legislation since 2005, when it acquired Georgia-Pacific and its then well-known asbestos liability. A central theme of these efforts has been vilification of victims.

30.     Koch has pursued this effort by funding media efforts to promote asbestos reform and vilify asbestos victims and attorneys.[8] Koch also contributed millions of dollars to organizations that lobby on behalf of asbestos reform.[9] The Koch leadership contributed at least $2.3 million to the American Legislative Exchange Council ("ALEC") which creates "model

---

[7] Koch has provided financial contributions with several of the large asbestos liability reform players including—American Legislative Exchange Council ("ALEC"), U.S. Chamber Institute for Legal Reform ("ILR"), Texas Public Policy Foundation ("TPPF"), and Americans for Prosperity Foundation ("APF")

[8] Koch Industries, ALEC and ILR are linked to an ongoing campaign led by the American Tort Reform Foundation, the Citizens Against Lawsuit Abuse and others to discredit asbestos plaintiffs and plaintiffs' lawyers. See infra fn. 11. The American Tort Reform Association has been the most visible organization on digital media to "smear" asbestos litigation and plaintiff lawyers through websites like JudicialHellholes.org and the now-defunct AsbestosLitigationWatch.org. The American Tort Reform Association received $2,477,500 in 2018 and 2019 from Civil Justice Reform Group which also provides funding to other Koch affiliated civil justice associations including the American Tort Reform Association.

[9] Koch, including their PACs, donated millions of dollars in the 2020 election cycle alone to the senators who sponsored or cosponsored the PROTECT Asbestos Victims Act of 2021, including Senators Tillis and Cornyn. Furthermore, these groups also donated large sums to a tangled web of PACs and super PACs that, while difficult to trace, likely donate to the Senators' re-election campaigns. For example, Koch Industries funnels hundreds of millions of dollars through its super PAC, Freedom Partners Action Group, to candidates who support its policy agenda. http://conservativetransparency.org/org/freedom-partners-action-fund/

15

policies" of asbestos reform.[10]  Currently seventeen (17) active bills targeting asbestos victims are based on ALEC's models.[11]

31. In addition to Koch's general efforts to curtail asbestos victims' rights, Koch funded the party that successfully pursued release of claimants' confidential files in *Garlock*.

32. From 2015 to 2019, Koch contributed $16,652,942[12] to Legal Newsline through the ILR which owns Legal Newsline.[13]  Legal Newsline has played a prominent role in asbestos liability reform by regularly publishing stories supporting ALEC's *Asbestos Claims Transparency Act* and other asbestos-related measures.  A search of the publication's website yields approximately 1,325 hits for "asbestos" and includes a dedicated section for asbestos-related content.[14]  The articles published by Legal Newsline from January 1, 2020 to February 11, 2022 are overwhelmingly supportive of asbestos defendants and critical of asbestos victims and their attorneys.

---

[10] $2,303,144 was contributed to ALEC from 2015 to 2019 by Koch.

https://pdf.guidestar.org/PDF_Images/2015/480/918/2015-480918408-0d951eeb-F.pdf;
https://pdf.guidestar.org/PDF_Images/2016/480/918/2016-480918408-0ea929e7-F.pdf;
https://pdf.guidestar.org/PDF_Images/2016/480/918/2016-480918408-0ea929e7-F.pdf;
https://pdf.guidestar.org/PDF_Images/2017/480/918/2017-480918408-100cbdaa-F.pdf;
https://pdf.guidestar.org/PDF_Images/2017/480/918/2017-480918408-100cbdaa-F.pdf;
https://charleskochfoundation.org/app/uploads/2021/04/CKF_2018_990.pdf;
https://charleskochfoundation.org/app/uploads/2021/04/CKF_2019_990.pdf;
https://pdf.guidestar.org/PDF_Images/2016/274/967/2016-274967732-0eabf91f-9.pdf;
https://pdf.guidestar.org/PDF_Images/2017/274/967/2017-274967732-1012b69d-9.pdf;
https://charleskochinstitute.org/app/uploads/2021/07/2018-CKI-990.pdf;
https://charleskochinstitute.org/app/uploads/2021/07/CKI-990-2019.pdf

[11] Georgia HB638/HB687; Illinois SB40/HB3926; Iowa HSB600/HF2501/SSB3167/SF2337; Missouri SB331; Nebraska LB421; North Dakota HB1207; South Carolina SB399/SB763; Tennessee SB873/HB1199; West Virginia HB2495/SB512

[12] https://projects.propublica.org/nonprofits/organizations/522109035/201603149349300985/full;
https://projects.propublica.org/nonprofits/organizations/522109035/201703179349303960/full;
https://projects.propublica.org/nonprofits/organizations/522109035/201813149349300116/full;
https://projects.propublica.org/nonprofits/organizations/522109035/201943159349301899/full;
https://projects.propublica.org/nonprofits/organizations/522109035/202003169349302910/full;
https://projects.propublica.org/nonprofits/organizations/522109035/202120919349300137/full;
https://projects.propublica.org/nonprofits/organizations/522109035/202003169349302910/full.

