**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

|  |  |
|---|---|
| In re | Chapter 11 |
| BESTWALL LLC,[1] | Case No. 17-31795 (LTB) |
| Debtor. | |

### OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS'
### MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

Pursuant to Article I, section 8, clause 4 of the U.S. Constitution and Rules 9013 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), the Official Committee of Asbestos Claimants (the "Committee") hereby moves to dismiss this Chapter 11 case for lack of subject matter jurisdiction. Bestwall is capable of fully paying all of its creditors in the ordinary course of business, and its economic viability is not threatened by its liabilities. Providing remedies available under the Bankruptcy Code to an entity such as Bestwall would extend bankruptcy court jurisdiction beyond the scope of the enabling powers granted to Congress by the Bankruptcy Clause of the Constitution. This Court lacks subject matter jurisdiction to provide Bestwall with any relief in this proceeding.

### INTRODUCTION

The Bankruptcy Clause of the Constitution grants Congress the power to legislate "on the subject of Bankruptcies." This grant is the source of the power of Congress to create Bankruptcy Courts. The Bankruptcy Courts created by Congress, therefore, only have those powers that fall

---

[1] The last four digits of the Debtor's taxpayer identification number are 5815. The Debtor's address is 133 Peachtree Street, N.W., Atlanta, Georgia 30303.

within the scope of the constitutional enabling clause.[2]  While these constitutional limits have not yet been fully delineated by the courts, it is clear that a company such as Bestwall, which is neither insolvent nor in need of bankruptcy for its survival, cannot qualify for bankruptcy relief. Bestwall's economic health and ability to timely and fully pay all its creditors, including all present and future asbestos claimants, is (and was at the time of its bankruptcy filing) unthreatened. Neither financial nor operational requirements have necessitated bankruptcy restructuring, and Bestwall is therefore not an eligible "subject of [B]ankruptc[y]" as that word was understood by the drafters of the Constitution and the delegates ratifying the Constitution.[3]

Before examining the statutory restrictions on debtors, including before considering whether a bankruptcy case should be dismissed as a bad faith filing, a bankruptcy court must first determine whether the entity seeking debtor status meets the fundamental requirements of the Constitution.  When this constitutional inquiry is made in the present case, it is clear that Bestwall's effort to obtain the protections afforded a debtor under the Bankruptcy Code is without support in the Constitution.[4]

The Funding Agreement between Georgia-Pacific and Bestwall affords Bestwall the financial wherewithal to meet all of its obligations as they come due, inside and outside of bankruptcy, now and in the future.  In the absence of bankruptcy, the Funding Agreement requires

---

[2] U.S. Const. art. I, § 8, cl. 4.

[3] Dictionary definitions in the Constitutional period support this conclusion. *See* William Perry, *The Royal Standard English Dictionary* 51 (1777) ("Bankrupt . . . one who cannot pay his debts;" "Bankruptcy . . . The state of a bankrupt"); Thomas Sheridan, *Dictionary of the English Language* 124 (1796) ("Bankrupt, In debt beyond the power of payment," "Bankruptcy, The state of a man broken, or bankrupt."); *see also D.C. v. Heller*, 554 U.S. 570, 576–77 (2008) ("In interpreting this text, we are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.' [] Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation.") (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)); *see also Gibbons v. Ogden*, 9 Wheat. 1, 188 (1824).

[4] Courts must construe statutes to avoid constitutional problems.  *See, e.g.*, *U.S. v. Simms*, 914 F.3d 229, 251 (4th Cir. 2019).

that Georgia-Pacific pay all costs and expenses associated with Bestwall's assigned asbestos

liabilities, specifically to pay:

> any and all costs and expenses of the Payee [Bestwall] incurred in the normal course
> of its business (including, without limitation, the payment of any indemnification
> or other obligations of the Payee owing to any managers or officers of the Payee)
> at any time when there is no proceeding under the Bankruptcy Code pending with
> respect to the Payee; . . . [and] any amounts necessary or appropriate to
> satisfy . . . the Payee's Asbestos Related Liabilities established by a judgment of a
> court of competent jurisdiction or final settlement thereof at any time when there is
> no proceeding under the Bankruptcy Code pending with respect to the
> Payee . . . and . . . any ancillary costs and expenses of the Payee associated with
> such Asbestos Related Liabilities and any litigation thereof, including the costs of
> any appeals; . . . [and] the funding of any amounts necessary to cause the Funding
> Account to contain at least $5,000,000 at such time . . . [and] the funding of any
> obligations of the Payee owed to the Payor or any Payor Affiliate . . . .[5]

Within bankruptcy, the Funding Agreement provides for Georgia-Pacific to pay all costs of the

bankruptcy and whatever is needed to fund a section 524(g) trust (effectively capping payment of

Bestwall's asbestos-related liabilities), specifically to pay:

> any and all costs and expenses of the Payee [Bestwall] incurred during the pendency
> of any Bankruptcy Case that are necessary or appropriate in connection therewith,
> including the costs of administering the Bankruptcy Case and any and all other
> costs and expenses of the Payee incurred in the normal course of its business
> (including, without limitation, the payment of any indemnification or other
> obligations of the Payee owing to any managers or officers of the Payee) . . . [and]
> the Payee's Asbestos Related Liabilities in connection with the funding of a trust
> under section 524(g) of the Bankruptcy Code for the benefit of existing and future
> claimants that is included in a plan of reorganization for the Payee confirmed by a
> final, nonappealable order of the Bankruptcy Court and the District Court,
> and . . . any ancillary costs and expenses of the Payee associated with such
> Asbestos Related Liabilities and any litigation thereof, including the costs of any
> appeals; [and] . . . the funding of any amounts necessary to cause the Funding
> Account to contain at least $5,000,000 at such time; and . . . the funding of any
> obligations of the Payee owed to the Payor or any Payor Affiliate . . . .[6]

---

[5] *Decl. of Tyler L. Woolson in Support of First Day Pleadings* at Annex 2: Funding Agreement (the "Funding Agreement") at § 1, "Permitted Funding Use" (Nov. 2, 2017) [Dkt. No. 2].

[6] *Id.*

From the early days of this bankruptcy case, Bestwall has repeatedly told this Court that, with the support of the Funding Agreement it is fully capable of paying all asbestos claims in full.[7] Accepting those representations, this Court made several findings of fact that, when applied to a threshold constitutional inquiry, preclude Bestwall from satisfying the most basic constitutional requirements for bankruptcy protection:

- "Bestwall has substantial assets, owns ongoing active businesses, and receives substantial cash flow . . . .  Most importantly, ***Bestwall has the full ability to meet all of its obligations (whatever they may be) through its assets and New GP's assets, which are available through the Funding Agreement***, [] and to continue as a going concern."[8]

- "In addition to holding subsidiary stock worth approximately $145 million, Bestwall has millions of dollars in cash of its own.  It also has the Funding Agreement—which permits Bestwall to draw from New GP an uncapped amount of money to pay the costs of this Chapter 11 case and fund Bestwall's liabilities to the extent that its assets are insufficient to do so."[9]

- "Even outside of the Funding Agreement, Bestwall owns substantial assets and operating businesses that produce cash flow.  These include bank accounts that contain approximately $20 million in cash, real estate that generates monthly lease revenue, and, most materially, the equity interest in non-debtor PlasterCo, which is projected to generate $18 million in annual EBITDA in 2019 and beyond and whose equity is valued at approximately $145 million."[10]

- ***"[B]ecause of the Funding Agreement, the Debtor's ability to pay valid Bestwall Asbestos Claims after the 2017 Corporate Restructuring is identical to Old GP's ability to pay before the restructuring.***"[11]

Furthermore, a review of the developments subsequent to the above quoted findings demonstrates that Bestwall's financial wherewithal is even stronger than it was when this Court

---

[7] *See, e.g., Informational Br. of Bestwall LLC* 7–9 (Nov. 2, 2017) [Dkt. No. 12] (record citations omitted).

[8] *Mem. Op. and Order Denying the Official Comm. of Asbestos Claimants' Mot. for Dismissal, or Alternatively, Venue Transfer* ("Dismissal Order") 5 (July 29, 2019) [Dkt. No. 891] (emphasis added) (internal citations omitted).

[9] *Id.* at 6–7.

[10] *Id.* at 6 (internal citations omitted).

[11] *Mem. Op. and Order Granting the Debtor's Request for Prelim. Injunctive Relief* 8 (July 29, 2019) (Case No. 17-03105) [Adv. Dkt. No. 164] (emphasis added).

made those findings of fact.  For example, Bestwall created and funded a $1 billion qualified

settlement trust, which is being overseen by this Court.  In addition, New GP, the counterparty to

the Funding Agreement, has been financially successful and has continued to improve on many

annual economic metrics.  During the more than five-year period since Bestwall filed this

bankruptcy, New GP has reported that its equity value has increased by $7.1 billion to $27.8

billion.[12]  Simultaneously, New GP has upstreamed over $5 billion in dividends to its ultimate

parent, Koch Industries.

