

```
FILED & JUDGMENT ENTERED
        Steven T. Salata

        February  21  2024

   Clerk, U.S. Bankruptcy Court
  Western District of North Carolina
```

*Laura T Beyer*
Laura T. Beyer
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

In re: )
)
**BESTWALL LLC**, )           Chapter 11
)           Case No. 17-31795
Debtor. )
)
_____ )

## ORDER DENYING THE MOTIONS TO DISMISS OF CLAIMANTS
## WILSON BUCKINGHAM AND ANGELIKA WEISS AND
## THE OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS

This matter comes before the court on the February 17, 2023 Motion to Dismiss

of Claimants Wilson Buckingham and Angelika Weiss (Dkt. 2882[1]) (the "Buckingham

Motion") and the March 30, 2023 Official Committee of Asbestos Claimants' Motion

to Dismiss for Lack of Subject Matter Jurisdiction (Dkt. 2925) (the "Committee's

Motion") (collectively the "Motions to Dismiss").  The court concludes that it has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334,[2] venue is proper

---

[1] Docket references in this order are to the docket for this case unless otherwise indicated.

[2] The court's jurisdictional conclusions are explained in (far) more depth later in this order.  See *infra*
¶¶ 25–60.

in this district pursuant to 28 U.S.C. §§ 1408 and 1409, and this is a core proceeding
pursuant to 28 U.S.C. § 157(b)(2).   Having reviewed and considered the Motions to
Dismiss, the joinders, responses, and replies thereto, and after considering the
arguments of counsel at the hearings on March 15, 2023 and May 17, 2023 and having
announced its ruling on the Motions to Dismiss at a hearing on July 28, 2023, the
court further finds and concludes that it should deny the Motions to Dismiss for the
reasons that follow.

### Facts and Procedural History

1.     Bestwall LLC (the "Debtor") filed a petition under Chapter 11 of the
United States Bankruptcy Code (the "Bankruptcy Code") on November 2, 2017.   The
Debtor's pre-petition history was unusual and unusually brief.   About three months
prior to the petition date, the Debtor was created in a divisive merger corporate
transaction pursuant to Texas state law that has come to be known as the "Texas
Two-Step."   See Debtor's Opposition to Third Motion to Dismiss Chapter 11 Case
(Dkt. 2894) ("Debtor's Response to the Buckingham Motion") at 3 (noting corporate
restructuring on July 31, 2017); Michael A. Francus, *Texas Two-Stepping Out of
Bankruptcy*, 120 MICH. L. REV. ONLINE 38, 40 (2022) (explaining divisive mergers).
The transaction divided the Debtor's predecessor, Georgia-Pacific LLC ("Old GP"
prior to the transaction), into two new entities, the Debtor and a new version of
Georgia-Pacific LLC ("New GP").   Informational Brief of Bestwall LLC (Dkt. 12) at
7–8.   The divisive merger imbued the Debtor with Old GP's asbestos liability and
certain assets including a "funding agreement" with New GP that "ensures that the

Debtor has the same financial resources and ability to satisfy asbestos claims as Old GP had prior to the 2017 Corporate Restructuring," while New GP took all of Old GP's other assets and liabilities.[3] Id. at 8.

2.      The Motions to Dismiss constitute the third and fourth motions to dismiss this bankruptcy case.  On August 15, 2018, the Official Committee of Asbestos Claimants (the "Committee") filed a motion to dismiss this case as a bad faith filing pursuant to 11 U.S.C. § 1112(b)[4] or, alternatively, to transfer venue of the case to Delaware (Dkt. 495) (the "First Motion to Dismiss").  The court entered its Memorandum Opinion and Order Denying the Official Committee of Asbestos Claimants' Motion for Dismissal, or Alternatively, Venue Transfer (Dkt. 891) (the "Opinion and Order") on July 29, 2019.  In re Bestwall LLC, 605 B.R. 43 (Bankr. W.D.N.C. 2019).  In its Opinion and Order, the court summarizes the two-prong standard for dismissing a Chapter 11 case as a bad faith filing established by the United States Court of Appeals for the Fourth Circuit (the "Fourth Circuit") in the Carolin case, which requires a determination that the case is both (i) objectively futile and (ii) filed in subjective bad faith. Bestwall, 605 B.R. at 48 (citing Carolin Corp. v. Miller, 886 F.2d 693, 700–01 (4th Cir. 1989)).  Among other things, the court determined that "[a]ttempting to resolve asbestos claims through 11 U.S.C. § 524(g)

---

[3] This is an oversimplified description of the divisive merger performed by Old GP intended to provide sufficient context for the following discussion of the Motions to Dismiss.  While the Texas Two-Step transaction informs the entirety of this case, it is not directly relevant to the Motions to Dismiss.  See, e.g., May 17, 2023 Hr'g Tr. 136:11–14 (Buckingham's counsel answering "Absolutely" when asked by the court if the Buckingham Motion would have been filed if there was no divisional merger and the debtor in this case was Georgia-Pacific).

[4] Subsequent statutory references in this order are to Title 11 unless otherwise indicated.

is a valid reorganizational purpose, and filing for Chapter 11, especially in the context of an asbestos or mass tort case, need not be due to insolvency." Id. at 49. The court also stated that "[t]he volume of current asbestos claims that Bestwall faced as of the Petition Date, coupled with the projected number of claims to be filed through 2050 and beyond, is sufficient financial distress for Bestwall to seek resolution under section 524(g) of the Bankruptcy Code" and that the asbestos-related claims could be "sufficiently addressed and fairly adjudicated through a section 524(g) trust." Id. at 49, 50. The court concluded that because Bestwall has the resources with which to reorganize, this case is not objectively futile, it need not reach the issue of whether the case was filed in subjective bad faith, and dismissal was not appropriate under the Fourth Circuit's stringent two-prong dismissal standard. Id. at 50–51.

3. On August 12, 2019, the Committee filed a notice of appeal (Dkt. 917) of the Opinion and Order, a motion for leave to appeal (Dkt. 918), and a request for certification of direct appeal to the Fourth Circuit (Dkt. 920). This court approved the request for the direct appeal on September 11, 2019 in its Certification for Direct Appeal to the United States Court of Appeals for the Fourth Circuit Under 28 U.S.C. § 158(d)(2) (Dkt. 987) ("Certification for Direct Appeal"),[5] and, in turn, the Committee filed its petition for direct appeal with the Fourth Circuit on October 11, 2019. On

---

[5] In its Certification for Direct Appeal, the court concluded that directly certifying the appeal to the Court of Appeals materially advanced the Debtor's case because the issue of reconsidering the Carolin standard would require a determination by the Fourth Circuit. Certification for Direct Appeal at 3. The court also concluded that the Opinion and Order involved a matter of public importance because the pre-petition restructuring created an issue of first impression in the Fourth Circuit regarding the subjective bad faith prong of the Carolin standard that "transcends this case, its litigants, and asbestos cases in general." Certification for Direct Appeal at 4.

November 14, 2019, the Fourth Circuit denied the petition for direct appeal, and New

GP opposed the Committee's motion for leave to appeal before the United States

District Court for the Western District of North Carolina (the "District Court").

4.     On February 3, 2023, the Committee filed a notice of supplemental

authority (W.D.N.C. Dkt. 12[6]) ("Committee's Notice") bringing to the attention of the

District Court the "pertinent and significant new authority" of the opinion of the

United States Court of Appeals for the Third Circuit in the LTL Management case

(the "LTL Opinion").  Committee's Notice at 2; see LTL Mgmt., LLC v. Those Parties

Listed on Appendix A to Complaint and John and Jane Does 1–1000 (In re LTL Mgmt.,

LLC), 64 F.4th 84 (3d Cir. 2023).  Based on the LTL Opinion, the Committee urged

the District Court to accept the pending notice of appeal (or grant the Committee's

motion for leave to pursue an interlocutory appeal) so the Fourth Circuit would have

a chance to consider the applicability of the Carolin standard to "a debtor that failed

to exhibit financial distress prior to invoking the substantial protections of the

Bankruptcy Code."  Committee's Notice at 2.  The Debtor responded (W.D.N.C. Dkt.

13) ("Debtor's Response to Committee's Notice") and asserted that nothing about the

LTL Opinion changed the reasons why the District Court should "deny leave to appeal

the interlocutory order denying the Committee's motion to dismiss Bestwall's

bankruptcy case."  Debtor's Response to Committee's Notice.  The Debtor further

opined that the LTL Opinion is based on a different standard and has no application

---

[6] "W.D.N.C." docket references are to the District Court's docket in case no. 19-396, the Committee's
appeal of the Opinion and Order.

to the appeal of the Opinion and Order.  Id. at ¶ 3.

5.      More recently in the District Court and based on the pleadings filed by the Committee in this case related to the Committee's Motion, the Debtor filed a motion for leave to file a statement regarding the Committee's change in position on the finality of the Opinion and Order (W.D.N.C. Dkt. 14) ("Debtor's Motion for Leave"). The Debtor points out that in support of the Committee's Motion in this court, the Committee argues that the Opinion and Order denying the First Motion to Dismiss is interlocutory contrary to its position in the District Court that the Opinion and Order is final and appealable as of right.  Debtor's Motion for Leave.  In addition, the Committee filed a second notice of supplemental authority (W.D.N.C. Dkt. 15) notifying the District Court of the recent decision of the United States Bankruptcy Court for the Southern District of Indiana dismissing Aearo's bankruptcy cases, which it argues supports the Committee's motion for leave to appeal the Opinion and Order.  See In re Aearo Techs. LLC, Ch. 11 Case No. 22-02890, 2023 WL 3938436 (Bankr. S.D. Ind. June 9, 2023).  Finally, the Debtor filed a notice of supplemental authority (W.D.N.C. Dkt. 17) ("Debtor's Notice") notifying the District Court of the Fourth Circuit's opinion in Bestwall LLC v. Off. Comm. of Asbestos Claimants (In re Bestwall LLC), 71 F.4th 168 (4th Cir. 2023).  The Debtor argues that the Fourth Circuit's decision is relevant because it (1) confirmed that the two-pronged standard of Carolin remains the controlling law in this circuit for a motion to dismiss a Chapter 11 case as a bad faith filing;[7] (2) reinforced the bankruptcy court's finding that this

---

[7] The Debtor further explains that in its jurisdictional analysis, the Fourth Circuit "rejected the Committee's attempts to invoke the [LTL Opinion] because, among other things, the Fourth Circuit

case is not objectively futile; and (3) rejected the Committee's "attempt to attack the preliminary injunction 'as a back-door way to challenge the propriety of the reorganization and the merits of a yet-to-be-filed chapter 11 plan,' which was 'both premature and improper.' " Debtor's Notice at 1–2 (quoting <u>Off. Comm. of Asbestos Claimants</u>, 71 F.4th at 183). The Committee's appeal and motion for leave to appeal the Opinion and Order remained pending before the District Court at the time the court issued its ruling from the bench on the Motions to Dismiss on July 28, 2023.[8]

6.    The Committee filed a second motion to dismiss (Dkt. 938) (the "Second Motion to Dismiss") on August 16, 2019, arguing primarily that the case should be dismissed based on the Debtor's failure to prosecute this case. The Committee filed the Second Motion to Dismiss less than one month after the court entered the Opinion and Order, and the court entered an order (Dkt. 1546) on December 22, 2020 denying the Second Motion to Dismiss without prejudice. The court decided that the Debtor had not failed to prosecute the Chapter 11 case within the meaning of section 1112(b)(4) and that the Committee had not established cause to dismiss the case.

---

'applies a more comprehensive standard' for a bad-faith dismissal than the Third Circuit, looking to both 'subjective bad faith' and 'objective futility of any possible reorganization.' " Debtor's Notice at 1–2 (quoting <u>Off. Comm. of Asbestos Claimants</u>, 71 F.4th at 182).

[8] Subsequent to the court issuing its oral ruling on the Motions to Dismiss but prior to the entry of this order memorializing that ruling, the District Court entered an Order on November 7, 2023 denying the Committee's motion for leave to appeal, denying as moot the Debtor's Motion for Leave, and dismissing the Committee's appeal. <u>In re Bestwall LLC</u>, No. 19-cv-00396, slip op. at 10 (W.D.N.C. Nov. 7, 2023). The District Court first concluded that the Opinion and Order is not appealable as a final order. <u>Id.</u> at 4–7. It then considered and denied the Committee's request for leave to appeal the Opinion and Order. <u>Id.</u> at 7–10. The District Court concluded that: (1) an appeal of the Opinion and Order does not involve a controlling question of law because this court applied <u>Carolin</u>, which is binding law in this circuit; (2) "there is not substantial ground for difference of opinion" about the test to use in the context of motions to dismiss under section 1112(b) in the Fourth Circuit; and (3) the Committee had not shown the exceptional circumstances required to ignore the policy of postponing appellate review until a final judgment has been entered. <u>Id.</u> at 9–10.

