**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| BESTWALL LLC,[1] | Case No. 17-31795 (LTB) |
| Debtor. | |

**THE OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS' AND**
**THE FUTURE CLAIMANTS' REPRESENTATIVE'S SUBMISSION IN**
**SUPPORT OF FACT DISCOVERY DEADLINE**

The Official Committee of Asbestos Claimants (the "ACC") and Sander L. Esserman (the "FCR" and, together with the ACC, the "Claimants' Representatives"), as the legal representative for persons who have not yet asserted an asbestos-related personal-injury claim against the above-captioned debtor (the "Debtor") but may in the future assert such a claim, hereby make this submission in support of a fact discovery deadline on the later of (i) 18 months after all discovery disputes, including privilege issues, have been resolved and outstanding discovery has been produced and responded to fully or (ii) November 1, 2027, and respectfully state as follows:

**INTRODUCTION**

The Claimants' Representatives recognize that the estimation proceeding has already taken longer than the Court envisioned and do not want to extend fact discovery any more than is absolutely necessary. It has taken more than three years (and counting) for the Claimants' Representatives to obtain just a portion of the document discovery that they are entitled to receive. The Debtor's document productions, however, are still deficient, and significant issues must be resolved before the Claimants' Representatives can proceed to fact-discovery depositions.

---

[1] The last four digits of the Debtor's taxpayer identification number are 5815.  The Debtor's address is 100 Peachtree Street, N.W., Atlanta, Georgia 30303.

Ultimately, the need for additional time is driven by the Debtor's attempts to use an incomplete record to rewrite its history resolving mesothelioma claims.  Since the Petition Date, the Debtor has accused individuals suffering from mesothelioma ("Mesothelioma Victims") of withholding material evidence of their exposures to other entities' asbestos-containing products.  Despite the Debtor's representations about the evidence it has and the fact that it is the only party to this bankruptcy case who was also a party to litigation in the tort system, it has repeatedly tried to limit the Claimants' Representatives' access to the information most relevant to test the truth of the Debtor's revisionist narrative—the contemporaneous litigation documents related to the Agreed Claims.[2]  Given the breadth of matters placed at issue by the Debtor and the length of time it takes to litigate a single asbestos case—much less relitigate the issues in the 4,107 sample cases—an additional three years for fact discovery is entirely reasonable.

Based on the Debtor's recent contention interrogatory response, the Claimants' Representatives believe that there are evidentiary issues the Court can address now that would eliminate the need for much of this potential discovery and drastically shorten the time needed to get to an estimation trial.[3]  The Claimants' Representatives anticipate filing motions soon to address some of these issues.  Unless and until those motions are resolved in the Claimants' Representatives' favor, the Claimants' Representatives must prepare to fully litigate the contentions the Debtor seeks to make based on a selective presentation of the facts. For these

---

[2] The "Agreed Claims" are the 4,107 claims referenced in the *Agreed Order With Respect to Estimation Discovery Matters* [D.I. 2862] (the "Agreed Claims Order").  The Agreed Claims include the claims in the Debtor's Sample and the Claimant Sample (as such terms are defined in the Agreed Claims Order).

[3] For instance, the Debtor has admitted that its historical claim files are incomplete and can never be fully recreated. The Debtor cannot rely on admittedly incomplete files to support an inference that information was not provided.  In addition, the Debtor has identified only 221 specific claims to support its evidence suppression theory.  Of those, only 79 contain any individual contentions.  Moreover, despite nearly a year's worth of litigation over an appropriate sample, the Debtor does not appear to have selected the 221 claims in any statistically meaningful way.  Further, even if each of the Debtor's contentions with respect to those claims were true (and they are not), the 221 claims represent only 5% of the 4,107 claims in the two samples, and the 79 claims for which the Debtor provides specific contentions, represent only 1.9%.

reasons, as more fully discussed below, this Court should set a fact discovery deadline that concludes on the later of (i) 18 months after all discovery disputes, including privilege issues, have been resolved and outstanding discovery has been produced and responded to fully or (ii) November 1, 2027.

## STATEMENT OF THE CLAIMANTS' REPRESENTATIVES

**I.    Why has it taken three years to get to this point?**

Understanding how much time is still required to get to estimation requires an understanding of where the parties have been occupied to date and where they are now. The discovery issues over the past three years can be broken down into three categories: (i) the scope and type of information to be produced, (ii) the number of prior cases for which the Debtor needs to provide discovery, and (iii) whether, and to what extent, the Debtor can withhold information on privilege grounds. These issues frequently overlapped but are summarized separately below.

**A.    The Claimant Documents Dispute (April 2021–April 2023).**

The Claimants' Representatives served their original discovery requests to the Debtor on April 15, 2021. The Debtor completed its initial document production in November 2021 (the "Initial Productions"). After reviewing the Initial Productions, the Claimants' Representatives realized that the documents produced were woefully deficient. For instance, the Debtor produced as few as three documents for substantial claims settled for six and seven figures. For some claims, the Debtor produced few, if any, emails with opposing counsel. The Debtor provided minimal metadata, even for electronically stored information ("ESI"), and many important court documents were missing. The Debtor itself acknowledged that for approximately 50% of the Initial Discovery

Claims,[4] it did not produce plaintiffs' discovery responses and that for approximately 60% of the Initial Discovery Claims, it did not produce deposition transcripts.[5]

Months of litigation regarding the Debtor's discovery obligations ensued. At each step along the way, the Debtor insisted that its document productions were sufficient and fought the Claimants' Representatives' efforts to cure the discovery deficiencies.[6] It was not until April 2022 (one year after the Claimants' Representatives served their original document requests seeking the information) that the Debtor conceded it neither requested nor instructed its outside law firms to search all ESI because it believed the information to be of "limited utility."[7] The Debtor's refusal to conduct reasonable searches of ESI in its possession, custody, or control forced the Claimants' Representatives to file yet another motion to compel.[8]

At the conclusion of the July 22, 2022 hearing, the Court indicated that a ruling on the Second Motion to Compel depended on the outcome of the parties' separate dispute (discussed in the following section) regarding the scope of claims that should be subject to discovery.[9] The Debtor's obligation to produce ESI was ultimately resolved in an agreed order (the "Custodial Email Order") that established a protocol for the Debtor to search and produce ESI, including

---

[4] The "Initial Discovery Claims" are identified in the Agreed Claims Order as a sample of 2,907 resolved mesothelioma claims comprised of (1) a sample of 2,407 resolved mesothelioma claims developed by the Debtor's expert (the "Debtor's Sample"), plus (2) 500 resolved mesothelioma claims added at the request of the experts for the Claimants' Representatives.