[13] https://web.archive.org/web/20111223212407/http://www.legalnewsline.com/about/

[14] https://legalnewsline.com/stories/tag/140-asbestos

33. Koch's own subsidiary, the Debtor here, is once again attempting to circumvent court safeguards and obtain confidential claimant information from the Subpoenaed Parties.

### VI. The Precedent That Not Striking the Subpoenas Will Have Will Dramatically Impact the Integrity of the Bankruptcy Courts and Bankruptcy Process

34. Here, the Debtor has embarked on an extraordinary effort to conduct discovery against Aldrich/Murray, DBMP, and Paddock for its own litigation purposes without seeking approval either from this Court or the courts presiding over the Aldrich/Murray, DBMP, and Paddock bankruptcy cases. Further, the discovery sought by the Debtor is not for use in those other bankruptcy cases, but for crafting an attack on the Debtor's own pending and future claimants.

35. If this discovery is permitted, every debtor will be targeted for information that it may possess that would assist another litigant in other, unrelated litigation. Every litigant could be pursued for information to assist another. In any mass tort case, the confidential, sensitive information of every claimant could lose all confidentiality just because the debtor filed for bankruptcy.

36. The potential for abuse of the process is more acute in this manufactured bankruptcy case. The fact that the Debtor seeks to use its bankruptcy to obtain information and achieve outcomes not available elsewhere should not be endorsed.

### VII. Alternatively, if the Court Fails to Strike the Subpoenas, Then it Must Order an At-Issue Waiver Regarding the Privileged Documents in the Claimant Files that Match in the Subpoenaed Parties' Claims Databases

37. The Court has stated that it "believe[s] there will be, there will come a time where there is, has been a waiver and what I'm not going to do is wait until we get to the eve of the estimation hearing to conclude that we have reached that point to the substantial prejudice, frankly, of the claimants and the FCR." *See Hr'g Tr.* 31:23-32:20 (Sept. 29, 2021). The Committee

submits that if the Debtor is permitted to proceed with the Subpoenas (which the Committee urges not happen) and receives matched claimant data from the Subpoenaed Parties, *then that time is now*.

38. In issuing the Subpoenas, the Debtor is not restricting itself to the claimant files already produced in discovery in this case nor is restricting itself to the "sample" that it has sought to impose on the claimant representatives (and which the Committee opposed). Any matched claimant information received from the Subpoenaed Parties will be picked apart by the Debtor for the purpose of looking for any fact that the Debtor can use to allege evidence suppression—even if those allegations are not factually true. The Committee should be entitled to receive all documents related to the matched claimants, including privileged documents. While the Committee believes that the Debtor has previously placed its actual settlement history at issue, the discovery it now seeks leaves no doubt that the Debtor has placed its settlement history—what it sought, what it knew, and why it actually settled—at issue.

[*Remainder of This Page Intentionally Left Blank*]

## **CONCLUSION**

WHEREFORE, for the reasons noted above, the Committee respectfully requests that this Court enter an order (i) striking the Subpoenas, or (ii) in the alternative, waiving any claim of privilege to documents in the claimant case files for any matched claimant in the Subpoenaed Parties' claims databases, and (iii) granting such other and further relief as this Court deems just and appropriate.

Dated: Charlotte, North Carolina
March 21, 2022

HAMILTON STEPHENS STEELE
+ MARTIN, PLLC

/s/ Glenn C. Thompson
Glenn C. Thompson (Bar No. 37221)
525 North Tryon Street, Suite 1400
Charlotte, North Carolina 28202
Telephone: (704) 344-1117
Facsimile: (704) 344-1483
gthompson@lawhssm.com

Linda W. Simpson
JD THOMPSON LAW
Post Office Box 33127
Charlotte, North Carolina 28233
Telephone: (828) 749-1865
lws@jdthompsonLaw.com

Natalie D. Ramsey (DE Bar No. 5378)
Davis Lee Wright (DE Bar No. 4324)
ROBINSON & COLE LLP
1201 North Market Street, Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile: (302) 516-1699
nramsey@rc.com
dwright@rc.com

*Counsel to the Official Committee of Asbestos Claimants*