Bestwall is a fully solvent entity with much more than adequate funding to pay its liabilities

in the ordinary course without a bankruptcy reorganization.  Bestwall does not have any anticipated

short- or long-term inability to fully and timely satisfy all of its costs and liabilities.  There is no

threat to its economic viability that would require it to resort to the bankruptcy laws.

From the time of the Constitutional Convention, through the early days of the Republic,

through times of economic upheaval (including the Great Depression), right up to the modern day,

judges and scholars have continued to examine the Bankruptcy Clause in the Constitution in order

to determine who is eligible to be a debtor.  Growth of the Nation's economy, along with the

changing nature of economic threats, led to the expansion and development of bankruptcy law; but

such expansion and development has not been, and cannot be, unfettered.  Congress cannot grant,

and the bankruptcy courts cannot exercise, jurisdiction unless that jurisdiction is provided for in

the Constitution.  The Constitution's guiding principles provide important guardrails for the

---

[12] *Decl. of Julie A. Anderson* ("Anderson Decl.") ¶¶ 7–11 (Jan. 18, 2023) [Dkt. No. 2857].  "*After accounting for the payment of regular and special dividends since the Petition Date (including those paid in 2022)*, New GP's shareholder equity is forecasted to be approximately $27.8 billion." *Id*. at ¶ 11 (emphasis added).  As the Committee has argued previously, had GP, the actual tortfeasor filed for bankruptcy, the dividends would constitute a violation of the absolute priority rule—a fundamental creditor protection afforded by the Bankruptcy Code.  Hr'g Tr. Jan. 19, 2023 at 29:5–24 (N. Ramsey).  Additionally, had GP filed, it would have incentives to expedite resolution of a bankruptcy case; because Bestwall has no business and no purpose other than to have commenced this case, it has no such incentives.  Hr'g Tr. Sept. 4, 2019, at 11:8–15 (N. Ramsey); Hr'g Tr. Sept. 19, 2019, at 116:22–117:15 (N. Ramsey); Hr'g Tr. Sept. 24, 2020 at 29:19–25 (N. Ramsey).

jurisdiction of all courts, including Bankruptcy Courts.  Consistent with those guardrails, Congress created section 524(g) to provide for the resolution of certain asbestos liabilities while simultaneously protecting the vital interests of asbestos victims.[13]  Numerous companies whose viability (and even existence) was threatened by crushing asbestos liabilities utilized these procedures.  Unlike those companies, however, Bestwall is a putative debtor that is fully solvent and that faces no threat to its economic vitality and its ability to fully pay all creditors without disruption.  Bestwall is different.  By attempting to obtain relief from the Bankruptcy Court, Bestwall is seeking to take this Court through the constitutional guardrails and into a jurisdictional abyss.

There is simply no possible interpretation of the meaning of the Constitution's Bankruptcy Clause or of the more than 225 years of case law and legal history that can accommodate a Bestwall bankruptcy.  Here, there is no need for this Court to struggle with fine distinctions concerning all conceivable constitutional limits on eligible bankruptcy debtors.  Regardless of these potential fine distinctions, it is very clear that the Bankruptcy Clause of the Constitution does not authorize bankruptcy court jurisdiction over a well-capitalized entity facing no threat to its economic viability and whose creditors would obtain full and timely payment in the absence of bankruptcy.

This bankruptcy case should be dismissed because this Court does not have subject matter jurisdiction to entertain Bestwall's bankruptcy case.

---

[13] *See* Hon. Judith K. Fitzgerald, *Over-Thinking Ramifications of the Dismissal of LTL Management LLC's Bankruptcy* 1 HARV. L. REV. BANKR. ROUNDTABLE (Feb. 14, 2023), http://blogs.harvard.edu/bankruptcyroundtable/ 2023/02/14/texas-two-step-and-the-future-of-mass-tort-bankruptcy-series-postscript-and-analysis-of-third-circuit- dismissal-of-ltl-managements-bankruptcy/ ("Bankruptcy has been a remedy for debtors with mass tort liabilities for decades. But those debtors had obvious financial reasons for filing bankruptcy.").  The Committee's constitutional argument contained herein does not call into question prior appropriate uses of the bankruptcy system and/or section 524(g).  However, section 524(g) may only be accessed by a debtor that satisfies the constitutional requirements to be in bankruptcy; it is not an independent basis of federal court jurisdiction.

## JURISDICTION

The Court has jurisdiction over this motion under 28 U.S.C. §§ 157 and 1334.  For the purposes of a hearing on this Motion to Dismiss, venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) properly raised by motion under Bankruptcy Rules 9013 and 9014.  The legal authority for the relief requested herein is Article I, section 8, clause 4 of the U.S. Constitution.  Parties cannot create or agree to subject matter jurisdiction,[14] the soundness of which may be raised at any time.[15]

## BACKGROUND

1.     The Committee filed two previous motions to dismiss.  The first, the *Motion of The Official Committee of Asbestos Claimants to (I) Dismiss the Debtor's Chapter 11 Case for Cause as a Bad Faith Filing Pursuant to 11 U.S.C. § 1112(b), or Alternatively, (II) Transfer Venue in the Interest of Justice and for the Convenience of the Parties Pursuant to 28 U.S.C. § 1412* ("2018 Motion to Dismiss") [Dkt. No. 495], focused on the issue of bad faith, as analyzed under the Fourth Circuit *Carolin*[16] test.  The Fourth Circuit declined direct certification of this Court's denial of that motion to dismiss; the Committee's request for leave to appeal is presently pending before the District Court, which, to date, has not acted on it.  The Committee's second motion to dismiss asserted the Debtor failed to prosecute its bankruptcy case.  The Court denied that motion without prejudice.[17]

---

[14] *Brady Devel. v. RTC*, 14 F.3d 998, 1006 (4th Cir. 1994).

[15] *GO Computer v. Microsoft*, 508 F.3d 170, 175 n.2 (4th Cir. 2007).

[16] *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989).

[17] *Order Denying Mot. of the Official Comm. of Asbestos Claimants to Dismiss the Chapter 11 Case for Cause or Set Deadlines Regarding a Plan of Reorganization or the Prelim. Inj.* (Dec. 22, 2020) [Dkt. No. 1546].

2.      In prior pleadings, the Committee raised some of the underlying factual predicates

concerning Bestwall's ability to constitutionally qualify as a bankruptcy debtor.  The Committee's

objection to Bestwall's motion for a preliminary injunction, for example, pointed out that "[n]one

of Old GP, New GP or the Debtor has made any claim that Georgia-Pacific's Asbestos Liabilities

***threaten their financial viability*** or that their ***ability to pay all present and future asbestos***

***liabilities*** was ever in question."[18]  Similarly, in connection with arguments over estimation

methodology, the Committee stated that "the Debtor (because of New GP) and New GP (as well

as Old GP prior to the divisive merger) are balance sheet solvent, have short-term ***liquidity to meet***

***all of their respective obligations as they become due,*** and ***are not now and have no expectation***

***of ever being in financial distress***."[19]  In fact, as the Committee's counsel observed early on, "[t]he

debtor could have ***continued to exist doing whatever it was doing forever*** with no financial

impact."[20]

3.      Consistent with the principle that courts do not determine constitutional questions

unless necessary, the instant motion now raises the constitutional issue.  While the constitutionality

---

[18] *Obj. of the Official Comm. of Asbestos Claimants to the Debtor's Mot. for an Order (I) Preliminarily Enjoining Certain Actions Against Non-Debtors, or (II) in the Alternative Declaring that the Automatic Stay Applies to Such Actions and (III) Granting a TRO Pending a Full Hearing on the Mot.* 14 (Aug. 15, 2018) (Case No. 17-03105) [Adv. Dkt. No. 47] (emphasis added); *see also id.* at 2 (Georgia-Pacific's scheme "provid[es] a blueprint for asbestos defendants ***whose financial viability is not threatened*** by their asbestos liabilities[.]")

[19] *The Official Comm. of Asbestos Claimants' Mot. To Establish a Methodology for Estimating the Debtor's Joint Compound Asbestos Liabilities* ¶ 1 (No. 12, 2020) [Dkt. No. 1449] (emphasis added).