7.      In the Committee's Motion (its third motion to dismiss this case), the Committee moves to dismiss this case for lack of constitutional subject matter jurisdiction.  The Committee asserts that the Debtor is not an eligible subject of bankruptcy pursuant to the Bankruptcy Clause of the Constitution because it lacks sufficient financial distress.  Committee's Motion at 2.  According to the Committee, the Debtor is neither insolvent nor in need of bankruptcy for its survival and, therefore, does not qualify for bankruptcy relief.  Id.  The Committee insists that "Bestwall's economic health and ability to timely and fully pay all its creditors, including all present and future asbestos claimants, is (and was at the time of its bankruptcy filing) unthreatened.  Neither financial nor operational requirements have necessitated bankruptcy restructuring, and Bestwall is therefore not an eligible 'subject of [B]ankruptc[y]' as that word was understood by the drafters of the Constitution and the delegates ratifying the Constitution."  Id.  The Committee contends that "a bankruptcy court must first determine whether the entity seeking debtor status meets the fundamental requirements of the Constitution" before considering statutory restrictions on debtors, including whether a bankruptcy case should be dismissed as a bad faith filing.  Id.  In other words, the Debtor must be in sufficient financial distress to be constitutionally eligible to seek protection under the Bankruptcy Code.

8.      In support of its argument, the Committee cites findings of fact made by this court in its Opinion and Order and its July 29, 2019 Memorandum Opinion and Order Granting the Debtor's Request for Preliminary Injunctive Relief (A.P. Dkt.

164[9]) in reliance on the Debtor's assertion that it is fully capable of paying all asbestos claims in full with the support of the funding agreement. Id. at 4. The Committee further relies on developments that have occurred since the filing of the case to demonstrate that Bestwall's financial wherewithal has grown stronger as this case has progressed. Id. at 4–5. Specifically, the Committee points to the facts that since the filing of the case, Bestwall has created and funded a $1 billion qualified settlement trust; New GP's equity value has increased by $7.1 billion to $27.8 billion; and New GP has upstreamed over $5 billion in dividends to its ultimate parent, Koch Industries. Id. at 5.

9.     The Committee asserts that this motion to dismiss "is a new and distinct argument from any previously raised; [and] it also provides additional context for considering the proper scope and application of the Fourth Circuit's Carolin test," which it concedes was the focus of the First Motion to Dismiss. Id. at 7, 9. According to the Committee, in addition to lacking constitutional subject matter jurisdiction, the "Fourth Circuit's case law, regarding debtors whose bankruptcies were dismissed for bad faith, must be read, interpreted and applied within the constitutional limitations of bankruptcy jurisdiction." Id. at 20. The Committee says that consistent with the constitutional requirement of significant financial distress, "[t]he rationale behind Carolin . . . suggests that real financial distress is, in effect, to be assumed or accepted before application of the Carolin test." Id. at 26.

10.     This part of the Committee's argument is consistent with the

---

[9] "A.P." docket references are to this court's docket in adversary proceeding no. 17-3105.

Buckingham Motion.  Mr. Buckingham argues this case must be dismissed because it does not meet the good-faith threshold established by the Fourth Circuit in <u>Carolin</u>, the Debtor is not eligible for bankruptcy relief because it is neither in financial distress nor facing "overwhelming liabilities," and it cannot confirm a § 524(g) plan of reorganization.  Buckingham Motion at 7.  The Buckingham Motion relies extensively on the Third Circuit's recent LTL Opinion dismissing the LTL Management case as a bad faith filing in urging the court to dismiss this case under 11 U.S.C. §§ 105 and 1112(b) for lack of good faith.[10]  <u>See</u> <u>id.</u> at 3, 4, 6, 10, 12–13, 19, 20, 22–23, 26–27.  Similar to the conclusion reached by the Third Circuit in the LTL Opinion, Mr. Buckingham argues that pursuant to <u>Carolin</u>, and as a threshold matter, the Debtor must demonstrate it is in sufficient financial distress due to overwhelming asbestos liability and that it has a limited fund that is insufficient to pay current and future claimants in order for its bankruptcy case to serve a legitimate bankruptcy purpose and to survive a motion to dismiss the case as a bad faith filing.  <u>Id.</u> at 8, 15.  Only once the Debtor has demonstrated sufficient financial distress should the court reach the question of the Debtor's ability to be rehabilitated.  <u>Id.</u> at 8.  And like the Committee's Motion, Mr. Buckingham relies on several events that have occurred since the filing of the case that he believes demonstrate the Debtor's lack of financial distress and the impropriety of the case, including the fact that New GP has

---

[10] In his reply in support of the Buckingham Motion and in his oral argument at the hearing on March 15, 2023, Mr. Buckingham's counsel characterized his argument as one of subject matter jurisdiction. However, at the May 17, 2023 hearing, Mr. Buckingham's counsel seemed to abandon that argument and focused on dismissal of the case as a bad faith filing under <u>Carolin</u>.  <u>See, e.g.</u>, May 17, 2023 Hr'g Tr. 118:10–17.

distributed over $5 billion in dividends to Koch Industries and New GP's substantial increase in equity value. Id. at 14–15, 17. Mr. Buckingham argues that the proper focus is not the number of asbestos claims pending against the Debtor but the Debtor's ability to pay those claims. Id. at 6. And the profitability of the Debtor since this case was filed—as evidenced by the dividends issued by New GP and the substantial increase in its equity—demonstrates the Debtor's clear ability to pay its current and future asbestos claims. Id. at 14–15. On this basis, Mr. Buckingham moves to have the court dismiss this case as a bad faith filing pursuant to Carolin.

11.    In response, the Debtor contends that the court lacks jurisdiction to consider the Buckingham Motion because it seeks the same relief that was sought by the Committee in its First Motion to Dismiss on fundamentally the same grounds. Debtor's Response to the Buckingham Motion at 1, 17–25. The Debtor argues the court is divested of jurisdiction to consider the Buckingham Motion due to the Committee's appeal of the court's Opinion and Order denying the First Motion to Dismiss and its motion for leave to appeal. Id. at 5–8. In addition, the Debtor insists that Mr. Buckingham should be barred by the doctrine of laches from bringing his motion to dismiss given the length of time this case has been pending. The Debtor also argues that the Opinion and Order is law of the case and the court should deny the Buckingham Motion because it seeks to dismiss the case on the same grounds argued by the Committee in the First Motion to Dismiss. Id. at 8–11. Finally, the Debtor insists that even if the court were to consider the merits of the Buckingham Motion, it presents no new arguments that would cause the court to reach a different

conclusion than when it denied the First Motion to Dismiss.  Id. at 17–25.

12.     Similarly, in its response to the Committee's Motion, the Debtor asserts that the doctrines of laches and law of the case bar the Committee's argument and that this court is divested of jurisdiction to consider the dismissal issues raised in the Committee's Motion because they are pending before the District Court on appeal. Debtor's Opposition to the Official Committee of Asbestos Claimants' Third Motion to Dismiss Chapter 11 Case (Dkt. 2973) at 2, 13–19.  In response to the Committee's assertion that this court lacks subject matter jurisdiction, the Debtor insists that the court has jurisdiction and has properly exercised it in the six years this case has been pending.  Id. at 2, 6–13.  According to the Debtor, the question of eligibility to be a debtor is not a question of jurisdiction because bankruptcy courts have subject matter jurisdiction over all cases filed under the Bankruptcy Code.  Id. at 7 (quoting In re Auto. Pros., Inc., 370 B.R. 161, 167 (Bankr. N.D. Ill. 2007)).  Further, the Debtor argues that the Bankruptcy Clause of the United States Constitution does not impose an insolvency or financial distress requirement to be a debtor.  Id. at 9.

**Discussion**

13.     Mr. Buckingham seeks dismissal of this case under Carolin largely for the same reasons previously argued by the Committee in its First Motion to Dismiss and considered and decided by this court in its Opinion and Order.  As demonstrated by the chart ("Debtor's Chart") attached as Exhibit A to the Debtor's Response to the Buckingham Motion, Mr. Buckingham and the Committee use similar language to argue that the court should dismiss this case as a bad faith filing and that the Debtor

and/or New GP are not in financial distress.

14.     Pursuant to the law of the case doctrine and in the interest of finality, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Carlson v. Bos. Sci. Corp., 856 F.3d 320, 325 (4th Cir. 2017) (quoting TFWS, Inc. v. Franchot, 572 F.3d 186, 191 (4th Cir. 2009)); see also Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs. U.S., LLC, 469 F. Supp. 3d 505, 524 (E.D. Va. 2020) ("[C]learly, courts could not perform their duties satisfactorily and efficiently if a question once considered and decided were to be litigated anew in the same case . . . ." (quoting Sejman v. Warner-Lambert Co., 845 F.2d 66, 68–69 (4th Cir. 1988))).

15.     To determine the extent to which the law of the case governs, the court must first determine what issues it decided in the Opinion and Order and then decide whether any exceptions apply that might justify departing from the law of the case. See Mar-Bow, 469 F. Supp. 3d at 525.  "The Fourth Circuit has recognized three exceptions to the law of the case doctrine: '(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice.' "  Id. (quoting TFWS, 572 F.3d at 191).  In addition, "the Supreme Court has advised that a 'court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances . . . .' "  Id. (quoting Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817 (1988)).

16.     As previously explained, the court concluded under <u>Carolin</u> in its Opinion and Order that this case is not objectively futile because Bestwall has the resources with which to reorganize, and, therefore, the court did not need to reach the issue of whether the case was filed in subjective bad faith and declined to dismiss this case under the Fourth Circuit's two-prong dismissal standard.  <u>Bestwall</u>, 605 B.R. at 49–51.  In reaching that conclusion, the court found that attempting to resolve asbestos claims through section 524(g) is a valid reorganizational purpose and that the volume of current asbestos claims coupled with the number of claims to be filed is sufficient financial distress for the Debtor to file this Chapter 11 case.  <u>Id.</u> at 49.

17.     In considering the exceptions to the law of the case doctrine, the court notes that Mr. Buckingham does not cite to substantially different evidence (or any evidence produced in a subsequent trial) sufficient to cause this court to revisit the Opinion and Order.  Rather, he relies on the comments of Bestwall's counsel at a meeting of the American Bankruptcy Institute, Buckingham Motion at 4, 5, 17, 20, 21, that largely appear to have been taken out of context and are not inconsistent (when read in context) with statements Debtor's counsel has made on the record to this court.  Mr. Buckingham focuses on the dividends issued by Georgia-Pacific post-petition, <u>id.</u> at 5, 6, 14–15, 16–17, 27, that have been disclosed throughout this case and are consistent with corporate practice predating this case, <u>see</u> Stipulation Regarding Postpetition Dividends Paid by Non-Debtor Georgia-Pacific LLC (Dkt. 997); Declaration of Tyler L. Woolson (Dkt. 998); Second Stipulation Regarding Postpetition Dividends Paid by Non-Debtor Georgia-Pacific LLC (Dkt. 2346);

Declaration of Tyler L. Woolson (Dkt. 2347); Declaration of Julie A. Anderson (Dkt. 2857). Additionally, the Debtor's rejection of the Committee's plan does not serve as a basis for this court to reconsider the Opinion and Order. At a prior hearing in this case, the court noted that the Committee's plan is "akin to dismissal" and would need to be modified to be confirmable. See Oct. 22, 2020 Hr'g Tr. 16:22–24; 17:22–23.

18.     Mr. Buckingham points to the Fourth Circuit's recently-issued opinion in the Kaiser case as new law issued by controlling authority that is applicable to the issue of whether the court should dismiss this case under Carolin. Buckingham Motion at 2, 6, 11 (citing In re Kaiser Gypsum Co., 60 F.4th 73 (4th Cir. 2023)). According to Mr. Buckingham, in Kaiser "the Fourth Circuit Court of Appeals reiterated the purpose of Chapter 11 generally and of Section 524(g) specifically: it is for (a) financially distressed debtors, (b) faced with overwhelming asbestos liabilities, to (c) create a trust that marshals limited and inadequate assets so that present and future claimants share equitably—providing all with a better outcome than a forced liquidation." Buckingham Motion at 2 (emphasis omitted) (citing Kaiser, 60 F.4th at 77–78). Mr. Buckingham, however, misconstrues the discussion of section 524(g), which is in two introductory paragraphs of an opinion that addresses an insurer's standing to object to a Chapter 11 plan. Financial distress was not at issue in Kaiser, and the cited portion of Kaiser actually confirms that "§ 524(g) of the Bankruptcy Code allows a Chapter 11 debtor with **substantial asbestos liabilities** to obtain a channeling injunction that diverts all asbestos claims, current and future, to a trust established by the debtor's reorganization plan and funded by the debtor," Kaiser, 60

F.4th at 77–78 (emphasis added), which is not inconsistent with the conclusion reached by this court in its Opinion and Order.