[5] *Debtor's Opposition to the Official Committee of Asbestos Claimants' and the Future Claimants' Representative's Motion for Entry of an Order (I) Compelling the Debtor to Produce Complete Claim Files, Including Electronically Stored Information, or, in the Alternative, (II) Issuing an Adverse Inference Against the Debtor* [D.I. 2621] at 7 (the "Motion to Compel Opposition").

[6] *See, e.g.,* Motion to Compel Opposition at 2 (arguing that the Claimants' Representatives' motion to compel "attempts to undermine the integrity of the Debtor's collection.").

[7] *See* Email from J. Mulvihill to R. Worf, *et al.*, dated March 28, 2022, attached to *The Official Committee of Asbestos Claimant's and the Future Claimants' Representative's Motion for Entry of an Order (I) Compelling the Debtor to Produce Complete Claim Files, Including Electronically Stored Information, or, in the Alternative, (II) Issuing an Adverse Inference Against the Debtor* [D.I. 2600] (the "Second Motion to Compel") as Ex. A.

[8] *See* Second Motion to Compel.

[9] Hr'g Tr. at 129:14-131:8 (July 22, 2022) [D.I. 2675].

4

custodial attorney emails.[10]  The Custodial Email Order was entered on April 21, 2023—*two years* after the Claimants' Representatives served their initial document requests.

**B.      Disputes Related to Scope of Claims Subject to Discovery (January 2022–December 2023).**

From the outset of estimation discovery, the Debtor refused to provide discovery with respect to any claimants other than those included in the Initial Discovery Claims, even though the Debtor itself was not limiting itself to that initial group.[11]  In June 2022, the Debtor filed a motion for protective order seeking a finding that it should not be required to provide discovery for any claims beyond those included in the Initial Discovery Claims and, instead, that it be authorized to make a limited production of privileged documents under Fed. R. Evid. 502(d). Even after the Court gave preliminary guidance that the Claimants' Representatives should be allowed to conduct discovery on additional claims,[12] the Debtor fought the Claimants' Representatives' efforts to have the experts develop and agree on a single sample of 1,500 to 2,000 claims[13] or for the Claimants' Representatives to use a separate claim sample developed by their experts.[14]

At the November 17, 2022 hearing, the Court reported that it was inclined to allow, over the Debtor's objection, the Claimants' Representatives to conduct discovery related to their own sample of claims.[15]  That preliminary ruling led to subsequent discussions between the parties that

---

[10] *Agreed Order with Respect to Custodial Email Search Protocol* [D.I. 2953].

[11] The Debtor responded to discovery requests and identified 29 claim files that it believed supported its claims of evidence suppression.  *See* Second Motion to Compel at Ex. G.  Several of those claim files were outside of the initial set of discovery claims.

[12] Hr'g Tr. at 131:16-21 (July 22, 2022) [D.I. 2675].

[13] Hr'g Tr. at 82:14-87:25 (July 22, 2022) [D.I. 2675].

[14] Hr'g Tr. at 31:8-21 (Nov. 17, 2022) [D.I. 2797].

[15] Hr'g Tr. at 84:9-14 (Nov. 17, 2022) [D.I. 2797].

resulted in entry of a series of agreed orders (the "Discovery Protocol Orders")[16] that, among other things, provided for the Claimants' Representatives to receive discovery related to an additional claim sample.  At every hearing where these orders were discussed, the Claimants' Representatives emphasized that these orders only provided for the production of documents and additional time would be needed to adequately review and analyze any documents produced.[17]  The Court likewise recognized that the Debtor's production of documents was only a first step and that the Claimants' Representatives would still need time to review documents produced.[18]  The Claimants' Representatives cannot complete that second step until all of the document production issues are resolved, and the Debtor completes its productions, including the production of all documents for every claimant placed at issue.

## C.    Privilege Issues (August 2021–TBD).

The Claimants' Representatives have consistently argued that, by contending that the Debtor and Old GP paid inflated settlement amounts because they lacked adequate information about past plaintiffs' other exposures, the Debtor has waived any privilege applicable to its historical litigation documents.[19]  Although the Court denied the Claimants' Representatives'

---

[16] Agreed Claims Order; *Agreed Order with Respect to Scope of Estimation Discovery* [D.I. 2878]; Custodial Email Order.

[17] *See, e.g.,* Hr'g Tr. at 44:9-13 (Feb. 16, 2023) [D.I. 2885] (N. Ramsey:  "And as far as timing goes, I mean, it is, you know, this will take a while and I just don't want anyone to forget  it, it sounds like the finish line is, it'll be produced to us and then we'll be able to tell you when the trial can be, but we have to review everything[.]"); *Id*. at 45:16-19 (E. Edwards:  "But, you know, our goal is and always has been we need thee [*sic*] documents. Because the debtors have put this litigation history at issue we have to get them and once we get them, we have to have time to review them and analyze them."); *Id*. at 46:1-4: (E. Edwards:  "But -- so I just wanted to make sure that everyone's aware, you know, when we have these discussions, that's just the beginning of when we get that production that we're going to have to add in this time.").