[20] Hr'g Tr. Nov. 9, 2018 at 29:22–23 (N. Ramsey) (emphasis added); *see also id.* at 19:20–22 (N. Ramsey) ("The objective futility test is also satisfied because this case has no relation to the statutory objective of resuscitating a financially troubled debtor"); *The Official Comm. of Asbestos Claimants' Omnibus Reply in Support of its Mot. to (I) Dismiss the Debtor's Chapter 11 Case for Cause as a Bad Faith Filing Pursuant to 11 U.S.C. § 1112(b), or Alternatively, (II) Transfer Venue in the Interest of Justice and for the Convenience of the Parties Pursuant to 28 U.S.C. § 1412* 12 (Oct. 17, 2018) [Dkt. No. 653] ("Bestwall is not the 'honest but unfortunate debtor' that the Bankruptcy Code is designed to protect, but instead is an entity carefully structured by a non-debtor to avoid the very process that provides the protections it seeks") (internal footnotes omitted); Hr'g Tr. Jan. 22, 2021 at 294:8–12 (N. Ramsey) ("The debtor's not balance sheet insolvent.  It's well funded through a funding agreement, according to what we've been told. Neither Bestwall nor Georgia-Pacific have indicated there is any financial distress, not today, not on the horizon"); *Williams v. U.S. Fid. & Guar. Co.*, 236 U.S. 549, 554 (1915) (bankruptcy is for "honest debtor[s]" suffering "from the weight of oppressive indebtedness . . .").

of subject matter jurisdiction over Bestwall's bankruptcy has not been explicitly raised before, the absence of subject matter jurisdiction may be raised at any time.[21]  The instant motion is a new and distinct argument from any previously raised; it also provides additional context for considering the proper scope and application of the Fourth Circuit's *Carolin* test.[22]  In light of the *LTL Mgmt.* decision[23] and the associated attention to the different articulations of the circuit tests for bad faith dismissal, the Committee believes that the Court should now address whether Bestwall is constitutionally eligible to be a debtor in bankruptcy.

4.      Presently pending before this Court is the motion to dismiss filed by a mesothelioma victim and his wife (the "Buckingham Motion").[24]  That motion was filed after the Third Circuit issued its decision dismissing LTL Management's bankruptcy case as a bad faith filing.  Relying extensively on *LTL Mgmt.*, the Buckingham Motion focuses on Bestwall's lack of good faith,[25] seeking dismissal pursuant to Bankruptcy Code sections 105 and 1112(b).  However, Buckingham's Reply in Support,[26] filed on the afternoon before the March 15, 2023 hearing, and the oral argument of Buckingham's counsel at the hearing on the Buckingham Motion, also characterized their argument as one of "subject matter jurisdiction."[27]

---

[21] *GO Computer*, 508 F.3d at 175 n.2.

[22] Because the debtor in *Carolin* was facing a threat to its viability and ability to fully pay all creditors, no party raised, and the Fourth Circuit assumed, subject matter jurisdiction.

[23] *LTL Mgmt., LLC v. Those Parties Listed on Appendix A (In re LTL Mgmt. LLC)* ("LTL Mgmt."), 58 F.4th 738 (3d Cir. 2023).

[24] *See Mot. to Dismiss of Claimants Wilson Buckingham and Angelika Weiss* (Feb. 17, 2023) [Dkt. No. 2882].

[25] *See, e.g.*, Buckingham Motion 8–9.  Indeed, the term "subject matter jurisdiction" does not appear in the argument section of the Buckingham Motion.

[26] *Claimants Wilson Buckingham and Angelika Weiss' Reply in Support of Mot. to Dismiss* ("Buckingham's Reply in Support") (Mar. 14, 2023) [Dkt. No. 2902].

[27] Hr'g Tr. Mar. 15, 2023, at 9:20–21.

5.     As counsel for the Committee explained during the March 15th hearing, as of the time of that hearing, the Committee already was working on the present motion, based on the constitutionality of exercising subject matter jurisdiction over Bestwall.[28]   The Committee suggested that this Court continue the hearing in order to avoid a circumstance in which the Court reached the issue of its subject matter jurisdiction before the Committee could be heard (a risk that was only evident to the Committee after Buckingham's Reply in Support was filed, and more evident after oral argument).

6.     While Buckingham's argument that the Court does not have subject matter jurisdiction appears to be based on statute, the present Motion by the Committee relies upon a different, constitutional, argument.

## ARGUMENT

## I.   THE BANKRUPTCY COURT HAS NO JURISDICTION OVER A PUTATIVE DEBTOR THAT FACES NO THREAT TO ITS ECONOMIC VIABILITY OR ITS ABILITY TO MAKE FULL AND TIMELY PAYMENT TO ALL OF ITS CREDITORS

7.     Bestwall, as the party claiming jurisdiction of a federal court, bears the burden of proving subject matter jurisdiction.[29]  Bestwall cannot meet that burden.

### A.   The Historical Record Supports Constitutional Limits On Who May Be A Bankruptcy Debtor

8.     As the Supreme Court has recognized, the resolution of constitutional issues in bankruptcy requires a consideration of the understanding and assumptions of the Founders and "[t]he history of the Bankruptcy Clause, the reasons it was inserted in the Constitution and the

---

[28] *Id*. at 23:19–24:7.

[29] *Piney Run Reservation Assn. v. Comm'rs of Carroll Cnty.*, 523 F.3d 453, 459 (4th Cir. 2008); *Demetres v. E. W. Constr.*, 776 F.3d 271, 272 (4th Cir. 2015).

legislation both proposed and enacted under its auspices . . . ."[30]  Further, the Supreme Court has noted that, "[t]he framers of the Constitution were familiar with Blackstone's Commentaries, and with the bankruptcy laws of England, yet they granted plenary power to Congress over the whole subject of 'bankruptcies[.]'"[31]  At the time of American independence, the English bankruptcy system was limited to involuntary proceedings where only a creditor could initiate bankruptcy proceedings against a debtor who was unwilling or unable to pay just debts.[32]  American courts have long recognized, however, that U.S. bankruptcy law was "not restricted to laws with such scope only as the English bankruptcy laws had when the constitution was adopted."[33]  Yet, the "subject of Bankruptcies" cannot and does not mean anything and everything.

9.      The classic *Commentaries on the Constitution* by Justice Story observed:

> Perhaps, as satisfactory a description of bankrupt law as can be framed is, that it is a law for the benefit and relief of creditors and their debtors, in cases in which the latter are unable or unwilling to pay their debts.  And a law on the subject of bankruptcies, in the sense of the constitution, is a law making provisions for cases of persons failing to pay their debts.[34]

10.     Likewise, in the 19th century, the court in *Kunzler v. Kohaus* said of the Bankruptcy Clause "I read the constitution thus: 'Congress shall have power to establish uniform laws on the subject of any person's general ***inability*** to pay his debts[.]'"[35]

---

[30] *Cent. Va. Comm. College v. Katz,* 546 U.S. 356, 362–63 (2006); *see also Allen v. Cooper,* 140 S.Ct. 994, 1002 (2020) (the exceptionalism of the Bankruptcy Clause as understood "at the Founding").

[31] *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 187 (1902).

[32] *See Cont'l Ill. Nat'l Bank & Trust Co. v. Chicago Ry*, 294 U.S. 648, 668 (1935); *see also In re Klein*, 42 U.S. 277, 14 F. Cas. 716 (C.C.D. Mo. 1843); Thomas E. Plank, *Constitutional Limits on Bankruptcy*, 63 TENN. L. REV. 487, 508–510 (1996).

[33] *In re Reiman*, 20 F.Cas. 490, 496 (S.D.N.Y. 1874); *see also Campbell v. Alleghany Corp.*, 75 F.2d 947, 952 (4th Cir. 1935) ("The grant of power to Congress to establish uniform laws on the subject of bankruptcies is not limited to the forms in which that power has heretofore been exercised by Congress or by the laws relating to bankruptcy which had been enacted in England or in the several American Colonies prior to the adoption of the Constitution").

[34] Quoted in *Reiman,* 20 F.Cas. at 493–94.

[35] 5 Hill 317, 321 (N.Y. 1843); *see also Cont'l Ill.*, 294 U.S. at 670.

11.     Even in the face of the Great Depression, the Supreme Court, in recognizing a valid expansion of bankruptcy law, was careful to point out, "it does not follow that [Congressional] power has no limitations."[36]  In an attempt to describe those limits, the Supreme Court in *Wright v. Union Central Life Ins.* looked back in history, stating:

> The subject of bankruptcies is incapable of final definition.  The concept changes. It has been recognized that it is not limited to the connotation of the phrase in England or the States, at the time of the formulation of the Constitution . . . The subject of bankruptcies is nothing less than "the subject of the relations between an ***insolvent or nonpaying or fraudulent debtor***, and his creditors, extending to his or their relief." [37]

12.     During the same period, the Fourth Circuit also considered bankruptcy's scope. Addressing "[w]hat is a law on the subject of bankruptcies within the meaning of the Constitution[,]" the court stated, "there can be no question, we think, but that the constitutional grant vests in Congress full power to deal with the relationship existing between debtors unable or unwilling to pay their debts and their creditors . . . [.]"[38]  Similarly in *Campbell v. Alleghany Corp.,* the Fourth Circuit stated, "[a]ll phases of the relationship between a debtor financially embarrassed and his creditors are brought under the control of Congress by the constitutional grant of power[.]"[39]

---

[36] *Cont'l Ill.*, 294 U.S. at 669; *see also* Charles J. Tabb, "*The Bankruptcy Clause, The Fifth Amendment And The Limited Rights Of Secured Creditors in Bankruptcy,*" 2015 No. 2 U. ILL. L. REV. 765, 767 ("On the 'subject of Bankruptcies,' the [Supreme] Court has uniformly upheld every law challenged on that basis, with the only requirement being that the law deal with relations between a debtor and its creditors, ***when the debtor is having difficulty paying its debts.***") (emphasis added).