19.    Mr. Buckingham also relies heavily on the Third Circuit's recent LTL Opinion as mandating the dismissal of this case. See supra ¶ 10. That opinion, however, is neither controlling nor applicable to this matter. Indeed, the Third Circuit recognizes in the LTL Opinion that "[i]n the Fourth Circuit, a court can only dismiss a bankruptcy petition for lack of good faith on a showing of the debtor's 'subjective bad faith' and the 'objective futility of any possible reorganization.' " LTL, 64 F.4th 98 n.8 (quoting Carolin, 886 F.2d at 694). The Third Circuit also acknowledges the reference by the bankruptcy court below to the Fourth Circuit's dismissal standard as a "much more stringent standard for dismissal of a case for lacking good faith" than the standard in the Third Circuit, but it did not analyze— nor should it have—whether this case should be dismissed pursuant to that standard. Id. (quoting In re LTL Mgmt., LLC., 637 B.R. 396, 406 (Bankr. D.N.J. 2022)).

20.    In sum, the Buckingham Motion seeks to have this court reconsider its earlier ruling in the Opinion and Order. Counsel for Mr. Buckingham insists to the contrary and at the hearing on the Buckingham Motion, he argued that the First Motion to Dismiss "was a different focus at a different time on different facts by a different party." March 15, 2023 Hr'g Tr. 19:12–13. While the movant is different and the motion was filed four and a half years after the First Motion to Dismiss, the focus is on substantially the same facts, some new facts that the court does not consider to be substantially different evidence, and some new law that is either not

controlling or is consistent with the court's Opinion and Order.  And the ultimate

question remains exactly the same: should the court dismiss this case as a bad faith

filing under <u>Carolin</u>?  Neither the new facts cited by Mr. Buckingham nor the new

law issued since the court entered its Opinion and Order cause this court to conclude

that its earlier decision to deny the First Motion to Dismiss was either erroneous or

works a manifest injustice, extraordinary circumstances do not exist which cause this

court to revisit its earlier decision, and the court concludes that the Opinion and

Order continues to be the law of this case.

21.    In addition to concluding that the Opinion and Order is the law of this

case and should not be reconsidered, the court also thinks that its jurisdiction to do

so is questionable given the pending appeal of the Opinion and Order.  Generally, the

timely filing of a notice of appeal "confers jurisdiction on the court of appeals and

divests the district court[11] of its control over those aspects of the case involved in the

appeal." <u>Levin v. Alms & Assocs., Inc.</u>, 634 F.3d 260, 263 (4th Cir. 2011) (quoting

<u>Griggs v. Provident Consumer Disc. Co.</u>, 459 U.S. 56, 58 (1982)).  For the same

reasons, "[a] bankruptcy court is divested of jurisdiction with respect to matters

raised in an appeal to a higher court." <u>In re Bryant</u>, 175 B.R. 9, 13 (W.D. Va. 1994)

(citing <u>In re Bialac</u>, 694 F.2d 625, 627 (9th Cir. 1982)).  "The purpose of the general

rule is to avoid the confusion of placing the same matter before two courts at the same

---

[11] In non-bankruptcy federal litigation like <u>Levin</u>, the district court is the trial court, and the court of appeals is the (initial) appellate court.  In bankruptcy matters, the bankruptcy court is the trial court, and the initial appeal goes to the district court (or, in certain other circuits, a bankruptcy appellate panel).  <u>See, e.g.</u>, FED. R. BANKR. P. 8003 (Appeal as of Right—How Taken; Docketing the Appeal), 8005 (Election to Have an Appeal Heard by the District Court Instead of the BAP).

time and [to] preserve the integrity of the appeal process." In re Whispering Pines Ests., Inc., 369 B.R. 752, 757 (B.A.P. 1st Cir. 2007) (citations omitted); see also Doe v. Pub. Citizen, 749 F.3d 246, 258 (4th Cir. 2014) (The divesting rule "fosters judicial economy and guards against the confusion and inefficiency that would result if two courts simultaneously were considering the same issues.").

22.    The court is attuned to the fact that bankruptcy cases often raise multiple issues, many of which are entirely unrelated to issues involved in an appeal. For that reason, "[t]he application of a broad rule that a bankruptcy court may not consider any request filed while an appeal is pending has the potential to severely hamper a bankruptcy court's ability to administer its cases in a timely manner." Whispering Pines, 369 B.R. at 758 (citations omitted).  And courts recognize that "when a notice of appeal has been filed in a bankruptcy case, the bankruptcy court retains jurisdiction to address elements of the bankruptcy proceeding that are not the subject of that appeal." In re Scopac, 624 F.3d 274, 280 (5th Cir. 2010) (quoting In re Transtexas Gas Corp., 303 F.3d 571, 580 (5th Cir. 2002)).  The end result is a functional test: "once an appeal is pending, it is imperative that a lower court not exercise jurisdiction over those issues which, although not themselves expressly on appeal, nevertheless so impact the appeal so as to interfere with or effectively circumvent the appeal process." Id. (quoting Whispering Pines, 369 B.R. at 759).

23.    That is the situation here given the similarity between the issues raised in the Buckingham Motion and those on appeal in the District Court.  For this court to exercise jurisdiction over the issues raised in the Buckingham Motion could

unnecessarily interfere with or confuse the appeal process.  For the same reasons previously explained, the Buckingham Motion is an attempt to have the court reconsider its Opinion and Order, and the issues raised in the motion are closely related to the issues on appeal in the District Court.  The Buckingham Motion seeks dismissal of this case for "cause" under section 1112(b) as a bad faith filing for many of the same reasons previously argued by the Committee in its First Motion to Dismiss and considered and decided by this court in its Opinion and Order denying that motion.  <u>See</u> Debtor's Chart (comparing arguments from the First Motion to Dismiss and the Buckingham Motion).  Mr. Buckingham asks this court to bring "fresh eyes" and "hindsight" to its prior ruling and disputes the Debtor's earlier arguments against dismissal.  Buckingham Motion at 4–5.  By way of further example, the Buckingham Motion cites the LTL Opinion in arguing that financial distress is a threshold requirement when considering a debtor's good faith in seeking the benefits of a bankruptcy filing.  <u>See</u> *supra* ¶ 10.  Similarly, the Committee filed a notice of supplemental authority to bring the LTL Opinion to the attention of the District Court and relies on it as a basis for the District Court to accept the appeal of the Opinion and Order so the Fourth Circuit can consider "the applicability of the <u>Carolin</u> standard [to] a debtor that failed to exhibit financial distress prior to invoking the substantial protections of the Bankruptcy Code."  Committee's Notice at 2.  Both the Committee and Mr. Buckingham argue that this case lacks a valid bankruptcy purpose, manipulates the Bankruptcy Code and bankruptcy jurisdiction, and deprives victims of jury trial rights.  <u>See, e.g.</u>, First Motion to Dismiss at 15–18,

Committee's reply in support of First Motion to Dismiss (Dkt. 653) at 13, Buckingham

Motion at 4, 7.  Finally, the crux of both motions is a determination of whether this

case should be dismissed under <u>Carolin</u> as a bad faith filing.  In short, the issues

raised in the Buckingham Motion are closely related to the matter on appeal and

consideration of the merits of the Buckingham Motion could "so impact the appeal . . .

as to interfere with or effectively circumvent the appeal process." <u>Scopac</u>, 624 F.3d

at 280 (quoting <u>Whispering Pines</u>, 369 B.R. at 759).

24.    There is an exception to the divestment rule if the appeal is

interlocutory.  <u>See</u> <u>BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea</u>, No. 14-

3551, 2016 WL 6167914, at *3 (D. Md. Oct. 24, 2016) ("Interlocutory appeals do not

divest [lower] courts of jurisdiction." (citing <u>Columbus-Am. Discovery Grp. v. Atl.</u>

<u>Mut. Ins. Co.</u>, 203 F.3d 291, 302 (4th Cir. 2000))).  The determination of whether the

Opinion and Order is interlocutory, however, is also pending in the District Court.

As <u>Bryant</u> recognized, "it is not for this court to determine ultimately whether its

order is properly appealable such that jurisdiction has vested in the appellate court."

175 B.R. at 12–13.  To rule on that issue and to reconsider the court's earlier ruling

on the First Motion to Dismiss while the appeal remains pending could moot the

appeal, lead to inconsistent results, or prompt a second appeal.  Undoubtedly, it

would unnecessarily muddy the waters.  For those reasons, the court will decline to

consider the merits of the issues raised in the Buckingham Motion.[12]

---

[12] After the District Court's November 7, 2023 decision not to allow an interlocutory appeal of this
court's ruling on the First Motion to Dismiss, Mr. Buckingham filed a Notice of Supplemental
Authority (Dkt. 3172) that reports the District Court's denial of the Committee's motion for leave to
appeal and asks the court to rule on the merits of his motion to dismiss.  The court declines the

25.    With respect to the arguments the Committee makes regarding <u>Carolin</u> by extension of its subject matter jurisdiction argument, the court will decline to reconsider its earlier rulings in the Opinion and Order for the same reasons it is declining to consider the Buckingham Motion on the merits.  Issues of subject matter jurisdiction, however, "may be resurrected at any point in the litigation." <u>Gonzalez v. Thaler</u>, 565 U.S. 134, 141 (2012); <u>see also</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 671 (2009) ("Subject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt." (citing <u>Arbaugh v. Y & H Corp.</u>, 546 U.S. 500, 514 (2006))); <u>Educ. Credit Mgmt. Corp. v. Kirkland (In re Kirkland)</u>, 600 F.3d 310, 315 (4th Cir. 2010) ("[S]ubject matter jurisdiction may be questioned at any stage of litigation, including an appeal."); <u>In re Aldrich Pump LLC</u>, Ch. 11 Case No. 20-30608, 2023 WL 9016506, at *9 (Bankr. W.D.N.C. Dec. 28, 2023) ("Lack of subject matter jurisdiction can be asserted at any time." (citations omitted)).  Because the absence of subject matter jurisdiction may be raised at any time, the court will consider that aspect of the Committee's Motion.

26.    This court and all federal courts have limited jurisdiction and can only exercise the power authorized by the Constitution and Congress.  <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 377 (1994); <u>Owen Equip. & Erection Co.</u>

---

invitation.  First, the court announced its ruling at the July 28, 2023 hearing, prior to the District Court's denial of the Committee's motion for leave to appeal, and this order memorializes that ruling.  In addition, and more importantly, even if the District Court's ruling occurred prior to the July 28 hearing, the court would not have gotten to the merits of the Buckingham Motion.  The court already ruled on the bad faith arguments at the heart of the Buckingham Motion, and the end of the appeal would not lead this court to reconsider its previous conclusions for the reasons explained in this order. <u>See, e.g.</u>, *supra* ¶ 20.

v. Kroger, 437 U.S. 365, 374 (1978).  Subject matter jurisdiction sets the outer limit of a court's authority, and nonjurisdictional rules control within the jurisdictional boundaries.  Santos-Zacaria v. Garland, 598 U.S. 411, 416 (2023) (citations omitted).  The Bankruptcy Clause of the Constitution determines the limits of constitutional subject matter jurisdiction for bankruptcy.  See Wright v. Union Cent. Life Ins. Co., 304 U.S. 502, 513 (1938) (providing that the right of Congress to legislate on bankruptcy is in general terms and quoting the Bankruptcy Clause); Schumacher v. Beeler, 293 U.S. 367, 374 (1934) ("The Congress, by virtue of its constitutional authority over bankruptcies (Const. Art. 1, § 8), could confer or withhold jurisdiction to entertain such suits and could prescribe the conditions upon which the federal courts should have jurisdiction."); Ralph Brubaker, *On the Nature of Federal Bankruptcy Jurisdiction: A General Statutory and Constitutional Theory*, 41 WM. & MARY L. REV. 743, 807 (2000) [hereinafter *Federal Bankruptcy Jurisdiction*] (noting that most Supreme Court discussions of bankruptcy jurisdiction rely on the Bankruptcy Clause); William E. Mussman & Stefan A. Riesenfeld, *Jurisdiction in Bankruptcy*, 13 LAW & CONTEMP. PROBS. 88, 89 (1948) (reading the scope of the Bankruptcy Clause with Article III as allowing all bankruptcy jurisdiction in federal court).  But see Aldrich, 2023 WL 9016506, at *13 ("[C]onstitutional challenges which are not targeted at the scope of Article III are not challenges to the Court's subject matter jurisdiction.").[13]  Congress determines subject matter jurisdiction within any

---

[13] If this debate is not jurisdictional, it is about congressional power pursuant to the Bankruptcy Clause.  Aldrich, 2023 WL 9016506, at *12–14.

limitations imposed by the Constitution.  United States v. Denedo, 556 U.S. 904, 912

(2009).  The party advocating in favor of a court's subject matter jurisdiction over a

particular case or issue bears the burden of proof.  Demetres v. E. W. Constr., Inc.,

776 F.3d 271, 272 (4th Cir. 2015); Piney Run Pres. Ass'n v. Cnty. Comm'rs, 523 F.3d

453, 459 (4th Cir. 2008); Glaspell v. United States (In re Glaspell), Ch. 7 Case No. 17-

bk-00301, Adv. No. 19-ap-36, 2020 WL 4577479, at *2 (Bankr. N.D. W. Va. Aug. 7,

2020).