[18] Hr'g Tr. at 48:14-17 (Feb. 16, 2023) [D.I. 2885] ("So then, we'll really know where we are, but keeping in mind that once the debtor has produced all of the documents, that you all have to go through those documents, that there's a second step to that, so.").

[19] *See, e.g., Motion to Compel Production of Documents* [D.I. 1968].

initial motion to compel based on at-issue waiver, it did so without prejudice and noted that eventual waiver of privilege was "inevitable."[20]

On November 15, 2021, the Debtor produced a privilege log for its Initial Productions containing nearly 500,000 entries (the "Initial Log") that the Court later described as "wholly inadequate."[21]  After an initial hearing on a motion to compel filed by the Claimants' Representatives based on obvious deficiencies with the Initial Log, the Debtor allegedly re-reviewed all documents on the Initial Log and produced a revised log (the "Revised Log").

On March 17, 2022, the Court denied the motion to compel. Although it noted "some lingering concerns" regarding the sufficiency of the Revised Log,[22] the Court held that the Revised Log was sufficient to avoid wholesale waiver of all logged documents but that the Claimants' Representatives could still make substantive privilege challenges to individual entries on the Revised Log.[23]  The Court further urged the parties to meet and confer regarding entry of an order pursuant to Fed. R. Evid. 502(d) that might minimize some of the ongoing privilege disputes.[24]

After several more months of discussion, the Debtor proposed producing some purportedly privileged documents pursuant to Fed. R. Evid. 502(d) by using search terms to isolate a subset of documents for production.  The Debtor then excluded some documents from that production based not on its log descriptions or review of the documents[25] but on its chosen search terms. The Claimants' Representatives agreed to that proposal because it provided for some documents to be

---

[20] Hr'g Tr. at 215:2–17 (Sept. 1, 2021) [D.I. 2068].

[21] *See The Official Committee of Asbestos Claimants and the Future Claimants' Representative's Motion to Compel Production of Documents Listed on the Debtor's Privilege Log* [D.I. 2277], ¶ 1(a).

[22] Hr'g Tr. at 18:5-8 (Mar. 17, 2022) [D.I. 2480].

[23] Hr'g Tr. at 18:5-8 (Mar. 17, 2022) [D.I. 2480].

[24] Hr'g Tr. at 18:5-8 (Mar. 17, 2022) [D.I. 2480].

[25] By contrast, the Claimants' Representatives understand that the Debtor reviewed the produced documents after production so that it could claw back certain documents that had survived the search-term exclusions.

7

produced, but the Claimants' Representatives expressed concerns regarding the breadth and significance of the documents the Debtor chose to exclude and expressly reserved rights to seek the production of additional purportedly privileged documents.[26]  The Debtor's proposal was ultimately reflected in the "502(d) Order."[27]   The 502(d) Order only partially resolved the outstanding privilege issues and preserved the right of the Claimants' Representatives to pursue production of additional withheld documents.

As of the date of this filing, the Debtor continues to withhold 278,050 documents as privileged, including approximately 30,000 documents for which the privilege log entry specifically references one of the 221 Alleged Non-Disclosure Claims (as defined below).

**D.     The Debtor Must Correct Numerous Deficiencies Before Its Document Productions Can Be Considered Complete.**

The Debtor seeks to compress the Claimants' Representatives' time to prepare for estimation even though, throughout the last three years, the Debtor has repeatedly obtained extensions of its own discovery obligation deadlines.  Ultimately, all discovery deadlines were suspended to allow the Debtor to begin collecting documents pursuant to the Discovery Protocol Orders before being required to provide an estimate of when that document production could be completed.[28]  The Second Amended CMO,[29] entered on August 17, 2023, required the Debtor to produce all documents by December 15, 2023.  Although the Debtor certified its productions were complete on that date, documents continued to be produced through May 2024, and as will be discussed below, issues remain with the productions that must be resolved.

---

[26] Hr'g Tr. at 64:25-66:5 (July 22, 2022) [D.I. 2675].

[27] *Consent Order Pursuant to Rule 502(d) of the Federal Rules of Evidence* [D.I. 2695].

[28] Hr'g Tr. at 37:11-40:4 (Feb. 16, 2023) [D.I. 2885].

[29] *Second Amended Case Management Order for Estimation of the Debtor's Liability for Mesothelioma Claims* [D.I. 3079].

The Second Amended CMO also provided deadlines for the Debtor to provide a final list of the specific claims it intends to rely upon to support its evidence-suppression theory (the "Alleged Non-Disclosure Claims") and respond to a contention interrogatory with respect to those claims. The Debtor identified 221 Alleged Non-Disclosure Claims on December 1, 2023, and provided a preliminary response to the contention interrogatory on December 15, 2023.  After the Claimants' Representatives objected to the sufficiency of that preliminary response, the Debtor obtained yet another deadline extension, until May 31, 2024, to provide a complete response to the contention interrogatory.  The Debtor provided its contention interrogatory response (the "Contention Interrogatory Response")[30] on that date.  In that response, the Debtor provided specific contentions for only 79 of the 221 Alleged Non-Disclosure Claims.[31]  On September 5, 2024, the Claimants' Representatives raised issues with the completeness of the Debtor's Contention Interrogatory Response.  The Debtor responded on September 25, 2024, and the parties are still in disagreement regarding the sufficiency of the Contention Interrogatory Response.

Since the Debtor provided its Contention Interrogatory Response, the parties have engaged in several meet and confers to discuss: (i) continuing issues with the Debtor's document productions, the privilege log, and the documents the Debtor continues to withhold; (ii) deficiencies related to the Contention Interrogatory Response; (iii) ways to streamline and minimize the issues litigated in this estimation proceeding; and (iv) the appropriate date for a fact discovery deadline.  Few of these issues have been resolved—none fully—and the parties remain

---

[30] *Bestwall LLC's Responses and Objections to the Claimants' Representatives' Discovery Requests Regarding the Debtor's Identification of Claimants with Alleged Non-Disclosure Claims*.