[37] 304 U.S. 502, 513–14 (1938) (internal footnotes omitted) (emphasis added); *see also Reiman*, 20 F.Cas. at 496; *Hanover Nat'l Bank*, 186 U.S. at 186–88.

[38] *Bradford v. Fahey,* 76 F.2d 628, 631 (4th Cir. 1935), *set aside on rehearing on other grounds*, 77 F.2d 992 (4th Cir. 1935).

[39] 75 F.2d at 952; *see also Hammond v. Lyon Realty,* 59 F.2d 592 (4th Cir. 1932) (discussing "the subject of bankruptcies"); Tabb, *supra* note 36, at 772–73 ("The unbroken line of case authority throughout the nineteenth century and up to and even into the Great Depression on the scope of the Bankruptcy Clause all proceeded on the universally shared assumption that the scope of the bankruptcy power was to be divined only by reference to the parameters of the Bankruptcy Clause itself.").

13.     This recognition of limits on congressional power to deal with entities facing significant and imminent threats to their very existence or who cannot or will not timely pay their creditors has extended into the modern era: "Although we have noted that '[t]he subject of bankruptcies is incapable of final definition,' . . . Congress' power under the Bankruptcy Clause 'contemplate[s] an adjustment of *a failing debtor's obligations*.'"[40]

14.     As recently as a month ago, the Supreme Court in *Bartenwerfer v. Buckley*[41] observed that the "Bankruptcy Code strikes a balance between the interests of *insolvent debtors and their creditors*."[42]  Notably, the Supreme Court rejected the concept that bankruptcy should "focus[] on the unadulterated pursuit of the debtor's interest."[43]

15.     The history of bankruptcy law represents a slow and steady progression from creditors pursuing unwilling or incapable debtors, to voluntary filings by honest debtors afflicted by financial reverses, to corporations and municipalities, to the modern view of bankruptcy as a tool for companies to restructure before total collapse—thereby benefiting creditors, employees, customers, and society at large.[44]  However, in more than two centuries of growth, courts have constantly recognized that the goal and meaning of the Bankruptcy Clause continues to provide a

---

[40] *Ry. Labor Exec's. Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982) (internal citations omitted; emphasis added); *see also Cent. Va. Comm. College*, 546 U.S. at 371 (quoting *Wright*, 304 U.S. at 513–514).

[41] 598 U.S. ___, 2023 WL 2144417 (Feb. 22, 2023).

[42] *Id.* at *3 (emphasis added).

[43] *Id*. at *7.

[44] *See* Plank, *supra* note 32, at 544 ("as the Supreme Court and other courts in the nineteenth century rejected creditor challenges to new ways that Congress chose to adjust [the debtor/creditor] relationship in light of changing commercial conditions, they have not stepped beyond the [Constitutional] boundaries[.]").  One bankruptcy court that considered constitutional history made a similar point.  *In re Marshall,* 300 B.R. 507 (Bankr. C.D. Cal. 2003) ruled on a claim that balance sheet insolvency was a requirement for bankruptcy.  The court rejected that argument (*id.* at 513) and in dicta also concluded liquidity insolvency was not required.  *Id.* at 509, 514–520.  The court, however, agreed that the Bankruptcy Clause does impose some limits, "Congress is not free to define the contours of bankruptcy without any limitations: the bankruptcy terrain must have some boundaries."  *Id.* at 510 (citing *Cont'l Ill.*, 294 U.S. at 669–70).  A decade later the Ninth Circuit affirmed for the reasons outlined in the Bankruptcy Court's decision but provided no independent analysis.  *In re Marshall,* 721 F.3d 1032, 1045 (9th Cir. 2013).

vehicle to address threats to the full and timely payment of creditors, particularly for those debtors overwhelmed or threatened with destruction of their economic viability.[45]  As Professor Thomas Plank has stated, the constitutional eligibility restriction "prevents debtors and creditors from taking advantage of [bankruptcy] rules, which are not available under nonbankruptcy law, to alter the rights of debtors and their creditors when the debtors can repay their creditors."[46]

16.    Case law and history teach two fundamental things about the Bankruptcy Clause. First, there is a limit to how far Congress can go in legislating on "the subject of Bankruptcies." And second, it is not as far as Bestwall has attempted to go.

**B.    Bestwall, A Financially Healthy Company Without Need For Bankruptcy Relief, Is Constitutionally Ineligible To Be A Debtor**

17.    From the outset Bestwall has stressed its ability—backstopped by the Funding Agreement—to fully and timely pay all asbestos claims, and related costs, now and in the future.[47] That position has been reiterated repeatedly by Bestwall's counsel from the early days of this case:

- "And importantly the goal is to pay all the claims in full.  We believe with the funding agreement, we have the capability of doing that."  Hr'g Tr. Nov. 7, 2017 at 33:5–8 (G. Gordon).

---

[45] Professor Ralph Brubaker recently described "debt overhang from massive disputed obligations" as a "problem[] bankruptcy is designed to address," but only if it "presents *a clear and present threat to entity viability and full payment of all claimants*."  Ralph Brubaker, *The Texas Two-Step and Mandatory Non-Opt-Out Settlement Powers*, Harv. L. Rev. Bankr. Roundtable (July 12, 2022), http://blogs.harvard.edu/bankruptcyroundtable/tag/ralph-brubaker/ (emphasis added).

[46] Thomas E. Plank, *Bankruptcy and Federalism*, 71 Fordham L. Rev. 1063, 1095 (2002).

[47] *Id.* at 9 ("Bestwall has sufficient resources to fully fund a section 524(g) trust . . . .").  This Court previously ruled:

In light of the Funding Agreement, which allows Bestwall to draw from New GP the amount of money necessary to pay the costs of this chapter 11 and to fund a [] Section 524(g) trust, to the extent the debtor's assets are insufficient to do so, there's no reason for the Court to conclude at this point that Bestwall does not have the ability to reorganize and to establish a trust that meets the statutory requirements of 524(g).

Hr'g Tr. Jan. 24, 2019 at 13:15–22.  *See also*, Dismissal Order 5.  This Court's ruling regarding the efficacy of the Funding Agreement has not been reviewed on appeal.  For the purposes of this Motion only, the Committee will accept this Court's determination regarding the Funding Agreement.

- "We have a company—and they [the Committee] know this—that has . . . a $22 billion net worth . . . ." Hr'g Tr. Nov. 9, 2018, 102:20–22 (G. Gordon).[48]

And the refrain continues right up to the present:

- "The Debtor continues to have the same assets available to it . . . ." *Debtor's Opp'n to Third Mot. to Dismiss Chapter 11 Case* ¶ 56 (Mar. 8, 2023) [Dkt. No. 2894].

- Bestwall, through the Funding Agreement, "has the full ability to meet all of its obligations[.]"[49]

18.    With the Funding Agreement, Bestwall has unlimited access to the assets of New GP with a value of at least $27.8 billion.  The Debtor assured this Court that it had sufficient assets to fully pay all claims.  Bestwall, therefore, faces no threat to its economic viability, and its creditors face no threat to their ability to be paid the full amount of compensation for their injuries as established in the tort system.  In the absence of bankruptcy, Bestwall could continue to pay its asbestos liabilities without disruption indefinitely.

19.    The Fourth Circuit, in one of its *A.H. Robins* decisions, described the circumstances supporting a mass tort target's status as a debtor:

> The costs of defense, the disruption that all the individual trials was placing on its executive force, and the expense of discharging some of the judgments were putting great financial strain on Robins.  Its funds had been so depleted by the suits that its unrestricted funds had been reduced to $5 million and "financial institutions were unwilling to lend it money."  It had actually experienced considerable difficulty in collateralizing as a condition of appeal the judgment in the case where the plaintiffs had recovered in early 1985 a $9.1 million judgment.  Faced with its obvious financial deterioration, a deterioration which gave every indication of accelerating,

---

[48] In the intervening four plus years the estimated value of New GP has increased by at least $7 billion.  *See* Anderson Decl. at ¶ 11.

[49] *Debtor's Opp'n to Third Mot. to Dismiss Chapter 11 Case* ¶ 34 (*quoting* Dismissal Order 5).  For the purposes of this Motion only, the Committee will accept this Court's determination regarding the Funding Agreement, subject to raising the issue later as appropriate.