27.    Since subject matter jurisdiction can be raised at any time and is a

requirement for courts to exercise their power, it cannot be defeated by equitable

defenses.  See Gonzalez, 565 U.S. at 141 ("Subject-matter jurisdiction can never be

waived or forfeited."); cf. Valley Historic Ltd. P'ship v. Bank of N.Y., 486 F.3d 831,

838 (4th Cir. 2007) (deciding even res judicata does not overcome a bankruptcy court's

obligation to determine its subject matter jurisdiction).  The concepts of consent,

waiver, and estoppel do not apply to subject matter jurisdiction because it is created

and limited by the Constitution and statutes.  Constantine v. Rectors & Visitors of

George Mason Univ., 411 F.3d 474, 480 (4th Cir. 2005); see MOAC Mall Holdings

LLC v. Transform Holdco LLC, 598 U.S. 288, 298 (2023) ("[N]ot even such egregious

conduct by a litigant could permit the application of judicial estoppel as against a

jurisdictional rule.").  Similarly, neither laches nor the law of the case doctrine[14]

---

[14] The Debtor's law of the case argument on the subject matter jurisdiction issue focuses on this court's
previous conclusion in the Opinion and Order that "[t]he volume of current asbestos claims that
Bestwall faced as of the Petition Date, coupled with the projected number of claims to be filed through
2050 and beyond, is sufficient financial distress for Bestwall to seek resolution under section 524(g) of
the Bankruptcy Code." Bestwall, 605 B.R. at 49.  While the court's previous order speaks for itself,
the court was not considering subject matter jurisdiction in that order, and, as the context of the entire

prevents review of subject matter jurisdiction. <u>Hager v. Gibson</u>, 188 B.R. 194, 196 (E.D. Va. 1995) (laches); <u>Aldrich</u>, 2023 WL 9016506, at *9 (laches); <u>Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc.</u>, 326 F.3d 505, 515–16 (4th Cir. 2003) (law of the case).

28.    Since the equitable defenses proffered by the Debtor are insufficient to defeat a motion challenging subject matter jurisdiction, the court will consider the Committee's Motion on the merits.  The Committee's nuanced argument is that the court does not have constitutional subject matter jurisdiction to hear this case due to the Debtor's lack of financial distress.[15]  <u>See</u> *supra* ¶ 7.  Put another way, the Committee contends that the language of the Bankruptcy Clause implicitly disqualifies entities that are not suffering financial distress from invoking the subject matter jurisdiction of this court.  Since there is no subject matter jurisdiction, according to the Committee, this case is void and must be dismissed.

29.    Accordingly, the court must look to the language of the Bankruptcy Clause and its meaning in order to determine whether there is subject matter jurisdiction for this case.  The Bankruptcy Clause is found at Article I, Section 8, Clause 4 of the Constitution and provides, in its entirety, that "Congress shall have

---

sentence makes clear, the court was only considering the evidence before it about the (significant) liabilities faced by the Debtor and was not considering the Debtor's (more significant) assets, <u>cf.</u> <u>LTL</u>, 64 F.4th at 104 ("These cases show that mass tort liability can push a debtor to the brink.  But to measure the debtor's distance to it, courts must always weigh not just the scope of liabilities the debtor faces, but also the capacity it has to meet them."); <u>Aldrich</u>, 2023 WL 9016506, at *15 (explaining argument that the court must consider the denominator (i.e., revenues/cash flow) as well as the numerator (i.e., asbestos liability) in determining financial distress).

[15] As mentioned *supra* ¶ 8, the Committee's Motion refers to the Debtor's financial situation at its petition date and since then, so it is not clear whether the court should examine the Debtor's alleged lack of financial distress as of the petition date over 6 years ago, now, or both.  Similarly and as discussed further *infra* ¶53, at the hearing on the Motions to Dismiss, the advocates for the Committee's position disagreed about whether the court should determine subject matter jurisdiction only as of the petition date or throughout the case.

Power . . . To establish . . . uniform Laws on the subject of Bankruptcies throughout the United States."  The limited constitutional guidance on the breadth of the bankruptcy power does not explicitly require debtors to suffer from any level of financial distress.  In fact, the Bankruptcy Clause does not provide any guidance at all about what types of entities are constitutionally eligible for bankruptcy protection. The Committee, however, contends that the Debtor exceeds the constitutional grant of jurisdiction because it is not a proper "subject of Bankruptcies" due to its lack of financial distress.  See Committee's Motion at 2.  In other words, according to the Committee, Congress could not make any "uniform Laws on the subject of Bankruptcies" applicable to this Debtor.  In a way, and contrary to more typical challenges to subject matter jurisdiction, the Committee is not challenging a law about subject matter jurisdiction but the absence thereof, contending that Congress failed to include a necessary condition, financial distress, in its statutory grant of jurisdiction to the bankruptcy court.

30.  Since the language of the Bankruptcy Clause does not address the meaning of "the subject of Bankruptcies," the court looks to the meaning of the clause at the time of adoption and as interpreted by courts since then.  Bankruptcy and insolvency law [16] as practiced in 1787 in England and the United States (pre-

---

[16] Until the 18th century, bankruptcy and insolvency were two separate (but related) bodies of substantive law.  Thomas E. Plank, *The Constitutional Limits of Bankruptcy*, 63 TENN. L. REV. 487, 516 (1996) (observing that English bankruptcy and insolvency law began to merge in 1758).  The Supreme Court has determined that the Bankruptcy Clause encompasses both types of law.  Cont'l Ill. Nat'l Bank & Tr. Co. of Chi. v. Chi., Rock Island & Pac. Ry. Co., 294 U.S. 648, 667–68 (1935) ("While attempts have been made to formulate a distinction between bankruptcy and insolvency, it long has been settled that, within the meaning of the constitutional provision, the terms are convertible."); Sturges v. Crowninshield, 17 U.S. 122, 195 (1819) ("This difficulty of discriminating with any accuracy between insolvent and bankrupt laws, would lead to the opinion, that a bankrupt law may contain

Constitution) undoubtably influenced the Framers of the Bankruptcy Clause.  See Cent. Va. Cmty. Coll. v. Katz, 546 U.S. 356, 362 (2006) ("It is appropriate to presume that the Framers of the Constitution were familiar with the contemporary legal context when they adopted the Bankruptcy Clause . . . .").  English law bore some similarities with modern bankruptcy law, but the modern bankruptcy practitioner would probably be more struck by the differences.  See Thomas E. Plank, *The Constitutional Limits of Bankruptcy*, 63 TENN. L. REV. 487, 499–503 (1996) [hereinafter "*Constitutional Limits*"] (discussing similarities and differences). Eighteenth-century English bankruptcy was exclusively for the benefit of creditors, and the system was strictly involuntary.  Cont'l Ill. Nat'l Bank & Tr. Co. of Chi. v. Chi., Rock Island & Pac. Ry. Co., 294 U.S. 648, 668 (1935).  But see *Constitutional Limits*, *supra*, at 496 n.33 & 510 (arguing that English bankruptcy was only technically limited to involuntary petitions because friendly creditors frequently commenced cases).  The concept of the discharge of debts was not introduced until 1705 (along with the death penalty for fraudulent debtors), and Parliament conditioned discharge on the consent of 80% of the creditor body (in number and amount of debt) the following year. *Constitutional Limits*, *supra*, at 500, 505–06.  In addition, only businessmen ("traders") could be debtors in England at the time.[17] Hanover Nat'l Bank of the City of N.Y. v. Moyses, 186 U.S. 181, 184–85 (1902).

---

those regulations which are generally found in insolvent laws; and that an insolvent law may contain those which are common to a bankrupt law.") (Marshall, C.J.).

[17] There is disagreement among authorities about when both English and American bankruptcy relief became available to debtors who were not traders.  See *infra* ¶ 33, nn.19–20.

Despite these fundamental differences, some aspects of 18th century English bankruptcy law, such as the use of the predecessors of trustees, meetings of creditors, and proofs of claims, would be recognizable to a modern bankruptcy practitioner. *Constitutional Limits*, *supra*, at 500–01.  Perhaps most importantly for this court's present purposes, 18th century English bankruptcy law did not require insolvency.[18] In re Klein, 14 F. Cas. 716, 717 (C.C.D. Mo. 1843) ("By the English law, . . . it mattered not whether the defendant was insolvent or otherwise . . . ."); Thomas E. Plank, *Bankruptcy and Federalism*, 71 Fordham L. Rev. 1063, 1094 (2002) [hereinafter *Bankruptcy and Federalism*] (noting that insolvency was not always required by 18th century laws).  But see *Bankruptcy and Federalism*, *supra*, at 1094 (arguing that "acts of bankruptcy" and other jurisdictional requirements represented "more particular examples of insolvency").

31.    Some American colonies and states got an early start on federalism, embraced the idea of the states as the laboratories of democracy, see New State Ice Co. v. Liebmann, 285 U.S. 262, 311 (1932) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens chose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."), and experimented more with their bankruptcy systems.  *Bankruptcy and Federalism*, *supra*, at 1085.  Unlike English law, certain jurisdictions allowed voluntary proceedings, non-consensual discharge of debts, and non-trader debtors.

---

[18] While very few opinions consider a debtor's degree of financial distress, and many of the authorities (including the majority of the sources cited by the Committee as support for its argument) discuss a debtor's financial condition in terms of insolvency, it is important to recognize that "insolvency" and "financial distress" are not synonymous.  See *infra* ¶¶ 49–51.

Klein, 14 F. Cas. at 717; *Bankruptcy and Federalism*, *supra*, at 1085–87.

32.      Against this backdrop, the Framers of the Constitution met in Philadelphia and adopted, among other provisions, the Bankruptcy Clause. Unfortunately for courts trying to divine its meaning 250 years later, the Framers did not give us much with which to work. See *Constitutional Limits*, *supra*, at 527 (noting that "[t]he proceedings of the Constitutional Convention shed little light" on the intent of the Bankruptcy Clause). The only vote against the Bankruptcy Clause came from a member of the Connecticut delegation who feared giving Congress the power to institute the death penalty as a punishment for bankruptcy. Katz, 546 U.S. at 369 (citation omitted); Ry. Lab. Execs.' Ass'n v. Gibbons, 455 U.S. 457, 472 & n.13 (1982) (citation omitted). In the only meaningful, if brief, discussion of bankruptcy in *The Federalist*, James Madison emphasized the close relationship between bankruptcy and commerce as proof of the importance of uniform bankruptcy laws. Gibbons, 455 U.S. at 465–66 ("As James Madison observed, '[t]he power of establishing uniform laws of bankruptcy is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may lie or be removed into different States, that the expediency of it seems not likely to be drawn into question.'" (alteration in original) (quoting THE FEDERALIST No. 42 at 285 (N.Y. Heritage Press 1945))). There is no direct evidence about whether the Framers intended to enshrine English bankruptcy law into the Constitution or had a more general concept of bankruptcy in mind. *Constitutional Limits*, *supra*, at 527. Likewise, there is no direct evidence that the Framers intended

to require financial distress for bankruptcy jurisdiction.

33.    It is difficult to discern exactly what the Framers had in mind for bankruptcy law, and subsequent developments (and the Supreme Court opinions allowing them) suggest that the Framers' intent was not of utmost importance, as the Framers could not have foreseen the ways that American bankruptcy would change (and be allowed to change).  The liberalization of bankruptcy law, however, did not start immediately.  The first several Congresses attempted but failed to pass a bankruptcy law until the first bankruptcy act passed in 1800.  Katz, 546 U.S. at 373 (quoting C. WARREN, BANKRUPTCY IN UNITED STATES HISTORY 10 (1935)).  The 1800 law was a copy of the familiar English law.  Id.; *Constitutional Limits*, *supra*, at 499 & 533.  But see Cont'l Ill., 294 U.S. at 670 (claiming the first American bankruptcy law "ignored" English law by expanding the reach beyond traders).[19]

34.    More fundamental changes to the American bankruptcy system followed.  The 1841 Act took a "radical step forward" by introducing voluntary petitions.  Cont'l Ill., 294 U.S. at 670; see also In re Marshall, 300 B.R. 507, 516, 520 (Bankr. C.D. Cal. 2003) (noting that the 1841 Act was the first American bankruptcy law that allowed voluntary petitions), *aff'd*, 403 B.R. 668 (C.D. Cal. 2009), *aff'd*, 721 F.3d 1032 (9th Cir. 2013).[20]  Previous bankruptcy regimes were intended to benefit creditors and viewed debtors as dishonest, but the 1841 law began the assumption of

---

[19] Professor Plank claims that English bankruptcy law of the 18th century had already expanded beyond traders prior to 1787.  *Constitutional Limits*, *supra*, at 541 n.309.