[31] Neither the Contention Interrogatory Response nor any other discovery response received from the Debtor specifies how many of the Agreed Claims the Debtor had to review to choose its Alleged Non-Disclosure Claims.

far apart on the opportunity that the Claimants' Representatives should be afforded to complete fact discovery in preparation for estimation.

**II.     What needs to be completed before the close of fact discovery?**

**A. The Claimants' Representatives need time to analyze the prior litigation documents, including the contemporaneous communications and laws, orders, and agreements governing litigation.**

The parties' disagreement regarding the fact discovery deadline is driven in large part by their competing views regarding whether the Claimants' Representatives are entitled to review all litigation documents and be provided sufficient time to conduct an analysis related to the information discovered in such documents and the issues raised with respect thereto. As set forth below, this diligence is extensive and complex. From the Claimants' Representatives' perspective, the years that the Debtor has spent trying to deny the Claimants' Representatives (and the Court) access to its old claim files and related documents demonstrates that the Debtor's theories depend entirely on an incomplete record, including the selective presentation of litigation documents and the wholesale omission of critical information. The Debtor seeks to cherry-pick isolated statements out of deposition transcripts or interrogatory responses and then use subsequent trust submissions or bankruptcy ballots to try to contradict those statements. When the Debtor finds what it believes to be evidence of a contradiction, it ignores everything else. The Debtor's analysis ignores the nature of the claim asserted by the individual plaintiff, the facts known or knowable to the parties, and the laws, agreements, or orders that governed the underlying litigation of claims. In short, the Debtor resists searching for emails or other ESI or producing case-related documents, among other things, because uncovering the truth undermines the Debtor's litigation narrative.

The Debtor's questioning of claimants' attorneys in this proceeding demonstrates how the Debtor uses an incomplete record to its advantage—a concern the Claimants' Representatives have repeatedly raised. In response, the Debtor has criticized Claimants' Representatives for describing

how the Debtor would present its evidence-suppression theory, asserting that the Debtor would be laughed out of court if it tried to use the absence of information in incomplete claim files to support its theory.[32]   Debtor's questioning of claimants' attorneys in depositions shows that the Debtor's precise strategy is to use the incompleteness of claim files to its advantage.   The following are just two examples:

- But my question pertained to disclosure, and based on your review of the documents, including the interrogatory answers, [Claimant's] trial transcript, his deposition and the other documents that Ferraro produced to Bestwall and Bestwall produced to Ferraro, has Ferraro found any indication that this exposure was disclosed to the defendants in [Claimant's] tort case?[33]

- I want to give the Ferraro firm an opportunity to tell me and point me to any of the documents that we have produced to each other [in the Bestwall bankruptcy] case. Can the Ferraro firm point me to any documents where [Claimant's] exposures . . . to [Company's] products were disclosed to the defendants in this case?[34]

As these questions show, the Debtor seeks to shift the burden onto the Claimants' Representatives and force them to disprove the Debtor's narrative using an incomplete record.   The Debtor, after all, cannot prove that plaintiff's disclosures were inadequate when the claim files offered to support the alleged inadequacy are themselves incomplete.

The Claimants' Representatives' evaluation of what factors drove the Debtor's historical settlement values and whether Mesothelioma Victims "suppressed" evidence requires access to, and examination of, the defense counsel representing Old GP and all documents related to litigation of a claim, including the docket of the case, deposition and hearing transcripts,

---

[32] Hr'g Tr. at 127:24-128:16 (June 23, 2022) [D.I. 2645] (G. Gordon: "In other words, if we have a file that, as they say, is woefully incomplete, how are we going to show evidence suppression? She's suggesting that we would show it by saying, 'Well, there's nothing in the file about alternative exposures. Therefore, Judge,' and we found out this person filed five trust claims, 'therefore, there's evidence suppression.' You would laugh, your Honor, if that's what our argument is.").

[33] Deposition of Marc P. Kunen at 43:14-21 (Aug. 16, 2022).

[34] Deposition of Marc P. Kunen at 46:11-18 (Aug. 16, 2022).

communications between counsel, expert and investigative reports (including those obtained by

co-defendants), and the laws, agreements, and orders governing the litigation of each claim.

Isolated, cherry-picked statements taken out of context do not tell the full story and certainly do

not constitute evidence that an alleged nondisclosure actually affected a settlement value.  If the

Debtor wants to relitigate its settlements, the Claimants' Representatives are entitled to review all

information.  The Court deserves as full and accurate a record as possible.

**B.      RFAs and PTMs alone are insufficient to test the Debtor's revisionist narrative.**

According to the Debtor, it is not necessary for the Claimants' Representatives to review

all litigation documents because the Debtor has produced requests for authority to settle ("<u>RFAs</u>")

or pre-trial memos ("<u>PTMs</u>") that "contain all of the information Old GP thought was important

when making settlement decisions."[35]   However, the RFAs and PTMs contain subjective

information that an author determined to include at a specific point in time.  Over the life of the

tort case, updated or new versions were created to account for updated facts, litigation strategy,

jurisdictional specific issues, or counsel experience and developments from related cases.  It is

critical to evaluate the other contemporaneous documents to evaluate key facts or information that

the Debtor and its professionals knew but omitted from the subjective summaries.