Robins felt its only avenue for paying equitably and fairly all the claims was through a Chapter 11 proceeding.[50]

20.     Bestwall has inherited asbestos liabilities that cost its predecessor $200 million in defense costs and settlements—*in its worst year*.  Rather than being down to its last $5 million (as in *A.H. Robins*), New GP, Bestwall's funding counterpart, has recently reported an equity value of $27.8 billion.[51]  In addition, during the pendency of this case, New GP has continued to earn record profits, and has distributed *$5 billion* in dividends.[52]  With a Funding Agreement providing Bestwall with access to *150 times* its most expensive year in asbestos-related costs, there was—and is—no credible threat to Bestwall's continued economic viability or its ability to fully and timely pay all of its creditors.[53]

21.     Bestwall is constitutionally precluded from filing for bankruptcy.  Bankruptcy is for those in need of relief—not those like Georgia-Pacific who want to merely use it as an alternative to an otherwise appropriate forum for determination of legal disputes.[54]  Bestwall is able to fully pay all of its asbestos liabilities and, until the instant bankruptcy case was filed, its

---

[50] *In re A.H. Robins Co.*, 880 F.2d 709, 717 (4th Cir. 1989).  The Fourth Circuit's language in *A.H. Robins* recognizes that an entity truly threatened by mass tort liabilities can appropriately—and constitutionally—be a debtor in bankruptcy.  Indeed, many companies have properly filed bankruptcy to resolve their asbestos liabilities, utilizing section 524(g) of the Code.  It is the unique use by Bestwall, an entity with no financial distress, to access bankruptcy for the purpose of seeking relief only available to an entity with a limited fund that is improper here.  *See, e.g.,* Plank, *supra* note 32, at 583 n. 489 (discussing why Johns-Manville was a proper use of the constitutional bankruptcy power).

[51] *See* note 12, *supra*.

[52] Anderson Decl. ¶¶ 7–10.  This figure is even more shocking when compared to Bestwall's/Georgia-Pacific's costs related to asbestos litigation in the tort system.  During the bankruptcy case, Georgia-Pacific has paid dividends to its equity that exceed *by over $2 billion* the cumulative total amount it had paid during its 40 years in the tort system for *all* asbestos-related defense and indemnity costs.  *See Informational Br. of Bestwall LLC* 6, 34.

[53] *See* Fitzgerald, *supra* note 13 at pp. 1-2 (noting bankruptcy relief not available "for a solvent entity with no need for that relief").

[54] The personal injury claimants, involuntary creditors who were unwittingly exposed to carcinogens contained in Georgia-Pacific products, have a constitutionally guaranteed right to a jury trial.  U.S. Const. amend. VII.  The Bankruptcy Court lacks jurisdiction to determine personal injury claims and cannot deprive personal injury claimants of their jury trial right.  28 U.S.C. § 157(b).  Any aggregate estimation proceeding conducted for the purpose of capping Bestwall's liability is, in reality, a constitutionally impermissible end run around a claimant's inviolable right to a jury trial utilizing applicable state substantive and procedural law and based on his or her individual facts.

predecessor and it (for the short time it existed before its filing) had been doing so.[55]  The use of bankruptcy by a fully solvent, financially healthy entity for economic advantage, litigation advantage, or other motive not ***requiring*** bankruptcy relief does not properly fall within "the subject of Bankruptcies."  Therefore, the Constitution does not permit what Bestwall (and/or Georgia-Pacific) seeks to do.

## C.    Bestwall's Constitutional Ineligibility For Bankruptcy Relief Deprives This Court Of Subject Matter Jurisdiction Over The Bankruptcy Case

22.     As Professor Plank has stated, a debtor's eligibility to be a proper "subject of Bankruptc[y]" within the meaning of the Bankruptcy Clause "is a jurisdictional requirement for invoking a bankruptcy proceeding."[56]  Bestwall's constitutional ineligibility to be a bankruptcy debtor means there is no properly commenced bankruptcy "case" over which this court can exercise subject matter jurisdiction.[57]

23.     The statutory basis of the subject matter jurisdiction of the federal courts in bankruptcy is granted via § 1334 of the Judicial Code, which provides that the district courts (and the bankruptcy courts via reference authorized by § 157) "shall have original and exclusive jurisdiction of all [bankruptcy] ***cases under [the Bankruptcy Code,]*** title 11."[58]

24.     The referenced Bankruptcy Code, in turn, provides that a "voluntary case under a chapter of this title [11, the Bankruptcy Code,] is commenced by the filing with the bankruptcy court of a petition under such chapter ***by an entity that may be a debtor under such chapter***."[59]

---

[55] *Informational Br. of Bestwall LLC* 6 ("Overall, Bestwall and its predecessors have spent approximately $2.9 billion over the last 40 years defending more than 430,000 asbestos-related personal injury lawsuits . . .") (internal footnote omitted).

[56] Plank, *supra* note 32, at 492.

[57] The basic requirement of all federal court jurisdiction is that there be a "case or controversy."  *Episcopal Church in S.C. v. Church Ins. Co.*, 997 F.3d 149, 155 (4th Cir. 2021) (citing *Spokeo v. Robins,* 578 U.S. 330, 337–38 (2016)).

[58] 28 U.S.C. § 1334(a) (emphasis added).

[59] 11 U.S.C § 301(a) (emphasis added).

25.     If a voluntary petition is filed by an entity that may **not** be a debtor, then no "case" has been commenced, and thus, there is no bankruptcy "case" over which the court can exercise the subject matter jurisdiction conferred by § 1334(a).  Many courts have so held.[60]

26.     The only Fourth Circuit precedent on the issue indicates that a federal court has no subject matter jurisdiction if a bankruptcy petition (filed under the predecessor Bankruptcy Act of 1898) is filed by an ineligible debtor.[61]  Several lower courts in the Fourth Circuit have likewise held that a court lacks subject matter jurisdiction over a case filed by an ineligible debtor. [62]

27.     Any interpretation or application of the statutory jurisdiction over bankruptcy must also be governed by the Bankruptcy Clause of the Constitution.  It would be an unconstitutional application of the Bankruptcy Code to provide jurisdiction over the affairs of putative debtors whose financial affairs are not a proper "subject of Bankruptc[y]" within the meaning of the Constitution's Bankruptcy Clause.  The filing of a bankruptcy petition by a constitutionally ineligible debtor cannot confer subject matter jurisdiction on the federal courts, and the Bankruptcy Code cannot be applied to do so.  The Constitution itself limits the bankruptcy jurisdiction of the

---

[60] *See, e.g.*, *In re Medcare HMO*, 998 F.2d 436, 437, 447 (7th Cir. 1993); *In re Goerg*, 844 F.2d 1562, 1565–66 (11th Cir. 1988).  Federal courts are courts of limited jurisdiction, and subject matter jurisdiction serves to protect the federalism values at the core of Article III.  Federal courts, in turn, have a "virtually unflagging obligation" to exercise only the jurisdiction given to them by Congress.  *Colo. River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 817 (1976).  This obligation is core to our judicial system, as federal courts have "no **more** right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia*, 19 U.S. 264, 404 (1821) (emphasis added).  Thus, difficult jurisdictional questions "may occur which [federal courts] would gladly avoid; but [the federal courts] cannot avoid them." *Id.*

[61] *See Smith v. Cent. Tr. Co.*, 139 F.2d 733, 735, 737 (4th Cir. 1944) ("the debtor was an [ineligible] insurance company and [] the federal court was therefore without jurisdiction to entertain the petition for reorganization," which is a defect that can be raised directly at any time, "even after the time for appeal has expired or for the first time in an appellate court").  The *Smith* court also recognized, though, "the established rule that when the jurisdiction of a court of bankruptcy is challenged on the ground that the debtor belongs to a class excepted from the operation of the statute, the court has jurisdiction to at least decide the controversy[,]" and held that "the power to care for the assets in the meantime and to make payment of the expenses involved is incidental to the admitted jurisdiction to decide the questions in dispute." *Id.* at 736–37; *see also In re Elgin's Paint & Body Shop, Inc.*, No. 99-01982-W, 2000 WL 33710257, at *5–7 (Bankr. D.S.C. Mar. 10, 2000) (discussing and following the *Smith* decision).

[62] *See, e.g.*, *In re Jones*, 112 B.R. 770 (Bankr. E.D. Va. 1990); *In re Keziah*, 46 B.R. 551, 554 (Bankr. W.D.N.C. 1985) ("§ 109 is a part of the eligibility (to be a debtor) section which involves the subject matter jurisdiction of this Court.").

federal courts to "the subject of Bankruptcies" over which Congress is authorized to create federal bankruptcy jurisdiction.

28.     As explained by the leading authority on federal bankruptcy jurisdiction, Professor Ralph Brubaker, "in the entirety of our Anglo-American experience, bankruptcy has been conducted as a judicial process[,]" and thus, "the Bankruptcy Clause of the Constitution, in authorizing Congress '[t]o establish . . . uniform Laws on the subject of Bankruptcies' was authorizing a ***federal judicial process***."[63]

29.     Consequently, and as is true for the Article III, section 2 limitations on the subject matter jurisdiction of all federal courts (including bankruptcy courts), the constitutional limits on the scope of "the subject of Bankruptcies" also constrain the scope of federal courts' subject matter jurisdiction in bankruptcy to debtors that are properly "the subject of Bankruptcies" within the meaning of the Bankruptcy Clause.[64]  In this manner, therefore, the federal judicial power in bankruptcy under the Constitution is "co-extensive" with Congress's legislative power, as the Framers intended.[65]  As Justice Story stated, in reference to the Bankruptcy Power and the

---

[63] Ralph Brubaker, *Explaining* Katz's *New Bankruptcy Exception to State Sovereign Immunity: The Bankruptcy Power as a Federal Forum Power*, 15 AM. BANKR. INST. L. REV. 95, 127 (2007) (emphasis in original; footnotes omitted). Indeed, "[m]ost of the Supreme Court's discussions of Congress's constitutional power to vest bankruptcy jurisdiction in the federal courts simply rely upon Congress's [bankruptcy] power under Article I[.]" Ralph Brubaker, *On the Nature of Federal Bankruptcy Jurisdiction: A General Statutory and Constitutional Theory*, 41 WM. & MARY L. REV. 743, 807 (2000) (collecting cases in omitted footnote).