[20] Marshall says the "second landmark major development" of the 1841 Act was the extension of bankruptcy law to non-traders.  300 B.R. at 520.

the honest but unfortunate debtor. <u>Cont'l Ill.</u>, 294 U.S. at 670–71 (quoting <u>Loc. Loan</u>

<u>Co. v. Hunt</u>, 292 U.S. 234, 244 (1934)).  Justice Catron, sitting as a circuit judge,

reversed a district court ruling that the Bankruptcy Clause only allowed the 1787

English version of bankruptcy. <u>Klein</u>, 14 F. Cas. at 716, 719.

35.     Insolvency was never a requirement for English or early American

involuntary cases, which instead required "acts of bankruptcy." <u>Marshall</u>, 300 B.R.

at 517–18.  The 1841 Act did include a requirement for voluntary debtors to plead an

inability to pay their debts, but it "was only a pleading requirement" as "[n]either the

parties nor the court had the authority to inquire into whether a debtor was in fact

insolvent." <u>Id.</u> at 516 (citing <u>Ex parte Hull</u>, 12 F. Cas. 853, 856 (S.D.N.Y. 1842)).  This

insolvency pleading requirement carried over into the 1867 Act but "disappeared

entirely in 1878 (the date of repeal of the 1867 Act)" and did not reappear for

voluntary cases in subsequent bankruptcy laws. <u>Id.</u> at 517.

36.     The 1867 Act also continued the expansion of (or at least change in)

American bankruptcy law from its English roots.  A creditor challenged a provision

of the 1867 Act allowing discharge on the partial payment of debt as not part of "the

subject of Bankruptcies" as intended by the Bankruptcy Clause. <u>In re Reiman</u>, 20 F.

Cas. 490, 492–93 (S.D.N.Y. 1874).  A future Supreme Court justice, then-Judge

Blatchford, catalogued the differences between bankruptcy as practiced in England

and the United States and held that "[i]t cannot be doubted, that [C]ongress, in

passing laws on the subject of bankruptcies, is not restricted to laws with such scope

only as the English bankruptcy laws had when the [C]onstitution was adopted." <u>Id.</u>

at 495–96; see also *Constitutional Limits*, *supra*, at 539–40 (summarizing Reiman and noting Judge Blatchford's subsequent Supreme Court position).

37.    Congress enacted the first permanent American bankruptcy law in 1898. *Constitutional Limits*, *supra*, at 540.  Among other innovations, the 1898 Act removed the need for creditors to consent to the debtor's discharge. Id.  The Supreme Court faced a creditor's complaint that the 1898 Act violated the Bankruptcy Clause due to a lack of uniformity, the delegation of legislative power to the states, allowing non-trader debtors, and permitting voluntary petitions. Moyses, 186 U.S. at 183–84. The new law, however, "easily withstood challenges to its constitutionality as within the 'subject of Bankruptcies.' " *Constitutional Limits*, *supra*, at 540–41 (citing Moyses, 186 U.S. at 187).

38.    Congress further expanded the 1898 Act in 1933 by adding reorganization provisions for individuals, farmers, and railroads. Id. at 541.  Both the Supreme Court and the Fourth Circuit endorsed the expansion.  See Cont'l Ill., 294 U.S. at 671 ("[T]hese acts, far-reaching though they be, have not gone beyond the limit of congressional power; but rather have constituted extensions into a field whose boundaries may not yet be fully revealed."); Campbell v. Alleghany Corp., 75 F.2d 947, 951 (4th Cir. 1935) ("[W]e entertain no doubt as to the constitutionality of the statute.").  The Supreme Court concluded that the "fundamental and radically progressive . . . extensions" were within Congress's bankruptcy power and showed the ability of the Bankruptcy Clause to address changes in business and social interactions, Cont'l Ill., 294 U.S. at 671, while the Fourth Circuit noted that Congress

was addressing the shortfalls of prior bankruptcy laws, <u>Campbell</u>, 75 F.2d at 951.

39.    Congress overhauled the 1898 Act by adopting our current bankruptcy law, the Bankruptcy Code, in 1978.  Frank R. Kennedy, *The Commencement of a Case Under the New Bankruptcy Code*, 36 WASH. & LEE L. REV. 977, 981 (1979).  Congress sought the recommendations of a Commission on Bankruptcy Laws of the United States, <u>id.</u> at 977–78, and, among other things, the Commission recognized the potential for a delay in filing a bankruptcy case to doom a reorganization before it even started and sought to remove barriers to voluntary petitions, REPORT OF THE COMMISSION ON THE BANKRUPTCY LAWS OF THE UNITED STATES, H.R. DOC. NO. 93-137, pt. 1, at 75 (1973) [hereinafter "REPORT"].  Accordingly, the Code provides for a "liberalization of access" by making the "order for relief"[21] "equivalent to adjudication under the Bankruptcy Act and . . . tantamount to an order approving the court's exercise of jurisdiction" and requiring "[n]either insolvency nor inability to pay debts nor even the fact that the debtor is indebted in any amount . . . to be alleged or proved" in voluntary petitions.  Kennedy, *supra*, at 983–84 (footnote omitted); <u>see also</u> *Constitutional Limits*, *supra*, at 496 (noting that, other than a few exceptions, "there is no requirement of insolvency in any sense" to commence voluntary cases under the Bankruptcy Code).

40.    This brief overview of the history of American bankruptcy law shows great change and innovation since the adoption of the Bankruptcy Clause, and the Supreme Court has described the clause in terms that suggest Congress has nearly

---

[21] The filing of a petition constitutes the "order for relief" in a voluntary case.  11 U.S.C. § 301(b).

unlimited power to determine the proper "subject of Bankruptcies."  The Court has
repeatedly emphasized that the "subject of Bankruptcies" is not limited to the English
and/or early state version of bankruptcy in 1787.  Wright, 304 U.S. at 513 (citing
Adair v. Bank of Am. Nat'l Tr. & Sav. Ass'n, 303 U.S. 350, 354 (1938); Cont'l Ill., 294
U.S. at 668); Cont'l Ill., 294 U.S. at 668 (remarking that the idea that the Framers
intended to limit Congress to English law had been long-dispelled (in 1935)); Moyses,
186 U.S. at 187 (observing that the Framers were aware of Blackstone[22] and English
law but granted power over the entire subject of bankruptcies without limitation); see
also Bradford v. Fahey, 76 F.2d 628, 632 (4th Cir. 1935) ("It is clear that the power of
Congress over bankruptcies is not limited by the terms of the British and colonial
statutes as they existed at the time of the adoption of the Constitution.").

41.    If the language of the Bankruptcy Clause does not require bankruptcy
as practiced in 1787, what exactly does it mean?  The Supreme Court has resisted
giving us a precise definition and has even asserted, as recently as 2022, that the
scope of the Bankruptcy Clause cannot be fully defined.  Siegel v. Fitzgerald, 596 U.S.
464, 473 (2022) ("[T]he 'subject of bankruptcies is incapable of final definition . . . .' "
(quoting Wright, 304 U.S. at 513)); see also Moyses, 186 U.S. at 186 ("In considering
the question before me, I have not pretended to give a definition (but purposely
avoided any attempt to define) the mere word 'bankruptcy.' " (quoting Klein, 14 F.

---

[22] William Blackstone, whose "*Commentaries* rank second only to the Bible as a literary and
intellectual influence on the history of American institutions," William D. Bader, *Some Thoughts on
Blackstone, Precedent, and Originalism*, 19 VT. L. REV. 5, 8 (1994) (quoting ROBERT A. FERGUSON, LAW
AND LETTERS IN AMERICAN CULTURE 11 (1984)), thoroughly considered English bankruptcy law and
did not include insolvency as a requirement.  Marshall, 300 B.R. at 517 (citing 2 WILLIAM BLACKSTONE,
COMMENTARIES *471–88).

Cas. at 718)); *Federal Bankruptcy Jurisdiction*, *supra*, at 747 ("[B]ankruptcy has

become the seemingly inscrutable crucible of federal jurisdiction theory."). Similarly,

the Supreme Court has said there are some limits to Congress's power pursuant to

the Bankruptcy Clause, but the limits are also beyond definition. Cont'l Ill., 294 U.S.

at 669–70 ("Those limitations have never been explicitly defined, and any attempt to

do so now would result in little more than a paraphrase of the language of the

Constitution without advancing far toward its full meaning."). Given its inability to

define the contours of the bankruptcy power, it is not surprising that the Court treats

bankruptcy jurisdiction as unusual and unique. See, e.g., Allen v. Cooper, 589 U.S.

___, 140 S. Ct. 994, 1002 (2020) (noting that Katz reflects "what might be called

bankruptcy exceptionalism" and distinguishing Katz based on the " 'singular nature'

of bankruptcy jurisdiction" (quoting Katz, 546 U.S. at 369 n.9)).

42.    The Supreme Court has, however, attempted to describe elements of the

undefinable bankruptcy power. For example, the "Court has repeatedly emphasized

that the Bankruptcy Clause's language, embracing 'laws on the subject of

Bankruptcies,' is broad." Siegel, 596 U.S. at 473; see also Charles J. Tabb, *The

Bankruptcy Clause, the Fifth Amendment, and the Limited Rights of Secured

Creditors in Bankruptcy*, 2015 No. 2 Univ. Ill. L. Rev. 765, 766 ("[T]he scope of

congressional power . . . is exceedingly broad."), 778 ("Justice Catron's *extraordinarily

broad* definition of the scope of congressional power under the Bankruptcy Clause [in

Klein] has been quoted in numerous cases with approval by the Supreme Court . . . ."

(emphasis added)). In fact, the scope is so broad that it includes concepts that do not

fit neatly into any possible definition.  See, e.g., Wright, 304 U.S. at 514 (observing that the purchase of a debtor's property by a third party is not part of the debtor-creditor relationship but "does enter into the radius of the bankruptcy power over debts"); *Bankruptcy and Federalism*, *supra*, at 1100–1104 (describing a few sections of the Bankruptcy Code, including 11 U.S.C. § 363(h), that violate "the Non-Expropriation Principle" by subordinating the property interests of third parties to the interests of creditors).

43.    Congress's bankruptcy power is not just broad; it is also potent.  Courts and commentators are especially fond of describing the power as "plenary"[23] and use similar terms that suggest that Congress's power in this field approaches omnipotence.  Siegel, 596 U.S. at 474 ("plenary" (quoting Moyses, 186 U.S. at 187)); Int'l Shoe Co. v. Pinkus, 278 U.S. 261, 265 (1929) ("unrestricted and paramount"); Campbell, 75 F.2d at 955 ("plenary"); Reiman, 20 F. Cas. at 496 ("general, unlimited and unrestricted"); Ralph Brubaker, *Explaining* Katz's *New Bankruptcy Exception to State Sovereign Immunity: The Bankruptcy Power as a Federal Forum Power*, 15 ABI L. REV. 95, 131 (2007) ("practically unlimited"); *Federal Bankruptcy Jurisdiction*, *supra*, at 746 ("Congress, of course, has plenary legislative power 'on the subject of Bankruptcies.' ").  In In re Klein, Justice Catron describes a "general and unlimited" power that "gives the unrestricted authority to [C]ongress over the entire subject, as the parliament of Great Britain had it, and as the sovereign states of this Union had

---

[23] *Black's Law Dictionary* defines "plenary" as "Full; complete; entire."  *Plenary*, BLACK'S LAW DICTIONARY (9th ed. 2009).

it before the time when the [C]onstitution was adopted."[24]  14 F. Cas. at 717.

44.    When courts do discuss the boundary of the bankruptcy power, it is usually in reference to the uniformity requirement mentioned in the Bankruptcy Clause, and uniformity is frequently referenced as the singular restriction.  See Siegel, 596 U.S. at 476 ("Although the Bankruptcy Clause confers broad authority on Congress, the Clause also imposes *a* limitation on that authority: the requirement that the laws enacted be 'uniform.' " (emphasis added)); Gibbons, 455 U.S. at 468 ("Unlike the Commerce Clause, the Bankruptcy Clause itself contains *an* affirmative limitation or restriction upon Congress' power: bankruptcy laws must be uniform throughout the United States." (emphasis added)); Kunzler v. Kohaus, 5 Hill 317, 324 (N.Y. 1843) ("The power conferred is without restriction, save in its uniformity.").  The court does not place excessive emphasis on one word, particularly an extremely short one, but it is notable that uniformity is described as *the* limitation on the bankruptcy power and not one of the limitations or even the primary one.  But see Tabb, *supra*, at 767 ("Two limits appear in the Clause: that the law be 'uniform,' and that it be 'on the subject of Bankruptcies.' ").

45.    As suggested by a broad and supreme power that is not moored to its roots in English bankruptcy law, courts and commentators have also described the ability of the Bankruptcy Clause to adapt to changing conditions, once as bluntly as "The concept changes."  Wright, 304 U.S. at 513; see also Cont'l Ill., 294 U.S. at 668

---

[24] Concerns about subject matter jurisdiction presumably did not limit the bankruptcy authority of Parliament and the pre-Constitution states.