Moreover, despite the Debtor's arguing that the RFAs and PTMs alone should be sufficient,

the Debtor admits that it has not produced all of those key documents to date.  On August 13, 2024,

the FCR informed the Debtor that based on a preliminary search of 156 of the 221 Alleged Non-

Disclosure Claims, it had been unable to locate either an RFA or PTM, or both, for many of the

claims.  The Debtor later conceded that 17 claimants lack either an RFA or PTM, and 2 claimants

---

[35] *Debtor's Motion for (A) A Protective Order Directing That It and Its Defense Firms Need Not Respond To Overbroad and Disproportionate Document Requests and (B) Order Authorizing Debtor To Produce Certain Privileged Documents Without Waiving Privilege Protection* [D.I. 2602] at 3 (the "<u>Motion for Protective Order</u>").

are missing both of those "key" documents.  The Claimants' Representatives' continued analysis

revealed that for more than 35% of the Alleged Non-Disclosure Claims, RFAs and/or PTMs are

either missing or incomplete.  Sixteen Alleged Non-Disclosure Claims lack any responsive PTM

or RFA documents and an additional 61 lack one or the other.

This exercise unearthed a larger issue.  Notwithstanding the belief and expectation (shared

by the Debtor) that it would provide all RFAs and PTMs, the Debtor is still withholding as

privileged at least 24 RFAs from the 221 Alleged Non-Disclosure Claims.  These documents fall

directly within the category of settlement evaluation documents to be produced under the 502(d)

Order and must be produced.  The Debtor has offered to produce the documents only if the

Claimants' Representatives agree to the entry of an *additional* 502(d) order.  To date, the Debtor

has not provided a draft order.

The Debtor also committed to searching its withheld documents to see whether additional

RFAs or PTMs related to the 221 Alleged Non-Disclosure Claims were improperly withheld due

to the application of search terms.  The Claimants' Representatives are still awaiting the results of

that review.  Even then, the Debtor has not committed to providing RFAs or PTMs for any of the

Agreed Claims other than the 221 Alleged Non-Disclosure Claims that the Debtor has selected as

supposedly supporting its contentions.  However, the reasons why the Debtor settled the claims it

did *not* select as Alleged Non-Disclosure Claims are no less important than the RFAs for the claims

that the Debtor wants to put before the Court.  Any RFAs and PTMs for any of the Agreed Claims

must also be produced.

The RFAs and PTMs that have been produced to date show the problems with trying to

rely on those documents.  Nearly 20 contain redactions, and at least 27 are missing referenced

attachments—and that is just with respect to the 221 Alleged Non-Disclosure Claims.  The lack of

metadata, and the cumbersome and vague privilege log, makes it even more difficult to understand what the Debtor has chosen to disclose and what it continues to withhold.

For example, the pre-trial report for claimant NDC-191 references an Exhibit A containing a legal memo on relevant aspects of Maine law.[36]  The Exhibit was not attached.  Similarly, the pre-trial report for claimant NDC-035 is missing the first page and unknown additional pages.[37]  Two pre-trial reports for claimant NDC-001 have been redacted to remove pertinent medical or investigation details.[38]  A responsive document for claimant NDC-182 references an attached chart that cannot be located.[39]

Even where RFAs and PTMs are available, they are no substitute for complete review of all litigation documents.  RFAs and PTMs are relevant not only for the information that they contain but also for information that they *do not* contain.  The Debtor claims that these documents "contain all of the information Old GP thought was important when making settlement decisions."[40]  Assuming that is correct, then the reverse corollary is also true: if other documents show that Old GP or its lawyers knew of a potential alternative exposure, or of the victim's employment at a job site known to contain asbestos, but did not include that information in the RFA, then it is clear that Old GP or its lawyers did not consider the information to be important when evaluating the settlement.  The Debtor would like the Court to conclude that information not

---

[36] *See* Rule 502(d)-BW-Ch11-000825617.   Pursuant to the *Agreed Protective Order Governing Confidential Information* [D.I. 337] (the "Protective Order"), the Claimants' Representatives are not attaching this document or any other document cited in this submission that the Debtor has previously marked as confidential.  Paragraph I.1 of the Protective Order provides that the Debtor may file a motion to seal such documents within 10 days.  If the Debtor does not file a motion to seal, then the Claimants' Representatives will file a supplement to this submission that contains the cited documents.

[37] *See* Rule 502(d)-BW-Ch11-000278638.

[38] *See* Rule 502(d)-BW-Ch11-000895879; Rule 502(d)-BW-Ch11-000895858.

[39] Rule 502(d)-BW-Ch11-000583681.

[40] Motion for Protective Order at 3.

included in an RFA was not disclosed—but it is just as likely that information was not included in an RFA or PTM because Old GP or its lawyers did not consider the information relevant or had already conveyed the information to Old GP separate from the RFA process.  A complete evaluation of all litigation documents (to the extent they exist) is the only way to test the Debtor's assertions.

**C.      The Debtor's document productions contain numerous material deficiencies.**

Because the Debtor's evidence suppression theory essentially involves litigation of 4,107 individual and unique claims, the most efficient way, and frankly, the only way, to analyze and respond to the Debtor's contentions was for the Claimants' Representatives to compile a "review file" for each of the Agreed Claims.  The process of compiling documents by claimant—before analysis of the documents can even begin—is incredibly laborious. Of the approximately l million documents produced to date, approximately 35% lacked metadata to tie the document to a particular claimant.  Those documents had to be manually reviewed to see if they were associated with an individual claimant.   Only after that process was complete could the Claimants' Representatives compile a "review file" for a given claimant—and only then could the Claimants' Representatives understand the full breadth of the deficiencies in the Debtor's document productions.

Once a review file was compiled for a claimant, the Claimants' Representatives began the process of reviewing and analyzing each claim to recreate, to the extent possible, what occurred in the underlying tort litigation.[41]  This process has helped identify issues such as the missing or incomplete RFAs and PTMs described above, as well as, among others, other document production

---

[41] The Claimants' Representatives have also tried to pull case dockets for each of the Agreed Claims, a process that is still ongoing and has uncovered that many of these dockets and the filings in these cases are no longer publicly available.

issues described below.  The Claimants' Representatives have focused their analysis over the last several months on the litigation documents associated with the 221 Alleged Non-Disclosure Claims.  Based on that review, the Claimants' Representatives have identified several issues and raised many of them with the Debtor.  The Debtor has cooperated in many cases, but given the size of the document productions and number of Agreed Claims involved, issues take time to resolve, and in many cases, one question just leads to many more.