[64] *See* William E. Mussman & Stefan A. Riesenfeld, *Jurisdiction in Bankruptcy*, 13 L. & CONTEMP. PROBS. 88, 89 (1948) (explaining the constitutional authority for bankruptcy jurisdiction in the federal courts as "[t]he scope of the bankruptcy clause in conjunction with the judiciary article of the Constitution").

[65] "If there are such things as political axioms, the propriety of the judicial power of a government being co-extensive with its legislative, may be ranked among the number."  Alexander Hamilton, *The Federalist No. 80*; *see also* Scott A. Rosenberg, *Note, The Theory of Protective Jurisdiction*, 57 N.Y.U. L. REV. 933, 944 & n.62 (1982) (collecting many references by the Framers to the co-extensive nature of the legislative and judicial powers under the Constitution).

constitutional limits on federal bankruptcy jurisdiction, "[t]he judicial power has, in this respect, under the constitution, always been construed to be co-extensive with the legislative powers[.]"[66]

30.     This court need not determine where the constitutional line is for all purposes, as this is not a "close case."  Wherever the constitutional line lies, Bestwall is the epitome of an entity that is constitutionally ineligible for voluntary bankruptcy relief.  As this Court has already found, Bestwall, by its own admissions, "has the full ability to meet all of its obligations (whatever they may be)."[67]

31.     Bestwall has therefore failed to meet its burden to prove subject matter jurisdiction.

## II.    A *NEED* FOR BANKRUPTCY RELIEF IS ALSO IMPLICIT IN THE FOURTH CIRCUIT JURISPRUDENCE ON BAD FAITH DISMISSAL

32.     This Court lacks subject matter jurisdiction because Bestwall is constitutionally ineligible to be a debtor.  Moreover, the Fourth Circuit's case law, regarding debtors whose bankruptcies were dismissed for bad faith, must be read, interpreted and applied within the constitutional limitations of bankruptcy jurisdiction.

### A.    The Fourth Circuit's Application Of Objective Good Faith Has Involved *Both* An *Ability* To Confirm A Plan *And* A *Need* For Bankruptcy Relief

33.     This Court's earlier ruling opined that Bestwall's bankruptcy case was not objectively futile.  Dismissal Order 5–7.  Unfortunately, neither the Fourth Circuit nor the District Court has addressed that issue since.

34.     The Fourth Circuit has long recognized that the "bad faith inquiry is to prevent abuse of the reorganization process through delay."[68]  Subsequent to Bestwall's filing, four

---

[66] *Mitchell v. Great Works Milling & Mfg. Co.*, 17 F. Cas. 496, 499 (C.C.D. Me. 1843) (No. 9,662) (Story, Circuit Justice).

[67] Dismissal Order 5; *see generally Informational Br. of Bestwall LLC* 9.

[68] *In re Yachting Connections,* 981 F.2d 1253, 1992 WL 372947, *1 (4th Cir. 1992) (citing *Carolin Corp.,* 886 F.2d at 701–702 (4th Cir. 1989)).

additional bankruptcy cases—*In re DBMP LLC, In re Aldrich Pump LLC, In re Murray Boiler LLC,* and the since-transferred *LTL Mgmt.*—have filed, each involving the division of companies' assets and liabilities and resulting in the assignment of mass tort liabilities to the entity without the vast majority of the assets.[69]

35.     These cases—as well as the extensive proceedings in the present case—highlight the problems created by attempting to apply *Carolin*'s[70] "objective futility" test to a fact pattern that involves an unconstitutional abuse of the bankruptcy courts and the bankruptcy process.  The Fourth Circuit has never considered bankruptcy subject matter jurisdiction in the context of the Constitution's Bankruptcy Clause.  In each of the "Texas Two-Step" cases, the debtor is a single-purpose instrumentality being controlled by its sister corporation for the benefit of that sister corporation, its affiliates, and its equity holder(s).  Each debtor has no employees and no meaningful operations of its own.  Each is a holding company with no operations except the passive ownership of property.  Each was created for the purpose of seeking bankruptcy relief for the entire corporate enterprise and to avoid a bankruptcy filing by the monied operating entities that held the historic liability.[71]

---

[69] While this has primarily involved a Texas divisional merger (the so-called Texas Two-Step), there are other permutations, such as in the 3M-Aearo Combat Earplugs Litigation.  *See In re Aearo Techs., LLC*, Case No. 22-02890 (S.D. Ind.).

[70] 886 F.2d at 700.

[71] *Findings of Fact and Conclusions of Law Regarding Order: (I) Declaring that the Automatic Stay Applies to Certain Actions Against Non-Debtors, (II) Denying Mot. of the Official Comm. of Asbestos Personal Injury Claimants to Lift the Stay, and Alternatively (III) Preliminarily Enjoining Such Actions* ¶ 83, *DBMP v. Those Parties Listed on Appendix A (In re DBMP LLC)*, Case No. 20-03004 [Dkt. No. 343] (W.D.N.C. Aug. 10, 2021) ("That DBMP was created with no employees and no operations reflects its single purpose: the Debtor was a vessel designed to ferry Old CertainTeed's asbestos liabilities into bankruptcy.").

36.     In contrast, *Carolin* dealt with a situation in which the alleged debtor had no chance of reorganization and was merely trying to maintain control over a valuable piece of property that was in foreclosure.[72]

37.     In applying the *Carolin* test, the Fourth Circuit has, at times, explicitly considered whether the debtor was experiencing financial distress at the time of the petition filing. Furthermore, even in instances where it has not explicitly considered financial distress, the underlying facts in the cases applying *Carolin* demonstrate that the bad faith standard was considered by the Fourth Circuit in the context of debtors that were experiencing ***real financial distress***.[73]

38.     The facts of the other Fourth Circuit decisions regarding the good-faith filing doctrine involved debtors that had a real, objective ***need*** for bankruptcy relief.[74]  Whether the case was objectively futile, therefore, turned on whether the debtor in each case had the objective ***ability*** to successfully confirm a plan of reorganization.  Not surprisingly, therefore, the objective futility analysis in each of those cases, including *Carolin* itself, focused primarily on the debtor's objective prospects of successfully reorganizing.  The courts did not separately analyze the objective need for bankruptcy relief (and the debtor's lack of financial distress) because the facts of those cases

---

[72] 886 F.2d at 695–96.

[73] *Wilson v. Md. Nat'l Bank (In re Wilson)*, 946 F.2d 889, 1991 WL 209004, *1 (4th Cir. 1991) (discussing "lack of real financial distress" as a factor for dismissal) (emphasis added); *see also Md. Port Admin. v. Premier Auto. Servs., Inc. (In re Premier Auto. Servs., Inc.)*, 492 F.3d 274, 280–81 (4th Cir. 2007) (debtor filing without "experiencing financial difficulties" is an indicia of its bad faith).

[74] *See In re Yachting Connections*, 981 F.2d 1253, 1992 WL 372947 (4th Cir. 1992) ; *In re Coleman*, 426 F.3d 719, 728 (4th Cir. 2005) (finding that the debtor qualified under the "general goal of 'resuscitating a financially troubled debtor'").  *See also Md. Port Admin. v. Premier Auto. Servs (In re Premier Auto. Servs.)*, 492 F.3d 274 (4th Cir. 2007; *Carolin Corp.*, 886 F.2d 693; *In re Superior Siding & Window, Inc.*, 14 F.3d 240 (4th Cir. 1994); *C&R*, 27 F.3d 562, 1994 WL 320214 (4th Cir. 1994); In re Finney, 992 F.2d 43 (4th Cir. 1993); *RCO Investment Co. v. Belair 301-50 SW Quadrant Commercial Properties, Inc. (In re Belair)*, 972 F.2d 338, 1992 WL 200849 (4th Cir. 1992).

demonstrated the obvious financial distress that each of those debtors were in prior to the bankruptcy filing.[75]

39.    Fourth Circuit cases applying *Carolin*'s objective futility requirement have generally addressed a much different issue than financial distress: typically, the misuse of the bankruptcy system in an attempt to obtain or keep control of valuable assets by a party without the financial wherewithal to do so outside of bankruptcy.  For example, in *Premier Automotive Services*, the Fourth Circuit concluded that the petitioner "had no cognizable property interest in its expired lease[,]" rendering its reorganization "wholly illusory."[76]  Additionally, *In re C and R, L.C.*[77] required the Fourth Circuit to review the bankruptcy petition of a company formed less than a month prior to the filing and that filed for bankruptcy on the same day it received the transfer of a certain piece of property already in foreclosure and scheduled for sale two days after the petition date.[78]  *Carolin* never considered the situation where a corporation could demonstrate a realistic possibility of reorganization exactly ***because it was completely capable of paying all of its liabilities before and without a bankruptcy filing***.  This is an abuse that *Carolin* never confronted—that a party would seek bankruptcy in spite of the fact it could pay its bills, not because it was unable to pay them (or soon would be).