(describing a tendency toward "progressive liberalization" of the bankruptcy power since its inception); Tabb, *supra*, at 804 ("[T]he scope of the constitutional grant on the 'subject of Bankruptcies' has an expansive and elastic reach . . . ."); *Constitutional Limits*, *supra*, at 567–68 (arguing that even though the automatic stay and discretionary injunction did not exist in early bankruptcy law, they are part of the "subject of Bankruptcies" because they are "logical developments"). "Congress is not limited by what has been attempted in the past but may shape its remedies in a way to meet adequately the problems of the present." Campbell, 75 F.2d at 955. Throughout the history of American bankruptcy law, the Supreme Court has determined that various changes of a "fundamental and radically progressive nature" are within Congress's power pursuant to the Bankruptcy Clause. Marshall, 300 B.R. at 520 (quoting Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 588 (1935)). But see *Constitutional Limits*, *supra*, at 500 (claiming the "subject of Bankruptcies" has not changed since the adoption of the Bankruptcy Clause and descriptions of the subject as constantly expanding are "both superficial and myopic").

46.    Despite forswearing the ability to do so, the Supreme Court has occasionally offered or endorsed definitions of the bankruptcy power.  These definitions, however, tend to "result in little more than a paraphrase[25] of the language of the Constitution without advancing far toward its full meaning." Cont'l Ill., 294 U.S. at 669–70.  Bankruptcy jurisdiction "extends to all cases where the law causes

---

[25] The lengthier of these definitions might be more like the opposite of a paraphrase since a paraphrase is usually shorter and simpler than the original statement.

to be distributed the property of the debtor among his creditors; this is its least limit. Its greatest is a discharge of the debtor from his contracts.   And all intermediate legislation, affecting substance and form, but tending to further the great end of the subject—distribution and discharge—are in the competency and discretion of [C]ongress." <u>Klein</u>, 14 F. Cas. at 718; <u>see</u> *Constitutional Limits*, *supra*, at 538 (noting that the Supreme Court has repeatedly expressed its approval of the <u>Klein</u> definition (citing <u>United States v. Bekins</u>, 304 U.S. 27, 47 (1938);[26] <u>Radford</u>, 295 U.S. at 588 n.18; <u>Cont'l Ill.</u>, 294 U.S. at 669; <u>Moyses</u>, 186 U.S. at 186)).   The "subject of Bankruptcies" is "not, properly, anything less than the subject of the relations between an insolvent or non-paying or fraudulent debtor, and his creditors, extending to his and their relief." <u>Reiman</u>, 20 F. Cas. at 496; <u>see</u> *Constitutional Limits*, *supra*, at 540 n.291 (noting that the Supreme Court endorsed the <u>Reiman</u> definition in <u>Wright</u>, 304 U.S. at 513–14, <u>Radford</u>, 295 U.S. at 588 n.18, <u>Cont'l Ill.</u>, 294 U.S. 672–673, and <u>Moyses</u>, 186 U.S. at 187).   "[T]he restructuring of debtor-creditor relations . . . is at the core of the federal bankruptcy power . . . ." <u>N. Pipeline Constr. Co. v. Marathon Pipe Line Co.</u>, 458 U.S. 50, 71 (1982).

47.     While the language of the Bankruptcy Clause, the history of American bankruptcy law, and the Supreme Court's descriptions of the bankruptcy power do not definitively answer, or even directly address, the question of whether

---

[26] Despite the citation in *Constitutional Limits*, the <u>Bekins</u> opinion does not actually discuss the <u>Klein</u> definition at all.   It does, however, quote the <u>Reiman</u> formulation of the bankruptcy power.   <u>Bekins</u>, 304 U.S. at 47.

constitutional subject matter jurisdiction requires a debtor in financial distress,[27] the

absence of support for the Committee's argument is conspicuous. There are simply

no cases at any level (of which this court is aware) that explicitly endorse the

proposition that bankruptcy courts do not have subject matter jurisdiction unless a

debtor has a sufficient degree of financial distress. See Aldrich, 2023 WL 9016506,

at *4, *16, *33 (observing that there are no cases that hold that financial distress is

a constitutional or jurisdictional requirement for debtors). With no precedent for the

exact relief it seeks, the Committee argues its position primarily by focusing on the

historical meaning of bankruptcy, see May 17, 2023 Hr'g Tr. 24:12–25:9 (discussing

bankruptcy in ancient Greece, Rome, and Europe); id. at 28:15–33:8 (discussing the

meaning of bankruptcy from "back in the day" (1777) through the present), references

to insolvency and other terms suggesting financial difficulty in dicta, see Committee's

Motion at 11 ("I read the constitution thus: 'Congress shall have power to establish

uniform laws on the subject of any person's general *inability* to pay his debts.' "

(quoting (and adding emphasis to) Kunzler, 5 Hill at 321)); id. at 12 ("The subject of

bankruptcies is nothing less than 'the subject of the relations between an *insolvent or*

*nonpaying or fraudulent debtor*, and his creditors, extending to his or their relief.' "

(quoting (and adding emphasis to) Wright, 304 U.S. at 513–14)); id. at 13 ("[T]he

'Bankruptcy Code strikes a balance between the interests of *insolvent debtors and*

*their creditors.*' " (quoting (and adding emphasis to) Bartenwerfer v. Buckley, 598

---

[27] But see Gibbons, 455 U.S. at 476 (Marshall, J., concurring) ("Congress may specify what debtors . . .
will be subject to bankruptcy legislation.").

U.S. 69, 72 (2023)), and the pleas of commentators about how the bankruptcy system should work (which is not always the same as how it actually operates), see Judith K. Fitzgerald, *Over-Thinking Ramifications of the Dismissal of LTL Management LLC's Bankruptcy*, HARV. L. SCH. BANKR. ROUNDTABLE (Feb. 14, 2023), https://bankruptcyroundtable.law.harvard.edu/2023/02/14/texas-two-step-and-the-future-of-mass-tort-bankruptcy-series-postscript-and-analysis-of-third-circuit-dismissal-of-ltl-managements-bankruptcy/ (claiming the LTL Opinion "determined that the need for some form of imminent and demonstrable financial relief is foundational to invoking bankruptcy jurisdiction"[28]); Ralph Brubaker, *The Texas Two-Step and Mandatory Non-Opt-Out Settlement Powers*, HARV. L. SCH. BANKR. ROUNDTABLE                (July                12,                2022), https://bankruptcyroundtable.law.harvard.edu/2022/07/12/texas-two-step-and-the-future-of-mass-tort-bankruptcy-series-the-texas-two-step-and-mandatory-non-opt-out-settlement-powers/ (theorizing that the risk of solvent defendants undercompensating their victims might be acceptable when there is "a clear and present threat to entity viability"); *Constitutional Limits*, *supra*, at 492, 545 (arguing that insolvency is a jurisdictional requirement for bankruptcy).

48.    It is not surprising that the popular understanding of the term "bankruptcy" relates to insolvency or that many bankruptcy opinions include references to insolvency, see, e.g., Wright, 304 U.S. at 513–14 (quoting Reiman, 20 F.

---

[28] Judge Fitzgerald appears to be using the word "jurisdiction" loosely in the quoted phrase.  See *infra* n.36, ¶ 58.

Cas. at 496), since most debtors are insolvent, see In re Ultra Petroleum Corp., 51

F.4th 138, 142 (5th Cir. 2022) ("Bankruptcy is ordinarily for the insolvent."); Aldrich,

2023 WL 9016506, at *17 (observing that "the vast majority" of debtors are insolvent

and financially distressed); *Constitutional Limits*, *supra*, at 488 ("[M]ost proceedings

under the Code do involve insolvent debtors . . . ."). Potential debtors normally do not

want to subject themselves to the disclosure requirements and negative societal

ramifications (like public disapproval/embarrassment and, for publicly-traded

companies, stock market consequences) of a bankruptcy filing unless they have no

other option, and they normally have other options until they are insolvent or very

close to it.[29] Cf. Kennedy, *supra*, at 980 ("A debtor contemplating reorganization

under Chapter XI frequently postponed the filing of the petition until losses and

deterioration of his financial condition frustrated efforts to accomplish any realistic

rehabilitation."). Some commentators argue in favor of a jurisdictional insolvency

requirement, see, e.g., *Bankruptcy and Federalism*, *supra*, at 1064 & 1129 (arguing

that Congress can only overrule state law to alter the relationship between insolvent

debtors and creditors); *Constitutional Limits*, *supra*, at 488, 492, 545 (claiming that

insolvency is a jurisdictional requirement), but courts, including this one, have

rejected a rule requiring debtors to be insolvent, see, e.g., LTL, 64 F.4th at 102 (noting

the lack of an insolvency requirement); Bestwall, 605 B.R. at 49 ("[F]iling for Chapter

---

[29] Texas Two-Step cases like this one, where an existing company (Georgia-Pacific here) creates a separate entity like the Debtor in order to gain access to benefits available only in bankruptcy for itself, appear to be an exception to this rule. Cf. *Bankruptcy and Federalism*, *supra*, at 1095 (contending that an insolvency requirement would prevent solvent debtors from taking advantage of bankruptcy rules that are not available elsewhere).

11, especially in the context of an asbestos or mass tort case, need not be due to insolvency."); In re Mid-Valley, Inc., 305 B.R. 425, 429 (Bankr. W.D. Pa. 2004) (Fitzgerald, J.) ("The Bankruptcy Code does not require that a debtor be insolvent."); Marshall, 300 B.R. at 509 (holding that the Bankruptcy Clause does not require insolvency), 519 ("[I]t is not credible that the framers of the Constitution thought that a requirement of insolvency was included in the concept of bankruptcy that found its way into the Bankruptcy Clause."), and no court has held that insolvency is a prerequisite for constitutional subject matter jurisdiction.  References to insolvency in bankruptcy opinions are dicta, see, e.g., Bartenwerfer, 598 U.S. at 72 (referring to the Bankruptcy Code's balance between insolvent debtors and creditors in the first sentence of the opinion); Kunzler, 5 Hill at 320 (asserting that "bankruptcy" is synonymous with "insolvency"), and the court is not bound by dicta, see Katz, 546 U.S. at 363 (citing Cohens v. Virginia, 6 Wheat. 264, 399–400 (1821)).

49.    In addition, "insolvency" and "financial distress" do not mean the same thing, LTL, 64 F.4th at 102 ("To say, for example, that a debtor must be in financial distress is not to say it must necessarily be insolvent."), and the Committee explicitly and emphatically rejects the concept of an insolvency requirement for bankruptcy jurisdiction, Official Committee of Asbestos Claimants' Consolidated Reply in Support of the Committee's Motion to Dismiss for Lack of Subject Matter Jurisdiction (Dkt. 2993) ("Committee's Reply") at 8 ("[T]he Committee ***does not*** argue that an entity must be insolvent to file for bankruptcy.").  There are several ways to define "insolvency," two of which are regularly used in bankruptcy: (1) balance sheet

42

insolvency, and (2) the liquidity (or "equity" or "cash flow") test for

insolvency. <u>Marshall</u>, 300 B.R. at 511–513. Generally, balance sheet insolvency means a debtor's

total debt exceeds the value of its property. *Balance-sheet insolvency*, BLACK'S LAW

DICTIONARY (9th ed. 2009) ("Insolvency created when the debtor's liabilities exceed

its assets."). The Bankruptcy Code includes its own modified versions of balance

sheet insolvency applicable to entities other than municipalities. 11 U.S.C.

§ 101(32)(A)–(B). Courts use the Code's versions of balance sheet insolvency

primarily "to define narrowly drawn rights under particular statutory provisions,"

<u>Marshall</u>, 300 B.R. at 512 (citing §§ 365, 525, 541, 543, 545, 546, 547, 548, 553), and

they are not used to determine debtor eligibility.

50.     The liquidity test for insolvency does not compare a debtor's assets and

liabilities. Instead, it looks at whether a debtor is promptly paying its debts. *Equity*

*insolvency*, BLACK'S LAW DICTIONARY (9th ed. 2009) ("Insolvency created when the

debtor cannot meet its obligations as they fall due."). The Bankruptcy Code includes

a version of the liquidity test in section 101(32)(C) that courts use to determine the

eligibility of municipalities to file bankruptcy under Chapter 9. <u>See</u> § 109(c)(3).[30] It

is the only type of insolvency ever used to determine debtor eligibility for bankruptcy

in the United States. <u>Marshall</u>, 300 B.R. at 512.