To be clear, the process is not yet complete, and additional issues will undoubtedly be identified as the Claimants' Representatives expand their in-depth review to claims outside the 221 Alleged Non-Disclosure Claims.

As noted above, the Claimants' Representatives identified several claims that were missing an RFA and/or a PTM.  For 12 of those claims, the Debtor identified by bates production number where the missing documents had been produced.  Upon review of those documents, the Claimants' Representatives learned that the "M-Claimant" metadata associated with the document related to different claimants and not the claimant that the Debtor now claims is the subject of the document.

For example, the Claimants' Representatives identified the claimant NDC-200 as a claimant missing both an RFA and PTM.  The Debtor identified two documents already produced as RFAs for NDC-200.  The first RFA document identified by the Debtor listed five claimant names in the "M-Claimant" metadata field.[42]  None of the five names are claimant NDC-200.  The second RFA document identified by the Debtor contained a 59-page request for settlement authority for a settlement package seeking to resolve 79 cases.[43]  Despite the fact that claimant

---

[42] Rule 502(d)-BW-Ch11-000537012.

[43] Rule 502(d)-BW-Ch11-000761651.

NDC-200 was the first plaintiff case summarized in this RFA, the "M-Claimant" metadata field listed five other claimant names, but NDC-200 was not listed.

Thus, the information contained in the "M-Claimant" metadata field provided by the Debtor is unreliable. That raises a significant issue. When the Claimants' Representatives compiled "review files" for individual claimants, they relied on the M-Claimant metadata field to associate documents with individual claimants. As noted above, 35% of the documents produced to date lacked M-Claimant metadata and needed to be individually reviewed to associate them with individual claimants. Because of the unreliability of the M-Claimant metadata, it now appears that the Claimants' Representatives may need to perform that time-consuming task for the remaining 65% of documents that contain apparently unreliable metadata.

Based on reports provided by the Debtor, it appears that the Debtor did not locate any custodial attorney emails for approximately 630 claims (roughly 15% of the Agreed Claims). While the Debtor reported in January 2024 that it was still trying to locate information for 197 of those claims, for at least 430 claims (roughly 10.5% of the Agreed Claims), the Debtor is unable to provide any custodial attorney emails. *Critically, 165 of the 221 Alleged Non-Disclosure Claims—approximately 75%—lack custodial attorney emails.*

In addition, the Debtor continues to withhold 278,050 documents as privileged, including approximately 30,000 documents for which the privilege log entry specifically references one of the 221 Alleged Non-Disclosure Claims. A search of the entries on the Debtor's privilege log indicates that the Debtor is continuing to withhold—

- 33,641 documents where the description includes "settlement analysis" (including 931 documents related to the Alleged Non-Disclosure Claims);

- 6,542 documents where the description includes "investigation of plaintiff" (including 1,100 documents related to the Alleged Non-Disclosure Claims); and

- 20,507 documents where the description includes "case assessment" (including 2,555 documents related to the Alleged Non-Disclosure Claims).

In revising its history to assert "evidence suppression" by the Mesothelioma Victims, the Debtor has waived any privilege applicable to these documents. It is the Debtor, not the Claimants' Representatives, that has put the reasonableness of Old GP's settlement decisions at issue. The Court previously stated that an at-issue waiver was inevitable.[44] Based on the Debtor's assertions in the Contention Interrogatory Response, that inevitable waiver has now occurred. The Claimants' Representatives raised this issue with the Debtor during a meet and confer on July 17, 2024, and identified it for the Court during the hearing on July 18, 2024.[45] It was not until a meet and confer on September 9, 2024, that the Debtor informed the Claimants' Representatives that it would not provide any additional information beyond the vague privilege log entries and would not produce any withheld documents other than RFAs or PTMs that it was able to identify (which also have not yet been produced).

Finally, the Debtor's initial production of documents contained more than 20,000 slipsheets noting that the document was withheld on the grounds of privilege, and it is not possible to determine whether or not the document was subsequently produced. On September 9, 2024, the Debtor reported that it was compiling a document it described as a "key" to help identify which slipsheeted documents had subsequently been produced. Although the Debtor provided spreadsheets with some additional information on this issue on September 24, 2024, the spreadsheets failed to provide a list of documents still withheld.

The Claimants' Representatives anticipate filing a motion soon seeking to compel production of the documents that the Debtor continues to withhold as privileged. Based on past

---

[44] Hr'g Tr. at 215:14-17 (Sept. 1, 2021) [D.I. 2068].

[45] *See* Hr'g Tr. at 39:1-20 (July 18, 2022) [D.I. 3462].

practice addressing privilege issues in this case, the Claimants' Representatives estimate that it will take at least 4-5 months to resolve privilege log and related privilege issues, to say nothing of the other outstanding discovery disputes, including disputes over the completeness of the Contention Interrogatory Response and the claim files themselves.

**D.    A substantial amount of work remains.**

The Claimants' Representatives have not been idle over the past three years. As discussed above, they have compiled "review files" for each of the Agreed Claims, which required a time-intensive review of those documents without claimant metadata to associate those documents with an individual claim, if possible. The Claimants' Representatives have also pulled the dockets, to the extent still publicly available, for a majority of the Agreed Claims, reviewed millions of pages of non-claimant-related estimation productions such as documents produced from Bestwall or New GP custodians, identified and attempted to consensually resolve discovery deficiencies, and analyzed the Debtor's voluminous and cumbersome privilege logs and related issues.

The remaining work to be done is complicated by the recently-discovered unreliability of the "M-Claimant" metadata that may require the manual review and tagging of 65% of the documents produced to date (approximately 700,000 documents) to associate the documents with an individual claimant.