40.    *Premier Automotive Services* is the only decision by the Fourth Circuit that arguably considers whether financial distress alone would be sufficient to dismiss a bankruptcy

---

[75] Ironically, the richer the debtor, the smaller the chance of objective futility; thus, the crucial importance of *first* evaluating subject matter jurisdiction.  Use of bankruptcy law is intended for the honest but unfortunate debtor who is unable to pay its creditors on time and in full.  *See Grogan v. Garner*, 498 U.S. 279, 286–87 (1991) (quoting *Loc. Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

[76] 492 F.3d at 280.

[77] 27 F.3d 562, 1994 WL 320214 (4th Cir. 1994).

[78] *Id.* at *1; *see also In re Yachting Connections*, 1992 WL 372947, at *2 (where the "facts here strongly resemble those in *Carolin*," as a property in foreclosure with a receiver for a year and bankruptcy was filed to "stave off an imminent foreclosure sale."); *In re A.H. Robins Co., Inc.*, 880 F.2d at 716-717.

petition.  In *Premier*, the debtor was fully solvent when it filed for bankruptcy, one day before it

was legally obligated to quit the premises on which it operated.[79]  While the Fourth Circuit, citing

the Third Circuit's decision in *SGL Carbon*, observed that Premier's solvency at the date of filing

might be enough alone to dismiss its case,[80] it also found that the debtor had no property interest

in the subject lease and therefore was unable to reorganize.[81]  The Court of Appeals stated that

"[h]olding an asset hostage is not a permissible use of the bankruptcy process . . . [and] Chapter

11 is not a procedural vehicle which may be commandeered solely for 'the purpose of invoking

[its] automatic stay.'"[82]

41.    Bestwall's case is even more egregious than *Premier Automotive*.  Bestwall is a

fully solvent debtor with no threat to its financial stability and future viability that could possibly

alter its ability to pay claims.  Bestwall filed bankruptcy in order to obtain a coerced, court-

sanctioned and imposed liability cap using the invocation and extension of the automatic stay to

the entire corporate enterprise.

42.    Reviewing pertinent Fourth Circuit authority in context, it strains credulity that the

Fourth Circuit intended to provide a forum for healthy businesses to circumvent obligations to

victims.  Thus, considering the facts and the reasoning of *Carolin,* the objective futility standard

should ***not*** be seen as prohibiting dismissal for a completely solvent, unthreatened company like

Bestwall.

43.    To the extent that this Court believes that the *Carolin* objective futility standard

and/or the pending Committee appeal from the Court's denial of the Committee's motion for a bad

---

[79] 492 F.3d at 281.

[80] *See id.* at 280.

[81] *Id.* at 281.

[82] *Id.* (quoting *Carolin*, 886 F.2d at 702).

24

faith filing constrains its ability to dismiss this Chapter 11 case, then the Committee should be

given an opportunity to appeal the issue.  Indeed, the integrity of the bankruptcy process requires

all participants in the system to ensure that the bankruptcy process is not subject to abuse, and now

is the moment to give the Fourth Circuit the opportunity to revisit and clarify the objective futility

prong of its bad-faith test and define the context in which such test would apply.

**B.      The Financial Distress Requirement Is Also Highly Relevant To Any
         Application Of The Subjective Prong Of *Carolin*'s Analytical Construct For
         Determining Whether A Chapter 11 Petition Was Filed in Bad Faith**

44.      Consistent with constitutional requirements, the Fourth Circuit's analysis in

*Carolin* suggests that the absence of any real financial distress at the time of a voluntary Chapter

11 petition, could, in the proper circumstances, be sufficient, in and of itself, to conclude that the

petition was filed for improper bad-faith purposes.

45.      *Carolin*'s entire textual discussion of the subjective bad-faith standard occupied

only one short paragraph:

> The subjective bad faith inquiry is designed to insure that the petitioner ***actually
> intends "to use the provisions of Chapter 11*** . . . to reorganize or rehabilitate an
> existing enterprise, or ***to preserve going concern values of a viable or existing
> business***." . . . .  Put obversely, its aim is to determine whether the petitioner's real
> motivation is "to abuse the reorganization process" and "to cause hardship or to
> delay creditors by resort to the Chapter 11 device merely for the purpose of
> invoking the automatic stay, without an intent or ability to reorganize his financial
> activities." [83]

46.      Additionally, in one of the most significant and far-sighted passages in the *Carolin*

opinion, the Fourth Circuit discussed the close relationship between objective and subjective bad

faith, including in some cases an apparent equivalence of the two:

> [T]hough separate inquiries into each are required, proof inevitably will overlap.
> Evidence of subjective bad faith in filing may tend to prove objective futility, and

---

[83] *Carolin*, 886 F.2d at 702 (emphasis added) (quoting *In re Victory Constr. Co.*, 9 B.R. 549, 564 (Bankr. C.D. Cal. 1981), and *In re Thirtieth Place, Inc.*, 30 B.R. 503, 505 (B.A.P. 9th Cir. 1983)).

*vice versa.* Indeed it could be that some of the courts ostensibly holding that dismissal is warranted upon a finding of either have considered that proof of either implicitly proves both.[84]

We do not rule out the possibility that in a given case proof of the objective futility of a proposed reorganization might be so overwhelming that it would support a parallel finding of subjective bad faith despite the lack of any other evidence more directly probative of the petitioner's motive. ***In some situations [objective] futility may be so obvious that the only rational inference to be drawn is that petitioner had to be aware of it, hence not to have intended to reorganize but only to delay or harass.***[85]

47.    The rationale behind *Carolin* therefore suggests that real financial distress is, in effect, to be assumed or accepted before application of the *Carolin* test.[86]   Indeed, because the entire good-faith calculus is designed to ensure that the debtor's Chapter 11 case will further "the statutory objective of resuscitating a ***financially troubled*** [debtor],"[87] if the debtor is ***not*** under credible threat of any real financial distress, then the debtor ***must be*** filing the case primarily to accomplish some ***other*** objective, beyond the legitimate (and constitutionally valid) purpose of the Bankruptcy Code, such as "invoking the automatic stay" in order to "cause hardship or to delay creditors[.]"[88]   Put differently, if the debtor has no objective ***need*** for bankruptcy relief (because the debtor is not experiencing any real financial distress), then the debtor simply ***cannot*** file Chapter 11 in order to achieve any ***legitimate*** aims of bankruptcy (which the debtor does not need). The absence of any real financial distress not only indicates subjective bad faith, but also provides obvious and overwhelming evidence of objective futility (based upon no objective need for bankruptcy relief) such that the "only rational inference" would be that the debtor could not qualify

---

[84] *Id.* at 701.

[85] *Id.* at 701 n.3 (emphasis added).

[86] It was not until a decade later, for example, that the seminal Third Circuit bad-faith decision regarding lack of real financial distress was decided.  *See In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999).

[87] *Carolin*, 886 F.2d at 701 (emphasis added; alteration in original).

[88] *Id.* at 702.

for Chapter 11 relief under either prong of the *Carolin* test.[89]

### III.   A FINANCIAL NONPERFORMANCE LIMITATION ON THE SCOPE OF THE BANKRUPTCY POWER IS ALSO NECESSARY TO PROTECT CLAIMANTS' CONSTITUTIONAL DUE PROCESS RIGHTS

48.   Creditor repayment problems are an intrinsic requisite for a particular debtor and its financial affairs to be a proper "subject of bankruptc[y]" within the meaning of the Constitution's Bankruptcy Clause because that requirement (of a credible, realistic threat to full creditor repayment) is essential to maintaining the appropriate structural relationship between the Constitution's Due Process guarantees and Congress's constitutional Bankruptcy Power.

49.   To maintain that relationship, the Bankruptcy Power must be utilized only in legitimate circumstances and within the confines of the constitutional grant to Congress.  If an entity that is not constitutionally eligible for bankruptcy is allowed to file and pursue relief appropriately available only to proper debtors, an almost inevitable clash with Due Process will arise.  For example, a claimant has a due process property right in a tort cause of action.[90] Fundamental to this right is the claimant's autonomy and control over prosecution of his or her claim such that any "settlement" of that claim cannot be imposed on the claimant without his consent.[91]  There are extraordinary exceptions to that principle, but as the Supreme Court stated in *Ortiz*, "the burden of justification rests on the exception."[92]

---

[89] *Id.* at 701 n.3.  Professor Brubaker has recently catalogued the many means that Chapter 11 gives defendants to monetarily short-change mass-tort claimants.  *See* Ralph Brubaker, *Assessing the Legitimacy of the "Texas Two-Step" Mass Tort Bankruptcy*, 42 BANKR. L. LETTER NO. 8, at 8–16.