51.     While insolvency examines whether a debtor's liabilities exceed its

---

[30] Municipalities must be insolvent to be debtors, but the requirement is included in section 109 and
does not implicate the court's subject matter jurisdiction. <u>See</u> <u>In re Hamilton Creek Metro. Dist.</u>, 143
F.3d 1381, 1385 n.2 (10th Cir. 1998) (noting that "none of the § 109(c) criteria is [sic] jurisdictional in
nature" while determining that a Chapter 9 debtor "did not meet the essential criterion of insolvency");
<u>see also</u> *infra* ¶ 57.

assets (literally for balance sheet insolvency and figuratively under the liquidity test), financial distress is a more nebulous concept that implies a less severe degree of financial trouble than insolvency.  The LTL Opinion, which the Committee (understandably) puts great stock in, does not attempt to define "financial distress." LTL, 64 F.4th at 102 ("[W]e need not set out any specific test to apply rigidly when evaluating financial distress."), 110 ("[W]hile it is unwise today to attempt a tidy definition of financial distress justifying in all cases resort to Chapter 11, we can confidently say the circumstances here fall outside those bounds.").  The concept is so vague that the Committee does not attempt to precisely define it despite asking this court to determine that it is implicitly required by the Bankruptcy Clause.  See Committee's Motion at 20 (asserting that "[t]his court need not determine where the constitutional line is" because it is so clear that the Debtor is not in financial distress). The court accepts the Committee's argument that the Debtor has never been in financial distress in the sense that its access to the funding agreement, and, therefore, Georgia-Pacific's assets, makes it able to pay any conceivable liabilities now and in the foreseeable future (and the Debtor does not argue to the contrary), but the requirements of constitutional subject matter jurisdiction, especially given the potentially drastic consequences of the lack thereof, see infra ¶ 53, need to be definable.  As previously noted, no court has ever concluded that financial distress is a requirement for constitutional subject matter jurisdiction, and there is some indication in the case law that it is not, see, e.g., United States v. Huebner, 48 F.3d

376, 379 (9th Cir. 1994) ("The Bankruptcy Act[31] does not require any particular degree of financial distress as a condition precedent to a petition seeking relief."); Rudd v. Laughlin, 866 F.2d 1040, 1041–42 (8th Cir. 1989) ("[T]he statutes governing the authority of federal courts to hear bankruptcy cases do not limit jurisdiction according to amounts involved."); In re Honx, Inc., No. 22-90035, 2022 WL 17984313, at *2 (Bankr. S.D. Tex. Dec. 28, 2022) (concluding that a debtor with asbestos liability did not commence its case in bad faith because "Congress recognized that . . . an asbestos bankruptcy differs from a 'classic' bankruptcy with an insolvent or near-insolvent debtor"); In re Gen. Growth Props, Inc., 409 B.R. 43, 60 (Bankr. S.D.N.Y. 2009) (declining to establish a rule that debtors cannot file bankruptcy unless their debt is due within a particular period of time); In re Mirant Corp., No. 03-46590, 2005 WL 2148362, at *12–13 (Bankr. N.D. Tex. Jan. 26, 2005) (using laches to deny motions to dismiss despite allegation that the debtor "was highly solvent and financially healthy on the date of its bankruptcy filing and has continued to be so since that date").

52.    Given the lack of support in bankruptcy history for a financial distress requirement, the relative abundance of references to insolvency (and, at least in relevant scholarship, support for an insolvency requirement), and the similarity of the two concepts (i.e., both look at the financial problems of a debtor), it is not surprising or unreasonable for the Committee to use references to insolvency to

---

[31] Huebner deals with the appeal of tax evasion convictions involving bankruptcy petitions filed in 1985 and 1986, see 48 F.3d at 377–79, well after the effective date of the Bankruptcy Code, so the reference to the Bankruptcy "Act" appears to be in error.

support its argument, but the Committee's rejection of the implications of most of the authorities it cites for support undermines its position. For example, the Committee says "a debtor's eligibility to be a proper 'subject of Bankruptc[y]' within the meaning of the Bankruptcy Clause 'is a jurisdictional requirement for invoking a bankruptcy proceeding,'" quoting Professor Plank. Committee's Motion at 17 (quoting *Constitutional Limits*, *supra*, at 492). Professor Plank's full assertion, however, is that "[t]he *insolvency* of the debtor in this sense [i.e., in the sense of balance sheet or liquidity insolvency] is a jurisdictional requirement for invoking a bankruptcy proceeding." *Constitutional Limits*, *supra*, at 492 (emphasis added). The Committee uses Professor Plank's contention, which advocates a position that the Committee explicitly disclaims (that insolvency is a jurisdictional requirement), to support its claim that a different concept, financial distress, is a jurisdictional requirement. Similarly, the LTL Opinion prompted the Committee's Motion to some extent, see Committee's Motion at 9 ("In light of the *LTL Mgmt.* decision . . . , the Committee believes that the Court should now address whether Bestwall is constitutionally eligible to be a debtor in bankruptcy." (footnote omitted)), and the Committee cites it for support, see May 17, 2023 Hr'g Tr. 18:8–10 ("[T]he language in LTL is entirely consistent with what we believe is the constitutional limitation on a company that seeks to access the bankruptcy laws."). In that case, however, the Third Circuit determined that it and the bankruptcy court below had subject matter jurisdiction, LTL, 64 F.4th at 99 ("The Bankruptcy Court had jurisdiction of the bankruptcy case under, *inter alia*, 28 U.S.C. §§ 157(a) and 1334(a). We have jurisdiction of the appeals

under 28 U.S.C. § 158(d)(2)(A)." (footnote omitted)), prior to determining that the debtor did not file its case in good faith due to its lack of financial distress, id. at 110. The Committee's need to reach for authorities that advocate a different (but related) argument shows the lack of support for its contention.

53.    One reason for the lack of support for a constitutional financial distress requirement is the difficulty in administering such a rule.  Professor Plank, a leading proponent of the insolvency requirement (which no party to this case supports), says "there does not seem to be any principled way" to administer a financial distress requirement.  *Constitutional Limits, supra*, at 493 n.23.  At the hearing on the Motions to Dismiss, the advocates for the requirement disagreed about whether financial distress should be determined at the outset of a case or throughout the proceedings.  On the one hand, despite citing post-petition developments as support, the Committee took the position that it was a "gatekeeping or access-to-bankruptcy question," May 17, 2023 Hr'g Tr. 43:19–20, and was not sure what should happen if subsequent events showed a debtor to be solvent, id. at 44:6–10.  On the other hand, the attorney representing certain claimants represented by Maune, Raichle, Hartley, French & Mudd, LLC ("Maune Raichle"), id. at 46:22–47:11, and the attorney for Mr. Buckingham, id. at 107:21–108:13, argued that the court has a continuing duty throughout its cases to constantly assess its jurisdiction and dismiss any case, at any point in the case, when a debtor is not in financial distress.  The latter position is arguably more consistent with a constitutional jurisdiction requirement since courts must always assess their subject matter jurisdiction, see, e.g., Valley Historic, 486

47

F.3d at 838 ("We do not find that these principles and our precedent, however, can be read or extended to preclude the bankruptcy court from exercising its unflagging obligation to examine its subject matter jurisdiction at every stage of the proceeding."), but determining that subject matter jurisdiction was lost due to post-petition developments would be contrary to both the Bankruptcy Code and long-standing traditions of bankruptcy practice, see, e.g., § 726(a)(5) & (6) (authorizing payment of interest and refunds to a Chapter 7 debtor when all claims are paid in full); Ultra Petroleum, 51 F.4th at 150 ("For some three centuries of bankruptcy law, courts have held that an equitable exception to the usual rules applies in the unusual case of a solvent debtor.");[32] see also Bankruptcy & Federalism, supra, at 1112–13 (noting that § 726(a)(5) allows "greater payments to creditors in bankruptcy than they would receive outside of bankruptcy" without addressing the apparent solvency of the debtor's estate in a situation where the provision is invoked). A rule that subject matter jurisdiction is lost when a determination is made post-petition that a debtor is no longer in financial distress would create a perverse incentive for Chapter 7 trustees, whose compensation is based on the assets recovered, not to find too many assets.[33] Likewise, many Chapter 13 cases end with early discharges and full payments to creditors as a result of the appreciation of the value of real property, an

---

[32] The Ultra Petroleum court described its debtor as becoming "supremely solvent," 51 F.4th at 142, "massively solvent," id. at 143, and, fittingly, "ultra solvent," id. at 150, due to a post-petition increase in the price of natural gas.

[33] The incentive for a Chapter 7 trustee not to find too many assets could also exist under the Committee's "gatekeeping" version of the financial distress requirement if the recovered assets indicated that a debtor was actually not in financial distress on its petition date.

inheritance, or some other financial good fortune.  See, e.g., In re Miloni, No. 20-30258, slip op. at 1–2 (Bankr. W.D.N.C. Nov. 8, 2023) (approving sale of debtor's real property with proceeds to pay off Chapter 13 plan at 100% and surplus refunded to the debtor and noting post-petition appreciation of the real property).  Under the version of the financial distress rule advocated by Mr. Buckingham and Maune Raichle, these Chapter 13 cases could instead conclude with dismissal due to the court's post-petition loss of subject matter jurisdiction.  Bankruptcy courts could also face attempts to revoke confirmation of Chapter 11 and 13 plans and the discharge of debtors after cases close based on allegations of a lack of financial distress.  Cf. In re Tatsis, 72 B.R. 908, 911 (Bankr. W.D.N.C. 1987) ("There are many instances in which Chapter 13 cases are filed where the qualifications of the debtor under § 109(e) might be called into question.  In such a case, when no issue is raised by a party in interest, the case will be administered pursuant to Chapter 13.  Can someone then come one, two, or three years after confirmation and question the jurisdiction of the court?  Can a creditor sue a debtor after his discharge in Chapter 13, alleging that the bankruptcy court never had jurisdiction?  These are questions that Congress never intended this Court or any other bankruptcy court be required to answer.").

54.    Whether assessed only at the beginning of a case or throughout, determining whether a debtor is in financial distress would not be easy.  As previously mentioned, the Committee is not concerned with a standard for the determination because it asserts that this case is not a close call.  See Committee's Reply at 16 ("Experience up until now has not required courts to further clarify those limits (and

even now this Court does not have to define the dividing line).").  But a constitutional rule would apply to all of the cases before the court, now and in the future, so the court needs to have some idea of how to enforce it.  Other courts and commentators have noted the difficulty of enforcing a theoretical insolvency rule, see, e.g., Marshall, 300 B.R. at 513 (noting the extensive amount of time necessary to make a solvency determination); *Constitutional Limits*, *supra*, at 493 ("To be sure, whether and when a debtor becomes insolvent in either sense may present difficult factual and conceptual questions."), and insolvency is a defined and familiar concept compared to financial distress.[34]  Any consideration of the practicalities of a financial distress rule leads to more questions than answers.  The Committee and its allies may not be concerned with the logistics of applying its rule in contexts other than this unusual case, but the court would have to apply a constitutional rule across the board, and very few debtors have access to the resources of Fortune 500 companies.

55.    Another problem with a financial distress requirement for subject matter jurisdiction is the tension with the goal of getting potential debtors to commence their cases early. In adopting the Bankruptcy Code, Congress saw the benefit in incentivizing Chapter 11 debtors to file their cases in time to maintain the value of their estates and avoid liquidation.[35] Gen. Growth, 409 B.R. at 60; In re Johns-Manville Corp., 36 B.R. 727, 736 (Bankr. S.D.N.Y. 1984); Kennedy, *supra*, at 980–81; REPORT, *supra*, at 75.  Under the Committee's rule, however, debtors would

---

[34] *Black's Law Dictionary* and the Bankruptcy Code do not include definitions for "financial distress."

[35] The court acknowledges that the priorities of the Bankruptcy Code would have to yield if financial distress was an element of constitutional subject matter jurisdiction.

have to thread the needle between filing early enough to preserve value as encouraged by the Code but not filing too early and therefore facing dismissal (or the threat thereof) for an absence of sufficient financial distress. In addition, the assessment of financial distress by courts would itself cause some loss of value. Cf. Marshall, 300 B.R. at 513 ("If a reorganization is held up pending a determination of balance sheet insolvency, businesses will rarely be reorganized, and at least some of the reorganization value (the value of a business as reorganized as opposed to its liquidation value) will inevitably be lost.").

56. Consistent with a policy decision to allow liberal access and encourage early filing, Congress did not make the statutory subject matter jurisdiction requirements for bankruptcy very strenuous. While the instant dispute focuses on the Constitution, the court notes that this case satisfies the modest statutory requirements for subject matter jurisdiction. Section 1334 of Title 28 determines statutory subject matter jurisdiction for bankruptcy. Kirkland, 600 F.3d at 315; Valley Historic, 486 F.3d at 839 n.3; Houck v. Lifestore Bank (In re Houck), Ch. 13 Case No. 11-51513, Adv. No. 15-5028, 2018 WL 722462, at *7 (Bankr. W.D.N.C. Feb. 5, 2018). Section 1334(a) gives district courts jurisdiction over the administration of bankruptcy cases, and section 1334(b) provides district courts with jurisdiction over all of the discrete proceedings within the cases. Houck, 2018 WL 722462, at *7. Section 157 of Title 28 allows district courts to send bankruptcy matters to bankruptcy courts, and the District Court's April 14, 2014 Amended Standing Order of Reference sends all local cases to this court. The statutes that establish the subject

matter jurisdiction of the bankruptcy court do not look at financial distress, insolvency, or any other characteristics of debtors.