### 1.    *Continued Review and Analysis of Documents*

The Claimants' Representatives continue to review the Debtor's document production while analyzing the specific allegations with respect to each of the Alleged Non-Disclosure Claims made in the Contention Interrogatory Response by reviewing the specific interrogatory response, compiling the referenced documents, and analyzing the specific assertions. That is a time-intensive process. The Contention Interrogatory Response contains over 3,000 footnotes citing to

approximately 2,000 individual documents, some of which have hundreds of pages.  From the time

it received trust discovery in December 2022, it took the Debtor 17 months (in addition to the, at

least, five years it spent reviewing documents) to provide a complete interrogatory response.

Seventeen months from the date the Claimants' Representatives received the Debtor's last

document production would be October 31, 2025 (and document production is not yet complete).

However, by the time the Debtor received trust discovery in December 2022, it had been

*reviewing claim files for more than five years*.[46]  Thus, when the Debtor received trust discovery,

its document review was largely limited to matching trust submissions to individual claimants.

The Claimants' Representatives did not have that five-year head start and must still conduct a

substantive review of all documents related to each of the Agreed Claims to fully evaluate the

Debtor's contentions.

In the Contention Interrogatory Response, the Debtor alleges that claimants failed to

disclose evidence of alternative exposures and that disclosure of those alternative disclosures:

- would have shown the true causes of the injured party's disease;

- would have put the injured party's claimed exposure to Georgia-Pacific's joint compound in its proper context;

- would have called into question the identification of Georgia-Pacific joint compound; and

- would have been relevant to apportionment of liability to other entities under applicable law.[47]

---

[46] The Debtor asserts it began searching for, and collecting litigation documents from, its outside law firms in June 2019—over a year before the Court ordered estimation and approximately two years before the Claimants' Representatives served their initial estimation discovery requests.  *See* Motion to Compel Opposition at 5.  It is now evident that Old GP engaged in significant efforts to gather entire electronic and hard copy claimant files from local defense counsel months before the Petition Date, requesting and receiving case files **as early as July 2017 and August 2017**, respectively.  *See* Rule 502(d)-BW-Ch11-000053038–Rule 502(d)-BW-Ch11-000053039; Rule 502(d)-BW-Ch11-000396978–Rule 502(d)-BW-Ch11-000396979.

[47] Contention Interrogatory Response at 17.

These allegations not only demonstrate that the Debtor intends to relitigate its prior resolved claims, but they also demonstrate the extensive discovery that is required. The Claimants' Representatives must evaluate whether the Debtor's characterization of a claimant's prior statements is accurate and whether the information that the Debtor claims was withheld was (1) actually disclosed and/or (2) information the claimant knew or was obligated to disclose to Old GP/the Debtor. That analysis requires a review of all documents related to a particular claimant, including every statement, objection and response made by the claimant in the pleadings, written discovery, testimony, correspondence, and applicable laws, orders, or agreements.

Likewise, the Debtor's contention that the alternative exposure evidence would have helped its causation defense raises the question of what knowledge Old GP or its lawyers had concerning potential alternative exposures. The Debtor's contention that the alternative exposure evidence would have impacted the final settlement amount also raises the question of what factors Old GP actually considered important when settling a particular claim.

Answers to these questions cannot be generalized. The facts and circumstances of each claim are unique. Thus, for each of the claims at issue, the Claimants' Representatives must (i) review all pleadings; (ii) read all deposition transcripts (some of which lasted for days); (iii) review all discovery responses and related objections; (iv) review emails between attorneys; (v) evaluate Georgia-Pacific's internal documents; (vi) review information gathered from the subpoenaed trusts and Aldrich Pump, Murray Boiler, and DBMP; (vii) review applicable laws, orders or agreements; and then (viii) compile all of the information obtained from that review into some form of a cohesive analysis.

The Debtor also contends that for each of the 221 Alleged Non-Disclosure Claims, the Debtor investigated the plaintiff's or injured party's alternative exposures.[48]  This raises numerous questions.   What investigation was conducted?   What evidence did Old GP consider worth investigating?  Was a plaintiff's work history investigated? What specific questions did Old GP ask during the plaintiff's deposition?  What objections did plaintiffs assert to requested discovery, and did Old GP make any effort to compel production of such information?  Did Old GP retain experts to assist with any investigation?

Bestwall's contentions also presume that disclosure was required.  However, in documents produced to date, Old GP's attorneys acknowledged that the information a claimant was required to provide depended on applicable laws, orders, or agreements between the parties in the underlying tort case. Because the underlying tort cases for the Agreed Claims involve claims in many different jurisdictions spanning more than 30 years, understanding the laws, orders, or party agreements that governed discovery and disclosures in a particular case is a monumental task.

The Claimants' Representatives must also analyze each of the asbestos trusts or litigation co-defendants.   The Claimants' Representatives need to understand what information was submitted to each trust and why the Alleged Non-Disclosure Claimant submitted a trust claim form at the time the claim was submitted.  The Claimants' Representatives will also need to review issues such as when the trust opened, what products or exposures the trust may be responsible for, the requirements for asserting a claim during the time period, whether the trust has a statute of limitations, whether the claim was submitted simply based on a location where the injured party worked, and whether the claim was ultimately withdrawn, disallowed, or paid.  In many instances,

---

[48] Contention Interrogatory Response at 15.

it is clear that claim forms were filed with the trusts simply to toll the statute of limitations and were subsequently withdrawn or abandoned.