[90] *See Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 485 (1988) ("a cause of action is a species of property . . . deserving due process protections").

[91] *See Martin v. Wilks*, 490 U.S. 755, 768 (1989) ("A voluntary settlement . . . cannot possibly 'settle,' voluntarily or otherwise, the conflicting claims of [those] who do not join in the agreement."); *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 529 (1986) ("Of course, parties who choose to resolve litigation through settlement may not dispose of the claims of a third party . . . without that party's agreement.").

[92] *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999).

50.     Of particular relevance in the bankruptcy context is the exception the Court rejected in *Ortiz*, where the lower courts had approved a mandatory no-opt-out "settlement" of a defendant's aggregate mass tort liability to both present and future asbestos claimants.  On further appellate review, the Supreme Court of the United States reversed, holding that mandatory no-opt-outs settlement of a defendants' aggregate mass tort liability is impermissible and unconstitutional if the defendant's resources are sufficient to fully pay all of the claims.

51.     Depriving individual claimants of their due process right to exclude themselves from such an aggregate resolution process and of their due process right to pursue their claims on an individual basis could be justified only if the defendant's resources were insufficient to fully pay all claims ("otherwise some . . . would be paid and others . . . would not").[93]  But if the defendant "admit[s] assets sufficient to cover its debts, . . . no [such] prejudice [] would result" from permitting individual claimants to pursue their claims separately.[94]  Thus, due process requires that a "plaintiff [must] be provided with an opportunity to remove himself" from the aggregate resolution process.[95]  Indeed, with respect to the aggregate resolution of money damages claims, the Supreme Court has repeatedly emphasized that the "absence of . . . opt out violates due process."[96]

---

[93] *Id.* at 837 (internal quotations omitted). "The concept driving this" limitation of claimants' ownership control over their individual claims is, therefore, "insufficiency, which alone justifie[s] the limit on an early feast to avoid a later famine . . . . The equity of the limitation is its necessity."  *Id.* at 838–39.  Indeed, it is the foundation of bankruptcy courts as courts of equity that they are authorized to allocate limited funds to protect the rights of all creditors. *See* 11 U.S.C. § 157(b); *In re Joe Gibson's Auto World, Inc.*, 416 B.R. 469, 476 (Bankr. D.S.C. 2009) (evaluating whether a proceeding is core in part from whether it "has a direct affect on a bankruptcy court's core administrative function of asset allocation among creditors.") (internal quotations omitted); *Bowles v. Massey Energy Co.*, No. 2:12-CV-05997, 2012 WL 6628953, at *7 (S.D.W. Va. Dec. 19, 2012) (same) (internal quotations omitted).

[94] *Ortiz*, 527 U.S. at 837 n.17.

[95] *Id.* at 848 (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985)).

[96] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362–63 (2011); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 349 (2011); *Ortiz*, 527 U.S. at 846–48; *Shutts*, 472 U.S. at 811–12.  And as the Supreme Court pointed out in *Ortiz*, a mandatory no-opt-outs settlement process in federal court also "compromises [claimants'] Seventh Amendment [jury trial] rights without their consent." 527 U.S. at 846.

52.    As noted in *Ortiz*, the most prominent exception to individual claimants' due process right to opt out of an aggregate claims resolution process is bankruptcy.[97]   Indeed, as Professor Ralph Brubaker recently observed, "the binding distribution scheme effectuated by a confirmed plan of reorganization is functionally identical to the mandatory non-opt-out settlement at issue in *Ortiz*.  Both systems enable a mass-tort defendant to impose a judicially approved hard cap on their aggregate mass-tort liability, without any opt outs by nonconsenting claimants."[98]

53.    The Constitution itself explicitly authorizes such a mandatory no-opt-outs settlement process in the Bankruptcy Clause, in particular, via the "[t]he 'great' discharge power, [which] provided the impetus for inclusion of the Bankruptcy Clause in the Constitution."[99]   By limiting "the subject of Bankruptcies" to debtors presenting a credible risk of inability to fully pay all creditors, though, the Constitution ensures that the Bankruptcy Power will not and cannot eviscerate claimants' fundamental due process rights.[100]

54.    But here—as this Court has previously recognized[101]—Bestwall is able to meet its obligations in full.[102]   Under the rationale of *Ortiz*, therefore, all claimants must retain their

---

[97] *See* 527 U.S. at 846 (quoting *Martin*, 490 U.S. at 762 n.2).

[98] Brubaker, *supra* note 45; *see also* Ralph Brubaker, *Mandatory Aggregation of Mass Tort Litigation in Bankruptcy*, 131 Yale L.J.F. 960, 995–98 (2022); Brubaker, *supra* note 89, at 1, 9–10.

[99] Brubaker, *Mandatory Aggregation of Mass Tort Litigation in Bankruptcy*, *supra* note 98, at 977 (quoting *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 186 (1902) (quoting *In re Klein*, 14 F. Cas. at 718)). "Indeed, the mandatory no-opt-outs aspect of limited fund class actions[,]" such as the one at issue in *Ortiz*, "is functionally identical to a bankruptcy discharge, which is a foundational pillar of Congress's constitutional Bankruptcy Power." Brubaker, *supra* note 89, at 9 n. 86.

[100] As the Third Circuit observed in *LTL Mgmt.*, "[r]isks associated with premature filing may be particularly relevant in the context of a mass tort bankruptcy. Inevitably those cases will involve a bankruptcy court estimating claims on a great scale—introducing the possibility of undervaluing future claims (and underfunding assets left to satisfy them) and the difficulty of fairly compensating claimants with wide-ranging degrees of exposure and injury." 58 F.4th at 756 (internal footnotes omitted).  The *en masse* removal of thousands of claims from state and federal courts into a single proceeding before a bankruptcy court without the power to determine their claims demonstrates the due process implications of an entity's misuse of bankruptcy for purposes other than financial need.

[101] *Dismissal Order* 5 (concluding Bestwall "has the full ability to meet all of its obligations (whatever they may be).").

[102] *See, e.g., Informational Br. of Bestwall LLC* 9.

absolute due process right to opt out of Bestwall's effort to force an aggregate resolution process of their claims.  Bankruptcy is available to businesses with "clean hands[,]" "teetering on the verge of a fatal financial plummet[,]" and seeking "an opportunity to reorganize on solid ground and try again[.]"[103]  Bankruptcy does not "give profitable enterprises an opportunity to evade contractual or other liability[]" or provide relief to debtors "whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes[.]"[104]  Bestwall should not be able to seek to impose a mandatory settlement of its asbestos liabilities upon nonconsenting claimants; constitutional due process rights simply cannot be so hollow as to be brushed aside by a putative debtor's artful bankruptcy machinations.  Resolution of asbestos liabilities by an artificially created entity with uncapped amounts available to it under a funding agreement that ensures that the entity faces no threat to its economic viability is simply not permissible.  This is Bestwall's exact situation; Bestwall's bankruptcy simply is not a constitutionally proper "subject of Bankruptc[y]."  Permitting Bestwall to remain in bankruptcy would therefore exceed the subject matter jurisdiction of this Court.

## CONCLUSION

As a threshold question, this Court must consider whether it has subject matter jurisdiction. There is no question that Bestwall, supported by the Funding Agreement, faces no threat to its financial viability and, in the absence of bankruptcy, is able to timely and fully pay all of its creditors without jeopardizing its financial viability.  In fact, Bestwall itself has repeatedly assured this Court that it is fully capable of paying all asbestos claims in full.  It is therefore not

---

[103] *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 381 (8th Cir. 2000) (internal quotations omitted).

[104] *Id.* (internal quotations omitted).

constitutionally eligible for bankruptcy relief, and this case should be dismissed because this Court

lacks subject matter jurisdiction.

Dated:  Charlotte, North Carolina
        March 30, 2023

<div style="margin-left:40%;">

/s/ Glenn C. Thompson_____
Glenn C. Thompson (Bar No. 37221)
HAMILTON STEPHENS STEELE +
MARTIN, PLLC
525 North Tyron Street, Suite 1400
Charlotte, North Carolina 28202
Telephone: (704) 344-1117
Facsimile: (704) 344-1483
Email:  gthompson@lawhssm.com

    and

Linda W. Simpson (Bar No. 12596)
JD THOMPSON LAW
Post Office Box 33127
Charlotte, North Carolina 28233
Telephone: (828) 489-6578
Email:  lws@jdthompsonlaw.com

    and

Natalie D. Ramsey (DE Bar No. 5378)
Davis Lee Wright (DE Bar No. 4324)
Thomas J. Donlon (CT Bar No. 22839)
ROBINSON & COLE LLP
1201 N. Market Street, Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Email:  nramsey@rc.com
        dwright@rc.com
        tdonlon@rc.com

*Counsel to the Official Committee of Asbestos
Claimants*

</div>