57.    Accordingly, if Congress decided to add a financial distress requirement for debtors in bankruptcy, it would most likely not implicate the subject matter jurisdiction of the court.  Congress would likely add the requirement to section 109, which "defines who may be a debtor under the various chapters of the Code."  Toibb v. Radloff, 501 U.S. 157, 160 (1991); see also Kennedy, supra, at 986 (similar).  Section 109's requirements for debtor eligibility are not jurisdictional.  In re Zarnel, 619 F.3d 156, 169 (2d Cir. 2010); Rudd, 866 F.2d at 1042 (citations omitted); see also In re Phillips, 844 F.2d 230, 235 n.2 (5th Cir. 1988) (section 109(g) is not jurisdictional); In re Stinnie, 555 B.R. 530, 533 (Bankr. W.D. Va. 2016) (section 109(h) is not jurisdictional); In re Baxter, Ch. 7 Case No. 06-30452, slip op. at 8 (Bankr. W.D.N.C. May 17, 2006) (section 109(h) is not jurisdictional).  But see In re Keziah, 46 B.R. 551, 554 (Bankr. W.D.N.C. 1985) ("§ 109 is a part of the eligibility (to be a debtor) section which involves the subject matter jurisdiction of this Court.").[36]  In municipal bankruptcies, which do require insolvency, the requirement is in section 109(c), and it is not jurisdictional.  Hamilton Creek, 143 F.3d at 1385 n.2.  A bankruptcy case commences even if a debtor is not eligible under a particular chapter, see, e.g., Tatsis,

---

[36] Keziah is an example of this court not being sufficiently rigorous in its analysis of subject matter jurisdiction.  See also infra ¶ 58.  The reasoning of Keziah has been explicitly and convincingly rejected by the Fifth Circuit, see Phillips, 844 F.2d at 235 n.2, and two years after Keziah, the same judge, the Honorable Marvin R. Wooten, took a contrary jurisdictional position consistent with this order, see Tatsis, 72 B.R. at 910 ("Filing of a case under Title 11 establishes jurisdiction in this Court in accordance with 28 U.S.C. §§ 1334 and 157.  It gives the Court the right and authority to administer the case in accordance with the Bankruptcy Code.").

72 B.R. at 910 ("Movant argues that in the event a debtor files a petition pursuant to Title 11, but chooses a chapter for which he is not qualified, then there is no jurisdiction of any kind or type in the court and the filing is a nullity. This argument is incorrect."), or at all, see, e.g., Zarnel, 619 F.3d at 169 ("[W]e find that the restrictions of § 301 and § 109(h) are not jurisdictional, but rather elements that must be established to sustain a voluntary bankruptcy proceeding."); see also Kennedy, *supra*, at 983 ("Filing the petition results in an automatic entry of an order for relief under the chapter invoked by the petition. The expression 'order for relief' in the Code is equivalent to adjudication under the Bankruptcy Act and is tantamount to an order approving the court's exercise of jurisdiction to grant relief pursuant to the provisions of the law. If the debtor is ineligible or the petition is insufficient, however, the language of the statute does not preclude the court from taking whatever action is appropriate to dispose of the document." (footnotes omitted)); REPORT, *supra*, at 75 ("There should be no legal barrier to voluntary petitions."). If debtor eligibility was an element of subject matter jurisdiction, a case commenced by an ineligible debtor would instead be void. See Baxter, slip op. at 7 ("Some courts maintain that compliance with Section 109(h) is jurisdictional and a filing by a debtor who does not qualify is a nullity." (citations omitted)); cf. Arbaugh, 546 U.S. at 514 ("[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety." (citing 16 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 106.66[1], at 106-88 to 106-89 (3d ed. 2005)).

58.    In part due to the harsh results of a decision that subject matter

53

jurisdiction is lacking, the Supreme Court has been trying "to bring some discipline"

to the jurisdictional analysis in recent years. MOAC, 598 U.S. at 298 (quoting

Henderson v. Shinseki, 562 U.S. 428, 435 (2011)). The Eleventh Circuit, applying the

Supreme Court's guidance in the bankruptcy context, noted that "the failure of a

cause of action does not automatically produce a failure of jurisdiction." In re Trusted

Net Media Holdings, LLC, 550 F.3d 1035, 1042 (11th Cir. 2008) (quoting Steel Co. v.

Citizens for a Better Env't, 523 U.S. 83, 91 (1998)); see also id. at 1043 (concluding

that the requirements of § 303 for involuntary cases are not jurisdictional). The

Supreme Court addressed subject matter jurisdiction multiple times in 2023,

including a determination of whether a bankruptcy statute implicated subject matter

jurisdiction. See MOAC, 598 U.S. at 292 (deciding that § 363(m) is not jurisdictional);

Santos-Zacaria, 598 U.S. at 413 (holding that an immigration law (8 U.S.C.

§ 1252(d)(1)) is not jurisdictional). In MOAC, the Court observed that "[t]he

'jurisdictional' label is significant because it carries with it unique and sometimes

severe consequences." 598 U.S. at 297. While these decisions deal with statutory

subject matter jurisdiction, they suggest the Supreme Court would not favor

expansive new ideas about constitutional subject matter jurisdiction for similar

reasons.

59.    There is no need for a harsh new jurisdictional rule because there are

other ways for courts to address any perceived abuse by debtors lacking financial

distress. Cf. *Constitutional Limits*, *supra*, at 555 ("The requirement of good faith, the

ability to lift the automatic stay for cause, and the discretion to disapprove rejection

of contracts may be sufficient to prevent solvent debtors from abusing the bankruptcy process."). As previously noted, the LTL Opinion is a basis for the Committee's Motion. <u>See</u> *supra* ¶¶ 51–52. In contrast with the Committee's Motion, however, the Third Circuit decided that it had jurisdiction, <u>LTL</u>, 64 F.4th at 99, and dismissed the LTL case pursuant to section 1112(b) because the debtor could not show that it commenced its case in good faith due to its lack of financial distress, <u>id.</u> at 110.[37] The LTL Opinion is not the only example of a court using good faith to police against financially healthy debtors abusing the bankruptcy system. <u>See, e.g.</u>, <u>In re Cedar Shore Resort, Inc.</u>, 235 F.3d 375, 381 (8th Cir. 2000) ("Nor did the bankruptcy court abuse its discretion in dismissing Cedar Shore's petition. Congress designed Chapter 11 to give those businesses 'teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liability.' " (quoting <u>Furness v. Lilienfield</u>, 35 B.R. 1006, 1009 (D. Md. 1983))); <u>In re SGL Carbon Corp.</u>, 200 F.3d 154, 164 (3d Cir. 1999) ("SGL Carbon cites no case holding that petitions filed by

---

[37] As mentioned previously *supra* ¶ 19, the LTL Opinion acknowledges that the good faith analysis is different in the Fourth Circuit and requires objective futility in addition to subjective bad faith. 64 F.4th at 98 n.8 (citing <u>Carolin</u>, 886 F.2d at 694); <u>see also</u> <u>Off. Comm. of Asbestos Claimants</u>, 71 F.4th at 182 (noting that the Fourth Circuit requires "a more comprehensive standard" to be met in order to dismiss a Chapter 11 case for a lack of good faith). The absence of financial distress ironically helps a debtor avoid a bad faith dismissal in this circuit. <u>See</u> <u>Bestwall</u>, 605 B.R. at 49–51 (finding that "Bestwall has the full ability to meet all of its obligations (whatever they may be) through its assets and New GP's assets, which are available through the Funding Agreement" in the course of concluding that this case is not objectively futile and denying the First Motion to Dismiss without addressing subjective bad faith); <u>Aldrich</u>, 2023 WL 9016506, at *27 (observing that all bankruptcy cases filed by solvent debtors without financial distress will survive dismissal under the <u>Carolin</u> standard and wondering if the <u>Carolin</u> court considered the application of its test to such debtors); *33 ("Aldrich and Murray were designed to meet the objective futility standard, and they do."). This case may provide a basis for the Fourth Circuit to reexamine its standard for good faith, at least in Texas Two-Step cases like this one, but it is not a basis to create a new jurisdictional requirement that could have "far-reaching consequences," <u>Phillips</u>, 844 F.2d at 235 n.2.

financially healthy companies cannot be subject to dismissal for cause."); *Constitutional Limits*, *supra*, at 548–551 (collecting cases). Some courts even find "cause" under section 362 to grant relief from the automatic stay when a debtor files a case in bad faith. See, e.g., In re Corp. Deja Vu, 34 B.R. 845, 850 (Bankr. D. Md. 1983) ("The petition was filed in bad faith. This bad faith constitutes cause to allow the secured creditor relief from the stay."); *Constitutional Limits*, *supra*, at 551 (citing In re Dixie Broad., Inc., 871 F.2d 1023 (11th Cir.), *cert. denied*, 493 U.S. 853 (1989)). In addition, some courts deny access to special bankruptcy rules and protections based on a debtor's solvency without examining good faith. See, e.g., Claughton v. Mixson, 33 F.3d 4, 6–7 & n.4 (4th Cir. 1994) (affirming bankruptcy court's lifting of stay due to debtor's solvency); *Constitutional Limits*, *supra*, at 551–52 (collecting cases including Claughton). There are many tools available for bankruptcy courts to deal with a debtor's lack of financial distress without a new rule of subject matter jurisdiction.

60. Based primarily on its analysis of the history of the Bankruptcy Clause and the Supreme Court's interpretation of Congress's expansive power pursuant to it, this court holds that financial distress is not a prerequisite for bankruptcy subject matter jurisdiction pursuant to the Constitution. Instead, the court joins others that have held that the subject matter jurisdiction for bankruptcy extends to all cases filed under the Bankruptcy Code. See, e.g., Zarnel, 619 F.3d at 169 ("Restricting whether an individual may be a debtor either under the Bankruptcy Code in general or under a given chapter does not speak in jurisdictional terms or invoke the jurisdiction of the

district court, delineated in 28 U.S.C. § 1344 as discussed above."); Rudd, 866 F.2d at 1041 ("When a petition is filed in a bankruptcy court seeking assistance in 'the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power,' the court has jurisdiction to administer the ensuing case in accordance with Title 11 of the United States Code." (quoting N. Pipeline, 458 U.S. at 71)); Auto. Pros., 370 B.R. at 167 (citing Phillips, 844 F.2d at 236 n.2); Baxter, slip op. at 7–8 (agreeing with courts that take the position that "it is the petition that invokes the bankruptcy court's jurisdiction, not the debtor's characteristics"); see also Mussman & Riesenfeld, *supra*, at 92 ("The jurisdiction of the court attaches from the filing of the petition . . . .").   The Founding Fathers, like many contemporary observers, might be surprised that an entity like the Debtor with access to significant financial resources has sought bankruptcy protection.  Their presumed astonishment, however, does not mean that the Debtor has violated the subject matter jurisdiction of the bankruptcy court, and the question of whether the Debtor should be able to access the bankruptcy system is different than the question of whether the Constitution bars it.   Accordingly, the court emphasizes the limited nature of this jurisdictional ruling.  The court is not making a policy judgment that a debtor without financial distress should be able to file bankruptcy; it is simply deciding that the limited language of the Bankruptcy Clause, as interpreted by the Supreme Court over the last 250 years, does not prevent the Debtor from doing so.

## Conclusion

While framed as new arguments, the Buckingham Motion and portions of the Committee's Motion actually seek reconsideration of this court's prior Opinion and Order on the Debtor's good faith without satisfying the standard for reconsideration. The law of the case doctrine counsels against a court straying from its previous legal conclusions. Furthermore, the divestment rule prevents a court from addressing issues on appeal, and the Committee's attempt to appeal the Opinion and Order was pending in the District Court when the Motions to Dismiss were filed, argued, and ruled on.

In addition to the good faith argument, the Committee's Motion asserts a new basis for dismissal: an absence of constitutional subject matter jurisdiction based on the Debtor's lack of financial distress. After analyzing the Bankruptcy Clause of the Constitution and its interpretation by the Supreme Court, other courts, and outside commentators, the court is confident that the Constitution does not require debtors to have financial distress in order for bankruptcy courts to have subject matter jurisdiction. The court's conclusion is buttressed by the complete lack of support for the Committee's novel argument in the relevant case law, the practical problems with a jurisdictional financial distress requirement, the policy decision to encourage potential debtors to file their cases early, the Supreme Court's recent approach to

issues of subject matter jurisdiction, and the ability of bankruptcy courts to use other tools to address the problem asserted by the Committee.

Based on these findings and conclusions, and for the additional reasons set forth on the record at the July 28, 2023 hearing (which record is incorporated herein), the Motions to Dismiss are hereby **DENIED**.

**SO ORDERED**.

This Order has been signed
electronically. The Judge's
signature and Court's seal
appear at the top of the Order.

United States Bankruptcy Court