This time-consuming review and analysis cannot be limited to the Alleged Non-Disclosure Claims selected by the Debtor.  The Debtor reserves all rights to contend that the 221 Alleged Non-Disclosure Claims do not constitute all of the claims among the Agreed Claims or in the Debtor's resolution history where plaintiff or its counsel failed to disclose alternative exposures and to argue that the alleged failure to identify alternative exposures affected other Agreed Claims not specifically identified and the Debtor's resolution history generally.[49]

Based on the preliminary reviews of the documents produced to date, it takes at least 50 hours on average to review and analyze documents related to an individual claim (and that average may be significantly greater if subsequent reviews are required because of the issues compiling a claimant file previously described by the Claimants' Representatives).[50]  That is completely understandable given the work involved as described above.  At a rate of 50 hours per claim on average, it would take 205,350 hours to fully review all of the 4,107 Agreed Claims.  That would take a team of 50 lawyers billing 2,000 hours per year more than two years to complete.  Even if the 50/hour per claim rate could be reduced over time, and even if the review were limited to the claims contained in either the Claimant Sample or the Debtor's Sample (or some meaningful subsets of the two), the project would still be massive.

###    2.  *Take and Schedule Depositions*

Under the current Estimation CMO, each of the Debtor and the Claimants' Representatives are entitled to take 20 fact depositions.  That number, however, may need to be adjusted upward

---

[49] Contention Interrogatory Response at 16.

[50] While the Claimants' Representatives have diligently reviewed documents when produced by the Debtor, the final analysis of a particular claim cannot be completed until all documents related to that claim have been produced.

because it was selected before documents were produced, before the Debtor identified the number of Alleged Non-Disclosure Claimants, and before the Debtor responded to the contention interrogatory.  For instance, in its initial disclosures, Bestwall identified 14 current or former employees of Old GP with relevant information;[51] it later identified over 30 defense law firms (and hundreds of individual defense attorneys) that represented Old GP in the tort system.  The Debtor has placed at issue the knowledge of its defense counsel and the contents of its lawyers' files.  Thus, the Claimants' Representatives likely will need to depose at least one representative from each of Old GP's tort defense law firms.  Additional fact depositions related to the other aspects of estimation (including, but not limited to medical science) may also be necessary, and the Claimants' Representatives will request additional depositions from the Court as soon as these additional deponents are identified.

Even if the number of depositions is not increased, there will be at least thirty depositions during the fact discovery period.  To date, the Debtor has taken the depositions of eight third-party plaintiff law firms and a plaintiff-side consultant.  The Debtor recently scheduled the deposition of another plaintiff law firm, for a total of ten depositions.  The Debtor has issued document subpoenas to an additional 22 plaintiff law firms.  Thus, while the Debtor has not confirmed its deposition discovery plans with the Claimants' Representatives, it appears likely that the Debtor will take at least 10 additional depositions.

Even if the Claimants' Representatives issued deposition notices on third parties before completion of document review, it is unlikely, given the experience of this case, that those depositions would begin before mid-2025.  It is more likely that the Claimants' Representatives' depositions would begin in 2026, after the Court addresses the outstanding privilege issues and

---

[51] Bestwall identified fifteen individuals, but one individual predeceased the bankruptcy.

remaining documents are produced, reviewed, and analyzed.  The bulk of the Claimants'

Representatives depositions are likely to be Debtor's state-tort defense counsel who may resist

deposition or the production of additional documents (should that be sought).  For obvious reasons,

however, the list of deponents cannot be finalized until document review is substantially complete.

Scheduling and taking at least 20 depositions (and likely more) would have these

depositions concluding around mid-2027, with an additional cushion (to November 1, 2027) to tie

up any final fact-related discovery or serve as a safety net for unforeseen concerns such as

extensive scheduling issues, prolonged resistance to depositions, the need to leave a deposition

open pending receipt of additional documentation, and the Debtor's remaining depositions should

they choose to take them.

### 3.   *Address the Debtor's Other Estimation Factual Contentions*

The Claimants' Representatives also must devote time and resources during the fact

discovery period to address the Debtor's other estimation contentions.  For instance, the Debtor

insisted on an estimation process that includes retrying decades worth of medical science and state-

specific laws regarding asbestos litigation.  The Claimants' Representatives must prepare to

address these allegations which may include additional documentary and deposition discovery.

### CONCLUSION

WHEREFORE, for the reasons set forth herein, the Claimants' Representatives

respectfully request that the Court enter an order that establishes a fact discovery deadline of the

later of (i) 18 months after all discovery disputes, including privilege issues, have been resolved

and outstanding discovery has been produced and responded to fully or (ii) November 1, 2027.

Dated: September 26, 2024

/s/ Glenn C. Thompson
Glenn C. Thompson (Bar No. 37221)
HAMILTON STEPHENS STEELE
+ MARTIN, PLLC
525 North Tyron Street, Suite 1400
Charlotte, North Carolina 28202
Telephone: (704) 344-1117
Facsimile: (704) 344-1483
Email: gthompson@lawhssm.com

-and-

Linda W. Simpson (Bar No. 12596)
JD THOMPSON LAW
Post Office Box 33127
Charlotte, North Carolina 28233
Telephone: (828) 489-6578
Email: lws@jdthompsonlaw.com

-and-

Natalie D. Ramsey (admitted *pro hac vice*)
Davis Lee Wright (admitted *pro hac vice*)
ROBINSON & COLE LLP
1201 N. Market Street, Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Email: nramsey@rc.com
        dwright@rc.com

*Counsel to the Official Committee
 of Asbestos Creditors*

/s/ Felton E. Parrish
Felton E. Parrish (Bar No. 25448)
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
227 West Trade Street, Suite 1910
Charlotte, North Carolina 28202
Telephone: 980-431-7540
Email: fparrish@ycst.com

-and-

James L. Patton, Jr. (admitted *pro hac vice*)
Edwin J. Harron (admitted *pro hac vice*)
Sharon M. Zieg (Bar No. 29536)
Erin D. Edwards (admitted *pro hac vice*)
Travis G. Buchanan (admitted *pro hac vice*)
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: jpatton@ycst.com
        eharron@ycst.com
        szieg@ycst.com
        tbuchanan@ycst.com

*Counsel to the Future Claimants'
Representative*